UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE,<br>    Plaintiff,<br><br>v.<br><br>MASSACHUSETTS DEPARTMENT<br>OF CORRECTION, et al.,<br>    Defendants. | C.A. NO. 17-12255-RGS |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

Defendants, Massachusetts Department of Correction ("DOC"), Thomas A Turco III, Sean Medeiros, Stephanie Collins, and James M. O'Gara, through counsel, submit this memorandum of law in support of their Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

Plaintiff Jane Doe ("Plaintiff") is an inmate incarcerated at MCI-Norfolk, a medium-security prison located in Norfolk, MA. Plaintiff's Complaint alleges that she has been diagnosed with Gender Dysphoria ("GD") and that the defendants have failed to provide her with reasonable accommodations for her disability. Complaint, ¶¶ 2, 6. The Complaint alleges violations of plaintiff's rights under Title II of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973 ("RA"), the Fourteenth Amendment, and Articles 1, 7, 106, and 114 of the Massachusetts Constitution. Compl., ¶ 7. The Complaint seeks injunctive relief. Id.

Named as defendants are the DOC; Thomas A Turco III, in his official capacity as Commissioner of Correction; Sean Medeiros, in his official capacity as Superintendent of MCI-Norfolk; Stephanie Collins, in her official capacity as the DOC's Assistant Deputy Commissioner of Clinical Services; and James M. O'Gara, in his official capacity as the DOC's

ADA Coordinator. Dismissal of the Complaint is warranted where GD, a.k.a. Gender Identity Disorder ("GID"), is excluded from coverage under both the ADA and the RA, plaintiff is unable to state a claim under the Fourteenth Amendment, and the claims brought under the Massachusetts Constitution are barred under the Eleventh Amendment.

## STATEMENT OF RELEVANT FACTS

1. Plaintiff is a transgender inmate currently incarcerated at MCI-Norfolk. Plaintiff's incarceration at MCI-Norfolk began on October 31, 2016. Compl. ¶¶ 1, 10, 25.

2. Plaintiff is currently serving a three to four year sentence for Possession of a Class A Narcotic with Intent to Distribute. Compl., ¶ 30.

3. The DOC contracts with vendors to provide medical, dental and mental health services to inmates. On July 1, 2013, the Massachusetts Partnership for Correctional Health ("MPCH") began providing medical, dental, and mental health services for DOC inmates pursuant to its contract with the DOC. MPCH is responsible for determining the actual type, timing, and level of medical and mental health care for DOC inmates. See Clinical Contract Personnel and Role of DOC Health Services, 103 DOC 610.00, et seq. (2017).

4. The DOC's GD policy, Identification, Treatment, and Correctional Management of Inmates Diagnosed with Gender Dysphoria, 103 DOC 652.00, et. seq. (2017), provides for the diagnosis, treatment, and management of inmates diagnosed with GD.

5. The DOC's GD policy provides that each inmate diagnosed with GD is assigned a qualified mental health professional, i.e., Primary Care Clinician ("PCC"), who is responsible for case management and the provision of direct treatment services. 103 DOC 652.01. The GD

policy establishes a GD Clinical Supervision Group and a GD Treatment Committee for purposes of monitoring the treatment of inmates diagnosed with GD.

6. The GD Treatment Committee's role is to review each GD inmate's treatment plan and proposed treatment recommendations to ensure clinical appropriateness and medical necessity. 103 DOC 652.04. The GD Treatment Committee consists of MPCH's Psychiatric Medical Director, Clinical Programs Director, and GD consultant. 103 DOC 652.01.

7. Treatment available for GD inmates includes regular psychotherapy with a mental health clinician (PCC) supervised by the GD Clinical Supervision Group, access to the same clothing and cosmetics available to females in DOC custody, and access to hormone therapy determined to be clinically appropriate and medically necessary. 103 DOC 652.06(D). GD inmates receiving hormone therapy are monitored by endocrinologists. 103 DOC 652.06(D)(1).

8. On November 3, 2016, plaintiff received an Initial Mental Health Appraisal conducted by a MPCH mental health professional. Compl., ¶ 46.

