# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JANE DOE,

      Plaintiff,

      v.

MASSACHUSETTS DEPARTMENT OF
CORRECTION; THOMAS A. TURCO III;
SEAN MEDEIROS; JAMES M. O'GARA JR.;
and STEPHANIE COLLINS,

      Defendants.

Civil Action No. 1:17-CV-12255-RGS

**LEAVE TO FILE GRANTED ON
FEBRUARY 2, 2018**

## JANE DOE'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Jennifer Levi (BBO# 562298)
Bennett Klein (BBO# 550702)
GLBTQ Legal Advocates & Defenders
30 Winter Street, STE 800
Boston, Massachusetts 02108
Tel.: +1 617 426 1350
Email: jlevi@glad.org

Elizabeth Matos (BBO# 671505)
Joel Thompson (BBO# 662164)
Prisoners' Legal Services
10 Winthrop Square, 3rd Floor
Boston, MA 02110
Tel.: +1 617 482 6383
lmatos@plsma.org
jthompson@plsma.org

J. Anthony Downs (BBO# 552839)
Tiffiney F. Carney (*pro hac vice* pending)
Louis L. Lobel (BBO# 693292)
Ashley E. Moore (BBO# 694731)
Goodwin Procter LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.: +1 617 570 1000
jdowns@goodwinlaw.com
tcarney@goodwinlaw.com
llobel@goodwinlaw.com
amoore@goodwinlaw.com

*Attorneys for Plaintiff*

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 1

ARGUMENT ....................................................................................................................... 4

      I.     THE COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS. ....... 4

          A.     Standard of Review. ......................................................................................4

          B.     Ms. Doe States a Claim of Disability Discrimination Under Title II of the ADA and § 504 of the FRA in Counts I and II of the Complaint. ...................................................................................................4

                1.     Ms. Doe is a Qualified Individual with a Disability Under the ADA and FRA. ..............................................................................5

                2.     Ms. Doe Has Sufficiently Pled That She Has Been Subjected to Discrimination Under Title II of the ADA and § 504 of the FRA. ..................................................................................................7

                3.     Gender Dysphoria is Not Excluded from the ADA. ......................12

                      a.     No Exclusion for Gender Dysphoria Appears Anywhere in the Text of the ADA. ...................................12

                      b.     Even if Gender Dysphoria is a GID, the ADA's GIDs Exclusion Does Not Apply to All Claims Based on that Condition. ...................................................15

                      c.     Defendants' View of The GIDs Exclusion Would Violate the Equal Protection Clause .................................16

          C.     Ms. Doe States a Claim for a Violation of Equal Protection Under the Fourteenth Amendment and 42 U.S.C. § 1983 in Counts III and VIII of the Complaint. .................................................................................20

          D.     Ms. Doe States a Claim for a Violation of Due Process Under the Fourteenth Amendment and 42 U.S.C. § 1983 In Counts IV and VIII of the Complaint. ............................................................................21

CONCLUSION .................................................................................................................. 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ability Ctr. Of Greater Toledo v. City of Sandusky*,
    181 F. Supp. 2d 797 (N.D. Ohio 2001) ............................................................................. 10

*Adkins v. City of New York*,
    143 F. Supp. 3d 134 (S.D.N.Y. 2015) ....................................................................... 17, 18

*Bd. Of Educ. Of the Highland Local Sch. Dist. v. United States Dep't of Educ.*,
    208 F. Supp. 3d 850 (S.D. Ohio 2016) ............................................................................ 18

*Bell Atlantic v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................ 4

*Blatt v. Cabela's Retail, Inc.*,
    2017 WL 2178123 (E.D. Pa. May 18, 2017) .................................................................. 15

*Blatt v. Cabela's Retail, Inc.*,
    2015 WL 9872493 (E.D. Pa. November 16, 2015) ......................................................... 15

*Bragdon v. Abbott*,
    524 U.S. 624 (1998) ............................................................................................................ 7

*Brocksmith v. United States*,
    99 A.3d 690 (D.C. 2014) ................................................................................................. 17

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ......................................................................................................... 23

*Cox v. Massachusetts Dep't of Corr.*,
    18 F. Supp. 3d 38 (D. Mass. 2014) .................................................................................. 5

*Crowder v. Kitagawa*,
    81 F.3d 1480 (9th Cir. 1996) .......................................................................................... 10

*Daniels v. Williams*,
    424 U.S. 327 (1986) ......................................................................................................... 23

*Doe 1 v. Trump*,
    2017 WL 4873042 (D.D.C. Oct. 30, 2017) .............................................................. 17, 18

*Doe v. Arrisi*,
    No. 3:16-cv-08640 (D.N.J. July 17, 2017), ECF No. 49 ................................................ 16

*Doe v. Dzurenda*,
    No. 3:16-CV-1934 (D. Conn. Oct. 27, 2017), ECF No. 57 ............................................ 16

*Doe v. United Consumer Fin. Serv.*,
    2001 WL 34350174 (N.D. Ohio, Nov. 9, 2001) ............................................................ 2

*Evancho v. Pine–Richland Sch. Dist.*,
    237 F.Supp.3d 267 (W.D. Pa. 2017) ....................................................................... 18

*Fabian v. Hosp. of Cent. Conn.*,
    172 F. Supp. 3d 509 (D. Conn. 2016) ...................................................................... 18

*Freeman v. Town of Hudson*,
    714 F.3d 29 (1st Cir. 2013) .................................................................................... 20

*Glenn v. Brumby*,
    663 F.3d 1312 (11th Cir. 2011) ........................................................................ 18, 19

*Gonzalez-Fuentes v. Molina*,
    607 F.3d 864 (1st Cir. 2010) ................................................................................. 23

*Hason v. Med. Bd. of California*,
    279 F.3d 1167 (9th Cir. 2002) ................................................................................. 8

*Henderson v. Thomas*,
    913 F. Supp. 2d 1267 (M.D. Ala. 2012) ................................................................... 9

*Innovative Health Systems v. City of White Plains*,
    117 F.3d 37 (2d Cir. 1997), *superseded on other grounds by Zervos v. Verizon N.Y.*,
    252 F.3d 163, 171 n.7 (2d Cir. 2001) ...................................................................... 8

*James v. Ranch Mart Hardware, Inc.*,
    1994 WL 731517 (D. Kan. Dec. 23, 1994) .............................................................. 13

*Jaros v. Illinois Dep't of Corr.*,
    684 F.3d 667 (7th Cir. 2012) ................................................................................... 8

*Johnson v. California*,
    543 U.S. 499 (2005) ............................................................................................. 21

*Karnoski v. Trump*,
    2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) ...................................................... 18

*Levesque v. State of New Hampshire*,
    2010 WL 2367346 (D.N. H. May 12, 2010) ............................................................. 11

*Lonergan v. Fla. Dep't of Corr.*,
    623 F. App'x 990 (11th Cir. 2015) .......................................................................... 11

*Matthews v. Commonwealth Edison Co.*,
    128 F.3d 1194 (7th Cir. 1997) ............................................................................... 10

*Michaels v. Akai Sec., Inc.*,
    2010 WL 2573988 (D. Colo. June 24, 2010) ........................................................... 13

*Mississippi Pub. Employees' Ret. Sys. v. Boston Sci.*,
  523 F.3d 75 (1st Cir. 2008) ................................................................................. 4

