**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

JANE DOE,

    Plaintiff,

    v.

MASSACHUSETTS DEPARTMENT OF
CORRECTION; THOMAS A. TURCO III;
SEAN MEDEIROS; JAMES M. O'GARA JR.;
and STEPHANIE COLLINS,

    Defendants.

Civil Action No. 1:17-CV-12255-RGS

**LEAVE TO FILE GRANTED ON**
**FEBRUARY 2, 2018**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF**
**JANE DOE'S MOTION FOR PRELIMINARY INJUNCTION**

Jennifer Levi (BBO# 562298)
Bennett Klein (BBO# 550702)
GLBTQ Legal Advocates & Defenders
30 Winter Street, STE 800
Boston, Massachusetts 02108
Tel.: +1 617 426 1350
Email: jlevi@glad.org

Elizabeth Matos (BBO# 671505)
Joel Thompson (BBO# 662164)
Prisoners' Legal Services
10 Winthrop Square, 3rd Floor
Boston, MA 02110
Tel.: +1 617 482 6383
lmatos@plsma.org
jthompson@plsma.org

J. Anthony Downs (BBO# 552839)
Tiffiney F. Carney (*pro hac vice* pending)
Louis L. Lobel (BBO# 693292)
Ashley E. Moore (BBO# 694731)
Goodwin Procter LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.: +1 617 570 1000
jdowns@goodwinlaw.com
tcarney@goodwinlaw.com
llobel@goodwinlaw.com
amoore@goodwinlaw.com

*Attorneys for Plaintiff*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 3

    I.      Jane Doe is a Woman with a Diagnosis of Gender Dysphoria. ..............................3

    II.    Ms. Doe's Placement in a Male Correctional Facility Impedes the Medical Treatment for her Gender Dysphoria, Causes Extreme Psychological Damage, and Places Her at High Risk for Physical Violence and Sexual Assault.....................................................................................................................6

    III.   Ms. Doe will Function Well in a Female Correctional Facility.............................9

ARGUMENT .................................................................................................................. 10

    I.      STANDARD OF REVIEW. ...............................................................................10

    II.    MS. DOE HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF HER CLAIMS. .......................................................................10

        A.    Ms. Doe is Likely to Succeed on Her Claims under Title II of the ADA and Section 504 of the FRA in Counts I and II of the Complaint.................................................................................................10

            1.    Ms. Doe is an Individual with a Disability Under the ADA and FRA. ...............................................................................12

            2.    Ms. Doe Has Been Subjected to Discrimination by Reason of her Gender Dysphoria in Violation of Title II of the ADA and § 504 of the FRA. ...........................................14

            3.    Gender Dysphoria is Not Excluded from the ADA. .....................19

                a.    No Exclusion for Gender Dysphoria Appears Anywhere in the Text of the ADA...................................20

                b.    Even if Gender Dysphoria is a GID, the ADA's GIDs Exclusion Does Not Apply to All Claims Based on that Condition....................................................22

                c.    The GIDs Exclusion is a Transgender and Sex-Related Classification that Violates the Equal Protection Clause under the Fourteenth Amendment to the Constitution................................................23

        B.    Ms. Doe is Likely To Succeed on the Merits of Her Equal Protection Claim Under the Fourteenth Amendment and U.S.C. § 1983 in Counts III and VIII of the Complaint. ......................................27

        C.    Ms. Doe is Likely to Succeed on the Merits of Her Due Process Claims Under the Fourteenth Amendment and 42 U.S.C. § 1983 in Counts IV and VIII of the Complaint. ......................................28

III.    PRELIMINARY RELIEF IS NECESSARY TO PREVENT IMMEDIATE
AND IRREPARABLE HARM TO MS. DOE. .......................................................30

IV.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST
FAVOR A PRELIMINARY INJUNCTION. .........................................................31

CONCLUSION ............................................................................................................................ 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ability Ctr. of Greater Toledo v. City of Sandusky*,
181 F. Supp. 2d 797 (N.D. Ohio 2001) ................................................................. 16

*Adkins v. City of New York*,
143 F. Supp. 3d 134 (S.D.N.Y. 2015) ............................................................... 24, 25

*American Freedom Def. Initiative v. Metro. Area Transit Auth.*,
898 F. Supp. 2d 73 (D.D.C. 2012) ........................................................................ 32

*Bd. Of Educ. Of the Highland Local Sch. Dist. v. United States Dep't of Educ.*,
208 F. Supp. 3d 850 (S.D. Ohio 2016) ................................................................. 25

*Black Tea Soc'y v. City of Boston*,
378 F.3d 8 (1st Cir. 2004) ....................................................................................... 10

*Blatt v. Cabela's Retail, Inc.*,
2015 WL 9872493 (November 16, 2015 E.D. Pa.) ................................................ 23

*Blatt v. Cabela's Retail, Inc.*,
2017 WL 2178123 (E.D. Pa. May 18, 2017) ................................................... 12, 22

*Borinquen Biscuit Corp. v. M.V. Trading Corp.*,
443 F.3d 112 (1st Cir. 2006) ................................................................................. 10

*Bragdon v. Abbott*,
524 U.S. 624 (1998) ............................................................................................... 13

*Brocksmith v. United States*,
99 A.3d 690 (D.C. 2014) ....................................................................................... 24

*ConverDyn v. Moniz*,
68 F. Supp. 3d 34 (D.D.C. 2014) .......................................................................... 32

*Cox v. Massachusetts Dep't of Corr.*,
18 F. Supp. 3d 38 (D. Mass. 2014) ....................................................................... 11

*Crowder v. Kitagawa*,
81 F.3d 1480 (9th Cir. 1996) ................................................................................. 16

*Doe 1 v. Trump*,
2017 WL 4873042 (D.D.C. Oct. 30, 2017) ..................................................... 24, 25

*Doe v. Arrisi,*
No. 3:16-cv-08640 (D.N.J. July 17, 2017), ECF No. 49 .......................................................23

*Doe v. Dzurenda,*
No. 3:16-CV-1934 (D. Conn. Oct. 27, 2017), ECF No. 57 ...................................................23

*Doe v. United States Postal Service,*
1985 WL 9446 (D.D.C. June 12, 1985) ................................................................................12

*DynaLantic Corp. v. U.S. Dep't of Def.,*
885 F. Supp. 2d 237 (D.D.C. 2012) .....................................................................................31

*Evancho v. Pine–Richland Sch. Dist.,*
237 F.Supp.3d 267 (W.D. Pa. 2017) ....................................................................................26

*Fabian v. Hosp. of Cent. Conn.,*
172 F. Supp. 3d 509, 527 (D. Conn. 2016) ..........................................................................25

*Gammett v. Idaho State Bd. of Corr.,*
2007 WL 2186896 (D. Idaho July 27, 2007) .......................................................................32

*Glenn v. Brumby,*
663 F.3d 1312 (11th Cir. 2011) ......................................................................................25, 26

*Goings v. Court Servs. & Offender Supervision Agency for D.C.,*
786 F. Supp. 2d 48 (D.D.C. 2011) .......................................................................................31

*Gonzalez-Fuentes v. Molina,*
607 F.3d 864 (1st Cir. 2010) ................................................................................................30

*Gordon v. Holder,*
721 F.3d 638 (D.C. Cir. 2013) .............................................................................................31

*Hason v. Med. Bd. Of California,*
279 F.3d 1167 (9th Cir. 2002) .............................................................................................14

*Henderson v. Thomas,*
913 F.Supp. 2d 1267 (M.D. Ala. 2012) ...............................................................................15

*Hobby Lobby Stores, Inc. v. Sebelius,*
723 F.3d 1114 (10th Cir. 2013) (en banc), *aff'd,* 134 S.Ct. 2751 (2014) ...............................32

*Innovative Health Systems, Inc. v. City of White Plains,*
117 F.3d 37 (2d Cir. 1997), *superseded on other grounds by Zervos v. Verizon
N.Y.,* 252 F.3d 163 (2d Cir. 2001).........................................................................................14

*Jaros v. Illinois Dep't of Corr.,*
684 F.3d 667 (7th Cir. 2012) ...............................................................................................14

*Karnoski v. Trump*,
    2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) ..................................................25

*Levesque v. State of New Hampshire*,
    2010 WL 2367346 (D.N. H. May 12, 2010)..........................................................19

*Lonergan v. Fla. Dep't of Corr.*,
    623 F. App'x 990 (11th Cir. 2015) ................................................................18, 19

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) .................................................................................32

*Mills v. D.C.*,
    571 F.3d 1304 (D.C. Cir. 2009)............................................................................31

*Nat'l Ass'n of the Deaf v. Harvard Univ.*,
    2016 WL 3561622 (D. Mass. Feb. 9, 2016), ), *report and recommendation*
    *adopted*, 2016 WL 6540446 (D. Mass. Nov. 3, 2016)............................................11

*Nattiel v. Tomlinson*,
    2017 WL 5799233 (N.D. Fla. July 13, 2017) ..................................................14, 19

*Noel v. N.Y. City Taxi & Limousine Comm'n*,
    687 F.3d 63 (2d Cir. 2012).....................................................................................14

*Pa. Dep't of Corr. v. Yeskey*,
    524 U.S. 206 (1998)................................................................................................11

*Reaves v. Dep't of Corr.*,
    195 F. Supp. 3d 383 (D. Mass. 2016) ....................................................................11

*Respect Maine PAC v. McKee*,
    622 F.3d 13 (1st Cir. 2010)....................................................................................10

