# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE,           )<br><br>      Plaintiff       )<br>            )<br>v.                )<br>            )<br>MASSACHUSETTS DEPARTMENT )<br>OF CORRECTION; THOMAS A. )<br>TURCO III; SEAN MEDEIROS; )<br>JAMES M. O'GARA JR.; and )<br>STEPHANIE COLLINS, )<br>            )<br>      Defendants. )<br>            ) | Civil Action No. 17-12255-RGS |

## AFFIDAVIT OF JAMES AIKEN

1. I have over 45 years of experience in the administration, operation, and management of correctional facilities, including as the Director of the Bureau of Corrections for the United States Virgin Islands (1992-1994), the Commissioner of the Indiana Department of Correction (1989-1992), and in various positions in the South Carolina Department of Corrections (1971-1989).

2. In the United States Virgin Islands I was given the specific mission to remedy overcrowding, gang problems, random and systemic violence, and general mismanagement. As the Commissioner of the Indiana Department of Correction, I was responsible for the overall administration of the Indiana corrections system that consisted of 46 separate adult and juvenile facilities with a population of 14,000 inmates. As a Deputy Regional Administrator of the South Carolina Department of Corrections (1987-1989), I supervised sixteen South Carolina institutions at all security levels. I was also Warden of the Central Correctional Institution (state

1

penitentiary, 1982-1987), the largest correctional facility in South Carolina with 1,800 medium

and maximum-security custody male inmates and the South Carolina death row. Prior to that I

was the Warden of the South Carolina Women's Correctional Institution (1979-1982)

responsible for all aspects of female inmate welfare and rehabilitation. In addition, I have

consulted with the United States Department of Justice, National Institute of Corrections, and

federal, state, and local prisons on a variety of subjects, including, but not limited to: inmate

classification, management of women offenders, management of youthful offenders in adult

prisons, prison security systems, security operational performance, prison critical event

avoidance, and riot/gang management. A full statement of my background and expert

qualifications is attached as Exhibit A.

3. In 2004 the United States Congress appointed me to be one of nine Commissioners of

the National Prison Rape Elimination Commission (the "Commission") established pursuant to

34 U.S.C. Sec. 30306 (detailing establishment and objectives of Commission). The Commission

held hearings throughout the country and was responsible for the development of standards that

would lead to the prevention, detection, and elimination of prison rape. *See* 34 U.S.C. Sec.

30306(d)(3)(B)(ii). The Commission issued the National Prison Rape Elimination Commission

Report (the "Report") in June 2009 that became the basis for regulations issued by the

Department of Justice in 28 C.F. R. Part 115.

4. The Commission's investigation and its Report accounted for the long-

underrecognized reality that transgender inmates (as well as lesbian, gay and bisexual inmates)

are particularly vulnerable to the prison's specific perils of intimidation, harassment, random and

systemic violence to include sexual assault. The Commission, over a five year period, carefully

considered the appropriate standard for the safe housing and placement of transgender inmates.

Based upon my over 45-years of experience and academic training in the correctional profession, prison systems have historically determined whether to place a transgender inmate in a male or female facility based solely and categorically on genital status. A housing policy and practice based on genital status creates significant threats to inmate health and safety. For example, when a person who lives and presents as a woman and has female secondary sex characteristics is placed by prison officials in a male correctional facility, they are perceived and treated by male inmates as a woman. For this reason, The Prison Rape Elimination Commission rejected the use of "genital status" as the sole basis to determine housing placements for transgender inmates. *See* Report at 77 ("The facility makes individualized determinations about how to ensure the safety of each inmate. Lesbian, gay, bisexual, transgender, or other gender-nonconforming inmates are not placed in particular facilities, units, or wings solely on the basis of their sexual orientation, genital status, or gender identity.").

5. The rejection of a housing standard and practice based solely on a transgender inmate's genital status is reflected in the Department of Justice regulations that provide "[i]n deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." 28 C.F.R. Sec. 115.42 (c). In addition, the Department of Justice regulations require that "[a] transgender or intersex inmate's own views with respect to his or her own safety shall be given serious consideration." 28 C.F.R. Sec. 115.42 (e).

6. I have reviewed the Complaint in this case, and the Affidavit of Jane Doe, that detail the conditions of Ms. Doe's confinement at the Massachusetts Correctional Institute at Norfolk

(MCI-Norfolk). I have also received detailed reports of Ms. Doe's experiences at MCI-Norfolk from her counsel.

