UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MASSACHUSETTS DEPARTMENT | ) |
| OF CORRECTION, et al., | ) |
| Defendants. | ) |
| | ) |
| | ) |

C.A. NO. 17-12255-RGS

**LEAVE TO FILE GRANTED
FEBRUARY 20, 2018**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTFF'S MOTION FOR A PRELIMINARY INJUNCTION

Defendants, Massachusetts Department of Correction ("DOC"), Thomas A Turco III, Sean Medeiros, Stephanie Collins, and James M. O'Gara, through counsel, submit this Memorandum of Law in Support of their Opposition to Plaintiff's Motion for a Preliminary Injunction.

## INTRODUCTION

Plaintiff Jane Doe ("Plaintiff") is an inmate incarcerated at MCI-Norfolk, a medium-security prison located in Norfolk, MA. Plaintiff's Complaint alleges that she has been diagnosed with Gender Dysphoria ("GD") and that the defendants have failed to provide her with reasonable accommodations for her disability. Compl., ¶¶ 2, 6. The Complaint alleges violations of plaintiff's rights under Title II of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973 ("FRA") and the Fourteenth Amendment. Compl., ¶ 7.[1]

Named as defendants are the DOC; Thomas A Turco III, in his official capacity as Commissioner of Correction; Sean Medeiros, in his official capacity as Superintendent of MCI-

---

[1] Jane Doe has agreed to dismiss the state constitutional claims raised in Counts V, VI, and VII of the Complaint. Plaintiff's Memorandum in Support of Motion for Preliminary Injunction (Mem. P.I.), p. 2, n. 2.

Norfolk; Stephanie Collins, in her official capacity as the DOC's Assistant Deputy Commissioner of Clinical Services; and James M. O'Gara, in his official capacity as the DOC's ADA Coordinator.

Plaintiff's motion seeks the following injunctive relief: 1) transfer to MCI-Framingham, the DOC's facility for female offenders; 2) prohibit male correction officers from conducting her strip searches; (3) train MCI-Norfolk staff to communicate with her using female pronouns and her chosen nickname; 4) provide a separate time for showering apart from male inmates; and 5) provide access to healthcare such as mammograms. Compl., ¶ 71.

## STATEMENT OF FACTS

1.    Plaintiff is a transgender inmate currently incarcerated at MCI-Norfolk. Compl. ¶¶ 1, 10, 25.  Plaintiff began her third DOC incarceration on October 31, 2016.  Plaintiff is serving a three to four year sentence for Possession of a Class A Controlled Substance with Intent to Distribute, G.L. c. 94C, § 32.  Compl., ¶ 30.  Presently, plaintiff has a parole eligibility date of September 16, 2018 and the date of her release from DOC custody is September 16, 2019.  Affidavit of Sean Medeiros, ¶ 5.  Exhibit 1.

**Plaintiff's Treatment for Gender Dysphoria**

2.    After plaintiff's arrival at MCI-Norfolk on November 30, 2016, the facility's mental health staff were made aware of her prior GD diagnosis based on medical records from her prior DOC incarcerations.  Plaintiff was previously incarcerated from October 1, 2010 to July 3, 2012, and from February 25, 2003 to September 3, 2005.  Id. ¶ 8.

3.      Inmates diagnosed with GD receive treatment pursuant to the DOC's GD policy, Identification, Treatment and Correctional Management of Inmates Diagnosed with Gender Dysphoria, 103 DOC 652.00, *et seq*. (2017). Exhibit 2.

4.      The treatment available for GD inmates includes regular psychotherapy with a mental health clinician ("PCC") supervised by the GD Clinical Supervision Group, access to the same clothing and cosmetics available to females in DOC custody, and access to hormone therapy determined to be clinically appropriate and medically necessary. 103 DOC 652.06(D). All hormone therapy is monitored by endocrinologists. 103 DOC 652.06(D)(1).

5.      Pursuant to the DOC's GD policy, the placement of GD inmates within DOC facilities is based upon an individualized assessment of the inmate's housing, work, education, medical/mental health, and program needs with a focus on individual safety. Affidavit of Mitzi Peterson, ¶ 14. Exhibit 3.  Pursuant to 103 DOC 652.09:

> These assessments will occur on a case by case basis and will include security level, criminal and discipline history, medical and mental health assessment of needs, vulnerability to sexual victimization and potential of perpetrating abuse based on prior history.  A Gender Dysphoric inmate's own views with respect to his or her own safety shall be given serious consideration.

6.      On November 3, 2016, plaintiff received an Initial Mental Health Appraisal conducted by a MPCH mental health professional. Compl., ¶ 46.

7.      On November 14, 2016, plaintiff received a Mental Health Comprehensive Evaluation by a MPCH mental health professional.  Compl., ¶¶ 47-48.

8.      On December 12, 2016, plaintiff was provided with an Initial Treatment Plan which set out both short-term and long-term goals for treatment of her GD.  Compl., ¶¶ 48-51.

9.      On June 1, 2017, plaintiff's GD treatment was reviewed pursuant to a six-month

Treatment Plan Review.  The Treatment Plan Review did not recommend changes to the Initial Treatment Plan.  Compl., ¶¶ 52-53.

10.    Based on her diagnosis of GD, plaintiff is able to receive the same female clothing and other feminizing items that are available for female offenders at MCI-Framingham. Plaintiff gets her hair "permed" in the MCI Norfolk Barber Shop.  Peterson Aff., ¶ 5; 103 DOC 652.06.

11.    Plaintiff is prescribed feminizing hormones. In documentation from her 2003 medical records, her treatment with feminizing hormones was confirmed by MCI-Concord staff during her initial assessment under her first DOC incarceration.  Id. ¶ 6.

12.    Plaintiff meets regularly with her primary care clinician ("PCC") Liz Sampson of MPCH for mental health therapy.  The frequency of her therapy sessions with Ms. Sampson was recently increased to twice a month based on clinical indication.  Id. ¶ 7.

13.    During her current incarceration, plaintiff has received numerous sessions of electrolysis/laser hair removal treatment for the removal of her facial hair.  Id. ¶ 8.

14.    Plaintiff works as a clerk in the canteen office, and served as the scorekeeper for the soccer league. She participates in an inmate coordinated LGBT group twice weekly. Id. ¶ 10.

