UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE,<br>Plaintiff,<br><br>v.<br><br>MASSACHUSETTS DEPARTMENT OF CORRECTION, et al.,<br>Defendants. | C.A. NO. 17-12255-RGS |

**AFFIDAVIT OF SEAN MEDEIROS**

I, Sean Medeiros, do on oath depose and state:

1. I am an employee of the Massachusetts Department of Correction ("DOC") and presently serve as the Superintendent of Massachusetts Correctional Institution in Norfolk, Massachusetts ("MCI-Norfolk"). I was appointed to this position in September 2014.

2. I have been employed by the DOC since September 1987. I was the Deputy Superintendent of Operations at MCI-Norfolk from September 2011 until February 2014, when I was promoted to Acting Superintendent of MCI-Norfolk. Prior to becoming the Deputy Superintendent of Operations I held the position of Director of Security at MCI-Norfolk.

3. The statements in this affidavit are based on my personal knowledge and/or upon my review of DOC records that are kept and maintained in the normal course of business.

4. As the Superintendent of MCI-Norfolk, I am responsible for the overall operation of the prison, including the maintenance of security, safety and order within the prison. *See* M.G.L. c. 125 § 14.



5. I am familiar with MCI-Norfolk inmate Jane Doe. I have reviewed her institutional records. According to her institutional records, Jane Doe began her third incarceration with the DOC on October 31, 2016 at MCI-Cedar Junction, the DOC's inmate reception facility. Jane Doe is presently serving a three (3) to four (4) year sentence for the crime of Possession with Intent to Distribute a Class A Drug, G.L. c. 94C, § 32. Presently, Jane Doe has a parole eligibility date of September 16, 2018 and the date of her release from DOC custody is September 16, 2019. Jane Doe's classification review, completed in December 2017, determined that she should remain at MCI-Norfolk.

6. In accordance with the federal Prison Rape Elimination Act ("PREA"), MCI-Norfolk inmates diagnosed with GD are provided with alternative showering times apart from other inmates on their housing units. GD inmates at MCI-Norfolk are now provided with letters which advise their housing unit staff that they are authorized to utilize an alternative time for showering pursuant to PREA. Attachment A.

7. All inmate showers at MCI-Norfolk must utilize plastic shower curtains specified by PREA, designed to discourage sexual activities between inmates in showers by enabling staff to detect if there is more than one inmate in the shower. The PREA required shower curtains have a large opaque portion covering the middle of the shower curtain, approximately three (3) feet wide, starting approximately one (1) foot from the bottom of the shower curtain. The bottom one (1) foot of the shower curtain and the top of the curtain, starting approximately four (4) feet from the bottom are transparent. The opaque portion of the shower curtain provides privacy for the inmate's torso while the transparent strips at the bottom and top of the shower curtain enable staff to determine if the inmate is not alone in the shower. Attachment B. As a result of the requirements of PREA, MCI-Norfolk is not permitted to use shower curtains that are entirely opaque for inmate showers.

8. According to institutional records, shortly after Jane Doe's arrival at MCI-Norfolk the facility's mental health staff were made aware her prior diagnosis of gender dysphoria ("GD") based on medical records from her prior DOC incarcerations. Jane Doe was previously incarcerated with the DOC from October 1, 2010 to July 3, 2012, and from February 25, 2003 to September 3, 2005.

9. On November 30, 2016, Jane Doe was transferred to MCI-Norfolk. Upon arrival at MCI-Norfolk, Jane Doe was housed on the P-1 Orientation Unit. The P-1 Orientation Unit is a dormitory style unit within the general population where all newly arriving inmates are initially housed. While on the P-1 unit, as an inmate diagnosed with GD, Jane Doe was provided with an alternative showering time that was separate from the other inmates on the unit. On December 12, 2016, Jane Doe was transferred to the 8-1 housing unit of MCI-Norfolk. Jane Doe was transferred from the P-1 unit to a single cell on the 8-1 unit on December 6, 2016 in response to a request made by mental health staff members in response to Jane Doe's statements to her therapist that she felt uncomfortable being housed on the P-1 housing unit.

10. While housed on the 8-1 unit, Jane Doe was provided an alternative time for showering apart from other inmates. Jane Doe was housed on the 8-1 unit from December 6, 2016 to December 28, 2016. Jane Doe's single cell contained a toilet and sink. The showers on the 8-1 housing unit are located at the end of each tier.