9. On November 14, 2016, plaintiff received a Mental Health Comprehensive Evaluation by a MPCH mental health professional. Compl., ¶¶ 47-48.

10. On December 12, 2016, plaintiff was provided with an Initial Treatment Plan which set out both short-term and long-term goals for treatment of her GD. Compl., ¶¶ 48-51.

11. On June 1, 2017, plaintiff's GD treatment was reviewed pursuant to a six-month Treatment Plan Review. The Treatment Plan Review did not recommend changes to plaintiff's Initial Treatment Plan. Compl., ¶¶ 52-53.

12. Plaintiff's present treatment for GD includes regular therapy sessions, hormone therapy monitored by an endocrinologist, facial hair removal treatments, a mammogram, and

access to female clothing and canteen items. Compl., ¶¶ 48-53; 103 DOC 652.06.

13.     Pursuant to the DOC's GD policy, the placement of GD inmates within DOC facilities is based upon an assessment of the inmate's housing, work, education, and program needs with a focus on individual safety. Pursuant to 103 DOC 652.09:

> These assessments will occur on a case by case basis and will include security level, criminal and discipline history, medical and mental health assessment of needs, vulnerability to sexual victimization and potential of perpetrating abuse based on prior history. A Gender Dysphoric inmate's own views with respect to his or her own safety shall be given serious consideration.

14.     Plaintiff recently completed MCI-Norfolk's Correctional Recovery Academy and is housed in a single cell which contains a toilet and sink.

## ARGUMENT

### I.  STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must satisfy the "plausibility" standard established by the Supreme Court in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) and Ashcroft v. Iqbal, 556 U.S. 662, 670 (2009). A complaint must allege facts that give rise to "a reasonable expectation" of relief." Twombly, 550 U.S. at 555. The Twombly Court set out a "flexible plausibility standard" which requires a plaintiff to amplify a claim where such amplification is necessary to render the claim plausible. Iqbal, 556 U.S. at 670. A "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation.") (citing Panasan v. Allain, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative

4

level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id.; Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d. 1, 12 (1st Cir. 2011) (A court "should begin by identifying and disregarding statements in the complaint that merely offer 'legal conclusion[s] couched as … fact[]' or '[t]hreadbare recital of the elements of a cause of action.'") (quoting Iqbal, 556 U.S. at 680).  "A complaint may not stand simply on the 'sheer possibility' that a defendant acted unlawfully or on facts that are merely consistent with a defendant's liability." Ocasio-Hernandez, 640 F.3d. at 11.

Furthermore, the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, places limits on the scope of injunctive relief to be awarded inmates.  Pursuant to the PLRA, "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1).  In determining whether to grant injunctive relief, a court must give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." Id.  See Feliciano v. Rullan, 378 F.3d 42, 50-51 (1st Cir. 2004); Oluwa v. Gomez, 133 F.3d 1237, 1239 (9th Cir. 1998) ("before granting prospective injunctive relief, the trial court must make the findings mandated by the PLRA").

## II.     PLAINTIFF IS UNABLE TO STATE A CLAIM UNDER THE ADA.

Count I of the Complaint alleges that the DOC violated plaintiff's rights under Title II of the ADA by failing to: 1) transfer her to MCI-Framingham, the DOC's facility for female offenders; 2) prohibit male correction officers from conducting her strip searches; (3) train MCI-Norfolk staff to communicate with her using female pronouns and her chosen nickname; 4)

provide her with a separate time from showering apart from male inmates; and 5) provide access to healthcare such as mammograms. Compl., ¶ 71.

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12101(1)(A). Title II of the ADA provides that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any entity." 42 U.S.C. §12132. Title II of the ADA defines a "qualified individual with a disability" as:

> An individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. §12131(2).