*Nat'l Ass'n of the Deaf v. Harvard Univ.*,
  2016 WL 3561622 (D. Mass. Feb. 9, 2016), *report and recommendation adopted*,
  2016 WL 6540446 (D. Mass. Nov. 3, 2016) ................................................... 5, 11

*Nattiel v. Tomlinson*,
  2017 WL 5799233 (N.D. Fla. July 13, 2017) ..................................................... 11

*Noel v. N.Y. City Taxi & Limousine Comm'n*,
  687 F.3d 63 (2d Cir. 2012) .................................................................................. 8

*Pa. Dep't of Corr. v. Yeskey*,
  524 U.S. 206 (1998) ............................................................................................ 5

*Parker v. Universidad de Puerto Rico*,
  225 F.3d 1 (1st Cir. 2000) ................................................................................... 5

*Phipps v. Sheriff of Cook County*,
  681 F. Supp. 2d 899 (N.D. Ill. 2009) ................................................................. 8

*Romer v. Evans*,
  517 U.S. 620 (1996) ........................................................................................... 19

*Rosa v. Park W Bank Trust Co.*,
  214 F.3d 213 (1st Cir. 2000) ........................................................................ 18, 19

*Sandin v. Conner*,
  515 U.S. 472 (1995) ...................................................................................... 21, 22

*Santiago Ortiz v. Caparra Ctr. Assocs., LLC*,
  261 F. Supp. 3d 240 (D.P.R. 2016) ( .................................................................. 6

*Schroer v. Billington*,
  577 F. Supp. 2d 293 (D.D.C. 2008) ................................................................... 18

*Schwenk v Hartford*,
  204 F.3d 1187 (9th Cir. 2000) ........................................................................... 18

*Smith v. City of Salem*,
  Ohio, 378 F.3d 566 (6th Cir. 2004) ............................................................... 18, 19

*Stockman v. Trump*,
  No. EDCV 17-1799 (C.D. Cal. Dec. 22, 2017) ................................................. 18

*Stone v. Trump*,
  2017 WL 5589122 (D. Md. Nov. 21, 2017) ...................................................... 18

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973) ........................................................................................... 20

*United States v. Dwinells*,
   508 F.3d 63 (1st Cir. 2007) .......................................................................................... 16

*United States v. Happy Time Day Care Ctr.*,
   6 F. Supp. 2d 1073 (W.D. Wis. 1998) ............................................................................ 7

*Vill. of Willowbrook v. Olech*,
   528 U.S. 562 (2000) ..................................................................................................... 20

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ......................................................................... 17, 18, 19

*Wilkinson v. Austin*,
   545 U.S. 209 (2005) ..................................................................................................... 22

*Wis. Cmty. Servs. v. City of Milwaukee*,
   465 F.3d 737 (7th Cir. 2006) (en banc) ........................................................................ 10

*Yeskey v. Com. of Pa. Dep't of Corr.*,
   118 F.3d 168 (3rd Cir. 1997), *aff'd sub nom*, *Pa, Dep't of Corr. v. Yeskey*, 524 U.S.
   206, 210 (1998) .............................................................................................................. 8

*Zond v. Fujitsu Semiconductor*,
   990 F. Supp.2d 50 (D. Mass. 2014) ................................................................................ 4

**Statutes**

28 U.S.C. § 794 ................................................................................................................. 5, 7

42 U.S.C. § 12102 ........................................................................................................ 5, 7, 13

42 U.S.C. § 12132 ............................................................................................................. 5, 7

42 U.S.C. § 12211 ......................................................................................................... 12, 15

Pub. L. No. 110-325, 122 Stat. 3553 (2008) ................................................................ 6, 7, 12

**Federal Regulations**

28 C.F.R. § 35.130 ...................................................................................................... 9, 10, 11

28 C.F.R. § 35.101 ................................................................................................................ 13

28 C.F.R. § 35.104 .................................................................................................................. 6

28 C.F.R. § 35.108 ............................................................................................................... 6, 7

28 C.F.R. § 115.5-501 .......................................................................................................... 17

28 C.F.R. § 115.42 ............................................................................................................... 22

29 C.F.R. § 1614.203 ........................................................................................................... 11

**Federal Rules**

Fed. R. Civ. P. 8(a) ............................................................................................................. 4

Fed. R. Civ. P. 12(b)(6).......................................................................................................... 4

**Other Authorities**

135 Cong. Rec. S10734-02, 1989 WL 183115 (daily ed. Sep. 7, 1989)................................... 19

135 Cong. Rec. S10765-01, 1989 WL 183216 (daily ed. Sep. 7, 1989)................................... 19

103 DOC 652 ................................................................................................................. 22, 23

103 DOC 519.02 ................................................................................................................. 23

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL
    MANUAL OF MENTAL DISORDERS (4th ed., rev. 2000) .............................................. 13

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL
    MANUAL OF MENTAL DISORDERS (5th ed. 2013) ............................................*passim*

AMERICAN PSYCHIATRIC ASSOCIATION, *GENDER DYSPHORIA* (2013),
    https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/APA_DSM-
    5-Gender-Dysphoria.pdf............................................................................................ 13, 14

Aruna Saraswat, MD, Jamie D. Weinand, BA, BS & Joshua D. Safer, MD, *Evidence
    Supporting the Biologic Nature of Gender Identity*, 21 ENDOCRINE PRACTICE
    199 (Feb.2, 2015).................................................................................................... 16

Christine Michelle Duffy, *The Americans with Disabilities Act of 1990 and the
    Rehabilitation Act of 1973*, *in* GENDER IDENTITY AND SEXUAL ORIENTATION
    DISCRIMINATION IN THE WORKPLACE: A PRACTICAL GUIDE (Christine Michelle
    Duffy ed., Bloomberg BNA 2014) ...................................................................... 15, 16

Kevin M. Barry et al., *A Bare Desire to Harm: Transgender People and the Equal
    Protection Clause*, 57 B.C. L. Rev. 507 (2016) .................................................... 20

Margo Schlanger, *How the ADA Regulates and Restricts Solitary Confinement for
    People with Mental Disabilities Mental Disabilities*, AM. CONST. SOC'Y FOR L. &
    POL'Y, May 2016................................................................................................. 10

U.S. Const., Amdt. XIV ..................................................................................*passim*

## INTRODUCTION

Plaintiff Jane Doe, a transgender woman who suffers from Gender Dysphoria, is wrongly incarcerated in a men's correctional facility, and despite her repeated requests for a change in how she is treated, she faces serious, daily discrimination, harassment, and affronts to human dignity.  Her complaint properly alleges claims under the Americans with Disabilities Act ("ADA"), the Federal Rehabilitation Act ("FRA"), the United States Constitution (Equal Protection and Due Process) and 42 U.S.C § 1983 for redress of, *inter alia*, Defendants' refusal to properly place her in the women's correctional facility and for denials of repeated requests for reasonable accommodations necessary in light of, and for treatment of, her medical condition. Defendants' Motion to Dismiss Ms. Doe's Complaint should be denied, as the Complaint clearly provides sufficient factual allegations to support her claims for relief under Federal Law.[1] Defendants' central assertion that Ms. Doe's Gender Dysphoria is excluded from the ADA and the FRA is contrary to the statutory language and, if adopted by this Court, would result in a constitutional violation.