*Romer v. Evans*,
    517 U.S. 620 (1996)................................................................................................27

*Rosa v. Park W Bank Trust Co.*,
    214 F.3d 213 (1st Cir. 2000)..................................................................................26

*Sandin v. Conner*,
    515 U.S. 472 (1995)..........................................................................................28, 29

*Schroer v. Billington*,
    577 F. Supp. 2d 293 (D.D.C. 2008) ......................................................................25

*Schwenk v Hartford*,
    204 F.3d 1187 (9th Cir. 2000) ...............................................................................25

*Simms v. D.C.*,
  872 F. Supp. 2d 90 (D.D.C. 2012) ................................................................31

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
  699 F.3d 1 (1st Cir. 2012) ...........................................................................10

*Smith v. City of Salem, Ohio*,
  378 F.3d 566 (6th Cir. 2004) ................................................................25, 26

*Soneeya v. Spencer*,
  851 F. Supp. 2d 228 (D. Mass. 2012) ..........................................................12

*Stockman v. Trump*,
  No. EDCV 17-1799 JGB (KKx) (C.D. Cal. Dec. 22, 2017) ...........................25

*Stone v. Trump*,
  2017 WL 5589122 (D. Md. Nov. 21, 2017) ...................................................25

*Texas Dep't of Housing and Cmty. Affairs v. Inclusive Communities Project*,
  135 S. Ct. 2507 (2015) .................................................................................17

*United States v. Dwinells*,
  508 F.3d 63 (1st Cir. 2007) ..........................................................................23

*United States v. Happy Time Day Care Ctr.*,
  6 F. Supp. 2d 1073 (W.D. Wis. 1998) ..........................................................13

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
  587 F.3d 464 (1st Cir. 2009) ........................................................................31

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017) ..............................................................24, 25, 26

*Wilkinson v. Austin*,
  545 U.S. 209 (2005) .....................................................................................29

*Winter v. Nat'l Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .........................................................................................10

*Wis. Cmty. Servs. v. City of Milwaukee*,
  465 F.3d 737 (7th Cir. 2006) (en banc) ........................................................16

*Yeskey v. Com. of Pa. Dep't of Corr.*,
  118 F.3d 168 (3rd Cir. 1997), *aff'd sub nom*, *Pennsylvania Dept. of Corr. v.
  Yeskey*, 524 U.S. 206 (1998) ........................................................................15

## Statutes

29 U.S.C. § 794 ............................................................................... *passim*

42 U.S.C. § 1983 ..........................................................................................2, 27, 28

42 U.S.C. § 12101, Pub. L. No. 110-325, 122 Stat 3553.......................................13, 14

42 U.S.C. § 12102...........................................................................................12, 13, 14

42 U.S.C. § 12132 *et seq.*................................................................................ *passim*

42 U.S.C. § 12211 ..............................................................................................20, 22

**Federal Regulations**

28 C.F.R. § 35.104 ...................................................................................................15

28 C.F.R. § 35.108 .............................................................................................12, 14

28 C.F. R. § 35.130 ..................................................................................................18

28 C.F.R. § 42.540 ...................................................................................................15

28 C.F.R. § 115.5-501 ..............................................................................................24

28 C.F.R. § 115.42 ........................................................................................... *passim*

29 C.F.R. § 1614.203 ...............................................................................................18

135 Cong. Rec. S10734-02, 1989 WL 183115 (daily ed. Sep. 7, 1989) ......................26

135 Cong. Rec. S10734-02, 1989 WL 183216 (daily ed. Sep. 7, 1989) ......................27

**Other Authorities**

103 DOC 652 ...........................................................................................................29

103 DOC 519.02 .......................................................................................................30

AMERICAN PSYCHIATRIC ASSOCIATION, *GENDER DYSPHORIA* (2013),
    https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/APA
    _DSM-5-Gender-Dysphoria.pdf ..........................................................................21

Aruna Saraswat, MD, Jamie D. Weinand, BA, BS & Joshua D. Safer, MD,
    *Evidence Supporting the Biologic Nature of Gender Identity*, 21 ENDOCRINE
    PRACTICE 199 (Feb.2, 2015) ...............................................................................22

Christine Michelle Duffy, *The Americans with Disabilities Act of 1990 and the
    Rehabilitation Act of 1973*, *in* GENDER IDENTITY AND SEXUAL ORIENTATION
    DISCRIMINATION IN THE WORKPLACE: A PRACTICAL GUIDE (Christine
    Michelle Duffy ed., Bloomberg BNA 2014) ....................................................21, 22

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND
STATISTICAL MANUAL OF MENTAL DISORDERS (3rd ed. 1980)................................5

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND
STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed., rev. 2000)..................5, 20

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND
STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013) ...................... *passim*

Kevin M. Barry et al., *A Bare Desire to Harm: Transgender People and the Equal
Protection Clause*, 57 B.C. L. Rev. 507 (2016)....................................................................27

Margo Schlanger, *How the ADA Regulates and Restricts Solitary Confinement for
People with Mental Disabilities*, AM. CONST. SOC'Y FOR L. & POL'Y , May
2016..........................................................................................................................17

Randi Ettner, <u>Principles of Transgender Medicine</u> (2007; 2d ed. 2016) ......................17

U.S. Const., Amdt. XIV ......................................................................................... *passim*

## INTRODUCTION

Plaintiff Jane Doe is a 53 year-old transgender woman who has been diagnosed with Gender Dysphoria, a serious medical condition resulting from a mismatch between her female gender identity and her assigned birth sex. She long ago completed gender transition and has lived her entire adult life as a woman.  Four decades of hormone therapy has feminized her body. She has normal female breast development and typical female body fat distribution, limited body hair, feminine vocalization from the long-term effects of hormones on her vocal chords, and softened skin. Notwithstanding that she is a woman, she is incarcerated in a men's prison because she is transgender.

This case challenges the daily brutalization she experiences from being wrongly incarcerated in a men's prison. She is forced while showering, and at other times, to reveal her naked body to male inmates who rightly view her as the only woman in their midst and treat her as a sex object, taunting her about her "boobs" and what they would like to do with her body; subjected to strip-searches by male correctional officers who lift and touch her breasts, including one particularly harrowing incident in which she was forced to strip naked in view of ten male inmates; and regularly denied the ability to live, function, and be recognized as a woman, which is the essential medical treatment for her condition (e.g., male guards refuse to call her by her female name or use female pronouns, refer to her as a "chick with a dick," and regularly tell her she is a man).

The consequences to her health and safety are dire. A corrections expert with 45 years of experience has concluded that Ms. Doe is at high-risk for physical and sexual assault potentially "escalating into a life and death situation" if she is not removed from the men's prison and appropriately housed in a female facility. Affidavit of James Aiken ("Aiken Aff."), at ¶¶ 10, 14 (discussed infra). A  psychologist with expertise in Gender Dysphoria evaluated Ms. Doe in

December 2017 and diagnosed her with Post Traumatic Stress Disorder and an anxiety disorder

as a direct result of incarceration in a men's prison, and warned that Ms. Doe's "mental health is

devolving" and she is at "risk for further emotional and physical decline" which may render her

unable to function at all.  Affidavit of Randi Ettner, Ph.D.[1] ("Ettner Aff."), ¶¶ 33, 37 (discussed

infra).

Ms. Doe brings claims under the Americans with Disabilities Act ("ADA"), the Federal

Rehabilitation Act ("FRA"), the United States Constitution (Equal Protection and Due Process)

and 42 U.S.C. § 1983 for redress of the correctional facility's refusal to properly place her in the

women's correctional facility and for denials of requests for reasonable modifications necessary

for treatment of her medical condition.[2]  The ADA and FRA, in particular, guarantee that the

ability of people with disabilities to function in society be based on medical judgment, not bias,

stereotypes, stigma, or unfounded beliefs. These laws recognize that people with medical

conditions often face barriers because policies and practices incorrectly presume that all human

bodies function the same. The fulfillment of their promise requires that social institutions,

including prisons, make reasonable accommodations when deeply entrenched policies and

practices interfere with a person's equal access to and inclusion in those institutions.

Ms. Doe's condition, Gender Dysphoria, is a quintessential stigmatized and

misunderstood health condition. The current scientific medical information relevant to her claim

is well-established: Ms. Doe is a woman, and the recognized medical treatment protocol for a

---

[1] Dr. Ettner is one of the nation's foremost experts on the diagnosis, treatment, and management of gender dysphoric individuals. She is the co-editor of a leading treatise in the field, Principles of Transgender Medicine (2007; 2d. ed. 2016), and is an officer and member of the board of directors of the leading professional association specializing in the treatment of gender variant people. Ettner Aff. ¶¶ 1-2.
[2] Plaintiff agrees to the dismissal without prejudice of her cognate state constitutional claims (Counts V, VI and VII).

woman with Gender Dysphoria requires that she live as a woman. Defendants, however, have acted at every turn in contravention of the medical, health and safety needs of Ms. Doe and have ignored her repeated requests that her medical condition be taken into account when enforcing prison policies.  Ms. Doe needs immediate relief from this Court. This Court should grant her motion for a preliminary injunction by ordering Defendants to: (1) transfer Jane Doe to MCI-Framingham; (2) enjoin Defendants from using male correctional officers to conduct strips searches of Jane Doe, except in exigent circumstances;  (3) enjoin Defendants from forcing Jane Doe to shower in the presence of men and with a shower curtain that does not adequately cover her; (4) enjoin Defendants from treating Jane Doe differently than other women held by the DOC; (5) train all staff on how to appropriately accommodate, treat and communicate with individuals with Gender Dysphoria within 60 days of this Order; (6) enjoin Defendants from using male pronouns when speaking to or about Jane Doe; (7) enjoin Defendants from referring to Jane Doe by her former male name (or any abbreviated version thereof); (8) refer to Jane Doe by her chosen female name; and (9) award such other and further relief as is just and proper.