7. More specifically, according Ms. Doe's Affidavit, she is routinely strip searched by male correctional officers. Department of Justice regulations require that inmates be strip-searched by corrections officers of the same gender, except in exigent circumstances. 28 C.F.R. Sec. 115.15. It is operationally unacceptable for a male corrections officer to strip-search an inmate who is female and who has female breasts. The avoidance of this practice is necessary to reduce the allegations of misconduct by staff and to ensure that inmates are not exposed to opposite gender searches which can present as an extremely traumatic unnecessary event for some inmates.

8. There is no operational reason that a correctional system cannot arrange to have a female correctional staff member strip search Ms. Doe, including in her current placement in a male correctional facility. Conducting strip searches is part of a corrections officer's job duties. While the Commission was in agreement that strip searches be conducted by a corrections officer of the same gender, the Commission also allowed for opposite sex strip searches in exigent circumstances. A Corrections officer must be prepared and willing to conduct a strip search on any prison inmate in a professional and respectful manner as part of their job duties.

9. According to Ms. Doe's Affidavit, she is repeatedly forced to shower in areas that men can access or see her. The Department of Justice regulations require that "[t]ransgender inmates shall be given the opportunity to shower separately from other inmates." 28 C.F.R. Sec. 115.42 (f). There is no reasonable justification for failing to follow this straightforward requirement as separate showers poses no threat to security or the normal operations of the facility.

10. However, even if the correctional facility were to accommodate Ms. Doe with private showers and appropriate strip searches, it is my opinion that continuing to house Ms. Doe in a male correctional facility creates an unnecessary perilous endangerment for her. Her placement in a male facility is the direct cause of Ms. Doe being the subject of systemic taunting, intimidation, harassment and violence, and needlessly subjects her to a very high risk of an event escalating into a life and death situation.

11. The correctional profession commonly uses a classification system as the foundation of a prison security delivery system. My operational definition of a prison classification system is a system that appropriately separates the inmate population based on demographic, social, health and behavioral factors. Such a management system is intended to ensure the reasonable security and safety of the public, staff and inmate population.

12.    Classification system assessments and reassessments of risk for inmates must be made based on particularized evidence about an inmate, and not from stereotypes or the personal perceptions and biases of a prison official. An individualized classification assessment for risk of assault or violence would include objective factors exampled by the inmate's age; institutional behavior pattern; vulnerability to or propensity for sexual abuse or violence; crime; mental health status; education level; and gang involvement. If an inmate is involved in random or systemic violence, or is a threat to other inmates, that is reflected in the objective classification assessment for that inmate, which then helps determine the security and programming needs of the inmate.

13. In addition to the classification system, the abatement of random or systemic violence of any sort by any inmate depends on the effective implementation of direct staff supervision[1]. Direct staff supervision is more than mere observation. It also requires correctional

---

[1] Direct staff supervision "…means that the security staff are in the same room with, and within reasonable hearing distance of, the resident or inmate." As defined at - *Prison Rape Elimination Act; Prisons And Jail Standards;*

staff that are well-qualified, trained and supervised with appropriate coverage in all physical areas in order to oversee an inmate population to reasonably detect and prevent violent and illicit acts.

14. I understand that Ms. Doe has lived and presented as a woman since her teens, and has female secondary sex characteristics, including breasts. Therefore, prison officials must develop and implement a classification plan that addresses the reality, which is that male inmates at MCI-Norfolk regard Ms. Doe as a woman and react to her as a female. This misclassification of Ms. Doe into a male prison setting unnecessarily creates a life-threatening situation for her and compromises the safe and orderly operation of the prison. According to Ms. Doe's Affidavit and discussions with counsel, these perils are manifested by the reports that men rush into areas where they can view her showering, and use sexualized taunts, such as "You have some big, nice boobies," and "I would like to see you spread like that in my room." If prison officials do not remove her from this environment and place her in a proper setting, more intense perils are likely to occur such as Ms. Doe being the victim of violence, being forced into prison prostitution by predator inmates in exchange for her protection, and becoming the catalyst for rival predator inmates attacking each other to reap the benefits from Ms. Doe's prostitution activity.