15.    Plaintiff completed the Correctional Recovery Academy, a six-month substance abuse program, in December 2017.  Id. ¶ 11.

16.    Plaintiff's PTSD diagnosis was recently added by Dr. Berger-Hershkowitz, M.D. due to symptoms of sleeplessness, anxiety and reports of dysphoria. The PCC indicates that the PTSD diagnosis is related to "prior undisclosed trauma" which she and plaintiff have yet to address in therapy.  Id. ¶ 13.

17.    The GD treatment Committee has not recommended that plaintiff be placed at MCI-Framingham by reason of her GD diagnosis.  During her recent reclassification, plaintiff requested placement at MCI-Framingham.  Plaintiff's reclassification included an individualized assessment of plaintiff, including a review of such factors as her security level, criminal and discipline history, GD diagnosis, medical and mental health needs, vulnerability as a victim and potential for predatory behavior, and plaintiff's own views with respect to her safety.  See 103 DOC 652.09; 103 CMR 420.09. On November 21, 2017, a classification board recommended that plaintiff remain at MCI-Norfolk.  On December 6, 2017, in response to plaintiff's appeal of the classification decision, the Superintendent's designee upheld the classification decision.  The Superintendent's designee reviewed the classification decision and found that there were no risk factors suggesting that another facility was more appropriate than MCI-Norfolk, and noted that the GD Treatment Committee had not determined that plaintiff required placement at MCI-Framingham based on her GD diagnosis.  Id. ¶ 15;  See  Classification  regulations,  103  CMR 420.00, et seq, Exhibit 4.

**Access to Private Showers**

18.    In accordance with the federal Prison Rape Elimination Act ("PREA"), MCI-Norfolk inmates diagnosed with GD are provided with alternative showering times apart from other inmates on their housing units.  GD inmates at MCI-Norfolk are now provided with letters which advise their housing unit staff that they are authorized to utilize an alternative time for showering pursuant to PREA.  Medeiros Aff., ¶ 6; 103 DOC 652.09(E).  During the alternative showering time for GD inmates, no other inmates are permitted to use the shower area.  Id. ¶ 13.

19.     All inmate showers at MCI-Norfolk must utilize plastic shower curtains specified by PREA, designed to discourage sexual activities between inmates in showers by enabling staff to detect if there is more than one inmate in the shower.  The PREA required shower curtains have a large opaque portion covering the middle of the shower curtain, approximately three (3) feet wide, starting approximately one (1) foot from the bottom of the shower curtain.  The bottom one (1) foot of the shower curtain and the top of the curtain, starting approximately four (4) feet from the bottom are transparent.  The opaque portion of the shower curtain provides privacy for the inmate's torso.  Id. ¶ 7.

20.     Where, according to institutional records, plaintiff is five (5) foot, three (3) inches tall (5'3"), and the opaque portion of the PREA shower curtain, measuring approximately one (1) foot to four (4) feet off the floor, the PREA shower curtain should be sufficient to cover plaintiff's torso.  Id. ¶ 17.

21.     Since her arrival at MCI-Norfolk, plaintiff has been provided with an alternative showering time separate from other inmates.  Id. ¶¶ 9-12.

22.     Presently, plaintiff is housed in a single cell on the third floor of the 3-2 housing unit and is provided with a separate showering period apart from other inmates on her floor.  Id. ¶ 16.  Plaintiff confirmed with her PCC Liz Sampson on February 12, 2018 that she is provided with private showers.  Peterson Aff., ¶ 9.

23.     Contrary to plaintiff's allegation that "male prisoners routinely stand on the tier above the bathroom to see me naked and sexually harass me," with the exception of the 8-1 housing unit, none of the housing units plaintiff has been assigned to at MCI-Norfolk, including her current 3-2 housing unit, have tiers.   Medeiros Aff., ¶ 18.

**Strip Searches**

24.     Strip searches are conducted on inmates at MCI-Norfolk pursuant to the DOC's Search policy, 103 CMR 506.00, et seq.  Exhibit 5.  Strip searches are an important part of MCI-Norfolk's security procedures and assist staff in their efforts reduce the presence of drugs, weapons, and other contraband within the facility.  Strip searches are employed for routine security checks or when there is a specific suspicious incident that would indicate that an inmate is perhaps carrying contraband.  Specific situations in which strip searches may be used include before and after court trips, medical trips, and visits.  103 CMR 506.04(1); Id. ¶ 19.

25.     Strip searches of inmates involve a visual inspection of the inmate and do not involve the correction officers conducting the search to touch the inmate.  103 CMR 506.04(1)(C).  It would be improper for a correction officer to touch an unclothed inmate during a strip search.  Such improper touching could also constitute a PREA violation.  Id. ¶ 20.

26.     The DOC Search policy provides that "[I]nmates identified as having gender identity disorder shall be identified as the gender of the facility in which they are housed."  103 CMR 506.04(1).  Id. ¶ 21.

27.     At the present time, MCI-Norfolk employs thirty-one (31) female correction officers: fourteen (14) on the 7:00 a.m. to 3:00 p.m. shift; six (6) on the 3:00 p.m. to 11:00 p.m. shift; four (4) on the 1:00 p.m. to 9:00 p.m. shift; two (2) on the 11:00 p.m. to 7:00 a.m. shift; and five (5) house officers who vary between the day and evening shifts.  MCI-Norfolk employs approximately 340 male correction officers.  Id. ¶ 22.

28.     Female officers are not restricted from working any posts at MCI-Norfolk based on the applicable collective bargaining agreements between the agency and the correction

officers' unions as well as current labor law requirements. By not restricting female officers' posts, they are afforded the full range of experience they may need to be competitive for promotional opportunities. Further, not restricting where female officers can work allows the institution the greatest flexibility in utilizing its line staff. Id. ¶ 22.

29.    Strip searches are performed by two correction officers and should be conducted in relative privacy rendering as much dignity to the situation as possible in accordance with the Search policy. 103 DOC 506.04(6). Id. ¶ 23.

30.    However, there are not always two female correction officers readily available to conduct strip searches of GD inmates at MCI-Norfolk. If there are two female correction officers are available on the shift, waiting for them to be relieved from their assigned posts may slow down the process of having the inmates complete the search procedure and enter the facility, their housing units, or other areas of the facility, or have visits. Id. ¶¶ 24-28.