11. On December 28, 2016, Jane Doe was transferred to the P-2 housing unit at her request. The P-2 housing unit is a dormitory unit similar to the P-1 unit.

12. On January 6, 2017, Jane Doe was moved to a single cell on MCI-Norfolk's 3-2 housing unit. The 3-2 housing unit houses 62 inmates in both single and double cells on three (3) floors. Each cell contains a toilet and a sink. There is a shower area on each floor on the 3-2

housing unit. While housed on the 3-2 housing unit, Jane Doe was provided with access to an alternative showering time separate from other inmates. During the alternative showering time for GD inmates, no other inmates are permitted to use the shower area.

13. Inmates on the 3-2 housing unit are required to utilize the showers located on their floor and are not permitted to take their showers on other floors. The shower area on the second and third floors of the 3-2 housing unit differ from the showers on the first floor in that the second and third floor showers have an adjacent changing area with a solid curtain. Contrary to Jane Doe's allegation, the shower on the third floor of the 3-2 housing unit is not designated as a GD shower. Jane Doe complains in her affidavit that she was told by a correction officer that she could not use the shower on the third floor when her cell was on the second floor. However, on February 22, 2017, Jane Doe was assigned to a cell on the third floor of the 3-2 housing unit and had access to the third floor shower area. Attachment B (photo of shower area on 3-2 housing unit)

14. On June 5, 2017, Jane Doe was approved for participation in the Correctional Recovery Academy ("CRA"), a substance abuse program available to MCI-Norfolk inmates. The CRA program is typically six (6) months long. Inmates participating in the CRA program are assigned to the 7-2 and 7-3 housing units for the duration of their participation in the program.

15. Due to her approval for participation in the CRA program, Jane Doe was assigned to a single cell on the 7-2 housing unit from June 5, 2017 to December 1, 2017. Jane Doe was assigned to a single cell on the 7-3 housing unit from December 1, 2017 to January 8, 2018. While housed on the 7-2 and 7-3 housing units Jane Doe was provided with an alternative showering time separate from the other inmates on the units.

16. Subsequently, Jane Doe completed the CRA program and was moved to a single cell on the 7-1 unit on January 8, 2018. On February 2, 2018, Jane Doe was moved to a single cell on the third floor of the 3-2 housing unit where she is presently housed.

17. Jane Doe has alleged in her affidavit that the PREA shower curtains do not provide privacy while she showers because the opaque portion of the curtain does go high enough to cover her breasts. However, measurements made of the PREA curtain show that the opaque portion of the curtain covers an area approximately one (1) foot to four (4) feet off the floor. Where, according to institutional records, Jane Doe is five (5) foot, three (3) inches tall (5'3"), and the opaque portion of the PREA shower curtain should be sufficient to cover Jane Doe's torso.

18. Jane Doe also alleges in her affidavit that "male prisoners routinely stand on the tier above the bathroom to see me naked and sexually harass me." However, with the exception of the 8-1 housing unit, none of the housing units Jane Doe has been assigned to at MCI-Norfolk, including her current 3-2 housing unit, have tiers.

19. Strip searches are conducted on inmates at MCI-Norfolk pursuant to the DOC's *Search* policy, 103 CMR 506.00, *et seq.* Strip searches are an important part of MCI-Norfolk's security procedures and assist staff in their efforts reduce the presence of drugs, weapons, and other contraband within the facility. Strip searches are employed for routine security checks or when there is a specific suspicious incident that would indicate that an inmate is perhaps carrying contraband. Specific situations in which strip searches may be used include before and after court trips, medical trips, and visits. 103 CMR 506.04(1).

20. Strip searches of inmates involve a visual inspection of the inmate and do not involve the correction officers conducting the search to touch the inmate. 103 CMR

506.04(1)(C). It would be improper for a correction officer to touch an unclothed inmate during a strip search. Such improper touching could also constitute a PREA violation.

21. The DOC *Search* policy provides that "[I]nmates identified as having gender identity disorder shall be identified as the gender of the facility in which they are housed." 103 CMR 506.04(1). It would be extremely difficult to implement a policy at MCI-Norfolk to require that only female correction officers could conduct the strip searches of Jane Doe and the other GD inmates incarcerated at MCI-Norfolk.