In order to state a claim under Title II of the ADA, a plaintiff must allege "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefit of some public entity's services, programs or activities, or was otherwise discriminated against; and (3) that such an exclusion, denial of benefits, or discrimination was by reason of his disability." Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000) (citing 42 U.S.C. §12132); Buchanan v. Maine, 469 F.3d 158, 170-171 (1st Cir. 2006) (plaintiff must satisfy all three prongs, including showing that he is a qualified individual). If these standards are met, then "reasonable accommodations" would need to be made. See Bibbo v. Massachusetts Department of Correction, 2010 WL 2991668, * 1 (D. Mass. 2010); Fulton v. Goord, 591 F.3d 37, 43-44 (2d Cir. 2009).

To the extent that a plaintiff is found to present a disability under the ADA, the claimant is entitled to a reasonable accommodation. An "[a]ccommodation is not reasonable if it either imposes 'undue financial and administrative burdens' on a grantee, or requires a 'fundamental alteration in the nature of the program.'" School Board of Nassau County v. Arline, 480 U.S. 273, 287 n. 17 (1987). In considering whether an accommodation presents an undue burden, a court must take into account the nature and cost of the accommodation, the size of the facility in terms of the financial resources and personnel, and the type of operations involved, including composition, structure, and function. Riel v. Electronic Data Systems Corp., 99 F.3d 678, 681 (5th Cir. 1996). An accommodation which presents an "extensive, substantial, or disruptive" deviation is considered an undue hardship and therefore not reasonable. 29 C.F.R. § 1630.2(p).

The ADA does not require that a plaintiff be provided with the accommodation of her choice. See Nunes v. Massachusetts Department of Correction, 766 F.3d 136, 146 (1st Cir. 2014) (The ADA requires the Department to provide reasonable accommodations, "not to optimal ones finely tuned to [inmate's] preferences.") (citing J.D. ex rel. J.D. v. Pawlet School District, 224 F.3d 60, 70-71 (2d Cir. 2000)). An accommodation is not reasonable if it would "fundamentally alter the nature of the service provided" or "impose an undue financial or administrative burden." Toledo v. Sanchez, 454 F.3d 24, 39 (1st Cir. 2006) (quoting Tennessee v. Lane, 541 U.S. 509, 532 (2004)); Enica v. Principi, 544 F.3d 328, 342 (1st Cir. 2008) (defendant may show that the proposed accommodation is not feasible and would constitute an undue hardship); McElwee v. County of Orange, 700 F.3d 635, 641 (2d Cir. 2012) (accommodation not reasonable if it imposes an undue hardship on program); Tucker v. Tennessee, 539 F.3d. 526, 532-533 (6th Cir. 2006).

A "reasonable accommodation" does not mean that prison officials must accede to every demand of an inmate; rather, an accommodation is reasonable so long as it gives "meaningful access" to the services sought. Bibbo, 2010 WL 2991668, *1 (citing Alexander v. Choate, 469 U.S. 287, 301 (1985)); Nunes, 766 F.3d at 145-146 (change in procedures did not deny inmate meaningful access to medications); Kiman v. New Hampshire Department of Correction, 451 F.3d 274, 283 (1st Cir. 2006); Parks v. Blanchette, 144 F.Supp.3d. 282, 339 (D. Conn. 2015) (failure to accommodate inmate's request for specific type of housing did not violate ADA); Knox v. Massachusetts Department of Correction, 2017 WL 3401443 *10 (D. Mass. Aug. 8, 2017) (failure to change housing assignment did not violate ADA); Lopes v. Beland, 2014 WL 1289455 *12 (D. Mass. Mar. 29, 2014) (failure to provide inmate with a single cell did not violate ADA); Polansky v. New Hampshire Department of Correction, 2013 WL 1398582 at *12 (D.N.H. Mar. 25, 2013) (failing to utilize inmate's preferred search procedure does not create an unreasonable accommodation so long as inmate has access to services).