## STATEMENT OF FACTS

The facts alleged in the Complaint (D.I. 1), including the following, must be accepted as true:  Plaintiff Ms. Doe is a woman.  Compl. ¶ 4 (she "has long ago undergone the process of gender transition and is a woman").  *See also* Compl. ¶¶ 28-29, 31.  Although she was assigned the sex of male at birth, Ms. Doe's female gender identity has been long-standing.  Consistent with her gender identity, Ms. Doe has lived as a woman for over four decades.  Her body reflects her identity as a woman and is seen that way by others.  Compl. ¶¶ 5, 24-25, 27, 33-34, 40, 47. She is currently serving a three- to four-year sentence for a nonviolent drug offense.  Compl.

---

[1] Plaintiff agrees to the dismissal without prejudice of her cognate state constitutional claims (Counts V, VI, and VII).

¶ 30.  Despite being a woman, she was placed in a male correctional facility (MCI Norfolk),

because she has a medical condition known as Gender Dysphoria.  Compl. ¶¶ 2, 6, 26, 43, 62.

Gender Dysphoria is a rare but serious medical condition and a disability that is defined

in the American Psychiatric Association's authoritative treatise, the Diagnostic and Statistical

Manual of Mental Disorders ("DSM"), as a condition characterized by a marked incongruence

between one's assigned sex at birth and one's gender identity, which results in clinically

significant distress.  Compl. ¶ 18.  Without treatment, individuals with Gender Dysphoria often

experience severe psychological harm and suffering, including suicidality.  Compl. ¶¶ 21-22.

While serious, Gender Dysphoria is also highly treatable.  Compl. ¶ 22.  The standard of

care for treatment of Gender Dysphoria has been established by the World Professional

Association for Transgender Health, the American Medical Association, American

Psychological Association, and other major medical and mental health organizations.  Compl.

¶ 3.  The required medical treatment for Gender Dysphoria is to live consistently with one's

gender identity through counseling, hormone therapy, gender reassignment surgery, and the

social and legal transition to the sex associated with one's gender identity.  Compl. ¶¶ 3, 23.

Upon Ms. Doe's incarceration, Defendants' contracted health care providers confirmed

her Gender Dysphoria diagnosis.  Compl. ¶ 45.  Nevertheless, Defendants' policies and practices

have made it impossible for Ms. Doe to "meet the single most important treatment goal:  that she

be supported and recognized as a woman."  Compl. ¶ 55; *see also id. ¶* 5 ("To avoid debilitating

psychological dysfunction and distress, Jane Doe must be able to live consistently with her

female gender identity . . .  Defendants have undermined Jane Doe's ability to live as a woman").

Defendants have refused Ms. Doe's request that she be placed in the correctional facility

for women.  Compl. ¶¶  59, 62.  Further, while at MCI-Norfolk, Ms. Doe has been treated

disadvantageously relative to other inmates who do not suffer from Gender Dysphoria.  For example, Ms. Doe has been forced to undergo strip searches in view of male inmates and shower in areas where males crowd in and view her naked.  Compl. ¶¶ 5, 32, 34-40.  Because Ms. Doe has a female gender identity and body, including having female breasts, she has been uniquely subjected to sexualized harassment, personal indignities, and violations of privacy that inmates without Gender Dysphoria are not subjected to.  Compl. ¶ 34 (strip-searched in front of males who viewed her breasts and yelled taunts like "You have some big, nice boobies!" and "I would like to see you spread like that in my room!").  Similarly, Defendants have a practice and policy of conducting strip searches by correctional officers of the same gender (except for emergencies).  Ms. Doe, however, is treated adversely because she is strip-searched by male correctional officers even though she has a female gender identity and a female body as a result of her diagnosis of and treatment for Gender Dysphoria.  *See* Compl. ¶ 33 (strip-searched by male correctional officers who "routinely grope her [female] breasts.").  In addition, Defendants' correctional officers regularly refuse to call Ms. Doe by her female name or refer to her by female pronouns, and instead tell her that she is a man, all in contravention of her medical needs.  Compl. ¶¶ 5, 42-44.  Defendants have refused Ms. Doe's requests that Defendants comply with her medical treatment protocol, including placement in a female facility, use of female pronouns, strip searches by female correctional officers, and separate showering time and accommodations to shield her body from the view of male inmates.  Compl. ¶¶ 40, 61-68.  These refusals have exacerbated her Gender Dysphoria.  Compl. ¶¶ 41, 54.

## ARGUMENT

## I.     THE COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS.

### A.     Standard of Review.

In considering a motion to dismiss, a court must take the "factual allegations in the complaint as true and make all reasonable inferences in plaintiff's favor."  *Mississippi Pub. Employees' Ret. Sys. v. Boston Sci.*, 523 F.3d 75, 85 (1st Cir. 2008); *see also Bell Atlantic  v. Twombly*, 550 U.S. 544, 555-56 (2007).  A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Federal Rule 8(a).  Rule 8(a)(2) merely requires a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, "in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555.  "[S]tating such a claim requires a complaint with enough factual matter (taken as true) to suggest [the required element]."  *Id.* at 556.  A complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits.  *See id.* at 554-55, 563 n.8; *Zond v. Fujitsu Semiconductor,* 990 F. Supp.2d 50, 53 (D. Mass. 2014) ("At the motion to dismiss stage a complaint generally will only be dismissed where it is 'entirely implausible' or impossible for the grouped defendants to act as alleged").

### B.     Ms. Doe States a Claim of Disability Discrimination Under Title II of the ADA and § 504 of the FRA in Counts I and II of the Complaint.

Title II of the ADA provides that:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  The substantive provisions of Title II and § 504 of the FRA of 1973, 29

U.S.C. § 794, are similar.  Section 504 provides:

> No otherwise qualified individual with a disability in the United
> States … shall, solely by reason of her or his disability, be
> excluded from participation in, be denied the benefits of, or be
> subjected to discrimination under any program or activity receiving
> Federal financial assistance . . . .

28 U.S.C. § 794(a).  The standards of liability under the FRA are identical to those under the

ADA, and thus the claims are usually analyzed together.  *See, e.g.*, *Nat'l Ass'n of the Deaf v.*

*Harvard Univ.*, 2016 WL 3561622, at *4 (D. Mass. Feb. 9, 2016), *report and recommendation*

*adopted*, 2016 WL 6540446 (D. Mass. Nov. 3, 2016).[2]  There is no dispute that these standards

apply to a state prison.  *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-210 (1998).

    To state a claim under the ADA, a plaintiff must establish "(1) that [s]he is a qualified

individual with a disability; (2) that [s]he was either excluded from participation in or denied the

benefits of some public entity's services, programs, or activities or was otherwise discriminated

against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the

plaintiff's disability." *Cox v. Massachusetts Dep't of Corr.*, 18 F. Supp. 3d 38, 48–49 (D. Mass.

2014) (quoting *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000)).

### 1.    Ms. Doe is a Qualified Individual with a Disability Under the ADA and FRA.

    The ADA defines disability as: "(A) a physical or mental impairment that substantially

limits one or more major life activities of such individual; (B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3))."  42 U.S.C. §

---

[2] Accordingly, plaintiff will analyze these claims under the ADA, with references to § 504 as appropriate.