## STATEMENT OF FACTS

### I.     Jane Doe is a Woman with a Diagnosis of Gender Dysphoria.

Jane Doe knew at a young age that she is a girl. Affidavit of Jane Doe ("Doe Aff.") ¶ 2. Although ascribed the sex of male at birth, Ms. Doe began wearing girls' clothes and playing with girls' toys at a young age. *Id.* ¶ 2.  As a teenager she adopted the female name she has used ever since. *Id.* She also sought and received medical care for the anguish she experienced as a result of the incongruence between her gender identity (i.e., her inner felt sense of being a woman) and the sex she was designated at birth. Doe Aff. ¶¶ 2-3; Ettner Aff. ¶¶ 6-11, 22. During her teenage years, she also began the process of gender transition that included hormone therapy to enable her to successfully live and function as a woman. Doe Aff. ¶ 3. She has been on

hormone therapy since that time. *Id.* ¶ 3. Ms. Doe has lived her entire adolescent and adult life as a woman; she was never socialized as a man. Ettner Aff. ¶ 29; *see also* Doe Aff. ¶¶ 4-6, 9.

Now, at age 53, Ms. Doe is, by the current scientific and medical understanding of sex, female. Ettner Aff. ¶¶ 24, 25 (explaining that current medical and scientific understanding of sex includes numerous components: genitals, chromosomes, gender identity, brain, and hormonal makeup). In addition, Ms. Doe has been taking "appropriate, confirming" female hormones for such a long time (almost four decades) that she has the same circulating sex steroids as a woman of similar age and testosterone levels that are barely measurable, also comparable to other women her age. *Id.* ¶ 27. Ms. Doe's hormone laboratory measurements indicate that she has been hormonally reassigned to female. *Id.* Consistent with Ms. Doe's long-time estrogen therapy, she has female secondary sex characteristics, including normal female breast development, redistribution of body fat consistent with a female shaped body, loss of muscle mass, female vocalization, and diminution of body hair. *Id.* ¶ 28. Ms. Doe's long-time estrogen therapy and lack of testosterone have also resulted in significant genital changes. *Id.* ¶ 30. If one were to view Ms. Doe naked, as correctional officers who strip-search her do, her genitals would not appear as typical male genitals. *Id.* Long-term female hormone therapy, especially when started at such a young age, creates significant atrophy and decreased mass of the genitals. *Id.* Nor would Ms. Doe have male genital function. *Id.* The hormonal changes would render her unable to have erections, produce ejaculate fluid, or engage in penetrative sex. *Id.* She would not be capable of reproduction. *Id.* ¶¶ 30-31.

Ms. Doe's diagnosis and course of medical care are long-established and recognized in the field of medicine. In terms of medical diagnosis, typically, persons born with the physical characteristics of males psychologically identify as men, and those with the physical

characteristics of females psychologically identify as women. *Id.* ¶ 4. However, for transgender individuals, the body and the person's gender identity – the elemental conviction of belonging to a particular gender that all people have – do not match. *Id.* ¶¶ 3-4. In 1980 the American Psychiatric Association introduced the diagnosis of gender identity disorder ("GID") in the third edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-III). This diagnosis remained in subsequent versions of the DSM issued in 1987 (DSM-III-R) and 1994 (DSM-IV). *Id.* ¶ 6. In 2013 the DSM removed the diagnosis of GID and replaced it with a fundamentally different diagnosis called Gender Dysphoria that is based on significant changes in our understanding of individuals whose assigned sex at birth does not match their gender identity. *Id.* ¶ 7. Importantly, consistent with the change in nomenclature, the new diagnosis reflects that the incongruence between a person's gender identity and birth sex is no longer by itself considered to be a disorder, but rather the critical element of the condition is the presence of clinically significant distress that results from such an incongruence. *Id.* ¶¶ 7, 10 (setting out diagnostic criteria).

Ms. Doe has long-standing early onset Gender Dysphoria. Although she was originally diagnosed with GID, consistent with the version of DSM in effect at the time, she meets all of the criteria for a diagnosis of Gender Dysphoria. *Id.* ¶ 22. *See also* Doe Aff. ¶ 7 (confirmation of diagnoses by Massachusetts Department of Correction).

DSM-V in 2013 also recognized that the medical research that supports the Gender Dysphoria diagnosis is different and discusses the genetic and hormonal contributions to Gender Dysphoria. Ettner Aff. ¶ 11. In fact, there is now a scientific consensus that gender identity is biologically based and a significant body of scientific research that Gender Dysphoria has a physiological and biological etiology that emanates from a different interaction of sex hormones

with the developing brain. *Id.* ¶¶ 11-14. The scientific evidence demonstrates different brain composition in transgender women and men, and a significant co-occurrence of Gender Dysphoria in families and twins. *Id.*

Without treatment, adults with Gender Dysphoria experience serious psychological debilitation (e.g., anxiety, depression, suicidality and other mental health issues). *Id.* ¶ 15. Fortunately, Gender Dysphoria is treatable by medically-recommended and supervised gender transition in order to ameliorate the debilitation of Gender Dysphoria and allow the individual to live a life consistent with one's gender identity. *Id.* ¶¶ 16-17. The protocol is contained in the World Professional Association for Health Standards of Care (7th version, 2011), which are endorsed by the nation's major medical and mental health organizations, and entail an individualized approach of one or more of four components: living consistent with one's gender; hormone therapy to feminize or masculinize the body; surgery to change primary and/or secondary sex characteristics; and psychotherapy. *Id.* ¶ 17. All of the standards are applicable to incarcerated persons. *Id.* ¶ 18.

II.   **Ms. Doe's Placement in a Male Correctional Facility Impedes the Medical Treatment for her Gender Dysphoria, Causes Extreme Psychological Damage, and Places Her at High Risk for Physical Violence and Sexual Assault.**

As Dr. Ettner has explained:

> A key component of medical treatment for gender dysphoric individuals is to live, function in society, and be regarded by others consistent with their gender identity. If any aspect of this social role transition is impeded, it will undermine an individual's core identity and psychological health . . . . The failure to treat a woman with Gender Dysphoria as a woman in an institutional setting will intensify gender dysphoria and psychological distress and precipitate psychological disorders.

*Id.* ¶¶ 19-20. In particular, Ms. Doe's Gender Dysphoria requires life-long medical care, including "the requirement that she live and function as a woman." *Id.* ¶ 23.

The placement of Ms. Doe in a male prison has resulted in inhumane conditions and severe harm caused by the refusal of prison officials to follow her medical protocol and treat her as a woman, and the resulting sexual harassment and intimidation by male inmates who rightly perceive her as the only woman in their midst. *See generally* Doe Aff. ¶¶ 12-23. Ms. Doe has, with rare exception, been denied access to a separate shower and forced to shower in areas where male prisoners view her naked body. *Id.* ¶¶ 12-17. She has frequently been forced to shower in stalls that can be watched from an upper tier where male prisoners routinely gather to see her naked and taunt her about her "boobs" and "shout out what they would like to do with [her] sexually." *Id.* ¶ 14. Currently and often throughout her incarceration she has been forced to shower in bathrooms open to men in a stall that has only a transparent curtain with an opaque strip intended to cover the genitals. But this leaves her torso, including her breasts, completely exposed to the bathroom's male occupants. *Id.* ¶¶ 14, 16 (noting that a fully opaque curtain she was afforded for a short while was taken down because a correctional officer told her "we're all men here"). Separate showers pose no threat to the security of the normal operations of the facility, and are in fact required by federal regulation.  (28 C.F.R. § 115.42(f)) ("[t]ransgender . . . inmates shall be given the opportunity to shower separately from other inmates")). Aiken Aff. ¶ 9.[3]

Ms. Doe has also endured regular strip searches by male guards who lift and touch her breasts. Doe Aff. ¶ 19. In one particularly cruel and harrowing circumstance, during an institution-wide lockdown, two male correctional officers entered Ms. Doe's cell and forced her

---

[3] Mr. Aiken has 45 years of experience in the administration, operation, and management of correctional facilities, including as the Commissioner of the Indiana Department of Correction. Aiken Aff. ¶ 1. He is distinguished by his Congressional appointment to the nine-member National Prison Rape Elimination Commission charged with developing standards that would lead to the prevention, detection and elimination of prison rape. *Id.* ¶ 3.

to strip naked for a search with her cell door open in full view of approximately 10 male prisoners who yelled "things at [her] about [her] body and things they would like [her] to do to them." *Id.* ¶ 21. There is no operational reason that a correctional system cannot arrange to have a female correctional officer strip-search Ms. Doe. Aiken Aff. ¶ 8.

Ms. Doe has also endured harassment and the refusal to acknowledge and treat her as a woman by correctional officers who are charged with her safety and welfare. They refuse to call her by her female name and use female pronouns when referring to her. Doe Aff. ¶ 25; Ettner Aff. ¶ 35 (appropriate female name crucial to psychological well-being). When Ms. Doe has asked for assistance securing a separate shower or with other concerns, she has been met with derision by correctional officers who ask whether she has a penis. Doe Aff. ¶ 17. Correctional officers make derogatory comments about her to other corrections personnel and other inmates, referring to transgender women as "chicks with dicks," and "wannabe women," and use other epithets such as "fags" and "homos." *Id.* ¶ 25. Since filing this lawsuit Ms. Doe has endured increased harassment. *See id.* ¶¶ 29-31.