15. Furthermore, it is well-documented and accepted in the field of corrections that transgender persons are at a greater risk for violence and sexual assault. For example, in a 2007 study commissioned by the California Department of Corrections and Rehabilitation, 4% of randomly sampled inmates in California state prisons reported being sexually assaulted, while 59% of transgender inmates reporting being sexually assaulted. Valerie Jenness, et al., *Violence*

---

*United States Department of Justice Final Rule; National Standards to Prevent, Detect, and Respond to Prison Rape Under the Prison Rape Elimination Act (PREA); 28 C.F.R. Part 115; Docket No. OAG-131; RIN 1105-AB34; May 17, 2012.*

*in California Correctional Facilities: An Empirical Examination of Sexual Assault* 27 (Apr. 27,

2007), https://www.prearesourcecenter.org/sites/default/files/library/54-cafinalpreareport.pdf.

Similarly, a 2014 report from the United States Department of Justice Bureau of Justice Statistics

found that between 2007-2012, 34% of transgender inmates in federal, state prisons and local

jails experienced sexual victimization. Allen J. Beck, U.S. Department of Justice, Bureau of

Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12:*

*Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates* 2

(Dec. 2014), https://www.bjs.gov/content/pub/pdf/svpjri1112_st.pdf.

16.    The fact that Ms. Doe has not yet been physically or sexually assaulted should be of

little comfort. The sexualized taunts Ms. Doe has already experienced, as referenced above,

gives sufficient notice that she is at high- risk for violence, including sexual violence. Basic

preventative actions must be taken to address this obvious peril to her wellbeing. It is simply not

sound correctional practice to allow a known potential endangerment to remain and not take

appropriate and validated steps to mitigate the issue.

17.    Placing Ms. Doe in a male facility undermines the security and good order of the

correctional facility's overall operation. Inmates fundamentally want to be protected and

constantly assess their own personal safety vis à vis how the prison and prison system will

protect them.  Regular and ongoing taunting and intimidation of a prisoner, such as what Ms.

Doe is experiencing, creates the perception, if not validation, that prison officials are unwilling to

take basic actions to prevent predictable violence and endangerment within the prison.  This

dynamic gives other inmates an indication that they must take matters into their own hands to

ensure that they are safe, such as joining a gang or collecting shanks or other contraband items

for protection. This is as true in a medium security prison as in a maximum security prison. If

prison officials do not demonstrate a reasonable level of productivity regarding their duty to protect inmates in their custody, some inmates will inevitably engage in self-protection.

18. It is my opinion that Ms. Doe's safety requires that she be transferred to a women's correctional facility to abate this clear, present and known endangerment issue. Furthermore, I have seen nothing to suggest that Ms. Doe has any of the significant risk factors assessed under the objective classification criteria that would otherwise raise any concerns about such a transfer.

19. There is simply no basis to conclude that Ms. Doe's placement in a female correctional facility creates any security or management concern solely because she is a woman who is transgender as there is nothing inherently dangerous about being a transgender person.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 1st DAY OF FEBUARY, 2018.

JAMES EVANS AIKEN

# EXHIBIT A

**EXHIBIT A - EXPERT BACKGROUND AND QUALIFICATIONS**

**James Evans Aiken**

The undersigned maintains a consulting concern in prison management and adjustment matters as James E. Aiken & Associates, Inc. I also served as Director of Corrections for the United States Virgin Islands, and Commissioner for the Indiana Department of Correction.  I began my corrections career in 1971 at the South Carolina Department of Corrections as a counselor with the Comprehensive Drug Abuse Treatment Program.  Also, while with the South Carolina Department of Corrections, I held positions as Deputy Regional Administrator in the Midlands Correctional Region (managing 16 prisons), Deputy Warden and Administrative Assistant to the Warden of the Manning Correctional Institution, Deputy Warden and Warden at the Central Correctional Institution (state penitentiary), and Warden of the Women's Correctional Center. While serving in these positions, I received extensive experience in the areas of prison classification and management of inmate population. During my years in prison work, I have conducted thousands of inmate classification evaluations relative to their adjustment to prison and current/future danger to the public, prison staff, and other inmates.  These reviews included minimum custody (low security offenders) to maximum security (violent, high profile, disruptive, predatory, aggressive inmates). Additionally, I participated in the development of prison classification systems designed to better protect inmate population from other more violent inmates and the public.