## ARGUMENT

## I.    STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy, that is never awarded as of right." Peoples Federal Savings Bank v. Peoples United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012); Mazurek v. Armstrong, 520 U.S. 968, 978 (1997) ("It is frequently observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.") (emphasis in original). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008) (quoting Amoco Production Co. v.

Gambell, 480 U.S. 531, 542 (1987)). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Id. (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)).

In order to succeed on a request for a preliminary injunction, "a plaintiff must establish: 1) that he is likely to prevail on the merits, 2) that he is likely to suffer irreparable harm in the absence of preliminary relief, 3) that the balance of equities tips in his favor, and 4) the injunction is in the public interest." People's Federal Savings, 672 F.3d at 8-9 (quoting Winter, 555 U.S. at 20). "Plaintiffs must show a strong likelihood of success, and they must demonstrate that irreparable injury will be likely absent an injunction." Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010) (citing Winter, 555 U.S. at 21.); Sindicato Puertorriqueno de Trabajadores v. Fortunao, 699 F.3d 1, 10 (1st Cir. 2012). Denial of a request for injunctive relief is warranted where the plaintiff fails to demonstrate the existence of all four factors. See Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2009); Aponte v. Calderon, 284 F.3d 184, 191 (1st Cir. 2002). However, several decisions in this circuit have held that the preliminary injunction analysis should focus on the first and second factors of the four-factor test. See Respect Maine PAC, 622 F.3d at 15 ("The first two factors are the most critical."); Swaroski Aktiengesellschaft v. Building No. 10, Inc., 706 F3d 44, 48 (1st Cir. 2013) ("…while each factor of the four factor is important, 'the cynosure of this four-part-test is more often than not the movant's likelihood of success on the merits.'") (quoting Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 115 (1st Cir. 2006)).

When a government agency is involved, the requirement that the government be granted the "widest latitude in the dispatch of its own internal affairs" must be observed. Lewis v. Casey,

518 U.S. 343, 378-379 (1996).  Such considerations are strengthened when a state agency is involved due to federalism concerns. O'Shea v. Littleton, 414 U.S. 488, 499 (1974) ("proper balance in the concurrent operation of federal and state courts counsels restraint against the issuance of injunctions against state officers").

Moreover, where a party seeks injunctive relief which alters the status quo by mandating some positive act by the non-moving party, the moving party must meet a higher standard.  See Braintree Laboratories, Inc. v. Citigroup Global Markets, Inc., 622 F.3d 36, 40-41 (1st Cir. 2010); W. Holding Co. v. AIG Inc., Puerto Rico, 748 F.3d 377, 383 (1st Cir. 2014) (same); Mass. Coalition of Citizens with Disabilities v. Civil Defense Agency and Office of Emergency Preparedness, 649 F.2d. 71, 76 n. 7 (1st Cir. 1981) ("Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of situation demand such relief."); Harris v. Wall, 217 F.Supp.2d 541, 553 (D.R.I. 2016) ("By contrast, an injunction that alters the status quo, which is what Plaintiff is seeking, is atypical. Designated as a "mandatory injunction," such relief "normally should be granted only in those circumstances when the exigencies of the situation demand such relief.")

Further, pursuant to the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1).  In determining whether to grant injunctive relief, a court must give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." Id.  See Feliciano v. Rullan, 378 F.3d 42, 50-51 (1st Cir. 2004).

## II.    PLAINTIFF IS UNABLE TO SHOW A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF HER CLAIMS.

### A.    PLAINTIFF WILL NOT SUCCEED ON HER CLAIM UNDER THE ADA AND THE FRA.

Count I of the Complaint alleges a violation of plaintiff's rights under Title II of the ADA. 42 U.S.C. § 12132.  Count II of the Complaint alleges a violation of plaintiff's rights under the FRA. 29 U.S.C. § 794(a).  The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual."  42 U.S.C. § 12101(1)(A).[2] Title II of the ADA provides that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any entity." 42 U.S.C. §12132.  The ADA defines a "qualified individual with a disability" as:

> An individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. §12131(2).

In order to state a claim under Title II of the ADA, a plaintiff must allege "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or

---

[2]  Like the ADA, the FRA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities."  29 U.S.C. § 705(9)(b).  Further, in 1992, Congress amended the FRA to include the same exclusions from the definition of "disability" found in 42 U.S.C. § 12211, including the exclusion of gender identity disorders without a physical impairment and transsexualism.  See Rehabilitation Act Amendments of 1992, Pub. L. 102-569 (October 29, 1992). Because the statutory definition of "disability" is the same for the ADA and the FRA, courts have consistently applied the same analysis for both federal statutes.  See Nunes v. Massachusetts Department of Correction, 766 F.3d 136, 14 (1st Cir. 2014); Kiman v. New Hampshire Department of Correction, 451 F.3d 274, 285 n. 10 (1st Cir. 2006); Katz v. City Metal Co., 87 F.3d 26, 31 n. 4 (1st Cir. 1996) (Section 504 of RA "is interpreted substantially identically to the ADA."). Accordingly, defendants will analyze the FRA claims under the ADA.

denied the benefit of some public entity's services, programs or activities, or was otherwise discriminated against; and (3) that such an exclusion, denial of benefits, or discrimination was by reason of his disability."  Parker v. Universidad de Puerto Rico, 225 F.3d 1, 5 (1st Cir. 2000) (citing 42 U.S.C. §12132); Buchanan v. Maine, 469 F.3d 158, 170-171 (1st Cir. 2006) (plaintiff must satisfy all three  prongs, including showing that he is a qualified individual).   If these standards are met, then "reasonable accommodations" would need to be made.  See Bibbo v. Massachusetts Department of Correction, 2010 WL 2991668, * 1 (D. Mass. 2010); Fulton v. Goord, 591 F.3d 37, 43-44 (2d Cir. 2009).