22. At the present time, MCI-Norfolk employs thirty-one (31) female correction officers: fourteen (14) on the 7:00 a.m. until 3:00 p.m. shift; six (6) on the 3:00 p.m. to 11:00 p.m. shift; four (4) on the 1:00 p.m. to 9:00 p.m. shift; two (2) on the 11:00 p.m. to 7:00 a.m. shift; and five (5) house officers who vary between the day and evening shifts. MCI-Norfolk employs approximately 340 male correction officers. Female officers are <u>not</u> restricted from working any posts at MCI-Norfolk based on the applicable collective bargaining agreements between the agency and the correction officers' unions as well as current labor law requirements. By not restricting female officers' posts, I feel that it affords them the full range of experience they may need to be competitive for promotional opportunities. Further, not restricting where female officers can work allows the institution the greatest flexibility in utilizing its line staff.

23. Strip searches are performed by two correction officers and should be conducted in relative privacy rendering as much dignity to the situation as possible in accordance with the *Search* policy. 103 DOC 506.04(6).

24. I am aware that Jane Doe has requested that her strip searches be conducted by female correction officers. However, there are not always two female correction officers readily available to conduct strip searches. In my professional opinion, even if there were two female

correction officers are available on the shift, requiring male officers to call for two female officers from other posts to conduct a strip search of Jane Doe or other GD inmates, and then wait for the two female correction officers officer to arrive, is not an acceptable security practice, given the associated security risks. Even if the GD inmate is placed at the end of the line of inmates to be strip searched until two female correction officers are located, it nonetheless may slow down the process of having the inmates complete the search procedure and enter the facility, their housing units, or other areas of the facility, or have visits. This, in turn, could raise tensions amongst the other inmates who might perceive and be resentful of experiencing delays in their access the prison, meals, programs, and/or recreation.

25. Operationally, the process of relieving two female correction officers from their posts in order that they could conduct a strip search of Jane Doe or other GD inmates is problematic since it would cause disruptions within the security of the prison and may delay the movement of inmates throughout the prison.

26. Another problem resulting from the request that only female correction officers conduct strip searches on GD inmates such as Jane Doe, concerns the fact that some of MCI-Norfolk's female correction officers may refuse to conduct strip searches of GD inmates. Presently, there are seven (7) inmates diagnosed with GD incarcerated at MCI-Norfolk.

27. In addition to potentially causing institutional climate problems amongst MCI-Norfolk inmates, requiring female correction officers to conduct the strip searches of Jane Doe and other GD inmates would likely cause tensions to arise between male and female correction officers where female correction officers may perceive the requirement as creating additional work or curtailing the female officers from being assigned to other posts within the prison due to the need to be available to conduct strip searches of GD inmates.

28. In my opinion, Jane Doe's request to be strip searched solely by female correction officers would be very difficult to facilitate given the limited number of female correction officers on staff. I believe that requiring that Jane Doe and other GD inmates be pat searched by female officers would also create safety and security problems for the prison.

29. Pursuant to the DOC *Inmate Grievance* policy, 103 CMR 491.00, *et seq*., inmates may submit grievances in order to bring issues to the attention of staff including issues pertaining to prison conditions, property, staff conduct, etc. *See* 103 CMR 491.11. Previously, I had not been made aware of any of the five (5) grievances submitted by Jane Doe since her arrival at MCI-Norfolk on October 31, 2016. However, as a result of this litigation, I reviewed the grievances submitted by Jane Doe. As a result of my review of Jane Doe's grievances, I located an informal grievance submitted by Jane Doe on June 8, 2017 in which she alleged that some MCI-Norfolk correction officers had touched her breasts during strip searches. Even though Jane Doe's allegation did not identify the correction officer(s) alleged to have touched her inappropriately, an investigation into the allegation should have been initiated at the time the allegation was made. Accordingly, I have now commenced an investigation into the alleged improper strip searches.

30. My recent review of Jane Doe's grievances also revealed a grievance submitted by Jane Doe on March 28, 2017 complaining that a correction officer on the 3-2 housing unit would not permit her to use the shower area on the third floor when she was housed on the second floor and had access to the shower on that floor. It is my understanding that that issue was remedied when Jane Doe was moved from a cell on the second floor to a cell on the third floor of the 3-2 housing unit on February 22, 2017.

31. MCI-Norfolk provides Staff Access periods twice weekly in which inmates may raise issues with MCI-Norfolk's senior staff members, including the Superintendent, Deputy Superintendents, Director of Treatment, Director of Security, Inner Perimeter Security ("IPS") and other staff members. While I have observed Jane Doe attend staff access on several times during her incarceration at MCI-Norfolk, I recall only one occasion that she approached me to discuss an issue with regard to her confinement. The issue raised by Jane Doe with me did not pertain to allegations of improper searches of her person or cell or harassing behavior by MCI-Norfolk staff.