Nor does Title II of the ADA itself mandate the provision of services. Buchanan, 469 F.3d at 174. Public entities are not obligated to provide new programs or services to the disabled which it has not previously provided to any group. Buchanan, 469 F.3d at 173 ("Although the ADA does not itself mandate the provision of services, it does prohibit discrimination against the disabled within services that *are* provided") (emphasis in original) (citing Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 603 n. 14 (1999) (The ADA does not require States to "provide a certain level of benefits to individuals with disabilities.").  An inmate cannot state an ADA claim merely because a prison supposedly fails to attend to the needs of its disabled inmates. The ADA does not create a remedy for questions of the adequacy of treatment. See Buchanan, 469

8

F.3d at 175; Leslie v. Chie, 250 F.3d 47, 54-55 (1st Cir. 2001) (citing Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996), reh. den. 91 F.3d 994 (7th Cir. 1996)). Further, "a State may rely upon the reasonable assessment of its own professionals in determining whether a patient meets the requirements for a particular treatment program." Buchanan, 469 F.3d at 174.

In addition, within "the prison context, whether accommodations are reasonable must be judged 'in light of the overall institutional requirements,' including '[s]ecurity concerns, safety concerns, and administrative exigencies.'" Holmes v. Godinez, 311 F.R.D. 177, 226 (N.D. Ill. Oct. 8, 2015) (quoting Love v. Westville Correctional Center, 103 F.3d 558, 561 (7th Cir. 1996)). The First Circuit has held that great deference should be afforded to administrators in determining whether changing the current system is a reasonable accommodation. Wynne v. Tufts University School of Medicine, 976 F.2d 791, 794 (1st Cir. 1992). Courts have long held that prison officials are to be afforded wide-ranging deference in the adoption of policies and practices that in their judgment are necessary to preserve institutional order and discipline. Bell v. Wolfish, 441 U.S. 520, 547 (1979). "Such considerations are peculiarly within the province and professional expertise of correction officials, and, in the absence of substantial evidence in the record that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Id. at 548 (citing Pell v. Procunier, 414 U.S. 817 (1974)); see also Lewis v. Casey, 518 U.S. 343, 361 (1996) (courts are not to engage in micro-management of prison affairs or become enmeshed in the minutiae of prison operation); Rhodes v. Chapman, 452 U.S. 337, 349 n. 14 (1981). Even in matters which involve the limitation of fundamental rights, there must be a "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general

application." Wolff v. McDonnell, 418 U.S. 539, 556 (1974). Importantly, classification decisions by prison administrators are presumptively valid and entitled to substantial deference. Bell, 441 U.S. at 521; see also Dawson v. Kendrick, 527 F. Supp. 1252, 1294 (S.D.W. Va. 1981) (adoption of a system of classification is a matter committed to the discretion and expertise of the defendants). [1]

### A. Plaintiff Is Not A Qualified Individual With A Disability.

In enacting the ADA in 1990, Congress specifically excluded from the definition of disability those individuals with "gender identity disorders not resulting from physical impairments." See 42 U.S.C. § 12211(b)(1).[2][3] Congress later amended the ADA by enacting the ADA Amendments Act of 2008 ("ADAAA"). Pub.L. No. 110-325 (2008). However, in amending the ADA, Congress left intact the exclusions from coverage set out in 42 U.S.C. § 12211. Thus, despite the opportunity to amend the ADA to eliminate the coverage exclusion for gender identity disorders in 2008, Congress explicitly left the exclusions from coverage defined in 42 U.S.C. § 12211, unchanged. Accordingly, numerous courts have excluded disability claims based on GID/GD pursuant to 42 U.S.C. § 12211(b)(1). See e.g., Michaels v. Akai Security, Inc., 2010 WL 2573988 *6 (D. Colo., June 24, 2010) ("Gender dysphoria, as a gender

---

[1] In constitutional challenges to the DOC classification regulations, both state and federal courts have indicated that the Commissioner of Correction has absolute discretion when it comes to classifying or transferring inmates. The classification of inmates to institutions of different levels of security neither implicates any protected liberty interest nor triggers any due process protection under the state and federal constitutions. See Meachum v. Fano, 427 U.S. 215 (1976); Montanye v. Haymes, 427 U.S. 236, 242 (1976); Olim v. Wakinekona, 461 U.S. 238, 245-248 (1983). The decision where to place prisoners within the correctional system is simply a matter of administrative discretion invoked for reasons such as security, convenience or rehabilitation. Jackson v. Commissioner of Correction, 388 Mass. 700, 703 (1983); Lombardo v. Meachum, 548 F.2d 13, 14-15 (1st Cir. 1977). Nor do state statutes governing classification, G.L. c. 124, § 1 (g), and G.L. c. 127, §§ 20 and 97, create any entitlement to any particular classification. Hastings v. Commissioner of Correction, 424 Mass. 46 (1997); Harris v. Commissioner of Correction, 409 Mass. 472, 478 (1991).