12102(1).  Ms. Doe's Gender Dysphoria is squarely within all three prongs of the ADA's definition of disability, and Defendants do not contend otherwise.[3]

For the first prong, Gender Dysphoria is clearly a serious medical condition which, as set forth in the DSM, results in debilitating psychological dysfunction without lifelong medical treatment.  *See, e.g., Santiago Ortiz v. Caparra Ctr. Assocs., LLC*, 261 F. Supp. 3d 240, 245-47 (D.P.R. 2016) (noting precedent that all that is required at the pleading stage is the identification of an impairment; the rationale for the lack of need to demonstrate "substantial limitation" of a major life activity has been "fortified" by the ADA Amendments Act of 2008 ("ADAAA") which shifted the focus away from "whether an individual's impairment is a disability" to compliance with the ADA's obligations) (quoting ADAAA, Pub. L. No. 110-325, September 25, 2008, 122 Stat. 3553, § 2(b)(5)).

Ms. Doe will show that her Gender Dysphoria is both a physical and mental impairment limiting her major life activities.  Gender Dysphoria is a "physiological … condition . . . affecting  . . . the endocrine system" because it is caused by an atypical interaction of sex hormones and the brain and, as a result, a person with Gender Dysphoria is born with circulating hormones inconsistent with their gender identity.  *See* 28 C.F.R. § 35.108(b)(1)(i).  Ms. Doe's Gender Dysphoria also meets the definition of a "mental or psychological disorder" in 28 C.F.R. § 35.108(b)(1)(ii) as a serious and debilitating psychiatric diagnosis.

In addition, Ms. Doe has suffered "substantial limitation of a major life activity" because she requires lifelong treatment for Gender Dysphoria, including the administration of female

---

[3] Under Title II, the term "[q]ualified individual with a disability means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  28 C.F.R. § 35.104. In a corrections context, any inmate is generally considered eligible to participate in basic aspects of prison life, and Defendants make no argument to the contrary.

hormones, which leaves her incapable of reproduction.  *See Bragdon v. Abbott,* 524 U.S. 624,

639 (1998) ("reproduction is a major life activity"); *United States v. Happy Time Day Care Ctr.*,

6 F. Supp. 2d 1073, 1080-81 (W.D. Wis. 1998) (noting that "caring for oneself" is a "major life

activit[y]," and describing the lifelong need for medical care for HIV when looked at over an

extended period of time as a "major life activity" under the ADA); 42 U.S.C. § 12102(2)(B)

(major life activity "includes the operation of a major bodily function, including . . . endocrine,

and reproductive functions").

    For the second prong, Ms. Doe has a "record of" Gender Dysphoria as she alleges that

she was diagnosed approximately four decades ago.  Compl. ¶ 26.

    For the third prong, Congress clarified in 2008 that under the "regarded as" prong a

plaintiff need only assert adverse action on the basis of an impairment, here Ms. Doe's Gender

Dysphoria.  *See* 42 U.S.C. § 12102(3)(A) ("An individual meets the requirement of 'being

regarded as having such an impairment' if the individual establishes that he or she has been

subjected to an action prohibited under this chapter because of an actual or perceived physical or

mental impairment whether or not the impairment limits or is perceived to limit a major life

activity"); ADAAA, 122 Stat 3553, § 2(b)(3) (reinstating "broad view of the third prong" of the

definition of disability); 28 C.F.R. § 35.108(a) (2)(iii) (no showing of substantial limitation

required under regarded as prong).

> **2.    Ms. Doe Has Sufficiently Pled That She Has Been Subjected to Discrimination Under Title II of the ADA and § 504 of the FRA.**

    Title II and § 504 contain broad, all-encompassing prohibitions of discrimination by

public entities.  *See* 42 U.S.C. § 12132; 29 U.S.C. § 794(a).  Contrary to Defendants' assertion,

Ms. Doe need not identify a specific program, activity or service from which she was excluded to

state a claim.  *See* Mem. of L. in Supp. Of Def's Mot. To Dismiss, D.I. 28, ("MTD"), at 13.

"[T]he language of Title II's anti-discrimination provision does not limit the ADA's coverage to conduct that occurs in 'programs, services, or activities' . . . . [I]t is a catch-all phrase that prohibits discrimination by a public entity, regardless of context."  *See Innovative Health Systems v. City of White Plains*, 117 F.3d 37, 44-45 (2d Cir. 1997), *superseded on other grounds by Zervos v. Verizon N.Y.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001).  *See also Noel v. N.Y. City Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) ("[T]he phrase 'services, programs, or activities' has been interpreted to be 'a catch-all phrase that prohibits all discrimination by a public entity.'"); *Hason v. Med. Bd. of California*, 279 F.3d 1167, 1172–73 (9th Cir. 2002) ("[T]he ADA's broad language brings within its scope anything a public entity does."); *Yeskey v. Com. of Pa. Dep't of Corr.*, 118 F.3d 168, 170-71 (3rd Cir. 1997), *aff'd sub nom*, *Pa, Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (stating that "[t]he statutory definition of '[p]rogram or activity' in Section 504 indicates that the terms were intended to be all-encompassing," and broadly interpreting Section 504 and Title II of the ADA to "appl[y] to anything a public entity does").  Defendants' conclusory statements that Ms. Doe has failed to show discrimination by reason of Gender Dysphoria ignores *both* the plain statutory language of the statute *and* the facts pled, misapprehending the nature of Gender Dysphoria and its treatment.  *See, e.g., Phipps v. Sheriff of Cook County,* 681 F. Supp. 2d 899, 916 (N.D. Ill. 2009); *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) ("Although incarceration is not a program or activity, . . . showers made available to inmates are.").

Ms. Doe has asserted facts supporting three separate theories of liability.  First, Ms. Doe pled sufficient facts to show she was "subjected to discrimination . . . by reason of her disability [Gender Dysphoria]" under the statutory prohibition of disparate treatment.[4]  Ms. Doe is a

---

[4] Title II regulations prohibit the outright denial of the benefits of a prison's programs; providing unequal, different, or separate opportunity to participate in programs, services or entities; and

woman with Gender Dysphoria.  All women – except those with Gender Dysphoria – are housed in the women's prison.  This is plainly discrimination "by reason of" Ms. Doe's Gender Dysphoria.  *See, e.g., Henderson v. Thomas*, 913 F. Supp. 2d 1267, 1276 (M.D. Ala. 2012) (determining that Alabama Department of Corrections excluding HIV-positive inmates from all prison and work-release facilities except for one violated the ADA and FRA).

Further, because of having and receiving treatment for Gender Dysphoria, Ms. Doe is a woman, has a female gender identity and a female body.  She has alleged a set of facts by which she will be able to show that she has female breasts, body fat distribution consistent with that typically associated with females, a feminized voice from the impact of hormones on her vocal chords, softened skin, and diminished body hair.  *See, e.g.* Compl. ¶¶ 5, 33, 40.  As a result, she is treated disadvantageously relative to other inmates at MCI-Norfolk who do not suffer from Gender Dysphoria.  For example, when her naked body is seen by male inmates and searched by male guards, she is subjected to sexual harassment, violations of privacy, personal indignities, and the risk of sexualized violence.  Compl.  ¶¶ 33-40.  Male inmates at MCI-Norfolk are not subjected to these same experiences because they have the same gender identity as the guards who search them.  Ms. Doe is subjected to them because she is a woman with Gender Dysphoria housed in a men's prison.  For this reason, Ms. Doe can show disparate treatment because of her Gender Dysphoria.