Ms. Doe's continued placement in a male correctional facility places her at high risk for physical and sexual assault.  As Mr. Aiken explains:

> [C]ontinuing to house Ms. Doe in a male correctional facility creates an unnecessary perilous endangerment for her. Her placement in a male facility is the direct cause of Ms. Doe being the subject of systemic taunting, intimidation, harassment and violence, and needlessly subjects her to a very high risk of an event escalating into a life and death situation . . . . If prison officials do not remove her from this environment and place her in a proper setting, more intense perils are likely to occur.

Aiken Aff. ¶¶ 10, 14. *See also Id.* ¶ 4 (noting peril of housing in male facility "a person who lives and presents as a woman"). He concludes that "Ms. Doe's safety requires that she be transferred to a women's correctional facility to abate this clear, present and known endangerment issue." *Id.* ¶ 18.

Further, Ms. Doe has suffered severe psychological damage as a result of being in an environment that subjects her to a high risk of assault and rape, refuses to treat her as a woman, forces her to reveal her naked body to male prisoners, permits her to be strip-searched and have her breasts touched by men, and is permeated by taunts about her womanhood. Ettner Aff. ¶¶ 33-35. It is Dr. Ettner's assessment that Ms. Doe has developed Post Traumatic Stress Disorder and an Anxiety Disorder as a direct result of being housed in a male correctional facility. *Id.* ¶ 33.

Even more concerning, given what she has endured and continues to endure on a daily basis, Ms. Doe's "mental health is steadily devolving" and she is at "risk for further emotional and physical decline," including the risk that she will be "render[ed] . . . incapable of functioning, a condition known as psychological decompensation, which can be irremediable." *Id.* ¶ 37. *See also* Doe Aff. ¶¶ 13-14, 19, 31 (describing fear of being raped, nightmares, anxiety, the dehumanization of feeling like a sex object, and the terror of having male guards handling her breasts).

### III.    Ms. Doe will Function Well in a Female Correctional Facility.

Ms. Doe will function well and she will likely be symptom-free if placed in an appropriate facility and treated as a female. Ettner Aff. ¶ 39. She has lived her whole life as female, excluding periods of incarceration. *Id.* ¶ 40. Mr. Aiken, with his extensive experience in corrections, has opined that "[t]here is no basis to conclude that Ms. Doe's placement in a female correctional facility creates any security or management concern solely because she is a woman who is transgender." Aiken Aff. ¶ 19. The classification for risk of violence or any other concern must be based on an individualized assessment of risk. *Id.* ¶ 12. There is no danger that Ms. Doe will be physically or sexually assaultive to other inmates. Ettner Aff.  ¶¶ 41-42. Her psychological testing reveals low levels of anger or aggression, and no sexual concerns on any measure. *Id.* Mr. Aiken also concludes that there is nothing to suggest that Ms. Doe has any risk

factors assessed under objective criteria that would raise concerns about such a transfer. Aiken Aff. ¶ 18.

## ARGUMENT

### I.    STANDARD OF REVIEW.

The standards for a preliminary injunction are well established.  "A plaintiff seeking a preliminary injunction must establish that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest."  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted); *see also Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 115 (1st Cir. 2006); *Black Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004).  While all four factors support preliminary relief in this case, "[t]he first two factors are the most critical.  Both require a showing of more than mere possibility.  Plaintiffs must show a strong likelihood of success, and they must demonstrate that irreparable injury will be likely absent an injunction." *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010) (citing *Winter*, 555 U.S. at 21); *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012).

### II.    MS. DOE HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF HER CLAIMS.

#### A.    *Ms. Doe is Likely to Succeed on Her Claims under Title II of the ADA and Section 504 of the FRA in Counts I and II of the Complaint.*

Defendants have discriminated against Ms. Doe on the basis of her disability, Gender Dysphoria, by treating her differently than women without Gender Dysphoria who are properly placed in the female correctional facility; subjecting her to disadvantageous treatment in the male correctional facility; and failing to provide modifications to policies and practices that are necessary for the medical treatment of her Gender Dysphoria.

Title II of the ADA provides that:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. The substantive provisions of Title II of the ADA and § 504 of the FRA, 29 U.S.C. § 794, are similar:

> No otherwise qualified individual with a disability in the United States . . .shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

The standards of liability under the FRA have been considered identical to those under the ADA, and thus the claims are usually analyzed together.  *See, e.g.*, *Nat'l Ass'n of the Deaf v. Harvard Univ.*, 2016 WL 3561622, at *4 (D. Mass. Feb. 9, 2016), *report and recommendation adopted*, 2016 WL 6540446 (D. Mass. Nov. 3, 2016).[4] There is no dispute that these standards apply to a state prison. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998).

To state a claim under the ADA, a plaintiff must establish "(1) that [s]he is a qualified individual with a disability; (2) that [s]he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability."  *Cox v. Massachusetts Dep't of Corr.*, 18 F. Supp. 3d 38, 48–49 (D. Mass. 2014) (quoting *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000)); *Reaves v. Dep't of Corr.*, 195 F. Supp. 3d 383, 418 (D. Mass. 2016) (applying FRA to state prisons).

---

[4] Accordingly, plaintiff will analyze these claims under the ADA, with references to § 504 as appropriate.

1.      **Ms. Doe is an Individual with a Disability Under the ADA and FRA.**[5]

The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). Ms. Doe's Gender Dysphoria is squarely within all three prongs of the ADA's definition of disability.

For the first prong, Ms. Doe's Gender Dysphoria is both a physical and a mental impairment that substantially limits her major life activities of reproduction and caring for one's self.  Gender Dysphoria is a "physiological . . .condition . . . affecting . . . [the] endocrine [system]" because it is marked by an atypical interaction of sex hormones with the brain and, as a result, a person with Gender Dysphoria is born with circulating hormones inconsistent with their gender identity. *See* 28 C.F.R. § 35.108(b)(1)(i). Gender Dysphoria also meets the definition of a "mental or psychological disorder" in 28 C.F.R. § 35.108(b)(1)(ii) as a serious and debilitating psychiatric diagnosis.[6]

---

[5] Ms. Doe will establish that she is a "qualified" individual with a disability in Section 2, *infra*.

[6] Case law also supports that gender dysphoria is a serious disability subject to protection. *See, e.g.*, *Doe v. United States Postal Service*, 1985 WL 9446, at *2-3 (D.D.C. June 12, 1985) (holding that a transgender woman plaintiff "allege[d] the necessary 'physical or mental impairment' to state a claim" for disability under the Rehabilitation Act before the ADA was passed by Congress); *Blatt v. Cabela's Retail, Inc.*, 2017 WL 2178123, at *4 (E.D. Pa. May 18, 2017) (finding that Plaintiff's gender dysphoria "substantially limits her major life activities of interacting with others, reproducing, and social and occupational functioning" and thus is covered by the ADA); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 244 (D. Mass. 2012) (finding GID to be a "serious medical need" under the Eighth Amendment depending on the degree of severity.

In addition, Ms. Doe's Gender Dysphoria substantially limits her major life activities.[7] Ms. Doe's medical treatment for Gender Dysphoria has rendered her incapable of reproduction, Ettner Aff. ¶ 31, which is a substantial limitation on a major life activity under the ADA. *See Bragdon v. Abbott,* 524 U.S. 624, 639 (1998) ("reproduction is a major life activity"). She is also substantially limited in the major life activity of caring for one's self because her Gender Dysphoria requires that she follow a lifelong medical protocol. *See* Ettner Aff. ¶¶ 16-20; *United States v. Happy Time Day Care Ctr.*, 6 F. Supp. 2d 1073, 1080-81 (W.D. Wis. 1998) ("[c]aring for oneself" is one of the enumerated examples of "major life activities, and describing the lifelong need for medical care for HIV when looked at over an extended period of time as a "major life activity" under the ADA). *See also* 42 U.S. C. § 12102(2)(B) (major life activity "includes the operation of a major bodily function, including . . . endocrine, and reproductive functions").[8]

For the second prong, Ms. Doe clearly has a "record of such an impairment," as she was diagnosed with Gender Dysphoria decades ago, a diagnosis that has been confirmed by correctional officials in previous incarcerations. Doe Aff. ¶¶ 2, 7.

Finally, for the third prong, Congress clarified in 2008 in the ADAAA that under the "regarded as" prong, a plaintiff need only demonstrate adverse action on the basis of an

---

[7] The findings and purposes of the ADA Amendments Act of 2008 ("ADAAA") explicitly reject the notion that these terms "'need to be interpreted strictly to create a demanding standard for qualifying as disabled'." 42 U.S.C. § 12101, Pub. L. No. 110-325, 122 Stat 3553 (quoting *Toyota Motor manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002)).