The United States Congress appointed me, in July 2004 to the National Prison Rape Elimination Commission. Over a five (5) year period, the Commission conducted comprehensive hearings and examined all penalogical, economic, physical, mental, medical and social issues relating to prison rape in America.  At the conclusion of its review, the Commission issued a comprehensive report on the subject, including a recommended set of national standards to reduce and eliminate prison rape. Also, a grant program made annual grants (up to $40 million each year) to state and local programs that enhanced the prevention and punishment of prison rape and maintain safe and secure prisons despite budget reductions. The Commission had authority to issue subpoenas, and the statue allows for the Attorney General to seek enforcement of subpoenas in district court. The Federal Bureau of Prisons must have total compliance to the final standards.

I received a Master Degree in Criminal Justice from the University of South Carolina and Bachelors of Arts Degree from Benedict College, Columbia, South Carolina. I have also taught a number of courses in corrections at the university and technical college levels.

I have consulted with the U.S. Department of Justice, National Institute of Corrections, as well as served as a private contract provider to federal, state and county jurisdictions (jails and prisons) in a number of areas to include but not limited to inmate classification, managing violent youthful offenders in adult prisons, managing prison security systems, correctional leadership development, assessment of security operational performance, executive training for new and experienced wardens, prison critical event avoidance, management of super-maximum security prisons, management of the hard to manage-violent inmate, STG/gang management, and riot management.

I have also consulted with attorneys and rendered expert testimony in capital, criminal and civil cases. I have been qualified as an expert and provided such testimony in the states of Washington, Ohio, Georgia, Arizona, Delaware, North Carolina, Montana, Pennsylvania, New York, South Carolina, Indiana, Virginia, Maryland, Louisiana, Oregon, New Hampshire, Missouri, Alabama, Mississippi, Florida, Texas and the United States District Courts of New York, Connecticut, Virginia, Ohio, South Carolina, Michigan, Arizona, West Virginia, Florida, Texas, Georgia, Alabama, Missouri, Tennessee, District of Columbia and Pennsylvania as well as the Court of Queen's Bench, Canada relative to: future danger posed to inmates, staff and the community by trial defendants, the ability of inmates to adjust to prison, classification of inmates to determine proper confinement levels, prison conditions, and other matters generally relating to prisons, jails, and criminal justice matters.

More specific overview of background qualifications is submitted: From August 1992 to August 1994, I was Director of the Bureau of Corrections for the United States Virgin Islands. My responsibilities encompassed the overall administration of the bureau which included jail and prison facilities. I also worked closely with other territorial agencies, the legislature, courts, and federal governmental entities. In the Virgin Islands, I had a specific mission to re-establish a correctional system (prison and jail) which was diminished by overcrowded conditions, gang problems, random and systematic violence, escapes, non-compliance with court orders (to include medical care and delivery issues), general mismanagement, and public mistrust.

From March 1989 until August 1992, I was Commissioner for the Indiana Department of Corrections. I was responsible for the overall administration of the Indiana corrections system that consisted of 46 separate adult and juvenile facilities with a population of 14,000 inmates and parole services with a population of 3,490 parolees. I reported directly to the Governor of Indiana and worked closely with the state legislature. Also, during my Indiana administration, I created a Division of Security to address gang problems, contraband control, drug testing, and other concerns. My administration also initiated an Offender Relations Division to resolve offender grievances and complaints, and to reduce court involvement.

From September 1971 until March 1989, I was with the South Carolina Department of Corrections in a variety of capacities including Deputy Regional Administrator, and different times as Warden of the Central Correctional Institution, Warden of the Women's Correctional Institution and as an inmate social worker.

As Deputy Regional Administrator from April 1987 to March 1989, I supervised sixteen South Carolina institutions at all security levels including maximum. I supervised a workforce of 2,500 with an annual budget of $97 million. This position required that I select institution heads and I was intimately involved with new facility design.

As Warden of the Central Correctional Institution (state penitentiary) from May 1982 until April 1987, I operated the largest correctional facility in South Carolina with 1,800 medium and maximum custody inmates, 530 staff members, and an annual budget of $8 million. I was personally responsible for all activities involving security and treatment staff, as well as coordinating and supervising all welfare and morale services for inmates. CCI is now closed. At the time it was where the South Carolina death row was located and where executions were carried out. I was called upon to carry out two executions. From September 1976 until September 1979, I was Deputy Warden of this institution.