To the extent that a plaintiff is found to present a disability under the ADA, the claimant is entitled to a reasonable accommodation.  An "[a]ccommodation is not reasonable if it either imposes 'undue financial and administrative burdens' on a grantee, or requires a 'fundamental alteration in the nature of the program.'"  School Board of Nassau County v. Arline, 480 U.S. 273, 287 n. 17 (1987).  In considering whether an accommodation presents an undue burden, a court must take into account the nature and cost of the accommodation, the size of the facility in terms of the financial resources and personnel, and the type of operations involved, including composition, structure, and function.  Riel v. Electronic Data Systems Corp., 99 F.3d 678, 681 (5th Cir. 1996).  An accommodation which presents an "extensive, substantial, or disruptive" deviation is considered an undue hardship and therefore not reasonable.  29 C.F.R. § 1630.2(p).

The ADA does not require that a plaintiff be provided with the accommodation of her choice.  See Nunes, 766 F.3d at 146 (The ADA requires the Department to provide reasonable accommodations, "not to optimal ones finely tuned to [inmate's] preferences.") (citing J.D. ex rel. J.D. v. Pawlet School District, 224 F.3d 60, 70-71 (2d Cir. 2000)).   A "reasonable

accommodation" does not mean that prison officials must accede to every demand of an inmate; rather, an accommodation is reasonable so long as it gives "meaningful access" to the services sought. Bibbo, 2010 WL 2991668, *1 (citing Alexander v. Choate, 469 U.S. 287, 301 (1985)); Nunes, 766 F.3d at 145-146 (change in procedures did not deny inmate meaningful access to medications); Kiman, 451 F.3d at 283; Parks v. Blanchette, 144 F.Supp.3d. 282, 339 (D. Conn. 2015) (failure to accommodate inmate's request for specific type of housing did not violate ADA); Knox v. Massachusetts Department of Correction, 2017 WL 3401443 *10 (D. Mass. Aug. 8, 2017) (failure to change housing assignment did not violate ADA); Lopes v. Beland, 2014 WL 1289455 *12 (D. Mass. Mar. 29, 2014) (failure to provide inmate with a single cell did not violate ADA); Polansky v. New Hampshire Department of Correction, 2013 WL 1398582 at *12 (D.N.H. Mar. 25, 2013) (failing to utilize inmate's preferred search procedure does not create an unreasonable accommodation so long as inmate has access to services).

Nor does Title II of the ADA itself mandate the provision of services. Buchanan, 469 F.3d at 174. Public entities are not obligated to provide new programs or services to the disabled which it has not previously provided to any group. Buchanan, 469 F.3d at 173 ("Although the ADA does not itself mandate the provision of services, it does prohibit discrimination against the disabled within services that are provided") (emphasis in original) (citing Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 603 n. 14 (1999) (The ADA does not require States to "provide a certain level of benefits to individuals with disabilities."). An inmate cannot state an ADA claim merely because a prison supposedly fails to attend to the needs of its disabled inmates. The ADA does not create a remedy for questions of the adequacy of treatment. See Buchanan, 469 F.3d at 175; Leslie v. Chie, 250 F.3d 47, 54-55 (1st Cir. 2001) (citing Bryant v. Madigan, 84

F.3d 246, 249 (7th Cir. 1996), <u>reh</u>. <u>den</u>. 91 F.3d 994 (7th Cir. 1996)).   Further, "a State may rely upon the reasonable assessment of its own professionals in determining whether a patient meets the requirements for a particular treatment program." <u>Buchanan</u>, 469 F.3d at 174.

In addition, within "the prison context, whether accommodations are reasonable must be judged 'in light of the overall institutional requirements,' including '[s]ecurity concerns, safety concerns, and administrative exigencies.'" <u>Holmes v. Godinez</u>, 311 F.R.D. 177, 226 (N.D. Ill. Oct. 8, 2015) (quoting <u>Love v. Westville Correctional Center</u>, 103 F.3d 558, 561 (7th Cir. 1996)).   The First Circuit has held that great deference should be afforded to administrators in determining whether changing the current system is a reasonable accommodation. <u>Wynne v. Tufts University School of Medicine</u>, 976 F.2d 791, 794 (1st Cir. 1992).   Courts have long held that prison officials are to be afforded wide-ranging deference in the adoption of policies and practices that in their judgment are necessary to preserve institutional order and discipline.   <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979).   "Such considerations are peculiarly within the province and professional expertise of correction officials, and, in the absence of substantial evidence in the record that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." <u>Id</u>. at 548 (citing <u>Pell v. Procunier</u>, 414 U.S.  817 (1974)); <u>see</u> <u>also</u> <u>Lewis</u>, 518 U.S. at 361 (courts are not to engage in micro-management of prison affairs or become enmeshed in the minutiae of prison operation); <u>Rhodes v. Chapman</u>, 452 U.S. 337, 349 n. 14 (1981).   Even in matters which involve the limitation of fundamental rights, there must be a "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application."

Wolff v. McDonnell, 418 U.S. 539, 556 (1974). Classification decisions by prison administrators are presumptively valid and entitled to substantial deference. See Bell, 441 U.S. at 521.[3]

### 1.    Plaintiff Is Not A Qualified Individual With A Disability.

In enacting the ADA in 1990, Congress specifically excluded from the definition of disability those individuals with "gender identity disorders not resulting from physical impairments." See 42 U.S.C. § 12211(b)(1).[4][5] Congress later amended the ADA by enacting the ADA Amendments Act of 2008 ("ADAAA"). Pub.L. No. 110-325 (2008).    However, in amending the ADA, Congress left intact the exclusions from coverage set out in 42 U.S.C. § 12211.    Thus, despite the opportunity to amend the ADA to eliminate the coverage exclusion for gender identity disorders in 2008, Congress explicitly left the exclusions from coverage defined in 42 U.S.C. § 12211, unchanged.    Accordingly, numerous courts have excluded disability claims based on GID/GD pursuant to 42 U.S.C. § 12211(b)(1).    See e.g., Michaels v. Akai Security, Inc., 2010 WL 2573988 *6 (D. Colo., June 24, 2010) ("Gender dysphoria, as a gender identity disorder, is specifically exempted as a disability by the Rehabilitation Act."); Doe v. United Consumer Fin. Serv., 2001 WL 34350174 *6 (N.D. Ohio, Nov. 9, 2001) (finding that