32. I am aware of the incident in which a shank was found in Jane Doe's cell on the 7-2 housing unit on November 29, 2017. According to the investigation into the incident, a shank was found taped to the underside of the desk in Jane Doe's cell. Contrary to her allegation, there was no note with a homophobic slur attached to the shank. The investigation into the incident determined that it was likely that the shank had been placed in Jane Doe's cell by another inmate. It is a routine practice to conduct a search of a cell upon discovery of a shank in the cell. Jane Doe did not submit a grievance reporting that her cell had been left in disarray by the staff members conducting the search. However, as a result of the incident, Jane Doe was transferred to the 7-3 housing unit where she was able to complete the CRA program without incident.

33. I was made aware of Jane Doe's allegations regarding an incident that took place on January 11, 2018 incident involving Sergeant Clement. Jane Doe alleges that Sergeant Clement made a comment, while processing her into the facility after her return from a medical appointment, that her pants were too tight. Jane Doe then alleges that Sergeant Clement required her to take the pants off and provided her with a pair of pants that were larger. Because MCI-

Norfolk inmates are not permitted to wear pants that are too small or too tight, it would have been appropriate for Sergeant Clement to have provided her with pants that fit her better. However, an investigation has been initiated into Jane Doe's allegations that Sergeant Clement made improper and degrading comments to her.

Signed under the pains and penalties of perjury this 15th day of February, 2018.

Sean Medeiros,
Superintendent




*The Commonwealth of Massachusetts*
*Executive Office of Public Safety and Security*
*Department of Correction*
*Massachusetts Correctional Institution Norfolk*
*2 Clark Street, P.O. Box 43*
*Norfolk, Massachusetts 02056*
*Telephone (508)660-5900*

*www.mass.gov/doc*

CHARLES D. BAKER
*Governor*

KARYN E. POLITO
*Lieutenant Governor*

DANIEL BENNETT
*Secretary*

THOMAS A. TURCO III
*Commissioner*

JOHN A. O'MALLEY
*Chief of Staff*

PAUL DIETL
BRUCE I. GELB
MICHAEL G. GRANT
CAROL A. MICI
*Deputy Commissioners*

Sean Medeiros
*Superintendent*

December 13, 2016

MCI-Norfolk/Unit 8-1
2 Clark Street
P.O. Box 43
Norfolk, MA 02056

Be advised you have been authorized for alternate shower periods based on your transgender classification.

You may use the shower between 2:30PM - 3:30PM on odd days and 8:00PM - 9:00PM on even days of the month.

I trust this addresses your concerns.

Sincerely,

Richard Pizzuto,
Deputy Superintendent

RP/hlb

pc: Andy Rego, Captain
Brett Barros, Housing Lt.
8 Block Sgt.
File

ATTACHMENT A




*The Commonwealth of Massachusetts*
*Executive Office of Public Safety & Security*

*Department of Correction*
*Massachusetts Correctional Institution Norfolk*
*2 Clark Street, P.O. Box 43*
*Norfolk, MA 02056*

*www.mass.gov/doc*

**Charles D. Baker**
*Governor*

**Karyn E. Polito**
*Lieutenant Governor*

**Daniel Bennett**
*Secretary*

**Thomas A. Turco III**
*Commissioner*

**John A. O'Malley**
*Chief of Staff*

**Paul Dietl**
**Bruce I. Gelb**
**Michael G. Grant**
**Carol A. Mici**
*Deputy Commissioners*

**Sean Medeiros**
*Superintendent*

January 18, 2018

[redacted]
MCI-Norfolk, Unit 7-1
P.O. Box 43
Norfolk, MA 02056

Dear [redacted]

You are being issued a new letter in relation to your approved shower time. As you are aware you have been authorized an alternate shower time based your gender identification.

Going forward you are authorized an individual shower time between 3:00pm -3:30am each day. During your designated time the shower area will be out of bounds to other inmates assigned to your unit. If you are moved from the 7-1 Unit for any reason you may be issued a new shower letter. Additionally, due to ongoing water conservation concerns, please keep your water usage to a minimum during your scheduled shower time.

If you should have any questions or concerns please see me during access hour.

Sincerely,

Kristie Ladouceur
Kristie Ladouceur
Deputy Superintendent

cc. Andrew Rego, Captain
Brett Barros, Housing Lt.
Block Sgt.
File

ATTACHMENT B