[2] 42 U.S.C. § 12211(b)(1) excludes from the definition of disability: "(1) "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavioral disorders."

[3] At the same time, Congress amended the Rehabilitation Act of 1973 to include the same exclusions from the definition of "disability" found in 42 U.S.C. § 12211. See 29 U.S.C. § 706(8)(F).

identity disorder, is specifically exempted as a disability by the Rehabilitation Act."); Doe v. United Consumer Fin. Serv., 2001 WL 34350174 *6 (N.D. Ohio, Nov. 9, 2001) (finding that ADA "explicitly excludes" GID from definition of disabilities); James v. Ranch Mart Hardware, Inc., 1994 WL 731517 *2 (D. Kan., Dec. 23, 1994) (same).

At the time Congress enacted the ADA of 1990, Gender Identity Disorder ("GID") and the sub-category of Transsexualism were identified as mental disorders in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Third Edition (DSM-III) (1980) and Third Edition, Revised (1987) ("DSM-III-R").  "Transexualism" was defined as a "persistent sense of discomfort and inappropriateness of one's anatomic sex" and "markedly impaired" social and occupational functioning.  DSM-III-R § 302.50.  In 1994, the Fourth Edition, Revised, of the DSM defined GID as being characterized by a strong desire to be the other gender and "clinically significant distress or impairment in social, occupational, or other important areas of functioning." DSM-IV-TR § 302.85.  In 2013, the Fifth Edition of the DSM revised the definition of GID, including changing the term to "Gender Dysphoria."  The diagnosis of gender dysphoria contained in the DSM-V still required that an individual experience "clinically significant distress or impairment in social, occupational, or other important areas of functioning."  DSM-V § 302.85.

Recently, a federal district court, in denying the defendant employer's motion to dismiss a claim under the Title I of ADA alleging discrimination based on GID, held that the ADA's exclusion of individuals diagnosed with GID from its coverage was limited to individuals who identified with a different gender but did not experience any impairment related to GID. See Blatt v. Cabela's Retail Inc., U.S.D.C. No. 5:14-cv-04822, (Denial of Partial Motion to Dismiss,

11

May 18, 2017). The Blatt Court interpreted the exclusion of GID from ADA coverage under 42 U.S.C. § 12211(b)(1) "narrowly to refer to only the condition of identifying with a different gender, not to encompass (and therefore exclude from ADA protection) a condition like Blatt's gender dysphoria, which goes beyond merely identifying with a different gender and is characterized by clinically significant stress and other impairments that may be disabling." Id. at *3. However, the Blatt Court's interpretation of GID effectively strips the disorder of the underlying mental condition that must be present in order to diagnosis an individual with GD/GID. See DSM-V § 302.85(B) ("The condition is associated with clinically significant distress or social impairment in social, occupational, or other important areas of function."). Thus, the Blatt Court seeks to create two distinct categories within the diagnosis of GD, one category contains individuals who merely identify with a different gender without experiencing any distress or impairments associated with GD and a second category of individuals who experience distress or impairments associated with GD. As described above, a clinical diagnosis of GD under the DSM-V specifically provides that the "condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." Thus, in the absence of clinically significant distress or impairment associated with the GD, an individual cannot be diagnosed with GD. DSM-V § 302.85(B).

Moreover, the Blatt Court's "narrowing" of the ADA's exclusion of gender identity disorders effectively rewrites the federal statute and eliminates the exclusion established by Congress in 1990 and left untouched by the ADAAA in 2008. Certainly, it is up to Congress to determine whether the exclusion of GD from the ADA's definition of disability should be

stricken or altered. Accordingly, plaintiff's claim under Title II of the ADA, based on a diagnosis of GD, must be dismissed pursuant to 42 U.S.C. § 12211(b)(1).