Second, Ms. Doe states a claim that Defendants' criterion for gender-based housing classifications, *see* Compl. ¶ 62, based on a person's assigned sex or genitals has a disparate impact on inmates with Gender Dysphoria whose treatment plans do not include genital surgery. The language and legislative history of Title II prohibits policies or practices that have the effect

---

using eligibility criteria that screen out or tend to screen out people with disabilities.  28 C.F.R. § 35.130(b)(1), (2) & (8).

of discriminating against an individual with a disability.[5]  A classification and treatment rule

based on assigned birth sex or genitals undermines the medical needs of inmates with Gender

Dysphoria by forcing them into an environment in which every aspect of their lives is contrary to

their prescribed treatment.  Further, it forces an individual such as Ms. Doe to endure overt

sexual abuse and harassment, and the risk of sexual assault, because males in a gender-

segregated setting view her as a sexual object.  The same classification rule does not similarly

adversely affect individuals without Gender Dysphoria who are placed in a facility, unlike Ms.

Doe, consistent with their gender identity and lived experiences as men or women.

Third, Ms. Doe has pled sufficient facts that she has been denied reasonable

accommodations for her Gender Dysphoria.  Title II regulations require a public entity to "make

reasonable modifications in policies, practices, or procedures when the modifications are

necessary to avoid discrimination on the basis of disability, unless the public entity can

demonstrate that making the modifications would fundamentally alter the nature of the service,

---

[5] *See Wis. Cmty. Servs. v. City of Milwaukee,* 465 F.3d 737, 753 (7th Cir. 2006) (en banc)
("defendant's rule disproportionately impact[ing] disabled people" actionable under Title II);
*Crowder v. Kitagawa*, 81 F.3d 1480, 1483-84 (9th Cir. 1996) (discussing Congressional intent to
"cover both intentional discrimination and discrimination as a result of facially neutral laws" that
"deny disabled persons public services disproportionately due to their disability"); *Ability Ctr. Of
Greater Toledo v. City of Sandusky*, 181 F. Supp. 2d 797, 800 (N.D. Ohio 2001) ("The Statutory
language prohibiting discrimination and the definition of a 'qualified individual with a disability'
do not necessarily require an intent to discriminate . . . [but include] taking action that has the
effect of discriminating against an individual with a disability"); *Matthews v. Commonwealth
Edison Co.*, 128 F.3d 1194, 1196 (7th Cir. 1997).  A helpful discussion of the availability of
disparate impact theory under Title II is contained in Margo Schlanger, *How the ADA Regulates
and Restricts Solitary Confinement for People with Mental Disabilities*, AM. CONST. SOC'Y FOR
L. & POL'Y, May 2016, at 6-7**.**  Professor Schlanger notes that the ADA's Title II regulations
include language that supports a disparate impact theory of liability.  *Id.* ("The ADA's Title II
regulations include two uses of the word 'effect,' which unambiguously reference a disparate
impact theory of liability") (citing 28 C.F.R. §§ 35.130(b)(3)(i)-(ii)).

program, or activity." 28 C.F.R. § 35.130(b)(7)(i); *see also* 29 C.F.R. § 1614.203(d)(3).[6]  A

plaintiff states a claim for a denial of reasonable accommodation when she alleges facts to show

that the prison has refused to alter some prison policy or practice that results in interference with

an inmate's medical treatment.  For example, in *Lonergan v. Fla. Dep't of Corr.*, 623 F. App'x

990, 991 (11th Cir. 2015), a dermatologist ordered that an inmate with pre-cancerous skin lesions

be provided a hat, sunblock, and be kept out of the sun.  Plaintiff requested, *inter alia*, a transfer

to a prison where no required activities are conducted outdoors in the sun.  *Id.*  The Eleventh

Circuit reinstated plaintiff's "reasonable accommodation" claim, noting in the ADA context, "a

prisoner's transfer from or to a particular prison may become relevant when prison officials

attempt to determine what constitutes a 'reasonable accommodation.'"  *Id.* at 993-94.[7]

Ms. Doe has alleged denial of reasonable accommodations necessary to her medical care

including being transferred to a women's prison, granted limited privacy while showering, strip

searched by guards of the same gender, referred to using her female name and female pronouns.

*See* Compl. ¶¶ 3 (treatment for Gender Dysphoria is "to live consistently with one's gender

identity"), 5 ("To avoid debilitating psychological dysfunction and distress, Ms. Doe must be

able to live consistently with her female gender identity. . . . Defendants have undermined Ms.

Doe's ability to live as a woman . . . in direct contravention of established treatment

recommendations"), 41 ("Jane Doe's inability to shower without the presence of men has

exacerbated her Gender Dysphoria and disrupted her treatment"), 55 (Ms. Doe has requested

---

[6] "Fundamental alteration" is an affirmative defense that is not appropriate for consideration on a motion to dismiss.  *See, e.g., Harvard University*, 2016 WL 3561622, at *11.

[7] *See also Nattiel v. Tomlinson*, 2017 WL 5799233, at *5-7 (N.D. Fla. July 13, 2017) (plaintiff with asthma successfully alleged substantial risk of injury that other inmates were not subjected to by failure to provide reasonable accommodation to forego use of chemical agents in restraint); *Levesque v. State of New Hampshire*, 2010 WL 2367346, at *34 (D.N. H. May 12, 2010) (claim for disabling skin condition requires provision of special footwear and access to showers sufficient to maintain certain level of cleanliness).

accommodations "to ensure that she can meet the single most important treatment goal that she be supported and recognized as a woman").  For this reason, she has alleged a refusal to reasonably accommodate her disability in violation of the ADA and Section 504.

### 3.    Gender Dysphoria is Not Excluded from the ADA.

Defendants argue that Ms. Doe is foreclosed from pursuing a claim under the ADA based on Gender Dysphoria because the statute and its regulations "specifically exclude[] ... 'gender identity disorders not resulting from physical impairments.'"  MTD at 10.  Defendants' argument finds no support in the text of the ADA, disregards the plain language of the statute, and therefore is not a reasonable interpretation of the ADA.[8]  But even if it were, Defendants' interpretation results in a categorical exclusion of transgender people from coverage under the ADA that violates constitutional guarantees of equal protection.  Such an interpretation is to be avoided under basic principles of statutory interpretation.

### a.  No Exclusion for Gender Dysphoria Appears Anywhere in the Text of the ADA.

Defendants' argument fails because there is no statutory exclusion for Gender Dysphoria, and gender identity disorder is not the same as Gender Dysphoria.  While exclusions from the ADA's definition of disability refer to "gender identity disorders," ("GIDs exclusion"), 42 U.S.C. § 12211(b), they are silent as to Gender Dysphoria.  And, as the DSM-V makes clear,

---

[8] No inference as to congressional intent can be drawn from Defendants' point that Congress left intact the GID exclusion when it passed the ADAAA, P. L. No. 110-325 (2008). Congress made clear that the purpose of the Act was to reverse the holdings of specific Supreme Court decisions that had nothing to do with the GID exclusion. *See* P.L. 110-325, Sec. 2 (a) (4)-(8); (b) (2)-6). The Act addressed nothing more.

Gender Dysphoria is different from gender identity disorder in key ways.[9]  Accordingly, this Court should reject Defendants' argument that rests on equating these two distinct conditions.

Construing the statute consistently with its plain language is required particularly in light of the 2008 amendments to the ADA, which clarify Congress' intent that the definition of disability should "be construed in favor of broad coverage of individuals . . . to the maximum extent permitted . . . ."  42 U.S.C. § 12102(4)(A).[10]  Defendants' interpretation of the statute would still result in a categorical exclusion of transgender people from coverage under the ADA, in violation of equal protection, as discussed below.