[8] In concluding that Ms. Doe's Gender Dysphoria is a disability, the Court must be mindful that "[t]he definition of disability in [the ADA] shall be construed in favor of broad coverage of individuals under this Act" (42 U.S.C. § 12102(4)(A), Pub. L. No. 110-325, § 3 (4)(A), 122 Stat 3553) and that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." 42 U.S.C. § 12101 (b)(5), Pub. L. No. 110-325, § 2(b)(5), 122 Stat 3553.

impairment, here Ms. Doe's Gender Dysphoria. *See* 42 U.S.C. § 12102(3)(A) ("An individual

meets the requirement of 'being regarded as having such an impairment' if the individual

establishes that he or she has been subjected to an action prohibited under this chapter because of

an actual or perceived physical or mental *impairment* whether or not the impairment limits or is

perceived to limit a major life activity") (emphasis added); ADAAA, Pub. L. No. 110-325, §

2(b)(3), 122 Stat. 3553 (2008) (reinstating "broad view of the third prong" of the definition of

disability); 28 C.F.R. § 35.108(a) (2)(iii) (no showing of substantial limitation required under

regarded as prong). *See* Sec. A(2), *infra,* for a discussion that Ms. Doe has been subjected to

discrimination on an action prohibited by the ADA.

### 2.     Ms. Doe Has Been Subjected to Discrimination by Reason of her Gender Dysphoria in Violation of Title II of the ADA and § 504 of the FRA.

Title II of the ADA and § 504 of the FRA contain broad, all-encompassing prohibitions

of discrimination by public entities. *See* 42 U.S.C. § 12132; 28 U.S.C. § 794(a). These

prohibitions are not limited to exclusion from specific programs, activities, or services of a

prison. Rather, the phrase "or be subjected to discrimination by any such entity" makes plain that

"the language of Title II's anti-discrimination provision does not limit the ADA's coverage to

conduct that occurs in the 'programs, services, or activities.' . . .  [I]t is a catch-all phrase that

prohibits all discrimination by a public entity, regardless of context." *See Innovative Health*

*Systems, Inc. v. City of White Plains*, 117 F.3d 37, 44-45 (2d Cir. 1997), *superseded on other*

*grounds by Zervos v. Verizon N.Y.*, 252 F.3d 163 (2d Cir. 2001); *Nattiel v. Tomlinson*, 2017 WL

5799233, at *5-7 (N.D. Fla. July 13, 2017).[9]

---

[9] *See also Noel v. N.Y. City Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) ("[T]he phrase 'services, programs or activities has been interpreted to be a 'catch-all phrase that prohibits all discrimination by a public entity.'"); *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) ("Although incarceration is not a program or activity . . . showers made available to inmates are."); *Hason v. Med. Bd. Of California*, 279 F.3d 1167, 1172-73 (9th Cir.

Ms. Doe has a strong likelihood of success on her claim that she has been "subjected to discrimination . . . by reason of her disability [Gender Dysphoria]" under the statutory prohibition of disparate treatment." Ms. Doe is a woman. The differential treatment Ms. Doe has experienced as a woman with Gender Dysphoria is flagrant. All women – except those with Gender Dysphoria – are given access to and housed in the women's prison. This is plainly discrimination "by reason of" Ms. Doe's Gender Dysphoria. *See, e.g., Henderson v. Thomas*, 913 F.Supp. 2d 1267, 1276 (M.D. Ala. 2012) (determining that Alabama Department of Corrections excluding HIV-positive inmates from all prison and work-release facilities except for one violated ADA and FRA).

Ms. Doe is a "qualified individual with a disability" with respect to her appropriate placement in a female correctional facility because she is female. [10] As Dr. Ettner explained, current medical and scientific understanding of transgender identity recognizes that a person's sex includes numerous components, including genitals, chromosomes, gender identity, brain, and hormonal makeup. Ettner Aff. ¶¶ 24-25. Ms. Doe has a female gender identity, completed hormonal reassignment to female and has lived consistently as a female from her teens to her current age of 53. *Id.* ¶¶ 27-30. Ms. Doe's Gender Dysphoria does not alter the conclusion that nearly 40 years after undergoing gender transition, she is female. *Id.* ¶ 24.

---

2002) ("[T[he ADA's broad language brings within its scope anything a public entity does."); *Yeskey v. Com. of Pa. Dep't of Corr.*, 118 F.3d 168, 170-71 (3rd Cir. 1997), *aff'd sub nom*, *Pennsylvania Dept. of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("[t]he statutory definition of '[p]rogram or activity' in Section 504 indicates that the terms were intended to be all-encompassing," and broadly interpreting Section 504 and Title II of the ADA to 'appl[y] to anything a public entity does").

[10] Under Title II, the term "qualified individual with a disability means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices … meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 28 C.F.R. § 35.104; *see also* 28 C.F.R. § 42.540(l) (2) (definition of qualified individual under FRA).

The flip side of the exclusion from the women's prison is that Ms. Doe has necessarily been subjected to disadvantageous treatment in a male correctional facility because of her Gender Dysphoria. By virtue of her diagnosis and its medical treatment, Ms. Doe has a female gender identity and a female body.  As a result, she is treated disadvantageously relative to other inmates housed at MCI-Norfolk who do not suffer from Gender Dysphoria. For example, Ms. Doe is subjected to sexualized harassment, violations of privacy, and increased risk of sexualized violence. When she is strip-searched by male correctional officers, her breasts are groped. Inmates without Gender Dysphoria placed in the men's correctional facility at MCI-Norfolk do not experience these adverse consequences because they have the same gender identity as the correctional officers who search them, but Ms. Doe does because she is a person with a female gender identity and female body – i.e., she has Gender Dysphoria.

Ms. Doe is also likely to prevail on her claim that defendants' apparent practice of using a person's genital status or assigned birth sex as a criterion for the gender-based housing classifications has a disparate impact on inmates with Gender Dysphoria. The language and legislative history of Title II prohibit policies or practices that have the effect of discriminating against an individual with a disability. *See Wis. Cmty. Servs. v. City of Milwaukee,* 465 F.3d 737, 753 (7th Cir. 2006) (en banc) ("defendant's rule disproportionally impact[ing] disabled people" actionable under Title II); *Crowder v. Kitagawa*, 81 F.3d 1480, 1483-1484 (9th Cir. 1996) (discussing Congressional intent to "cover both intentional discrimination and discrimination as a result of facially neutral laws" that "deny disabled persons public services disproportionately due to their disability"); *Ability Ctr. of Greater Toledo v. City of Sandusky*, 181 F. Supp. 2d 797, 800 (N.D. Ohio 2001) ("The Statutory language prohibiting discrimination and the definition of a 'qualified individual with a disability' do not necessarily require an intent to discriminate . . .

16

[but include] taking action that has the effect of discriminating against an individual with a disability").[11]

Once Ms. Doe makes a prima facie case establishing that defendant's actions or policies cause a disparate impact, a defendant may "explain the valid interest served by their policies." *See Texas Dep't of Housing and Cmty. Affairs v. Inclusive Communities Project*, 135 S. Ct. 2507, 2522 (2015) (in context of Fair Housing Act). If a defendant successfully does so, the plaintiff must then show "an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs." *Id.* at 2518 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009)).

A policy based solely on a person's genitalia, anatomy, or assigned birth sex disadvantages inmates with Gender Dysphoria whose treatment does not include genital surgery. Inmates with Gender Dysphoria who have not had genital surgery are, unlike other inmates, placed in correctional facilities contrary to their gender and their required medical treatment protocol and accordingly are subjected to harassment, severe psychological harm, and risk of sexual assault. Further, defendants cannot assert a "valid interest" served by any policy or practice exclusively and categorically based on anatomy, genital status, or assigned birth sex where such a policy itself violates Federal regulations. The Department of Justice regulations on housing transgender inmates reject any categorical rule and instead provide that "[i]n deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in

---

[11] A helpful discussion of the availability of disparate impact theory under Title II is contained in Margo Schlanger, *How the ADA Regulates and Restricts Solitary Confinement for People with Mental Disabilities*, AM. CONST. SOC'Y FOR L. & POL'Y , May 2016, at 6-7.  Professor Schlanger notes that the ADA's Title II regulations include language that supports a disparate impact theory of liability. *Id.* ("The ADA's Title II regulations include two uses of the word 'effect,' which unambiguously reference a disparate impact theory of liability") (citing 28 C.F.R. §§ 35.130(b)(3)(i)-(ii)).

making other housing and programming assignments, the agency shall consider on a case-by-case-basis whether a placement would ensure the inmate's health and safety, and whether the placement would prevent management or security problems." 28 C.F.R. § 115.42 (c).

Indeed, Ms. Doe presents the quintessential example of why the health and safety of a female with Gender Dysphoria require placement in the women's correctional facility. *See* Ettner Aff. ¶¶ 19-20, 23-27, 33-42; Aiken Aff. ¶¶ 10, 14, 18-19. The facts of this case underscore that there is no alternative to placement in a women's correctional facility that would adequately protect Ms. Doe's health and safety and that would not interfere with her medical care.

Finally, Ms. Doe has a strong likelihood of prevailing on her claim that that she has been denied reasonable modifications to policies and procedures necessary for her Gender Dysphoria. Title II regulations require that:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F. R. § 35.130 (b) (7)(i); *see also* 29 C.F.R. § 1614.203(d)(3). The denial of a requested modification necessary to implement a medical treatment protocol violates this provision. For example, in *Lonergan v. Fla. Dep't of Corr.*, 623 F. App'x 990 (11th Cir. 2015), a dermatologist ordered that an inmate with pre-cancerous skin lesions be provided a hat, sunblock, and be kept out of the sun. *Id.* at 991. Plaintiff requested, among other things, a transfer to a prison where no required activities are conducted outdoors in the sun. *Id.* The Eleventh Circuit reinstated plaintiff's "reasonable accommodation" claim, noting that "in the context of the ADA, a prisoner's transfer from or to a particular prison may become relevant when prison officials attempt to determine what constitutes a 'reasonable accommodation.'" *Id.* at 993-94. In addition, it noted that the "plaintiff successfully alleges more than the mere disagreement with his medical

18

treatment. He seeks the treatment recommended by his dermatologist." *Id.* at 994. *See also Tomlinson*, 2017 WL 5799233, at *5-7 (N.D. Fla. July 13, 2017) (plaintiff with asthma successfully alleged substantial risk of injury that other inmates were not subjected to by failure to provide reasonable accommodation to forego use of chemical agents in restraint); *Levesque v. State of New Hampshire*, 2010 WL 2367346, *34 (D.N. H. May 12, 2010) (claim for disabling skin condition requires provision of special footwear and access to showers sufficient to maintain certain level of cleanliness).