As Warden of the Women's Correctional Institution from September 1979 until May 1982, I was chief administrator of a state women's prison. I was responsible for all employee hiring, evaluation, and supervision as well as, all aspects of inmate welfare. During my tenure, I studied and reviewed all available records and files on assigned inmates to evaluate their behavior changes and rehabilitation progress.

From about 1990 to 1992, I was also Adjunct Professor at the Indiana University-Purdue University in Indianapolis, teaching corrections related criminal justice courses.

I am able to render an expert opinion, in an operational context, regarding future danger and adaptability of inmates and issues pertaining to prison/jail safety, operations, administration and security.

**Summary of Qualifications:**
I have over forty (45) years of experience in correctional administration, facility operations/management, inspection/assessment of facility performance and technical assistance consultations with clients in the United States, Dutch Kingdom, Canada, Costa Rica, Puerto Rico, and U.S. Virgin Islands. He has provided services to federal, state, county and local correctional facilities and jurisdictions in the areas of correctional leadership/organizational development, management of prison disturbances, system productivity, cost containment, enhancing prison security systems, managing the violent youthful offender in adult prisons, gang/security threat group (STG) management, new warden's training, super maximum security facility management training, inmate classification, assessment of prison security/operational performance, prison staffing analyses, reduction of prison critical security events (murder/suicide/riot/hostage situation) and advising governments relative to prison privatization transactions/productivity.

**Employment History:**
August 1994 to present, president, James E. Aiken and Associates, Inc. (correctional consultant firm); August, 1992 to August 1994, Director, Bureau of Corrections, United States Virgin Islands and consultant; March, 1989 to August, 1992, Commissioner, Indiana Department of Correction; April, 1987 to March 1989, Deputy Regional Administrator, South Carolina Department of Corrections; May, 1982 to April, 1987, Warden, Central Correctional Institution (state penitentiary) South Carolina Department of Corrections; September, 1979 to May, 1982, Warden, Women's Correctional Center, South Carolina Department of Corrections; September, 1976 to September, 1979, Deputy Warden for Administration, Central Correctional Institution(state penitentiary) South Carolina Department of Corrections; February, 1974 to September, 1976, Deputy Warden for Institutional Operations, Manning Correctional Institution, South Carolina Department of Corrections; September, 1972 to February 1974 Administrative Assistant to Warden, Manning Correctional Institution, South Carolina Department of Corrections; September, 1971 to September, 1972, Social Worker for Substance Abuse Treatment, South Carolina Department of Corrections.


**Relevant Experience:**
I have provided direct professional and consultant services in almost every aspect of the correctional field. More specifically, his scope of expertise includes the following:


*Director, Bureau of Corrections, United States Virgin Islands*
Held the position as Director that encompassed authority and responsibility for the overall administration of the Corrections Bureau for the United States Virgin Islands (jails and prison). Worked closely with other territorial agencies, the legislature, courts and federal governmental agencies.


My task was to coordinate a project to re-establish a jail/prison correctional system which was diminished by overcrowded conditions, lack of medical care, escapes, and noncompliance to court orders, corruption, general mismanagement, negative media, gang involvement, work force dysfunction, and public mistrust.

<u>*Commissioner, Indiana Department of Correction*</u>
The position encompassed the overall administration of the Department of Correction for the State of Indiana, which consisted of forty-six (46) separate adult and juvenile facilities (population 14,000) and parole services (population 3, 490) with an operations budget of $305 Million.

As Commissioner, reported directly to the Governor of the State of Indiana and worked closely with the legislature, other state and federal agencies, the courts and the public. My tasks were to establish an operational mission and priority of issues for the agency; establish agency mission goals; manage overpopulation, develop a new basic employee supervision program; and reorganized daily operations to ensure a more responsive and efficient structure.

My accomplishments included but were not limited to:

***Offender Health Care Delivery:*** The department contracted with the Indiana University School of Medicine to provide a medical director for clinical services. Developed and implemented a program to reduce cost and increase the quality of medical care.

***Security:*** Created the Division of Security to address agency security needs. Initiated a gang intelligence network to tract and evaluate their activities. Increased contraband control efforts by additional searches, drug testing, use of K-9 units, provided additional training and equipment, and increased prosecution efforts. Designed 650 bed maximum security unit that conformed to modern correctional security management and Court mandates. Conducted meetings with the National Guard, State Police, as well as other mutual aid agencies to coordinate and develop an emergency response and disaster preparedness program. Conducted full response drills to evaluate the agency's response capability. Evaluated and enhanced escape prevention/ apprehension measures. Conducted security audits and inspections of facilities.