---

[3] In constitutional challenges to the DOC classification regulations, both state and federal courts have indicated that the Commissioner of Correction has absolute discretion when it comes to classifying or transferring inmates.  The classification of inmates to institutions of different levels of security neither implicates any protected liberty interest nor triggers any due process protection under the state and federal constitutions. See Meachum v. Fano, 427 U.S. 215 (1976); Montanye v. Haymes, 427 U.S. 236, 242 (1976); Olim v. Wakinekona, 461 U.S. 238, 245-248 (1983).  The decision where to place prisoners within the correctional system is simply a matter of administrative discretion invoked for reasons such as security, convenience or rehabilitation. Jackson v. Commissioner of Correction, 388 Mass. 700, 703 (1983); Lombardo v. Meachum, 548 F.2d 13, 14-15 (1st Cir. 1977). Nor do state statutes governing classification, G.L. c. 124, § 1 (g), and G.L. c. 127, §§ 20 and 97, create any entitlement to any particular classification. Hastings v. Commissioner of Correction, 424 Mass. 46 (1997); Harris v. Commissioner of Correction, 409 Mass. 472, 478 (1991).

[4]  42 U.S.C. § 12211(b)(1) excludes from the definition of disability: "(1) "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavioral disorders."

[5]  At the same time, Congress amended the Rehabilitation Act of 1973 to include the same exclusions from the definition of "disability" found in 42 U.S.C. § 12211.  See 29 U.S.C. § 706(8)(F).

ADA "explicitly excludes" GID from definition of disabilities); James v. Ranch Mart Hardware, Inc., 1994 WL 731517 *2 (D. Kan., Dec. 23, 1994) (same).

At the time Congress enacted the ADA of 1990, Gender Identity Disorder ("GID") and the sub-category of Transsexualism were identified as mental disorders in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Third Edition (DSM-III) (1980) and Third Edition, Revised (1987) ("DSM-III-R"). "Transexualism" was defined as a "persistent sense of discomfort and inappropriateness of one's anatomic sex" and "markedly impaired" social and occupational functioning. DSM-III-R § 302.50. In 1994, the Fourth Edition, Revised, of the DSM defined GID as being characterized by a strong desire to be the other gender and "clinically significant distress or impairment in social, occupational, or other important areas of functioning." DSM-IV-TR § 302.85. In 2013, the Fifth Edition of the DSM revised the definition of GID, including changing the term to "Gender Dysphoria." The diagnosis of gender dysphoria in the DSM-V still required "clinically significant distress or impairment in social, occupational, or other important areas of functioning." DSM-V § 302.85.

Recently, a federal district court, in denying the defendant employer's motion to dismiss a claim under the Title I of ADA alleging discrimination based on GID, held that the ADA's exclusion of individuals diagnosed with GID from its coverage was limited to individuals who identified with a different gender but did not experience any impairment related to GID. See Blatt v. Cabela's Retail Inc., U.S.D.C. No. 5:14-cv-04822 (Denial of Partial Motion to Dismiss, May 18, 2017). The Blatt Court interpreted the exclusion of GID from ADA coverage under 42 U.S.C. § 12211(b)(1) "narrowly to refer to only the condition of identifying with a different gender, not to encompass (and therefore exclude from ADA protection) a condition like Blatt's

gender dysphoria, which goes beyond merely identifying with a different gender and is characterized by clinically significant stress and other impairments that may be disabling." Id. at *3.  However, the <u>Blatt</u> Court's interpretation of GID effectively strips the disorder of the underlying mental condition that must be present in order to diagnosis an individual with GD/GID.  <u>See</u> DSM-V § 302.85(B) ("The condition is associated with clinically significant distress or social impairment in social, occupational, or other important areas of function.").  Thus, the <u>Blatt</u> Court seeks to create two distinct categories within the diagnosis of GD, one category contains individuals who merely identify with a different gender without experiencing any distress or impairments associated with GD and a second category of individuals who experience distress or impairments associated with GD.  As described above, a clinical diagnosis of GD under the DSM-V specifically provides that the "condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."  Thus, in the absence of clinically significant distress or impairment associated with the GD, an individual cannot be diagnosed with GD.  DSM-V § 302.85(B).

The <u>Blatt</u> Court's "narrowing" of the ADA's exclusion of gender identity disorders effectively rewrites the federal statute and eliminates the exclusion established by Congress in 1990 and left untouched by the ADAAA in 2008.  Whether the exclusion of GD from the ADA's definition of disability should be stricken or altered should be left to Congress.  Where plaintiff will not succeed on the claims under the ADA and FRA, injunctive relief should be denied.

### 2.  <u>Plaintiff's Constitutional Challenge To The ADA And FRA</u>.

Plaintiff's Opposition to Defendants' Motion to Dismiss argues that the ADA's exclusion of GID/GD from the definition of disability is unconstitutional in that the exclusion violates the

Equal Protection Clause of the Fourteenth Amendment.  Pursuant to Fed. R. Civ. P. 5.1, plaintiff has filed a Notice of Constitutional Question. (ECF #36).  Defendants take no position on the constitutionality of the ADA and defer to the United States Attorney General's position regarding the constitutionality of the federal statute.

### 3.    Plaintiff Has Failed To Show That Defendants Have Engaged In Discrimination In Violation Of The ADA and FRA.

Even if this Court were to determine that plaintiff's claim is not excluded from the ADA, pursuant to 42 U.S.C. § 12211(b)(1), it is clear that plaintiff is not entitled to injunctive relief where she has failed to show that she was excluded from or denied a benefit or service or subject to discrimination *by reason of* her gender dysphoria.  Plaintiff's request for injunctive relief focuses on alleged unlawful conditions of her confinement, i.e., failing to reclassify her to MCI-Framingham; permitting male correction officers to conduct her strip searches; failing to provide a separate time for showering apart from male inmates; failing to train MCI-Norfolk staff to communicate with her using female pronouns or her chosen nickname; and a lack adequate medical care.  Compl., ¶¶ 61-69.