### B. Plaintiff Fails To Allege Exclusion From Participation Or Denial Of Benefits Of Services, Programs, Or Activities At MCI-Norfolk.

Even if this Court were to determine that plaintiff is not excluded from the ADA, pursuant to 42 U.S.C. § 12211(b)(1), it is clear that plaintiff's Complaint fails to plead any facts, and cannot demonstrate, that she was excluded from or denied a benefit or service *by reason of* her gender dysphoria. Instead, the Complaint focuses on alleged unlawful conditions of her confinement, i.e., failing to reclassify her to MCI-Framingham; permitting male correction officers to conduct her strip searches; failing to provide a separate time for showering apart from male inmates; failing to train MCI-Norfolk staff to communicate with her using female pronouns or her chosen nickname; and a lack adequate medical care. Compl., ¶¶ 61-69.

Here, plaintiff has failed to establish a *prima facie* case for discrimination in violation of the ADA. Title II of the ADA obligates the defendants to provide plaintiff with reasonable access to programs, activities or services. Plaintiff's ADA claim fails where her reasonable accommodation request has not identified the specific programs, activities or services she has been excluded from participating in or benefiting from. See Parker, 225 F.3d at 56. Plaintiff has not articulated an ADA claim in the absence of facts which might plausibly support a finding of discrimination against her on the basis of her alleged disability. While, for the purposes of this motion, defendants do not dispute plaintiff's contention that she has been diagnosed with GD, plaintiff has failed to show that she has been excluded from participation in or denied the benefits of any service, program, or activity while confined at MCI-Norfolk by reason of her GD diagnosis. See Parker, id. Nor does the Complaint allege that plaintiff is excluded from services,

programs or activities that are only available at MCI-Framingham.  The Complaint fails to present any facts which demonstrate that plaintiff has been discriminated against with regard to her classification, searches, shower times, communications with staff, and medical treatment by reason of her GD.  Plaintiff's ADA claim cannot stand because she is not complaining of her *exclusion* or *denial* from services, programming, or activities available at MCI-Norfolk.

Even if plaintiff could show that she was denied a specific type of programming or benefit, dismissal of the claim is appropriate because "the ADA prohibits discrimination because of disability, not inadequate treatment for disability." Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1022 (9th Cir. 2010) (finding that deprivation of programs or activit[ies] to lessen his depression is not actionable under the ADA).

Further, plaintiff's ADA claim must be dismissed where she fails to plausibly show that, to the extent she was excluded from any programs, activities or services, the exclusion was the result of discrimination by the defendants by reason of her GD.  See Parker, id.  The Complaint lacks facts that plausibly support a finding of discrimination against defendants under the ADA.

### III. PLAINTIFF HAS FAILED TO STATE A PLAUSIBLE CLAIM UNDER THE REHABILITATION ACT.

Count II of the Complaint alleges a violation of plaintiff's rights under the Rehabilitation Act of 1973, 29 U.S.C. § 794(a).  The Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States … shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. …

29 U.S.C. § 794(a).

Like the ADA, the Rehabilitation Act defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 29 U.S.C. § 705(9)(b). Further, in 1992, Congress amended the Rehabilitation Act to include the same exclusions from the definition of "disability" found in 42 U.S.C. § 12211, including the exclusion of gender identity disorders without a physical impairment and transsexualism. See Rehabilitation Act Amendments of 1992, Pub. L. 102-569 (October 29, 1992).

Because the statutory definition of "disability" is the same for the ADA and the Rehabilitation Act, courts have consistently applied the same analysis for both federal statutes. See Nunes, 766 F.3d at 144; Kiman, 451 F.3d at 285 n. 10 (1st Cir. 2006); Katz v. City Metal Co., 87 F.3d 26, 31 n. 4 (1st Cir. 1996) (Section 504 of RA "is interpreted substantially identically to the ADA."); Tardie v. Rehab. Hosp. of Rhode Island, 168 F.3d 538, 542 (1st Cir. 1999); Rivera-Concepcion v. Puerto Rico, 786 F.Supp.2d 489, 500 (D. P.R. 2011) (claim of discrimination under Rehabilitation Act "is analyzed under the same standards as those used to determine whether Title II [ADA] has been violated."). Thus, for the reasons set forth in part II, infra, plaintiff's claim under the Rehabilitation Act must be dismissed.