Defendants' argument based on the exclusion of "gender identity disorders not resulting from physical impairments" ignores that the replacement of the diagnosis of gender identity disorder with Gender Dysphoria in the DSM-V in 2013 was more than semantic; it reflects a substantive difference between the medical conditions themselves.  Unlike the outdated diagnosis of gender identity disorder, the hallmark or presenting feature of Gender Dysphoria is *not* a person's gender identity.  Rather, it is the clinically significant distress, termed dysphoria, that some people experience as a result of the mismatch between a person's gender identity and their assigned sex.[11]

---

[9] Cases upon which Defendants rely were decided prior to 2013, before the diagnosis of Gender Dysphoria appeared in the DSM, and bear no weight.  *See, e.g.*, *Doe v. United Consumer Fin. Serv.*, 2001 WL 34350174 (N.D. Ohio, Nov. 9, 2001); *Michaels v. Akai Sec., Inc.*, 2010 WL 2573988 (D. Colo. June 24, 2010); *James v. Ranch Mart Hardware, Inc.*, 1994 WL 731517 (D. Kan. Dec. 23, 1994).  Plaintiffs in those cases either did not or could not distinguish their medical conditions from gender identity disorder.

[10] Department of Justice regulations implementing the ADA, as amended by the ADAAA, strongly support a broad interpretation of the law.  *See* 28 C.F.R. § 35.101(b) ("[T]he definition of 'disability' in [Title II] shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA.").

[11] *See* AMERICAN PSYCHIATRIC ASSOCIATION, *GENDER DYSPHORIA* 2 (2013), https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/APA_DSM-5-Gender-

Reflecting this distinction, the diagnostic criteria for Gender Dysphoria in the DSM-V are different than those for gender identity disorder.  Gender identity disorder had been characterized by a "strong and persistent cross-gender identification" and a "persistent discomfort" with one's sex or "sense of inappropriateness" in the gender role of that sex.  *See* DSM-IV at 581.  In contrast, Gender Dysphoria is defined as a "marked incongruence" between gender identity and assigned sex, rather than a cross-gender identification *per se*.  DSM-V at 452, 814.  Even though both gender identity disorder and Gender Dysphoria require clinical distress as an accompanying feature of the diagnosis, Gender Dysphoria focuses on the incongruity of a person's identity and sex and not on cross-gender identification, a significant change in the presenting feature of the diagnosis.

The criteria for Gender Dysphoria, unlike gender identity disorder, also include a "post-transition specifier for people who are living full-time as the desired gender."  APA, *GENDER DYSPHORIA* 1.  The specifier was "modeled on the concept of full or partial remission," recognizing that treatment can relieve the distress associated with the diagnosis, but that someone who undergoes gender transition to alleviate that distress, putting them in remission, can still have a gender dysphoria diagnosis.  DSM-V at 815.  Significantly, this substantive change means there are people with Gender Dysphoria that would not meet the criteria for gender identity disorder, underscoring that Gender Dysphoria is a different diagnosis.

Lastly, inclusion of a new and different diagnosis rests upon a growing body of new scientific research showing that Gender Dysphoria has a physical cause.  DSM-V includes a new section entitled "Genetic and Physiological," which specifically discusses the genetic and hormonal underpinnings of Gender Dysphoria.  *See* DSM-V at 457.   These findings, together

---

Dysphoria.pdf (hereinafter APA, *GENDER DYSPHORIA*) (stating that gender identity disorder connoted "that the patient is 'disordered'").

with numerous recent medical studies, strongly suggest Gender Dysphoria results from physical

impairments or causes.  *See* Christine Michelle Duffy, *The Americans with Disabilities Act of*

*1990 and the Rehabilitation Act of 1973*, *in* GENDER IDENTITY AND SEXUAL ORIENTATION

DISCRIMINATION IN THE WORKPLACE: A PRACTICAL GUIDE 16-72 to 16-74 & n.282 (Christine

Michelle Duffy ed., Bloomberg BNA 2014) [hereinafter Duffy] (citing numerous medical studies

conducted in past eight years that "point in the direction of hormonal and genetic causes for the

in utero development of gender dysphoria").

Therefore, even if the GIDs exclusion could be interpreted to exclude all persons with

*gender identity disorder* from bringing claims, it does not apply to persons like Ms. Doe with

*Gender Dysphoria*, a new and distinct diagnosis.[12]

### b.  Even if Gender Dysphoria is a GID, the ADA's GIDs Exclusion Does Not Apply to All Claims Based on that Condition.

The ADA excludes "gender identity disorders *not resulting from physical impairments*."

42 U.S.C. § 12211(b)(1) (emphasis added).  Therefore, even if this Court were to disregard the

significant differences between gender identity disorder and Gender Dysphoria, as Defendants'

assert, this Court should not dismiss Plaintiff's claim since, as just noted, she will be able to

---

[12] Recently faced with the same argument presented in Defendants' MTD, the Eastern District of Pennsylvania advanced a separate reason for why the GIDs Exclusion does not apply to Gender Dysphoria.  The GIDs Exclusion, the court stated, "refer[s] to only the condition of identifying with a different gender, [and does] not . . . encompass (and therefore exclude from ADA protection) a condition like . . . gender dysphoria, which goes beyond merely identifying with a different gender and is characterized by clinically significant stress and other impairments that may be disabling."  *Blatt v. Cabela's Retail, Inc.*, 2017 WL 2178123, at *2 (E.D. Pa. May 18, 2017).  Simply put, the GIDs Exclusion "exclude[es] certain sexual identities from the ADA's definition of disability" – not the "disabling conditions that persons of those identities might have."  *Id.* at *3.

show that her medical condition results from a physical impairment. *Id.* The burgeoning

medical research underlying Gender Dysphoria points to a physical etiology.[13]

> As the United States recently opined in the case of *Blatt v. Cabela's Retail, Inc.*:

>> While no clear scientific consensus appears to exist regarding the *specific* origins of gender dysphoria (*i.e.*, whether it can be traced to neurological, genetic, or hormonal sources), the current research increasingly indicates that gender dysphoria has physiological or biological roots. . . . In light of the evolving scientific evidence suggesting that gender dysphoria may have a physical basis, along with the remedial nature of the ADA and the relevant statutory and regulatory provisions directing that the terms "disability" and "physical impairment" be read broadly, the GID Exclusion should be construed narrowly such that gender dysphoria falls outside its scope.

Second Stat. of Int. of the U.S., 2015 WL 9872493 (November 16, 2015 E.D.Pa.) (emphasis

added).[14]

> Because Plaintiff may show that Gender Dysphoria results from a physical impairment,

there is no construction of the GIDs exclusion that supports dismissal of her claim.

### c.  Defendants' View of The GIDs Exclusion Would Violate the Equal Protection Clause.

> Defendants' proposed construction of the GIDs exclusion would preclude an ADA claim

based on *any* medical condition associated with transgender people.  Even though the term

"Gender Dysphoria" does not appear in the statute, Defendants contend that the existing

exclusion does not simply exclude the stated medical condition, but should be read to exclude all

---

[13] *See, e.g.*, Duffy at 16-72 to 16-74 & n.282; Aruna Saraswat, MD, Jamie D. Weinand, BA, BS & Joshua D. Safer, MD, *Evidence Supporting the Biologic Nature of Gender Identity*, 21 ENDOCRINE PRACTICE 199, 199-202 (Feb.2, 2015) (providing a review of data in support of a "fixed, biologic basis for gender identity" and concluding that "current data suggest a biologic etiology for transgender identity").