Ms. Doe's requested modifications that she be placed in a female correctional facility, be provided with privacy in showering and other areas, and be referred to and recognized as a woman (Doe Aff. ¶ 10) are all, as set forth above, necessary medical care and essential to avoid the profound psychological harm she has experienced due to being a person with Gender Dysphoria placed in a male prison. There is nothing in these requested reasonable modifications that would entail any fundamental alteration of defendant's correctional system. *See supra* STATEMENT OF FACTS Section III, discussing placement of a female in a female correctional facility; Aiken Aff. ¶¶ 7-8 (no operational reason a correctional system cannot have a female staff member strip search Ms. Doe); ¶ 9 (noting 28 C.F.R. § 115.42 (f) requires that "transgender inmates shall be given the opportunity to shower separately from other inmates" and finding no justification for failing to implement this provision). Defendants have unlawfully denied Ms. Doe reasonable modifications to its policies and procedures necessary to address her Gender Dysphoria.

### 3.   Gender Dysphoria is Not Excluded from the ADA.

Ms. Doe's ADA claim based on Gender Dysphoria is not foreclosed because the statute and its regulations "specifically exclude . . . *gender identity disorders not resulting from physical impairments*."  Any argument for precluding Ms. Doe's claim based on the GIDs exclusion finds

no support in the text of the ADA, disregards the plain langauge of the statute, and therefore is

not a reasonable interpretion of the ADA.  But even if it were, such an interpretation results in a

categorical exclusion of transgender people from coverage under the ADA, violates

constitutional guarantees of equal protection, and should be avoided under basic principles of

statutory interpretation.

> *a.*      ***No Exclusion for Gender Dysphoria Appears Anywhere in the Text of the ADA.***

There is no statutory exclusion for Gender Dysphoria and gender identity disorder is not

the same as Gender Dysphoria.  While exclusions from the ADA's definition of disability refer

to "gender identity disorders," ("the GIDs exclusion")**,** 42 U.S.C. § 12211(b), they are silent as to

Gender Dysphoria.  Gender Dysphoria is different from gender identity disorder in key ways; the

two diagnoses are not the same.  Ettner Aff. ¶ 7.

The replacement of the diagnosis of gender identity disorder with Gender Dysphoria in

the DSM-V was more than semantic; it reflects a substantive difference between the medical

conditions themselves. *Id.*  Unlike the outdated diagnosis of gender identity disorder, the

hallmark or presenting feature of Gender Dysphoria is ***not*** a person's gender identity.  Rather, it

is the clinically significant distress, termed dysphoria, that some people experience as a result of

the mismatch between a person's gender identity and their assigned sex. *Id.*

Reflecting this distinction, the diagnostic criteria for Gender Dysphoria in the DSM-V are

different than those for gender identity disorder.  Gender identity disorder had been characterized

by a "strong and persistent cross-gender identification" and a "persistent discomfort" with one's

sex or "sense of inappropriateness" in the gender role of that sex.  *See* DSM-IV at 581.  In

contrast, Gender Dysphoria is defined as a "marked incongruence" between gender identity and

assigned sex, rather than a cross-gender identification *per se*.  DSM-V at 452; *see also id.* at 814

(stating that DSM-V "emphasiz[es] the phenomenon of 'gender incongruence' rather than cross-gender identification per se, as was the case in DSM-IV gender identity disorder").

The criteria for Gender Dysphoria, unlike gender identity disorder, also include a "post-transition specifier for people who are living full-time as the desired gender." *See* AMERICAN PSYCHIATRIC ASSOCIATION, *GENDER DYSPHORIA* 1 (2013), https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/APA_DSM-5-Gender-Dysphoria.pdf. The specifier was "modeled on the concept of full or partial remission," recognizing that treatment can relieve the distress associated with the diagnosis, but that someone who undergoes gender transition, putting them in remission, can still have a Gender Dysphoria diagnosis. DSM-V at 815. Significantly, this substantive change means there are people with Gender Dysphoria that would not meet the criteria for gender identity disorder, underscoring that Gender Dysphoria is a different diagnosis.

Lastly, the removal of the diagnosis of GID and inclusion of the diagnosis of Gender Dysphoria reflects changed understanding of the underlying medical condition. Ettner Aff. ¶ 11. "Unlike DSM's treatment of GIDs, the DSM-5 includes a section entitled 'Genetics and Physiology,' which discuss the genetic and hormonal contributions to Gender Dysphoria." *Id. See also* Christine Michelle Duffy, *The Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973*, *in* GENDER IDENTITY AND SEXUAL ORIENTATION DISCRIMINATION IN THE WORKPLACE: A PRACTICAL GUIDE 16-72 to 16-74 & n.282 (Christine Michelle Duffy ed., Bloomberg BNA 2014) [hereinafter "Duffy"] (citing numerous medical studies conducted in past eight years that "point in the direction of hormonal and genetic causes for the in utero development of Gender Dysphoria").

Therefore, even if the GIDs exclusion could be interpreted to exclude all persons with *gender identity disorder* from bringing claims, it does not apply to persons like Ms. Doe with *Gender Dysphoria*, a new and distinct diagnosis.[12]

b.      **Even if Gender Dysphoria is a GID, the ADA's GIDs Exclusion Does Not Apply to All Claims Based on that Condition.**

The ADA only excludes "gender identity disorders *not resulting from physical impairments*." 42 U.S.C. § 12211(b)(1) (emphasis added). Therefore, even if this Court were to disregard the significant differences between gender identity disorder and Gender Dysphoria, and determine that the two are somehow the same or equivalent, Ms. Doe has a strong likelihood of success because she can establish that her medical condition results from a physical impairment. *Id.*

"There is now a scientific consensus that gender identity is biologically based and a significant body of scientific and medical research that Gender Dysphoria has a physiological and biological etiology."  Ettner Aff. ¶ 12. *See also, e.g.*, Duffy at 16-72 to 16-74 & n.282; Aruna Saraswat, MD, Jamie D. Weinand, BA, BS & Joshua D. Safer, MD, *Evidence Supporting the Biologic Nature of Gender Identity*, 21 ENDOCRINE PRACTICE 199, 199-202 (Feb.2, 2015) (providing a review of data in support of a "fixed, biologic basis for gender identity" and concluding that "current data suggest a biologic etiology for transgender identity").  As Dr. Ettner states: "It has been demonstrated that transgender women, transgender men, non-

---

[12] Recently faced with the same argument presented in Defendants' motion to dismiss, the Eastern District of Pennsylvania advanced a separate reason for why the GIDs Exclusion does not apply to Gender Dysphoria.  The GIDs Exclusion, the court stated, "refer[s] to only the condition of identifying with a different gender, [and does] not . . . encompass (and therefore exclude from ADA protection) a condition like . . . gender dysphoria, which goes beyond merely identifying with a different gender and is characterized by clinically significant stress and other impairments that may be disabling."  *Blatt*, 2017 WL 2178123, at *2.  Simply put, the GIDs Exclusion "exclude[es] certain sexual identities from the ADA's definition of disability" – not the "disabling conditions that persons of those identities might have."  *Id.* at *3.

transgender women, and non-transgender men have different brain composition, with respect to the white matter of the brain, the cortex (central to behavior), and subcortical structures." Ettner Aff. ¶ 12 (citing to scientific studies). "It is now believed that Gender Dysphoria evolves as a result of the interaction of the developing brain and sex hormones." *Id. ¶*14.

The United States Justice Department ("DOJ") is in accord with this view and has taken the position that individuals with Gender Dysphoria are not precluded from bringing claims under the ADA. *See* Second Stat. of Int. of the U.S., *Blatt v. Cabela's Retail, Inc.*, 2015 WL 9872493 (November 16, 2015 E.D. Pa.); Stat. of Int. of U.S. at 2-3, *Doe v. Dzurenda*, No. 3:16-CV-1934 (D. Conn. Oct. 27, 2017), ECF No. 57; Stat. of Int. of U.S. at 2-3, *Doe v. Arrisi*, No. 3:16-cv-08640 (D.N.J. July 17, 2017), ECF No. 49. As the DOJ explains:

> While no clear scientific consensus appears to exist regarding the *specific* origins of gender dysphoria (*i.e.*, whether it can be traced to neurological, genetic, or hormonal sources), the current research increasingly indicates that gender dysphoria has physiological or biological roots. . . . In light of the evolving scientific evidence suggesting that gender dysphoria may have a physical basis, along with the remedial nature of the ADA and the relevant statutory and regulatory provisions directing that the terms "disability" and "physical impairment" be read broadly, the GID Exclusion should be construed narrowly such that gender dysphoria falls outside its scope.