***Offender Relations:*** Established an Offender Relations Division and appointed a coordinator. This division functions as part of Internal Audits and works in tandem with the Division of Internal Affairs, the Operations Division and the Division of Legislative and Information Services. The task of this division is to resolve offender grievances and complaints that originate from inside the agency and resolve them prior to court involvement.

***Prison Population:***
- Completed site selection, plans and construction of a new maximum security Institution
- Increased community corrections coverage from 35 to 50 counties (from 3,500 to 7,000 clients)
- Established community service/restitution programs
- Established county work release programs
- Established residential treatment programs and created home detention utilizing electronic monitoring

- Created over five hundred (500) new emergency prison beds within the first nine months of tenure

*Juvenile Justice:*
- Reduced Indiana Boy's School population from a high of 670 in 1989 to a low of 380 in 1990
- Conducted comprehensive reviews using several committees of community representatives concerning treatment programs, educational programs and employee training programs
- Established a Research Department at the Indiana Boy's School.
- Group home placements had tripled during 1992.
- Community involvement and recreational programs have been increased at both Indiana Boy's School and Indiana Girl's School.

*Cost Containment:* Developed a plan to increase participative management and input to the budget process. Meetings were held with State Budget Agency personnel on a regular basis in an effort to increase the Budget Agency's participation in the department's budget preparation regarding cost control. Reduced the operational budget of 305 million dollars by 41 million dollars for fiscal year 1992.

## Deputy Regional Administrator, Midlands Correctional Region, South Carolina Department of Corrections

Served as the Deputy Chief Administrator for the following: Directly planned, prescribed and supervised activities of sixteen (16) institutions, including minimum, medium and work release, shock probation (boot camp), restitution centers and maximum security facilities. Also, had general supervision of a ninety-seven (97) million dollar budget, as well as a work force of 2,500 employees. Duties also included policy development and interaction with lawmakers, management of over population, the community and other departmental agencies concerning long-range agency planning and developing agency future needs. Additionally, made selections of institutional heads, as well as being involved in new facility design, reviewed all use of force actions, and provided supervision to prison wardens during emergency situations and normal operations.

## Warden, Central Correctional Institution, South Carolina Department of Corrections

The previous largest correctional facility in South Carolina with 1800 medium/-maximum/super maximum custody inmates, 530 staff members, and an operating budget of eight (8) million dollars. Served as the chief administrator for the following areas/- activities: Directly planned, prescribed and supervised all security control and safety activities/operations, as well as, conducted announced and unannounced inspections of the institution. Interviewed, selected and evaluated employee's performance and effected other personnel actions as required. Personally responsible for all activities involving population management, security and treatment staff, as well as, coordinated and supervised all welfare/morale services for inmates to include medical delivery and access. Supervised and coordinated all activities with representatives from non-departmental agencies. Duties also involved emergency preparedness, interpreting all laws, policies, rules and regulations, compliance with court orders (conditions of confinement) and

6

operating procedures for employees and inmates. Studied and analyzed long-range department requirements for institutions, as well as participating in litigation action involving the South Carolina Department of Corrections. Duties also included meeting with the Inmate Advisory Council and acting on recommendations received from the Inmate Grievance Committee, as well as meeting with members of the legislature on matters relating to corrections. Also was responsible for carrying out the capital punishment laws for the state of South Carolina. This facility also provided high security management for population that were under the jurisdiction of the South Carolina Department of Mental Health and for population that were in pre-adjudication status that required more intense security to which the jail system could not provide.

## Warden, Women's Correctional Institution, South Carolina Department of Corrections

Served as the chief administrator for the following:  Directly planned, prescribed and supervised all security, control and safety activities and operations, personally responded to all disturbances and emergencies, interviewed/selected and evaluated employee's performance, counseled employees, supervised and coordinated all activities of the security and treatment staff, management of overpopulation, coordinated ad supervised all welfare and morale services for female inmates including clothing, food service, mail service, visitation, medical services, religious services, educational programs and recreational programs. Supervised the implementation and executing of all laws, policies, rules, regulations and operating procedures applicable to the Women's Correctional Center.  Also, studied and reviewed all available records/files on assigned inmates to evaluate their behavioral changes and rehabilitation progress. Duties included meeting with the Inmate Advisory Council as well as receiving and acting upon recommendations received from the Inmate Grievance Committee.