Plaintiff is not entitled to a preliminary injunction where she has failed to establish a *prima facie* case for discrimination in violation of the ADA.  Title II of the ADA obligates the defendants to provide plaintiff with reasonable access to programs, activities or services. Plaintiff has not articulated an ADA claim in the absence of facts which support a finding of discrimination against her on the basis of her gender dysphoria.  While, for the purposes of their opposition, defendants do not dispute plaintiff's contention that she has been diagnosed with GD, plaintiff has failed to show that she has been excluded from participation in or denied the benefits of any service, program, or activity or subject to discrimination while confined at MCI-

Norfolk by reason of her GD diagnosis.  See Parker, id.  Nor has plaintiff demonstrated that she is excluded from services, programs or activities that are only available at MCI-Framingham. Plaintiff has failed to demonstrate that she has been discriminated against with regard to her conditions of confinement, including classification, searches, shower times, communications with staff, and medical treatment by reason of her GD.  Even if plaintiff could show that she was denied a specific type of programming or benefit, she will not succeed on the claim since "the ADA prohibits discrimination because of disability, not inadequate treatment for disability." Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1022 (9th Cir. 2010) (finding that deprivation of programs or activit[ies] to lessen his depression is not actionable under the ADA).

Here, plaintiff has failed to demonstrate that the defendants have engaged in discrimination based on her GD diagnosis, in violation of the ADA and FRA.  It is undisputed that plaintiff is being provided with treatment for her GD in the form of hormone therapy, regular psychotherapy, access to the same clothing and cosmetics available to female offenders, laser hair removal, and preventative healthcare, including mammograms.  Peterson Aff., ¶¶ 5-8. Plaintiff was able to participate in and complete the Correctional Recovery Academy in December 2017 and is able to engage in work at MCI-Norfolk.  Id. ¶¶ 10-11.  Plaintiff also participates in program and recreational activities. Id. ¶ 10.  Plaintiff has a single cell on the 3-2 housing unit and is provided with an alternative time for showering separate from other inmates. Id. ¶ 9; Medieros Aff. ¶ 13.   Plaintiff's placement within the DOC underwent an individualized assessment, pursuant to the DOC's GD policy, 103 DOC 652.09, and classification procedures, 103 CMR 420.09, in December 2017. The classification assessment considered such factors as plaintiff's security level, criminal and discipline history, GD diagnosis, medical and mental

health needs, vulnerability to sexual victimization, and potential for perpetrating abuse. The classification decision determined that plaintiff should remain at MCI-Norfolk. The Superintendent's designee reviewed the classification decision and found that there were no risk factors suggesting that placement at MCI-Framingham was more appropriate and noted that the GD Treatment Committee had not recommended that plaintiff be placed at MCI-Framingham based on her GD diagnosis. 103 DOC 652.09; 103 CMR 420.09; Peterson Aff., ¶¶ 14-15.

Further, the DOC has provided training to staff regarding issues associated with working with GD inmates, including the proper use of pronouns. Peterson Aff. ¶ 19. Plaintiff's allegations of harassment are being investigated. Medeiros Aff. ¶¶ 29, 33. Plaintiff has opportunities to raise concerns regarding her conditions of confinement with senior prison staff via the DOC Grievance regulations, 103 CMR 491.00, et seq., and in staff access periods at MCI-Norfolk. Id. ¶¶ 29-33.

Accordingly, to the extent plaintiff can assert claims under the ADA and FRA, injunctive relief should be denied due to her failure to show that defendants have engaged in discrimination or denied her access to services, programs or benefits based on her diagnosis of GD.

### 4.   Requested Relief Would Impose Undue Burdens On Defendants.

Plaintiff seeks an injunction that mandates plaintiff's transfer to MCI-Framingham. In the alternative, plaintiff seeks an injunction requiring that her strip searches at MCI-Norfolk be conducted solely by female correction officers. Compl., ¶ 71.

An accommodation is not reasonable if it would "fundamentally alter the nature of the service provided" or "impose an undue financial or administrative burden." Toledo v. Sanchez, 454 F.3d 24, 39 (1st Cir. 2006) (quoting Tennessee v. Lane, 541 U.S. 509, 532 (2004)); Enica v.

20

Principi, 544 F.3d 328, 342 (1st Cir. 2008) (defendant may show that the proposed accommodation is not feasible and would constitute an undue burden); McElwee v. County of Orange, 700 F.3d 635, 641 (2d Cir. 2012) (accommodation is unreasonable if it imposes an undue hardship on program); Tucker v. Tenn., 539 F.3d 526, 532 (6th Cir. 2006); School Bd. of Nassau County, 480 U.S. at 287 n. 17.

### i.      Transfer To MCI-Framingham Would Impose Undue Burden.

Here, an accommodation requiring that plaintiff be transferred to MCI-Framingham would impose an undue burden on the defendants.  Plaintiff has already received an individualized assessment regarding her placement within the DOC which considered such factors as her security level, criminal and discipline history, GD diagnosis, medical and mental health needs, vulnerability as a victim and potential for predatory behavior, and plaintiff's own views with respect to her safety.  The December 2017 individualized assessment of plaintiff as to her placement within the DOC determined that she should remain at MCI-Norfolk. 103 DOC 652.09; 103 CMR 420.09; Peterson Aff. ¶¶ 14-15.  The assessment also considered that fact that the DOC's GD Treatment Committee has not recommended that plaintiff be placed at MCI-Framingham as necessary for treatment of her GD.  Peterson ¶ 15.

In the absence of any evidence that plaintiff's December 2017 classification process was improper and violated DOC regulations and policies, plaintiff's individualized assessment as to her DOC placement should stand.  Invalidating the December 2017 assessment or requiring the defendants to conduct another individualized assessment of plaintiff would place an unreasonable burden upon the defendants.  To the extent that plaintiff's request for injunctive

relief seeks to invalidate plaintiff's December 2017 classification and require defendants to conduct another individualized assessment, the request should be denied.