### IV. PLAINTIFF HAS FAILED TO STATE A PLAUSIBLE CLAIM FOR A VIOLATION OF HER EQUAL PROTECTION RIGHTS.

Count III of the Complaint alleges a violation of plaintiff's rights under the Equal Protection guarantees of the Fourteenth Amendment. "Plaintiffs claiming an equal protection violation must first 'identify and relate *specific instances* where persons *situated similarly in all relevant aspects* were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were singled out for unlawful oppression.'" Buchanan, 469 F.3d at 178 (emphasis in original) (quoting Rubinovitz v. Rogato, 60 F.3d 906, 910 (1st Cir. 1995).

A plaintiff not relying on "typical" impermissible categories, such as race or religion, must show that 1) he was intentionally treated differently than others similarly situated; 2) that there is no rational basis for the difference in treatment; and 3) that the different treatment was based on a malicious or bad faith intent to injure. See Buchanan, 469 F.3d at 178 (citing Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004); Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Walker v. Exeter Region Coop. School Dist., 284 F.3d 42, 45 n. 4 (1st Cir. 2002) ("The underlying equal protection inquiry, … is whether different treatment of two separately classified groups is at least marginally *reasonable*.") (emphasis in original). A plaintiff must also show that a discriminatory purpose was the motivating factor in the unequal treatment. See Washington v. Davis, 426 U.S. 229 (1976); Smith v. Stratus Computer, Inc., 40 F.3d 11, 16 (1st Cir. 1994), cert. denied, 514 U.S. 1108 (1995). See also, Washington v. Harper, 494 U.S. 210, 233 (1990) (A state's interest in maintaining safety and security justifies interference with an inmate's fundamental rights as long as the interference reasonably furthers this goal.) (quoting Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989), overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61 (1st Cir. 2004)).

"An individual is 'similarly situated' to others for equal protection purposes when a 'prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" Davis v. Coakley, 802 F.3d 128, 133 (1st Cir. 2015) (quoting Barrington Cove Ltd. P'ship v. Rhode Island Housing Mortgage Fin. Corp., 246 F.3d 1, 8 (1st Cir. 2001)). See also Marrero-Gutierrez v. Molina, 491 F.3d 1, 9 (1st Cir. 2007) (The test for determining whether individuals are "similarly situated" is "whether an objective person would see two people similarly situated based upon the incident and contest in question.").

16

Here, plaintiff's Equal Protection claim must be dismissed where the Complaint fails to identify specific instances where she has been treated differently as compared to similarly situated individuals, *i.e.*, other inmates at MCI-Norfolk diagnosed with gender dysphoria. The Complaint fails to identify any instances in which plaintiff was subjected to improper treatment as compared to similarly situated inmates with regard to her classification, searches, showering times, communications with MCI-Norfolk staff, and receipt of adequate medical care. The Complaint fails to identify specific instances where similarly situated persons, *i.e.*, GD inmates at MCI-Norfolk, have been classified to MCI-Framingham. The Complaint fails to identify specific instances where inmates similarly situated to plaintiff are searched by female correction officers and plaintiff is searched by male correction officers. The Complaint fails to identify specific instances where inmates similarly situated to plaintiff are provided with shower times separate from non-GD inmates and plaintiff is not. The Complaint fails to identify specific instances where inmates similarly situated to plaintiff are addressed by MCI-Norfolk staff by their chosen female names and female pronouns while plaintiff is not. The Complaint fails to identify specific instances where inmates similarly situated to plaintiff are provided with preventative healthcare, including mammograms, and plaintiff is not.

Accordingly, in the absence of facts showing that plaintiff has intentionally been treated differently from similarly situated inmates, the equal protection claim must be dismissed.