[14] The United States has maintained this position in two additional cases.  See Stat. of Int. of U.S. at 2-3, *Doe v. Dzurenda*, No. 3:16-CV-1934 (D. Conn. Oct. 27, 2017), ECF No. 57; Stat. of Int. of U.S. at 2-3, *Doe v. Arrisi*, No. 3:16-cv-08640 (D.N.J. July 17, 2017), ECF No. 49.

transgender-related health conditions, thereby creating a facially discriminatory classification. Further, under well-settled law, courts must, where possible, construe statutes to avoid rendering them unconstitutional. *United States v. Dwinells*, 508 F.3d 63, 70 (1st Cir. 2007) ("between two plausible constructions of a statue, an inquiring court should avoid a constitutionally suspect one in favor of a constitutionally uncontroversial alternative").

Here, construing the GIDs exclusion as Defendants argue creates a sweepingly broad and discriminatory exclusion from the ADA's protection for transgender people. Policies that target transgender individuals constitute a suspect classfication under the United States Supreme Court's four-factor test and are therefore, subject to strict scrutiny. First, "hostility and discrimination that transgender individuals face in our society today is well-documented." *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *Brocksmith v. United States*, 99 A.3d 690, 698 n.8 (D.C. 2014); *see also Doe 1 v. Trump*, 2017 WL 4873042, at *27 (D.D.C. Oct. 30, 2017) ("As a class, transgender individuals have suffered, and continue to suffer, severe persecution and discrimination."); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) ("There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity."); Prison Rape Elimination Act, 28 C.F.R. § 115.5-501 (acknowledging "the particular vulnerabilities of inmates who are LGBTI or whose appearance or manner does not conform to traditional gender expectations"). Second, the incongruence transgender people experience between their assigned sex and gender identity "bears no relation to ability to contribute to society." *Adkins*, 143 F. Supp. 3d at 139; *Trump*, 2017 WL 4873042, at *27 ("the Court is aware of no argument or evidence suggesting that being transgender in any way limits one's ability to contribute to society"). Third, being transgender is an immutable distinguishing characteristic

that is core to a person's identity. *Adkins*, 143 F. Supp. 3d at 139.  And fourth, transgender

people are a minority at 0.6% of the adult population and lack political power. *Id.* at 139;

*Trump*, 2017 WL 4873042, at \*27 ("transgender people as a group represent a very small subset

of society lacking the sort of political power other groups might harness to protect themselves

from discrimination").

Apart from the four factor test, Defendants' construction of the statute to exclude all

transgender people warrants heightened scrutiny because a transgender classification is sex-

based.  *See Trump*, 2017 WL 4873042, at \*28 ("well-established that gender-based

discrimination includes discrimination based on non-conformity with gender stereotypes.");

*Schwenk v Hartford*, 204 F.3d 1187, 1200-02 (9th Cir. 2000) (holding that discrimination based

on a person's transgender status is sex-based discrimination); *Whitaker*, 858 F.3d at 1051

(applying heightened scrutiny in case brought by transgender student challenging school

bathroom policy); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (holding that

discrimination against a transgender individual because of her gender-nonconformity is sex

discrimination); *Smith v. City of Salem*, Ohio, 378 F.3d 566, 577 (6th Cir. 2004) (same); *Fabian*

*v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016) (same); *Schroer v. Billington*,

577 F. Supp. 2d 293, 308 (D.D.C. 2008) (discrimination against transgender woman was

"literally discrimination 'because of . . . sex'").  A wall of established precedent recognizes that

transgender-based classifications are subject to heightened review.[15]

---

[15] *See, e.g.*, *Adkins*, 143 F. Supp. 3d at 139-40 (S.D.N.Y. 2015); *Bd. Of Educ. Of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 872-77 (S.D. Ohio 2016); *Trump*, 2017 WL 4873042, at \*27-28 (holding the transgender community satisfies the criteria for heightened review); *Evancho v. Pine–Richland Sch. Dist.*, 237 F.Supp.3d 267, 288 (W.D. Pa. 2017) (holding that "all of the indicia for the application of the heightened intermediate scrutiny standard are present" for transgender individuals); *Karnoski v. Trump*, 2017 WL 6311305, at \*7 (W.D. Wash. Dec. 11, 2017); *Stone v. Trump*, 2017 WL 5589122, at \*15 (D. Md. Nov. 21, 2017); *Stockman v. Trump*, No. EDCV 17-1799 JGB (KKx) (C.D. Cal. Dec. 22, 2017).

Circuit courts agree that transgender discrimination is sex-based whether because it reflects sex-stereotypes, or because the root of the discrimination is based on a person's change of sex or assigned sex at birth.  *See, e.g.*, *Rosa v. Park W Bank Trust Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000).  The First Circuit was among the first to recognize that disparate treatment against a person for being transgender or having a gender identity that does not match a person's assigned birth sex is sex-based.  *See Rosa*, 214 F.3d at 215-16.  Numerous circuits have since agreed, often citing the First Circuit's case in support.  *See, e.g.*, *Whitaker*, 858 F.3d at 1049 (7th Cir.); *Glenn*, 663 F.3d at 1317 (11th Cir.); *Smith*, 378 F.3d at 574 (6th Cir.).  Accordingly, at a minimum, to defend its broad construction of the ADA exclusion, Defendants must show that there is an important or exceedingly persuasive justification for the exclusion of transgender people from the ADA's scope and that the exclusion is substantially related to that interest. Because there is not even a legitimate interest in excluding transgender people from the law's protection, much less an important or compelling one, Defendants' argument fails.

The GIDs exclusion fails under any level of review because it reflects animus toward a disfavored group.  The legislative history associated with the GIDs exclusion is replete with evidence of animus, including statements that erroneously equate medical conditions associated with being transgender with moral failure.  *See, e.g.*, 135 Cong. Rec. S10734-02, 1989 WL 183115 (daily ed. Sep. 7, 1989) (statement of Sen. Armstrong) ("I could not imagine the [ADA] sponsors would want to provide a protected legal status to somebody who has such [mental] disorders, particularly those [that] might have a moral content"); *id.* at S10765-01, 1989 WL 183216 (statement of Sen. Helms) ("What I get out of all of this is here comes the U.S. Government telling the employer that he cannot set up any moral standards for his business"); *see also id.* (statement of Sen. Rudman) ("In short, we are talking about behavior that is immoral,

improper, or illegal and which individuals are engaging in of their own volition, admittedly for reasons we do not fully understand.").[16]

Such moral animus against transgender people is plainly insufficient to constitute a compelling, important, or even legitimate governmental interest.  *See Romer v. Evans*, 517 U.S. 620, 634-35 (1996) (concluding that "a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest" – much less a compelling or important one) (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)) (emphasis in original).  For that reason alone, Defendants' proposed construction cannot survive review.

### C.    Ms. Doe States a Claim for a Violation of Equal Protection Under the Fourteenth Amendment and 42 U.S.C. § 1983 in Counts III and VIII of the Complaint.