Second Stat. of Int. of the U.S., *Blatt*, 2015 WL 9872493 (November 16, 2015 E.D. Pa.) (emphasis added).

Because plaintiff can show that Gender Dysphoria results from a physical impairment, Defendants cannot rely on the GIDs exclusion to refute her claim.

   *c.*    ***The GIDs Exclusion is a Transgender and Sex-Related Classification that Violates the Equal Protection Clause under the Fourteenth Amendment to the Constitution.***

Under well-settled law, courts must, where possible, construe statutes to avoid rendering them unconstitutional. *United States v. Dwinells*, 508 F.3d 63, 70 (1st Cir. 2007) ("between two

plausible constructions of a statue, an inquiring court should avoid a constitutionally suspect one in favor of a constitutionally uncontroversial alternative").  The GIDs exclusion cannot be interpreted to create a sweepingly broad and discriminatory exclusion from the ADA's protection for transgender people.  Such class-based discrimination against a discrete and insular minority is inherently suspect and triggers strict scrutiny.  At a minimum, because it is discrimination based on a person's sex or gender identity, it is subject to intermediate review.  And where, as here, the basis for the exclusion is animus, the exclusion fails under any level of review.

Policies that target transgender individuals constitute a suspect classfication under the United States Supreme Court's four-factor test and are therefore, subject to strict scrutiny.  First, "hostility and discrimination that transgender individuals face in our society today is well-documented."  *Brocksmith v. United States*, 99 A.3d 690, 698 n.8 (D.C. 2014); *see also Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *Doe 1 v. Trump*, 2017 WL 4873042, at *27 (D.D.C. Oct. 30, 2017) ("As a class, transgender individuals have suffered, and continue to suffer, severe persecution and discrimination."); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) ("There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity."); Prison Rape Elimination Act, 28 C.F.R. § 115.5-501 (acknowledging "the particular vulnerabilities of inmates who are LGBTI or whose appearance or manner does not conform to traditional gender expectations").  Second, the incongruence transgender people experience between their assigned sex and gender identity "bears no relation to ability to contribute to society."  *Adkins*, 143 F. Supp. 3d at 139; *Trump*, 2017 WL 4873042, at *27 ("the Court is aware of no argument or evidence suggesting that being transgender in any way limits one's ability to contribute to society").  Third, being transgender is an immutable distinguishing

characteristic that is core to a person's identity.  *Adkins*, 143 F. Supp. 3d at 139.  And fourth, transgender people are a minority at 0.6% of the adult population and lack political power.  *Id.* at 139; *Trump*, 2017 WL 4873042, at *27 ("transgender people as a group represent a very small subset of society lacking the sort of political power other groups might harness to protect themselves from discrimination").

Apart from the four factor test, a construction of the statute that excludes all transgender people warrants heightened scrutiny because a transgender classification is sex-based.  *See Trump*, 2017 WL 4873042, at *28 ("well-established that gender-based discrimination includes discrimination based on non-conformity with gender stereotypes.") (citation omitted); *Schwenk v Hartford*, 204 F.3d 1187, 1200-02 (9th Cir. 2000) (holding that discrimination based on a person's transgender status is sex-based discrimination); *Whitaker*, 858 F.3d at 1051 (applying heightened scrutiny in case brought by transgender student challenging school bathroom policy); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (holding that discrimination against a transgender individual because of her gender-nonconformity is sex discrimination); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 577 (6th Cir. 2004) (same); *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016) (same); *Schroer v. Billington*, 577 F. Supp. 2d 293, 308 (D.D.C. 2008) (discrimination against transgender woman was "literally discrimination 'because of . . . sex'").  A wall of established precedent recognizes that transgender-based classifications are subject to heightened review.[13]

---

[13] *See, e.g.*, *Stockman v. Trump*, No. EDCV 17-1799 JGB (KKx) (C.D. Cal. Dec. 22, 2017); *Karnoski v. Trump*, 2017 WL 6311305, at *7 (W.D. Wash. Dec. 11, 2017); *Stone v. Trump*, 2017 WL 5589122, at *15 (D. Md. Nov. 21, 2017); *Adkins*, 143 F. Supp. 3d at 139-40 (S.D.N.Y. 2015); *Bd. Of Educ. Of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 872-77 (S.D. Ohio 2016); *Trump*, 2017 WL 4873042, at *27-28 (holding the transgender community satisfies the criteria for heightened review); *Evancho v. Pine–Richland Sch. Dist.*, 237 F.Supp.3d 267, 288 (W.D. Pa. 2017) (holding that "all of the indicia for the

Circuit courts agree that transgender discrimination is sex-based whether because it reflects sex-stereotypes, or because the root of the discrimination is based on a person's change of sex or assigned sex at birth.  *See, e.g.*, *Rosa v. Park W Bank Trust Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000).  The First Circuit was among the first to recognize that disparate treatment against a person for being transgender or having a gender identity that does not match a person's assigned birth sex is sex-based.  *See Rosa*, 214 F.3d at 215-16.  Numerous circuits have since agreed, often citing the First Circuit's case in support.  *See, e.g.*, *Whitaker*, 858 F.3d at 1049 (7th Cir.); *Glenn*, 663 F.3d at 1317 (11th Cir.); *Smith*, 378 F.3d at 574 (6th Cir.).

Accordingly, at a mininimum, to defend a broad construction of the ADA exclusion, Defendants would have to show that there is an important or exceedingly persuasive justification for the exclusion of transgender people from the ADA's scope and that the exclusion is substantially related to that interest.  Because there is not even a legitimate interest in excluding transgender people from the law's protection, much less an important or compelling one, an interpretation of the GIDs exclusion that sweeps in all claims by transgender indviduals based on a related health condition, fails review.

The GIDs exclusion also fails under any level of review because it reflects animus toward a disfavored group.  The legislative history associated with the GIDs exclusion is replete with evidence of animus, including statements that erroneously equate medical conditions associated with being transgender with moral failure.  *See, e.g.*, 135 Cong. Rec. S10734-02, 1989 WL 183115 (daily ed. Sep. 7, 1989) (statement of Sen. Armstrong) ("I could not imagine the [ADA] sponsors would want to provide a protected legal status to somebody who has such [mental] disorders, particularly those [that] might have a moral content"); *id.* at S10765-01, 1989 WL

---

application of the heightened intermediate scrutiny standard are present" for transgender individuals).

183216 (statement of Sen. Helms) ("What I get out of all of this is here comes the U.S.

Government telling the employer that he cannot set up any moral standards for his business");

*see also id.* (statement of Sen. Rudman) ("In short, we are talking about behavior that is immoral,

improper, or illegal and which individuals are engaging in of their own volition, admittedly for

reasons we do not fully understand.").[14]

Such moral animus against transgender people is plainly insufficient to constitute a

compelling, important, or even legitimate governmental interest.  *See Romer v. Evans*, 517 U.S.

620, 634-35 (1996) (concluding that "a bare . . . desire to harm a politically unpopular group

cannot constitute a *legitimate* governmental interest" – much less a compelling or important one)

(quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)) (emphasis in original).  For

that reason alone, Defendants' proposed construction cannot survive review.

> **B.      Ms. Doe is Likely To Succeed on the Merits of Her Equal Protection Claim
> Under the Fourteenth Amendment and U.S.C. § 1983 in Counts III and VIII of
> the Complaint.**

Ms. Doe is a transgender woman who is housed in a men's facility. Doe Aff. ¶¶  2-3, 7-9;

Ettner Aff. ¶ 22.  She was told that she could not be transferred to the women's facility because

she has not had genital surgery.  Doe Aff. ¶ 27.  As a result, unlike other women prisoners in

DOC facilities, she is strip-searched by male correctional officers, and made to shower and use

toilet facilities in the presence of and under the gaze of men.  *Id.* ¶¶ 12-21.  Inmates without

Gender Dysphoria throughout DOC facilities and who are not transgender are not subjected to

the kinds of sexual harassment, violation, and indignities that result from being a transgender

inmate housed exclusively based on the individual's birth sex or genitals without regard to the

---

[14] *See also* Kevin M. Barry et al., *A Bare Desire to Harm: Transgender People and the Equal
Protection Clause*, 57 B.C. L. Rev. 507, 574 (2016) ("Senators Armstrong, Helms, and Rudman
repeatedly invoked immorality as the justification for the transgender exclusions, decrying the
ADA's coverage of "sexually deviant behavior.").

person's gender identity or the fact of having undergone gender transition.  As set forth above, *see* ARGUMENT Section II.A.3.c, because DOC's policy regarding prison placement discriminates against transgender inmates, it is subject to heightened scrutiny.

DOC's placement policy cannot satisfy any level of review, much less the heightened review that is required here.  DOC has done no individualized assessment to determine where Ms. Doe should be placed and there is no justification that survives constitutional scrutiny for categorically placing transgender women in men's prisons, without regard to their individual circumstances.  Transgender women such as Ms. Doe pose no unique safety threats to other women. Aiken Aff. ¶¶ 12, 19. And because DOC has not done an individualized review of Ms. Doe's placement, it can hardly be heard to justify its placement decision based on safety.  Nor could it. *Id.* ¶¶ 11-12.

DOC's blanket policy of placing transgender inmates based on their assigned birth sex or genitals does not serve a compelling, important, or even legitimate purpose.  Accordingly, Ms. Doe has a likelihood of succeeding on her equal protection claim.

## C.     Ms. Doe is Likely to Succeed on the Merits of Her Due Process Claims Under the Fourteenth Amendment and 42 U.S.C. § 1983 in Counts IV and VIII of the Complaint.