## Deputy Warden/Administration, Central Correctional Institution, South Carolina Department of Corrections

Served as the Institutional Coordinator for the following areas/activities:

Maintenance/construction, boiler room/energy, food service, employee parking, canteen services, Adjustment Committee, mail service, all security systems, transportation, pest control, criminal investigations and emergency response.

## Deputy Warden/Institutional Operations, Manning Correctional Institution South Carolina Department of Corrections

Served as the Institutional Coordinator for the following areas:  Youthful Offender Division, medical services, living areas, maintenance/construction, laundry services, visitation, emergency response, security, transportation, food service, commissary, administrative/punitive segregation, officer's quarters, classification teams, inmate interview/correspondence, recreation programs, energy (usage/conservation), Parole Board (prepared parole evaluations), supervision of security staff of fifty-five (55) employees, Chairman of  Employee Evaluation Committee, purchasing, inmate pay and Chairman of  Adjustment Committee.  Prepared correspondence for the warden, conducted the majority of institutional investigations, coordinated all escape apprehension efforts and remained on twenty-four (24) hour call.

**Administrative Assistant/Institutional Operations, Manning Correctional Institution, South Carolina Department of Corrections**

Responsibilities included vocational rehabilitation, alcoholics anonymous, Project Mate (Paraprofessional Counseling Program), Classification Team #2, Pastoral Care, Drug Abuse Treatment Program, Recreation Program, Occupational Safety and Health Act (O.S.H.A.), Emergency Response, Work Release Program, Education Program, tours, Employee Evaluation Committee member and inmate interviewing/correspondence.
Performed duties of deputy warden in his absence and remained on twenty- four (24) hour call at all times.

**Social Worker/Drug Abuse Treatment Program, Manning Correctional Institution, South Carolina Department of Corrections**

Responsibilities included conducting group therapy and individualized counseling to offenders with drug problems.  Conferred with the warden and staff to integrate the Drug Abuse Program with other institutional activities. Member of the Adjustment committee and the Warden's Treatment Team.

A major focus of my career has been the assessment and restoration of facilities and systems that have experienced chronic and acute security critical events and management shortfalls.  These have included issues of:
- Inmate management and security,
- staff malfeasance,
- corruption,
- prison violence,
- security critical-event prevention, evaluation, and management,
- budget shortfalls,
- public loss of trust in the confinement system,
- inmate loss of trust in the professionalism of confinement facility staff,
- staff loss of trust in the professionalism of administrators,
- emergency response and preparedness,
- inmate disruptive and violent behavior management,
- confinement facility and system culture assessment and improvement,
- confinement facility and system overall performance assessment,
- performance of death penalty executions of condemned inmates,
- inmate classification system (design, implementation and monitoring),
- addressing civil legal complaints,
- adherence with court orders,
- inmate disciplinary system performance assessments,
- confinement facility security technology (development, implementation and monitoring),
- new prison construction,
- renovation of existing confinement facilities to enhance security performance,
- confinement facility operational policy and procedure issues,
- post order development, reassessment, interpretation, and monitoring,
- facility operational performance assessments,

8

- policy development and interpretation,
- contraband control,
- staff training and development,
- evaluation of training,
- employee productivity evaluations,
- employee discipline,
- confinement facility cost containment strategies,
- use of force and restraint evaluation and implementation,
- criminal and administrative investigations (operational evaluations) of confinement setting critical incidents,
- staff supervision, and
- Gang/SGT management.

I have also assisted the legislative and executive branches of government on the state and federal levels by providing expert advice concerning budgetary issues and statutory reforms regarding confinement facilities and systems.

Additionally, I have provided consulting services to the U. S. Department of Justice, National Institute of Corrections, as well as served as a private contract provider to federal, state and county jurisdictions in a number of areas including, but not limited to:
- inmate classification,
- management of women offenders,
- managing violent youthful offenders in adult prisons,
- managing prison security systems,
- prison culture change,
- correctional leadership development,
- assessment of security operational performance,
- executive training for new and experienced wardens,
- prison critical event avoidance,
- management of super-maximum security prisons,
- management of the hard-to-manage violent inmate,
- riot/gang management,
- use of force evaluation and application, and
- post critical event evaluations.

9