### ii.     Strip Searches Of Plaintiff By Female Correction Officers At MCI-Norfolk Present An Undue Burden.

Plaintiff seeks a preliminary injunction requiring that her strip searches at MCI-Norfolk be conducted solely by female correction officers. However, requiring that strip searches of plaintiff at MCI-Norfolk be conducted by female correction officers would present significant operational and security burdens. MCI-Norfolk Superintendent Medeiros describes the substantial difficulties that would confront the prison if the strip searches of the plaintiff and other GD inmates were conducted solely by female correction officers. Medeiros Aff. ¶¶ 22-29. First, MCI-Norfolk presently employs 31 female correction officers across three shifts, as compared to 340 male correction officers. Id. ¶ 22. Female correctional officers are not restricted in the type of posts they may have while working at the facility. Because DOC regulations require that two correction officers be present to conduct a strip search, two female correction officers would need to be relieved of their posts in order to conduct a strip search of the plaintiff or other GD inmates. Id. ¶ 23. Relieving female correction officers from their assigned posts in order that they may conduct strip searches of plaintiff and other GD inmates would be disruptive of the facility's operations. Inmates would likely experience delays in completing the search procedures and entering the facility, returning to their units or other areas of the facility or having visits. Id. ¶ 24. Further, the requirement that only female correction officers conduct strip searches of plaintiff and other GD inmates may result in tensions between male and female correction officers where female correction officers may object to conducting strip searches of plaintiff and other GD inmates who possess male genitalia and object to

22

restrictions on the posts they may be assigned to within the prison.  Id. ¶ 27.    The request for an injunction requiring that only female officers conduct strip searches of plaintiff would place an undue burden on the defendants.

### B.    PLAINTIFF WILL NOT SUCCEED ON THE CLAIM BROUGHT UNDER THE EQUAL PROTECTION CLAUSE.

Count III of the Complaint alleges a violation of plaintiff's rights under the Equal Protection guarantees of the Fourteenth Amendment.  Plaintiff alleges that her rights under the Equal Protection Clause are violated in the absence of an individualized assessment determining whether she should be classified for placement at MCI-Framingham.  Mem. P. I. at 28.

The Fourteenth Amendment's Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 439 (1985).  "The general rule is that legislation is presumed valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." Id. at 440.  See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Walker v. Exeter Region Coop. School Dist., 284 F.3d 42, 45 n. 4 (1st Cir. 2002) ("The underlying equal protection inquiry, … is whether different treatment of two separately classified groups is at least marginally *reasonable*.") (emphasis in original).  A plaintiff must show that a discriminatory purpose was the motivating factor in the unequal treatment.  See Washington v. Harper, 494 U.S. 210, 233 (1990) (A state's interest in maintaining safety and security justifies interference with an inmate's fundamental rights as long as the interference reasonably furthers this goal.) (quoting Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989), overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61 (1st Cir. 2004)).

On the other hand, plaintiff asserts that the DOC's GD policy, focused on the identification, treatment, and correctional management of GD inmates, constitutes gender based discrimination and requires defendants to show that the policy, with regard to the plaintiff's placement within the DOC, is substantially related to a sufficiently important government interest.  See City of Cleburne, 473 U.S. at 440.

Here, it is clear that, even using an intermediate level of scrutiny, plaintiff's Equal Protection claim will not succeed where she was recently provided with an individualized assessment to determine her placement within the DOC.  The GD policy provides criteria for the placement of GD inmates into DOC facilities, requiring a case-by-case assessment of each inmate:

> An assessment will inform housing, work, education, and program assignments and will focus on individual safety.  These assessments will occur on a case by case basis and will include security level, criminal and discipline history, medical and mental assessment of needs, vulnerability to sexual victimization and potential of perpetrating abuse based on prior history.  A Gender Dysphoric inmate's own views with respect to his or her own safety shall be given serious consideration.

103 DOC 652.09(A).

The GD Treatment Committee has not recommended that Jane Doe be placed at MCI-Framingham by reason of her GD diagnosis. See 103 DOC 652.04; Peterson Aff. ¶ 15. During her recent reclassification, pursuant to 103 CMR 420.00, et seq., plaintiff requested placement at MCI-Framingham.  On November 21, 2017, a classification board recommended that plaintiff remain at MCI-Norfolk.  The classification decision was based on an individualized assessment of factors, including plaintiff's security level, criminal and discipline history, GD diagnosis, medical and mental health needs, vulnerability as a victim, potential for predatory behavior, and

plaintiff's own views with respect to her safety.  On December 6, 2017, in response to plaintiff's appeal, the Superintendent's designee conducted a review of the classification decision. The Superintendent's designee upheld the classification decision, finding that there were no risk factors suggesting that MCI-Framingham was more appropriate for plaintiff. The Superintendent's designee noted that the GD Treatment Committee had not recommended that plaintiff be placed at MCI-Framingham based on her GD diagnosis.  Peterson Aff. ¶ 15.

Here, it is clear that the DOC's GD policy does not provide a blanket requirement that all GD inmates are placed in a facility which matches their assigned birth sex, but, instead, provides for an individualized assessment for each GD inmate.  The individualized assessment considers a wide variety of factors, including security level, criminal and discipline history, GD diagnosis, medical and mental needs, vulnerability, potential for predatory behavior, and the GD inmate's own views as to personal safety.  In light of the December 2017 individualized assessment as to plaintiff's placement, it is clear that there has been no violation of her equal protection rights. See 103 DOC 652.09; 103 CMR 420.09. See also 28 C.F.R. § 115.42(c) (Department of Justice regulation providing that "[i]n deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would prevent management or security problems.").  Accordingly, plaintiff will not succeed on her Equal Protection claim and the request for injunctive relief must be denied.

### C.    PLAINTIFF WILL NOT SUCCEED ON THE DUE PROCESS CLAIM.

Count IV of the Complaint raises a claim under the Fourteenth Amendment for a

violation of plaintiff's substantive due process rights.  To succeed on a substantive due process

claim, a "plaintiff must show *both* that the acts were so egregious as to shock the conscience *and*

that they deprived him of a protected interest in life, liberty, or property."  Harron v. Town of

Franklin, 660 F.3d 531, 536 (1st Cir. 2011) (citing Pagan v. Calderon, 448 F.3d 54, 64 (1st Cir.

2006) (emphasis in original)). See also Martinez v. Cui, 608 F.3d 54, 64-65 (1st Cir. 2010);

County of Sacramento v. Lewis, 523 U.S. 833, 845-846 (1998) (establishing the two-tiered

approach of the shocks-the-conscience test and clarifying that the test applies to all substantive

due process claims based on executive, as opposed to legislative, action).  The First Circuit has

set a high bar for showing when an executive action violates substantive due process:

> Executive acts that shock the conscience must be 'truly outrageous,
> uncivilized, and intolerable,' and 'the requisite arbitrariness and caprice
> must be stunning, evidencing more than humdrum legal error.  Indeed, '[a]
> hallmark of successful challenges is an extreme lack of proportionality, as
> the test is primarily concerned with violations of personal rights so severe
> [,] so disproportionate to the need presented, and so inspired by malice or
> sadism rather than merely careless or unwise zeal that it amounted to a
> brutal and inhumane abuse of official power literally shocking to the
> conscience.