## V. **PLAINTIFF WILL NOT SUCCEED ON THE DUE PROCESS CLAIM.**

Count IV of the Complaint raises a claim against the defendants under the Fourteenth Amendment for a violation of her substantive due process rights. To succeed on a substantive due process claim, a "plaintiff must show *both* that the acts were so egregious as to shock the

17

conscience *and* that they deprived him of a protected interest in life, liberty, or property." Harron v. Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011) (citing Pagan v. Calderon, 448 F.3d 54, 64 (1st Cir. 2006) (emphasis in original)). See also Martinez v. Cui, 608 F.3d 54, 64-65 (1st Cir. 2010); County of Sacramento v. Lewis, 523 U.S. 833, 845-846 (1998) (establishing the two-tiered approach of the shocks-the-conscience test and clarifying that the test applies to all substantive due process claims based on executive, as opposed to legislative, action). The First Circuit has set a high bar for showing when an executive action violates substantive due process:

> Executive acts that shock the conscience must be 'truly outrageous, uncivilized, and intolerable,' and 'the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error. Indeed, '[a] hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe [,] so disproportionate to the need presented, and so inspired by malice or sadism rather than merely careless or unwise zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.

Harron, 660 F.3d at 536 (quoting Gonzales-Fuentes v. Molina, 607 F.3d 864, 880-881 (1st Cir. 2010)); Williams v. City of Brockton, 146 F.Supp.3d 290, 312 (D. Mass. 2015). "The history of the substantive due process doctrine indicates that it is to be applied with 'caution and restraint.'" Santiago de Castro v. Morales Medina, 943 F.2d 129, 130 (1st Cir. 1991).

Here, plaintiff is unable to state a claim under the Fourteenth Amendment for a violation of her substantive due process rights. The complained of policies of the DOC regarding plaintiff's conditions of confinement as a GD inmate fall far short of the shocks-the-conscience test. In the absence of facts plausibly demonstrating that the defendants have engaged in conduct that is "truly outrageous, uncivilized, and intolerable," the due process claim must be dismissed.

## VI. THE CLAIMS BROUGHT UNDER THE STATE CONSTITUTION MUST BE DISMISSED.

The Complaint alleges violations of plaintiff's rights under Articles 1, 7, 106, and 114 of the Massachusetts Constitution (Counts V, VI and VII). However, it is well established that the Eleventh Amendment prohibits state law claims from forming the basis for injunctive relief in a case filed in federal court. See Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 106 (1984) (finding that the Ex Parte Young exception is inapplicable to suits against state officials on the basis of state law); Associacion De Subscripcion Conjuncta Del Securo De Responsabilidad Obligatorio v. Flores Galarza, 484 F.3d 1, 24, n.26 (1st Cir. 2007) ("Ex Parte Young, 209 U.S. 123 (1908) does not allow injunctive relief against state officials for violation of state law … because '[a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law.'") (quoting Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 43 (1st Cir. 2006)); Municipality of San Sebastian v. Puerto Rico, 116 F. Supp.3d 49, 57 (D. P.R. 2015) (Eleventh Amendment does not permit injunctive relief against state officials for violations of state law.). "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." Diaz-Fonseca, 451 F.3d at 43 (quoting Pennhurst State School & Hospital, 465 U.S. at 106). Accordingly, the state law claims raised in Counts V, VI and VII of the Complaint must be dismissed.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Complaint be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

                                      Defendants,
                                      By their attorneys,

                                      NANCY ANKERS WHITE
                                      Special Assistant Attorney General

Dated: January 5, 2018          /s/ *Richard C. McFarland*
                                      Richard C. McFarland, BBO# 542278
                                      Legal Division
                                      Department of Correction
                                      70 Franklin Street, Suite 600
                                      Boston, MA 02110-1300
                                      (617) 727-3300, ext. 1132
                                      richard.mcfarland@state.ma.us

## **CERTIFICATE OF SERVICE**

      I, Richard C. McFarland, counsel for defendants, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on 1/5/18.

                                                      /s/ *Richard C. McFarland*
                                                     Richard C. McFarland