Ms. Doe's complaint alleges sufficient facts to support an equal protection claim in at least two ways.  First, she has alleged facts to show that all women prisoners in DOC facilities without Gender Dysphoria or who are not transgender are housed at MCI-Framingham, strip searched by women correctional officers, and allowed to shower and use toilet facilities outside of the presence of men.  She has also alleged sufficient facts to show that incarcerated individuals without Gender Dysphoria or who are not transgender are not subjected to the kinds of sexual harassment, violation, and indignities that result from being a transgender inmate housed exclusively based on the individual's birth sex or genitals without regard to the person's gender identity or the fact of having undergone gender transition.

Defendants turn equal protection analysis on its head by insisting that Ms. Doe must allege that she is treated differently than other inmates *with* Gender Dysphoria.  MTD at

---

[16]  *See also* Kevin M. Barry et al., *A Bare Desire to Harm: Transgender People and the Equal Protection Clause*, 57 B.C. L. Rev. 507, 574 (2016) ("Senators Armstrong, Helms, and Rudman repeatedly invoked immorality as the justification for the transgender exclusions, decrying the ADA's coverage of "sexually deviant behavior.").

17.  Defendant's argument ignores that plaintiff's claim is based on class membership and mistakenly moves for dismissal because she may not meet the standard for proving a "class of one" claim.  But the so-called "class of one" equal protection analysis applies only where "*the plaintiff did not allege membership in a class or group.*"  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (emphasis added).  In *Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir. 2013), the First Circuit analyzed a "class of one" claim only after noting that plaintiffs claimed "no membership in a protected class."  Here, the proper equal protection analysis calls for a comparison between a person in the targeted class and a similarly situated person *not* in the targeted class.  Because Plaintiff's claim alleges facts which will show that Defendants maintain policies that discriminate against transgender inmates on the basis of sex, Gender Dysphoria, and transgender status, she may proceed under ordinary class-based equal protection analysis. *Johnson v. California*, 543 U.S. 499, 505-09 (2005) (applying strict scrutiny to race-based challenge to unwritten double celling policy).

> **D.     Ms. Doe States a Claim for a Violation of Due Process Under the Fourteenth Amendment and 42 U.S.C. § 1983 In Counts IV and VIII of the Complaint.**

Plaintiff's allegations also properly state a claim for violations of procedural and substantive due process.  First, Ms. Doe's liberty interest in not being confined in a men's prison, with the constant affront to her very existence and the unique unending risk of harm that such confinement entails, gives rise to a procedural due process claim.  State regulations create a liberty interest if they impose a form of restraint that represents an "atypical and significant hardship on the inmate in relation to the normal incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995).  Such is undeniably the case here.  The ongoing harms and heightened potential for victimization that come with being a woman housed in a men's prison give rise to a liberty interest, particularly where such placement is indefinite, where Ms. Doe's placement in

the men's prison is not necessary for safety.  *See Wilkinson v. Austin*, 545 U.S. 209, 224 (2005)

(indefinite placement in supermax facility, even if facility's conditions are necessary, gives rise

to liberty interest in avoiding such placement).

Even if state regulations did not already create a liberty interest, Ms. Doe would still have

one because the restraint in question – requiring her to be housed in a men's prison, where it is

foreseeable that she would be openly discriminated against, harassed and threatened – clearly

creates an "atypical and significant hardship" on Ms. Doe that so exceeds the "normal incidents

of prison life" that it gives rise to due process protection by its own force.  *Sandin*, 515 U.S. at

484.  Her confinement in a male facility implicates due process because of the atypical hardship

it imposes on her and the departure it represents from the experiences of other prisoners.  *See id.*

(citing cases finding due process protection in transfer to mental hospital or involuntary

administration of psychotropic medication to prisoner).[17]

Where there is a liberty interest, the question in a procedural due process claim is whether

the process afforded to the plaintiff is sufficient.  The Complaint firmly alleges that in Ms. Doe's

case, it is not.  Ms. Doe is faced with an administration that has categorically rejected her

requests to be considered for placement at MCI-Framingham, the DOC's facility for female

prisoners.  Compl. ¶ 62.  DOC policy requires case-by-case assessments of housing assignments

with consideration of, *inter alia*, individual safety, criminal and disciplinary history, treatment

needs, and vulnerability to sexual victimization, as well as the prisoner's own views concerning

---

[17] The DOC's own policy acknowledges how unusual Ms. Doe's circumstances are.  *See*
Massachusetts Department of Correction: Identification, Treatment and Correctional
management of Inmates Diagnosed with Gender Dysphoria, 103 DOC 652, Att. B ("Risk of
Victimization" factors on internal housing form include "Is or perceived to be transgender,
intersex, Gender Dysphoria . . .").

her safety.  103 DOC 652.09(A).[18]  By alleging her housing requests received no individualized

consideration, in violation of DOC's own rules, Ms. Doe's complaint states a procedural due

process claim.

Second, as alleged in the Complaint, the persistent sexual harassment and constant affront

to her long-standing identity as a woman that Ms. Doe experiences, as a direct result of her

placement in a men's prison, would also prove a violation of substantive due process.  To place a

woman in a men's prison, subjecting her to a known increased risk of sexual harm and to

intentionally place her in an environment that inherently denies her the identity-affirming

treatment required by her Gender Dysphoria is the type of government action that is clearly

improper "regardless of the fairness of the procedures" afforded to her.  *Gonzalez-Fuentes v.*

*Molina*, 607 F.3d 864, 880 (1st Cir. 2010) (quoting *Daniels v. Williams*, 424 U.S. 327, 331

(1986)).  Government action violates substantive due process if it is "so egregious, so

outrageous, that it may fairly be said to shock the conscience."  *Id.* (quoting *County of*

*Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).  Analysis of whether certain conduct shocks

the conscience is fact-specific and unique to the circumstances of the particular case.  *Id.* at 881.

Because Plaintiff's complaint include sufficient allegation to prove facts that support her claim,

this Court should deny Defendants' motion.

## CONCLUSION

For the foregoing reasons, Plaintiff Jane Doe requests that the Court deny Defendants'

Motion to Dismiss.

---

[18] This policy closely tracks, and presumably is intended to adhere to, federal regulations
implementing the Prison Rape Elimination Act.  *See* 28 C.F.R. § 115.42; 103 DOC 519.02 ("The
Department shall embrace the [PREA] standards").

/s/ J. Anthony Downs
J. Anthony Downs (BBO# 552839)
Tiffiney F. Carney (*pro hac vice*
pending)
Louis L. Lobel (BBO# 693292)
Ashley E. Moore (BBO# 694731)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.: +1 617 570 1000
E-mail: jdowns@goodwinlaw.com
tcarney@goodwinlaw.com
llobel@goodwinlaw.com
amoore@goodwinlaw.com

Jennifer Levi (BBO# 562298)
Bennett Klein (BBO# 550702)
GLBTQ Legal Advocates & Defenders
30 Winter Street, STE 800
Boston, Massachusetts 02108
Tel.: +1 617 426 1350
Email: jlevi@glad.org
bklein@glad.org

Elizabeth Matos (BBO# 671505)
Joel Thompson (BBO# 662164)
Prisoners' Legal Services
10 Winthrop Square, 3rd Floor
Boston, MA 02110
Tel.: +1 617 482 6383
E-mail: lmatos@plsma.org
jthompson@plsma.org

Dated: February 2, 2018

## **CERTIFICATE OF SERVICE**

I, J. Anthony Downs, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on February 2, 2018.

/s/ J. Anthony Downs

25