Finally, Ms. Doe is likely to succeed on her procedural and substantive due process claim.  First, Ms. Doe's liberty interest in not being confined in a men's prison, with the constant affront to her very existence and the unique unending risk of harm that such confinement entails, gives rise to a procedural due process claim.  State regulations create a liberty interest if they impose a form of restraint that represents an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).  Such is undeniably the case here.  The ongoing harms and heightened potential for victimization that come with being a woman housed in a men's prison give rise to a liberty interest,

particularly where such placement is indefinite, and where Ms. Doe's placement in the men's prison is not necessary for safety. *See Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (indefinite placement in supermax facility, even if facility's conditions are necessary, gives rise to liberty interest in avoiding such placement).

Even if state regulations did not already create a liberty interest, Ms. Doe would still have one because the restraint in question – requiring her to be housed in a men's prison where it is foreseeable that she would be openly discriminated against, harassed and threatened – clearly creates an "atypical and significant hardship" on Ms. Doe that so exceeds "the normal incidents of prison life" that it gives rise to due process protection by its own force. *Sandin*, 515 U.S. at 484. Her confinement in a male facility, and the consequences that flow from it, implicate due process because of the atypical hardship it imposes on her and the departure it represents from the experiences of other prisoners. *See id.* (citing cases finding due process protection in transfer to mental hospital or involuntary administration of psychotropic medication to prisoner).[15]

Where there is a liberty interest, the question in a procedural due process claim is whether the process afforded to the plaintiff is sufficient. In Ms. Doe's case, where there was no individualized consideration of her placement, there is not. Ms. Doe is faced with an administration that has categorically rejected her requests to be considered for placement at MCI-Framingham, the DOC's facility for female prisoners, Doe Aff. ¶ 27, and has otherwise allowed Ms. Doe to be subjected to discrimination and harmful treatment as described above, *see, e.g.*, Doe Aff. ¶ 23-26. DOC policy requires case-by-case assessments of housing

---

[15] The DOC's own policy acknowledges how unusual Ms. Doe's circumstances are. *See* Massachusetts Department of Correction: Identification, Treatment and Correctional Management of Inmates Diagnosed with Gender Dysphoria, 103 DOC 652, Att. B ("Risk of Victimization" factors on internal housing form include "Is or perceived to be transgender, intersex, Gender Dysphoria . . .").

assignments with consideration of, *inter alia*, individual safety, criminal and disciplinary history, treatment needs, and vulnerability to sexual victimization, as well as the prisoner's own views concerning her safety.  103 DOC 652.09(A).[16]  By showing that her housing requests received no individualized consideration, *see* Doe Aff. ¶ 27, in violation of DOC's own rules, Ms. Doe has a likelihood of success on her procedural due process claim.

Second, the persistent sexual harassment and constant affront to her long-standing identity as a woman that Ms. Doe experiences, as a direct result of her placement in a men's prison, supports a likelihood of success on her substantive due process claim.  To place a woman in a men's prison, subjecting her to a known increased risk of sexual harm and to intentionally place her in an environment that inherently denies her the identity-affirming treatment required by her Gender Dysphoria is the type of government action that is clearly improper "regardless of the fairness of the procedures" afforded to her.  *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 880 (1st Cir. 2010) (quoting *Daniels v. Williams*, 424 U.S. 327, 331 (1986)).  Government action violates substantive due process if it is "so egregious, so outrageous, that it may fairly be said to shock the conscience."  *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).  The established facts in this case including Ms. Doe being regularly sexually violated, harassed, and objectified (Doe Aff. ¶¶ 2-20; 23-24; 28-31) readily meets the standard.

### III.   PRELIMINARY RELIEF IS NECESSARY TO PREVENT IMMEDIATE AND IRREPARABLE HARM TO MS. DOE.

The irreparable harm that Ms. Doe experiences, and will continue to experience in her current circumstances and without transfer to a female correctional facility, is harrowing. She has been diagnosed with Post Traumatic Stress Disorder and Generalized Anxiety Disorder as a

---

[16] This policy closely tracks, and presumably is intended to adhere to, federal regulations implementing the Prison Rape Elimination Act.  *See* 28 C.F.R. § 115.42; 103 DOC 519.02 ("The Department shall embrace the [PREA] standards").

result of her placement in a men's prison and the violations and indignities she has endured

there, and "if she remains in a male prison under current conditions, she is at risk for further

emotional and physical decline . . . [including] a condition known as psychological

decompensation" which "render[s] an individual incapable of functioning . . . which can be

irremediable." Ettner Aff. ¶¶ 33, 37. Housing her in a men's prison also "creates an unnecessary

perilous endangerment for her . . . [and subjects her to] high-risk for violence, including sexual

violence . . . [including] a very high risk of an event escalating into a life and death situation,"

Aiken Aff. ¶¶ 10, 16.

     Ms. Doe will also suffer an additional form of irreparable harm absent an injunction: the

continued deprivation of her constitutional rights.  *See Vaqueria Tres Monjitas, Inc. v. Irizarry*,

587 F.3d 464, 484 (1st Cir. 2009) (finding irreparable harm for "long-standing violations of

constitutional rights for extensive protracted periods of time"); *Gordon v. Holder*, 721 F.3d 638,

653 (D.C. Cir. 2013) ("[A] prospective violation of a constitutional right constitutes irreparable

injury."); *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that

the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes

irreparable injury.") (internal quotations omitted); *DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F.

Supp. 2d 237, 292 (D.D.C. 2012) (equal protection violation constitutes irreparable harm);

*Simms v. D.C.*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (procedural due process violation

constitutes irreparable harm); *Goings v. Court Servs. & Offender Supervision Agency for D.C.*,

786 F. Supp. 2d 48, 78 (D.D.C. 2011) (substantive due process violation constitutes irreparable

harm).  Defendants' violations of Ms. Does equal protection and due process rights constitute

irreparable harm.

    **IV.**    **THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST**
           **FAVOR A PRELIMINARY INJUNCTION.**

The balance-of-equities factor directs the Court to "'balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief.'"  *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 52 (D.D.C. 2014) (quoting *Winter*, 555 U.S. at 24). *See also Gammett v. Idaho State Bd. of Corr.*, 2007 WL 2186896, *15-16 (D. Idaho July 27, 2007) (find balance of harms "sharply" favored plaintiff, who would experience mental harm without Gender Dysphoria treatment).  The harm to Ms. Doe without preliminary relief from this Court is flagrant. In contrast, there is no injury to the defendants who are prohibited by federal regulation from determining housing assignments for transgender prisoners based solely on genital status, anatomy, or assigned birth sex, and instead must consider the health and safety of a transgender prisoner. 28 C.F.R. § 115.42 (c). All of the evidence here points to the ease of housing Ms. Doe in the women's prison.

The public interest in this case also weighs strongly in favor of Ms. Doe.  Federal regulations prohibit the defendants' categorical exclusion of Ms. Doe from a women's correctional facility. It is also in the public interest to promote the implementation of medical treatment protocols for people with disabilities like Ms. Doe, and to end practices that unnecessarily exacerbate mental health conditions.  Finally, *"*it is always in the public interest to prevent the violation of a party's constitutional rights." *See  Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc), *aff'd*, 134 S.Ct. 2751 (2014); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (same); *American Freedom Def. Initiative v. Metro. Area Transit Auth.*, 898 F. Supp. 2d 73, 84 (D.D.C. 2012) (same).

## CONCLUSION

For the foregoing reasons, this court should grant Ms. Doe's motion for a preliminary injunction and order Defendants to: (1) transfer Jane Doe to MCI-Framingham; (2) enjoin Defendants from using male correctional officers to conduct strips searches of Jane Doe, except

in exigent circumstances;  (3) enjoin Defendants from forcing Jane Doe to shower in the presence of men and with a shower curtain that does not adequately cover her; (4) enjoin Defendants from treating Jane Doe differently than other women held by the DOC; (5) train all staff on how to appropriately accommodate, treat and communicate with individuals with Gender Dysphoria within 60 days of this Order; (6) enjoin Defendants from using male pronouns when speaking to or about Jane Doe; (7) enjoin Defendants from referring to Jane Doe by her former male name (or any abbreviated version thereof); (8) refer to Jane Doe by her chosen female name; and (9) award such other and further relief as is just and proper.

/s/ J. Anthony Downs_____
J. Anthony Downs (BBO# 552839)
Tiffiney F. Carney (*pro hac vice*
pending)
Louis L. Lobel (BBO# 693292)
Ashley E. Moore (BBO# 694731)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.: +1 617 570 1000
E-mail: jdowns@goodwinlaw.com
tcarney@goodwinlaw.com
llobel@goodwinlaw.com
amoore@goodwinlaw.com

Jennifer Levi (BBO# 562298)
Bennett Klein (BBO# 550702)
GLBTQ Legal Advocates & Defenders
30 Winter Street, STE 800
Boston, Massachusetts 02108
Tel.: +1 617 426 1350
Email: jlevi@glad.org
bklein@glad.org

Elizabeth Matos (BBO# 671505)
Joel Thompson (BBO# 662164)
Prisoners' Legal Services
10 Winthrop Square, 3rd Floor
Boston, MA 02110
Tel.: +1 617 482 6383
E-mail: lmatos@plsma.org
jthompson@plsma.org

Dated: February 2, 2018

## CERTIFICATE OF SERVICE

I, J. Anthony Downs, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on February 2, 2018.

/s/ J. Anthony Downs