Harron, 660 F.3d at 536 (quoting Gonzales-Fuentes v. Molina, 607 F.3d 864, 880-881 (1st Cir.

2010)); Williams v. City of Brockton, 146 F.Supp.3d 290, 312 (D. Mass. 2015).  "The history of

the substantive due process doctrine indicates that it is to be applied with 'caution and restraint.'"

Santiago de Castro v. Morales Medina, 943 F.2d 129, 130 (1st Cir. 1991).

Here, plaintiff will not succeed on her claim under the Fourteenth Amendment for a

violation of her substantive due process rights.  The complained of policies of the DOC

regarding plaintiff's conditions of confinement as a GD inmate fall far short of the shocks-the-

conscience test.  In the absence of facts plausibly demonstrating that the defendants have

engaged in conduct that is "truly outrageous, uncivilized, and intolerable," the due process claim will fail and the request for injunctive relief must be denied.

### III.    PLAINTIFF HAS FAILED TO DEMONSTRATE THE POTENTIAL FOR IRREPARABLE HARM .

Here, plaintiff has failed to demonstrate that she suffers from or will suffer irreparable harm in the future as a result of defendants' alleged conduct with regard to her placement at MCI-Norfolk.  It is undisputed that plaintiff is presently provided with treatment for her GD in the form of hormone therapy, psychotherapy, access to the same clothing and cosmetics available to female offenders, laser hair removal, and preventative healthcare, including mammograms.  Peterson Aff., ¶¶ 5-8.  Plaintiff was provided with an individualized assessment of her placement within the DOC in December 2017.  Id. ¶ 15.  Plaintiff was able to participate in and complete the Correctional Recovery Academy in December 2017 and is able to engage in work at MCI-Norfolk.  Id. ¶¶ 10-11.  Plaintiff also participates in program and recreational activities. Id. ¶ 10.  Plaintiff has a single cell on the 3-2 housing unit and is provided with an alternative time for showering separate from other inmates.  Id. ¶ 9; Medieros Aff. ¶ 13.  Plaintiff's allegations of harassment are being investigated.  Medeiros Aff. ¶¶ 29, 33.  Plaintiff has opportunities to raise concerns regarding her conditions of confinement via the DOC grievance procedures and in staff access periods at MCI-Norfolk. Id. ¶¶ 29-33. Further, the DOC has provided training to staff regarding issues associated with working with GD inmates, including the proper use of pronouns.  Peterson Aff. ¶ 19.

Accordingly, the request for injunctive relief should be denied where plaintiff is able to demonstrate that she faces irreparable harm.

## IV.  **DEFENDANTS WILL SUFFER THE GREATER HARM IF INJUNCTIVE RELIEF IS GRANTED.**

A preliminary injunction is not warranted in this action and the DOC will suffer the greater harm should the requested injunctive relief be provided.  The request for injunctive relief, in effect, seeks to have the court step in and mandate that the defendants undertake specific actions on behalf of plaintiff.  As detailed above, much of the relief sought by plaintiff, i.e., an individualized assessment as to placement; access to alternative shower times separate from other inmates; an adequate shower curtain, have been made available to plaintiff.  In addition, the DOC provides training for staff regarding working and communicating with GD inmates. Importantly, the DOC's GD policy provides for an individualized assessment of each GD inmate with regard to placement within DOC facilities and there is no blanket policy requiring that all GD inmates be placed in a prison matching their birth sex.  See 103 DOC 652.09.  However, mandating that plaintiff be placed at MCI-Framingham despite her December 2017 individualized assessment would harm the defendants by overriding its valid administrative process.  Further, mandating that only female correction officers conduct strip searches of plaintiff at MCI-Norfolk would place safety, security, and operational burdens upon the defendants.    In order to provide for public safety as well as maintain institutional integrity and ensure the efficient use of scarce resources, it is imperative that prison administrators be permitted to utilize their experience and skills developed working in the difficult environments of correctional facilities to address the issues raised by plaintiff in this action, including classification, search procedures, and staff training.

## V.  **GRANTING INJUNCTIVE RELIEF IS NOT IN THE PUBLIC'S INTEREST.**

It is in the public's interest that the DOC be provided with the flexibility to respond to

28

issues which raise operational, safety, security, and financial concerns within the correctional system. Such issues should remain in the hands of those with the expertise and experience to handle them.  The management of a prison system is an extremely difficult task and it is in the public's interest that qualified prison administrators be permitted to address operational and security issues.  It is not in the public's interest for this Court to step in where the DOC has already implemented a GD policy which provides for the identification, treatment and management of GD inmates.  The DOC's GD policy provides for placement of GD inmates based on individualized assessments.  The DOC has already addressed the majority of the issues raised by plaintiff in this action, including providing her with an individualized assessment of her placement within the DOC, alternative times for showering, PREA shower curtains, and medical healthcare.  Positive steps have been taken to address the issues raised with regard to plaintiff's conditions of confinement as an inmate diagnosed with GD while remaining cognizant of the significant operational, security and financial requirements of the correctional system. Accordingly, it is not in the public's interest for this court to enter the injunction sought by plaintiff.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that Plaintiff's Motion for a Preliminary Injunction be denied.

Defendants,
By their attorneys,

NANCY ANKERS WHITE
Special Assistant Attorney General

Dated: February 21, 2018        /s/ *Richard C. McFarland*
                                Richard C. McFarland, BBO# 542278

Legal Division
Department of Correction
70 Franklin Street, Suite 600
Boston, MA 02110-1300
(617) 727-3300, ext. 1132
richard.mcfarland@state.ma.us

## CERTIFICATE OF SERVICE

I, Richard C. McFarland, counsel for defendants, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on 2/21/18.

 /s/ *Richard C. McFarland*
Richard C. McFarland

30