COMMONWEALTH OF MASSACHUSETTS

DEPARTMENT OF CORRECTION

103 DOC 506

SEARCH POLICY

TABLE OF CONTENTS

506.01    Superintendent's Search Authority ...................... 2
506.02    Definitions ........................................... 2
506.03    Institution Search Plan ............................... 3
506.04    Strip Searches ........................................ 7
506.05    Fully Clothed Searches (Pat Search) ................... 13
506.06    Housing Area Searches ................................. 15
506.07    Non-Housing, Shop, Program and Activity Area Searches .. 19
506.08    Vehicle and Supply Searches ........................... 20
506.09    Cell Phone and Contraband Interdiction Plan ........... 22
506.10    Seizure of Contraband/Evidence ........................ 23
506.11    Storage of Contraband/Evidence ........................ 24
506.12    Disposal of Contraband/Evidence ....................... 26
506.13    Crime Scene Search and Investigation .................. 28

ATTACHMENTS    A Permission to Search Vehicle Waiver ............ 29
               B Vehicle Inventory Sheet  ...................... 30
               C Seizure Inspection Form ....................... 31
               D Evidence Custody Form ......................... 33
               E Protection of Crime Scene ..................... 34
               F Dying Declaration ............................. 38
               G Body Orifice Security Scanner (BOSS Chair) ..... 39
               H Protocol for Searching Medicine Bag ........... 40
               I MA State Police Drug Unit Submission Guidelines 41
               J B-Scan Body Scanner............................ 44

EXHIBIT

5

| MASSACHUSETTS DEPARTMENT OF CORRECTION | POLICY DEVELOPMENT AND COMPLIANCE UNIT |
|---|---|
| SEARCH POLICY | 103 DOC 506 |

**PURPOSE:** The purpose of this policy is to establish internal Departmental Procedures for searching person(s) and/area(s) within the legal boundaries of each institution. Searches are conducted to detect and prevent the introduction of contraband, recover missing or stolen property, to prevent escapes and other disturbances.

**REFERENCES:** M.G.L. Chapter 124, Section 1 (a), (b) and (q)
DPH Drug Destruction Protocol

**APPLICABILITY:** Staff/Inmates          **PUBLIC ACCESS:** Yes

**LOCATION:** DOC Central Policy File
Institution/Superintendent Central Policy File

**RESPONSIBLE STAFF FOR IMPLEMENTATION AND MONITORING OF POLICY:**
- Director of the Policy Development and Compliance Unit
- Superintendents

**EFFECTIVE DATE:** 08/10/2017

**CANCELLATION:** This policy cancels all previous department policy statements, bulletins, directives, orders, notices, rules and regulations regarding planning which are inconsistent with this policy.

**SEVERABILITY CLAUSE:** If any part of this policy is for any reason held to be in excess of the authority of the commissioner, such decision will not affect any other part of this policy.

October 2017                                                                 506 - 1

## 506.01    SUPERINTENDENT'S SEARCH AUTHORITY

The superintendent or his/her designee may order the search of any person entering or confined in an institution, in or on state property, including parking areas, in order to ensure the security and safety of that institution, its inmates, employees, and visitors.

Staff, inmates and visitors shall be notified in writing (e.g., handbooks, posting, etc.) of the general institution policy regarding searches and items considered to be contraband.

## 506.02    DEFINITIONS

Reasonable Suspicion – Reasonable suspicion exists if the facts and circumstances known to a staff member warrant rational inferences by a person with correctional experience that a person is engaged in, attempting, or about to engage in criminal or other prohibited activities, including possession of prohibited objects.  Reasonable suspicion may be based on:
- Observations by staff;
- Reliable information, even if confidential;
- A positive reading by a metal detector or other electronic device;
- Finding contraband or  indication of contraband during the search of a staff member's belongings.

Anonymous information cannot be the basis for reasonable suspicion without reliable corroboration. "Hunches," "gut feelings," or "mere suspicion" do not meet the reasonable suspicion standard.

Staff –  For purposes of this policy, the term "staff" includes DOC employees, vendors and volunteers.

Strip Search – A search in which a person removes all clothes. A strip search may include a visual inspection of a person's oral, anal, or vaginal cavity.  This also includes a thorough search of all of the individual's clothing while it is not being worn.

Pat Search - A clothed search of an individual limited to the pressing of palms of the hand against the outer surface of an individual's clothing, and examination of all pockets, shoes, caps and hairpieces.  It does not include the removal of any of the person's clothing except removable outer garments (e.g. cardigan sweaters, blazers, suit jackets, coats).

## 506.03    INSTITUTION SEARCH PLAN

1.  Each superintendent shall develop and annually update an institution search plan which will include frequent unannounced searches of inmates, inmate quarters and every other area of the facility as often as necessary to ensure the safety and security of the facility.  Searches are conducted for the following reasons:

    A.  To prevent the unauthorized introduction of contraband to include weapons, electronic devices and other dangerous items into an institution.

    B.  To detect the manufacture of weapons, escape devices, etc. to prevent against escape or other disturbances.

    C.  To discover and suppress trafficking between inmates as well as between employees and inmates, and inmates and visitors.

    D.  To discourage theft and trafficking in institution stores and property.

    E.  To check malicious waste or destruction of state property.

    F.  To discover hazards to health and safety that may go unnoticed during a more routine inspection.

    G.  To recover missing or stolen property.

    H.  To discover suicide and homicide attempts or potential suicide and homicide attempts by detecting excess items such as shoelaces, metal, plastic bags, medications, etc., within an inmate's cell/room.  When searching an inmate's cell/room his/her mental status should be considered.

2.  Institution search plans shall include the following:

    A.  Medium and Maximum Security Facilities:

        I.  Frequency of Searches

            Housing Units- All cells/bed areas shall be searched at a minimum of once per month.

Non Housing/common areas (inmate access) - All non-housing/common areas that have routine access by inmates shall be searched at a minimum of once per month, i.e., library, gym, work areas, etc.

Non housing areas - All non-housing areas that are not routinely accessible to inmates may be searched at a minimum of once per quarter.

B.   Minimum and Pre-release Facilities:

I.   Frequency of Searches:

Housing Units - All inmate rooms/bed areas shall be searched at a minimum of once per quarter.

Non Housing/common areas - All non housing/common areas shall be searched at a minimum of once per month.

Inmates - All inmates shall be strip searched and pat searched at a minimum of once per quarter. These searches are above and beyond those searches that occur on a routine basis.

C.   All facilities:

I.   Departmental Property List

This list shall be attached to the institution search plan. All items not listed shall be considered contraband.

II.   Reporting

The superintendent must also establish standard reporting periods for cyclical searches.

III.  Metal Detector Guidelines

Each superintendent shall develop institutional procedures respecting the use of hand-held and walk-through metal detectors in order to safeguard against the risk posed to individuals with automatic implantable cardioverter defibrillator and/or pacemakers.

At a minimum, the following sign shall be posted permanently in any institutional area where such searches are commonly done:

"Use of hand-held and walk-through metal detectors may interfere with the operation of an automatic implantable cardioverter defibrillator and/or pacemaker. Notify staff if you have such a device and an alternative search procedure will be used."

3. A tracking system to allow staff review of what searches have been conducted to date and to plan for the assignment of future searches, of areas or inmates, in advance, as appropriate.

   A. The Schedule Cell Searches screen should be utilized to schedule specific cell or bed searches, to schedule cells that are still outstanding for the month (or quarter for Minimum and Pre-release facilities), or to use IMS to randomly schedule a selected number of cells to be searched. The Schedule Cell Searches (Auto) screen should be utilized to automatically schedule cells or beds to be searched for a specified time period and frequency by shift.

   B. Common area searches shall be scheduled utilizing the Schedule Common Area Searches screen.

   C. Inmate searches for Minimum and Pre-release facilities shall be scheduled utilizing the Schedule Inmate Searches screen.

   D. The tracking system shall ensure that no particular area of the facility is either ignored or over saturated with searches.

4. A system by which search results are entered into the IMS database.

   A. The results of all prescheduled searches shall be documented in the Cell Search Results, Common Area Search Results, or Scheduled Inmate Results screens, as applicable.

> NOTE:    All fields must be completed within the IMS Search Results screens (the only exceptions being the search comments and items confiscated areas if the search results were negative).

B.    The results of unscheduled inmate searches shall be documented as follows:

    I.    Routine random inmate searches (i.e. searches of random inmates after a meal period, searches of inmates returning from outside work crews, etc.) need not be normally documented. However, if during the course of a routine random search contraband is discovered, the information shall be documented in the Unscheduled Inmate Search Results screen.

    II.    Unscheduled inmate strip searches of Minimum and Pre-release inmates conducted in addition to those required by 103 DOC 506.02 (B) shall be documented in the Unscheduled Inmate Search Results screen.

> NOTE:    The routine random search type (pat search or strip search) of the group must be entered in the "Unscheduled Searches" section of the screen. If the search type for the group is identified as a pat search and a particular inmate is subsequently strip searched, the 'strip' flag shall be checked in the "Inmates Searched" section of the screen.

    III. Unscheduled searches of common areas (i.e. searches of the visiting room before and after visits, yard area searches prior to opening the yard, etc.) shall be documented in the appropriate IMS Activity Log.

C.    Searches of staff members and visitors (i.e. search of the day, etc.) shall be documented in the appropriate IMS Activity Log or logbook.

5.    Posts for routine searches shall be identified in the facilities procedures and will include areas that require the searching of inmates, visitors, and staff. The plan should also cite the strategic advantages and purpose for

such post assignments duties, including the type of search technique generally employed.

506.04    STRIP SEARCHES

1.    Strip Searches of Inmates –

Strip searches should be employed, when necessary, for the close scrutiny of an inmate's person in determining if that inmate is carrying an item(s) considered to be contraband. Searches are to be conducted in a professional and respectful manner and in the least intrusive manner possible, consistent with security needs.

Strip searches shall be employed for routine security checks or when there is a specific suspicious incident that would indicate that an inmate is perhaps carrying contraband.

Searches or physically examining a transgender or intersex inmate for the sole purpose of determining the inmate's genital status shall not be permitted. If the inmate's genital status is unknown, it may be determined during conversations with the inmate, by reviewing medical records, or, if necessary, by learning that information as part of a broader medical examination conducted in private by a medical practitioner.

Inmates identified as having gender identity disorder shall be identified as the gender of the facility in which they are housed. All searches shall be conducted accordingly.

Cross-gender strip searches or cross-gender visual body cavity searches shall not be conducted except in exigent circumstances or when performed by medical practitioners. Should such a situation arise, permission from the superintendent must be obtained prior to the search. The search must be documented in writing through a confidential incident report.

Specific situations in which strip searches may be employed, include but are not limited to:

    a. entrance or exit from a secure perimeter and area;
    b. before and after court, medical trips, or visits;

    c. after the detection of an alleged disciplinary infraction; when custodial staff have reason to believe a person may possess contraband;

    d. after an escape or attempted escape;

    e. prior to placement in segregation from the general population;

    f. routine searches of housing or work areas;

    g. transfer to/arrival at a new institution.

Note: When strip searching an inmate, make notes on observations of tattoos with sketches if possible and send information to your institution's inner perimeter security unit.    Pictures of the tattoos shall be obtained and the Marks, Scars, Tattoo screen in IMS shall be completed, if not previously documented on the screen.

2.    Authorization for Strip Searches of Staff –

    A.    The Officer in Charge must be able to describe the subject's specific behavior(s) and other information supporting the inference of reasonable suspicion. The Officer in Charge should immediately consult with the superintendent of the facility when considering whether a strip search is justified based on reasonable suspicion. The Officer in Charge shall review the information and circumstances with the superintendent. If a superintendent believes that there is reasonable suspicion for a strip search of a staff member (i.e., a DOC employee, vendor or volunteer) to occur, s/he shall notify the Assistant Deputy Commissioner of the Northern or Southern Sector, as appropriate. The subject should remain under direct observation until the strip search occurs.

    B.    A comprehensive review by the Assistant Deputy Commissioner and the Office of Investigative Services and/or the Office of Internal Affairs, depending on the case, verifying reasonable suspicion, will result in a request to the Deputy Commissioner of Prisons for approval of the actual strip search on grounds of reasonable suspicion.

    C.    The Deputy Commissioner of Prisons, or his/her designee, must then make a determination of reasonable suspicion, based upon a review of the specific facts in each situation and rational inferences drawn from

the facts. The Deputy Commissioner of Prisons shall brief the Commissioner prior to the strip search of the staff member based on a determination of reasonable suspicion, or as soon thereafter as reasonably possible.

D.   Body cavity searches of staff members are prohibited.

3.   Procedure for Strip Searches of Staff Members When Reasonable Suspicion Exists

A.   Strip searches of staff members may only be conducted when authorized by the Deputy Commissioner of Prisons or his/her designee, after a determination of reasonable suspicion that the staff member is engaging, or attempting to engage, in, prohibited activities, including possession of prohibited objects.

B.   Each Superintendent shall develop a confidential report containing the documentation of sources/evidence relied upon to determine reasonable suspicion.

C.   The staff member shall be offered union representation prior to the strip search. The staff member may request that a same sex union representative remain present during the strip search.

D.   The staff member may not return to the parking lot prior to being searched.

E.   The entire situation shall be recorded using audio recording. Date, time, place of search, all names and titles of individuals involved and role in search; circumstances justifying the search; and search results shall be stated, and the OIS/IAU officer supervising the search shall give verbal instructions and dictate the progress of the search.

F.   Staff members must sign a Consent/Refusal form to be searched and audio-recorded.

G.   If the staff member refuses to comply with the search or refuses to sign the Consent/Refusal form, said staff member will be immediately escorted from DOC

property and not allowed on any DOC property, pending the results of the investigation.  The staff member should receive notice that the consequences of refusal may result in immediate disciplinary action.

H.   Strip searches by members of the opposite sex shall not be permitted.  If a ranking female supervisor is not available, the Deputy Commissioner of Prisons shall designate a female employee (trained in strip search procedure and holding a higher grade than the staff member being searched) from another facility or division to conduct the search. Strip searches must be supervised only by an Office of Investigative Services supervisor or Internal Affairs Unit supervisor, from another work site.   All employees conducting strip searches must have received training in the Department's strip search policy from the Training Academy.

I.   No more than two employees, from OIS/IAU, trained in the Department's strip search policy may be present as part of the strip search team, in addition to the union representative of the staff member being searched.   The presence of additional strip search team members must be approved by the Deputy Commissioner of Prisons.

4.   Refusal by Staff to a Strip Search

Upon learning that a staff member refuses to submit to or comply with an authorized search procedure, the supervisor from OIS/IAU must inform the staff member of the potential consequences of refusal.  The strip search team may not use force to require staff members to submit to searches unless there is evidence of an imminent threat of serious personal injury, or other result that imminently jeopardizes the safety, security, or orderly operation of the facility, or threatens public safety (e.g. a concealed firearm or other weapon).   If the staff member refuses to comply with/consent to such search, said staff member shall be immediately escorted from DOC property and not allowed on any DOC property, pending the results of the investigation. Refusal may result in immediate disciplinary action.

5.   Role of Office of Investigative Services ("OIS")/Internal Affairs Unit ("IAU") in Strip Searches of Staff Members

OIS/IAU shall develop an action plan for each site to include:

- Location of search (to be conducted in a private area);
- Time of search;
- OIS/IAU staff trained/approved to conduct strip searches on staff members;
- Males shall search males and females shall search females;
- There shall always be two same sex strip search team employees present during searches;
- Staff members must sign a consent log before the strip search and audio-recording begins;
- OIS/IAU shall maintain the consent log of staff member strip searches.

6.   Recommended Strip Search Techniques for Inmates

A.   Strip searches of individual inmates should be conducted in relative privacy usually by two security personnel. Strip searches by members of the opposite sex shall not be permitted, except under extraordinary or emergency situations.

B.   In conducting a strip search, the following procedures should be followed: the inmate should remove his/her clothing, place each article in one location and then move at least five feet from that location.

C.   The custodial staff member should conduct a visual examination of the nude inmate rendering as much dignity to the situation as possible. During said search the staff member should verbally instruct the inmate through the strip search procedure to include, but not be limited to: hair (inmates shall be directed to remove hair accessories, hair extensions/weaves/wigs, curlers, barrettes, hats, etc.) ears, nose, hands, fingers, under the tongue, armpits, navel, pubic region, rectum, vaginal area, inner portion of the legs, between the legs, between the toes, and soles of feet. Inmates will also be instructed to lift excess skin or body parts (i.e., breasts, penis, scrotum, etc.) for visual inspection. The inmate should not be instructed to touch or penetrate the anal or vaginal areas. Female inmates shall be instructed to remove any sanitary napkins or

tampons. A replacement shall be given to the inmate at the conclusion of the strip search. Make note of any tattoos, puncture marks, or bruises. If band-aids are detected, have the inmate remove them. As part of the strip search, the inmate shall be instructed to turn around in the standing position, and spread their legs in such a way as to allow for visual inspection of the anal and vaginal area. The inmate shall be instructed to bend forward at the waist and spread their buttocks.

If there is suspicion that the inmate is concealing contraband, in addition to the above-noted procedures, the officer shall instruct then inmate to squat down and cough forcibly.

Any casts, bandages, or artificial limbs shall be scanned by a non-intrusive device.

D. The inmate should be given verbal instruction, on removing the false teeth so item(s) and mouth area can be visually inspected, or on any other articles to be removed to expedite the situation.

E. An examination of the inmate's clothing should follow, including: turning clothing inside out, checking linings, cuffs, waistbands, seams, patches, collars, and shoe heels, soles and interior. Eyeglass cases, watches and any other item found on the inmate's person shall be checked for contraband.

7. Intrusive body cavity search procedure:

A. There will be no intrusive body cavity searches; manual or instrumental, for security reasons unless all of the following have occurred.

 1. Probable cause has been determined through reasonable belief that the inmate is carrying contraband or other prohibited material.

 2. Authorization has been given by the superintendent.

 3. Search warrant has been obtained.

Note: The inspection shall be done by medically trained health care personnel.

8.   Rectal exams performed for medical reasons will be performed for medical cause, in private, by medical personnel, with consent and with the standard medical privacy and confidentiality in effect.

9.   Fecal search procedure: The following procedure is to eliminate or minimize the employees' exposure to all body substances while carrying out his tour of duty.

   A.   The following equipment shall be supplied to conduct the fecal search:

      1.   Disposal latex gloves.
      2.   Disposable resistant surface barrier.
      3.   Plastic or wooden utensils.
      4.   Puncture proof fluid resistant container with biohazard label.
      5.   Red plastic bag for garbage.
      6.   Antimicrobial soap.
      7.   High level disinfectant for cleaning work surface.

   PROCEDURE:

      1.   Cover work surface with protective padding.
      2.   Glove or double glove if preferred.
      3.   Using utensils cut or mash excreta as needed.
      4.   If evidence is found, it is placed in fluid resistant container with biohazard label.
      5.   When done, roll up protective padding with all contents inside and dispose infectious waste.
      6.   Take gloves off and wash hands with an antimicrobial soap.
      7.   Spray surface with high-level disinfectant, wipe it down and spray again to leave a residue on surface.

## 506.05   FULLY CLOTHED SEARCHES (PAT SEARCH)

1.   Pat Searches of Inmates-

   General - Fully clothed searches (pat search) should be employed for the relatively quick scrutiny of an inmate's person. Searches are to be conducted in a professional and

respectful manner and in the least intrusive manner possible, consistent with security needs. Situations where fully clothed searches may be employed include, but are not limited to: egress and ingress to housing units, work sites, dining areas and recreation areas. Cross-gender pat searches of female inmates shall not be permitted absent exigent circumstances. Inmates identified as having gender identity disorder shall be identified as the gender of the facility in which they are housed. All searches shall be conducted accordingly.

2.   Recommended Fully Clothed Search Techniques

A.   When searching a group of inmates, keep searched and unsearched inmates separate. Prior to the actual search, the inmate shall be instructed to remove outer garments such as jacket, sweater, hat, gloves, etc. Then with arms extended to the side at a right angle to the inmate's torso and feet apart shoulder width, the search should commence.

B.   Approaching the inmate from the rear, the custodial staff member shall remove all contents from the inmate's pockets, then custodial staff member will start at the bottom of the head, using both hands, touch or pat a direct course across the bottom of the arms to the armpits and then proceed to the bottom of the shoulders.

C.   Returning hands to the original starting position, pat the shoulders and then down the back and sides to the belt line. Search the belt line, all pockets and then up to the top of the chest area.

D.   At the back of the waistline, proceed down the back and sides of the legs to the shoe tops. Check the shoe tips, cuffs and socks and then the front and inside of the legs to the shoe tops. Check the shoe tips, cuffs and socks and then the front and inside of the legs up to the groin area.

E.   Observation should be made of the hair, ears, mouth, as well as any article carried or worn by the inmate.

F. Special care should be exercised in the examination of necklaces and jewelry.

3.   Authorization for Non-Emergency Pat Searches of Staff beyond the search of the day –

   A.   The Officer in Charge must be able to describe the subject's specific behavior(s) and other information supporting the inference of reasonable suspicion. The Officer in Charge should immediately consult with the superintendent of the facility when considering whether a pat search is justified based on reasonable suspicion. The Officer in Charge shall review the information and circumstances with the superintendent. If a superintendent believes that there is reasonable suspicion for a search of a staff member (i.e., a DOC employee, vendor or volunteer) to occur, authorization may be given. The subject should remain under direct observation until the pat search occurs.
   B.   The staff member shall be offered union representation.
   C.   The staff member may not return to the parking lot prior to being searched.
   D.   If the staff member refuses to comply with the search, said staff member will be immediately escorted from DOC property and not allowed on any DOC property, pending the results of the investigation. The staff member should receive notice that the consequences of refusal may result in immediate disciplinary action.
   E.   Pat searches of any staff shall be witnessed by a Shift Commander.
   F.   Pat searches shall be conducted by staff holding a higher grade than the staff member being searched and are to be conducted in a professional and respectful manner and in the least intrusive manner possible, consistent with security needs.
   G.   Cross gender pat searches of staff shall not be permitted.
   H.   All searches will be appropriately documented in a confidential report.

506.06   <u>INMATE HOUSING AREA SEARCHES</u>

1.   General - In conducting searches of housing areas as with other types of searches two basic objectives are sought: identification of contraband and the detection of future escape attempts. As a result, efforts should be made to be thorough in conducting searches of these areas. Care should be taken not to damage an inmate's property or unnecessarily disarrange same. Facilities shall document

all housing area searches in the IMS Cell Search Results and Common Area Search Results screens. Mechanisms shall be established for tracking all types of searches by the designated supervisor, e.g., utilization of the IMS search reports, Morning Report, etc.

2.  Searching cells is a time consuming operation, so it is important to proceed systematically. Searches of cells having up to three bunks shall entail the search of the entire room, including all bunk areas each time the room is searched. For multiple bunk and dormitory areas consisting of four or more bunks, facility procedures shall detail the approach to be taken, i.e., the number of bunks and which areas will be searched at one time and should consider the manageability of the task. The following is recommended techniques for searching housing areas.

A.  Staff should search cells the same way each time until it becomes automatic; this will promote efficiency and thoroughness.

B.  Remove the inmate from the cell/area, strip search and escort him or her to another secure area.

C.  Before entering the cell, secure the cell door in the open position to avoid being accidentally locked in the cell.

D.  Before searching the cell, look at the items that are about to be searched. See if anything is out of the ordinary. If so examine that item carefully.

E.  Start the search with the bed and use it as a workbench when finished searching it. Remove the mattress and other bedding and examine above and below the bunk and in any crevices between the bunk frame and the wall. Look under the bed and check for items suspended from springs or fastened to the bed frame. With the mattress removed, examine the upper side of the bed frame and springs. Examine the bed frame supports to ensure that they have not been partially sawed through for easy removal.

F.  Examine the mattress and pillows by rolling them lengthwise. Check the sides and ends for cuts and tears in the covering. Any indication of re-sewn seams calls for a more careful examination, including

opening the seams for extensive probing.  A hand held metal detector is very effective in finding metallic contraband in these items.

G.  Examine the remaining bedding.  Pay special attention to any seams or double thickness of cloth.

H.  Search the foot/wall locker next, one shelf at a time, and return all items to their original positions. Examine all surfaces of the locker.  Contraband may be taped to the underside of shelves or concealed in shelf ledges, supports, legs, or false sides or backs of the shelves. Also, examine any paper used to line shelves.

I.  Check all clothing (including dirty laundry) piece by piece.  Pay special attention to seams, double thickness of material, and pockets.

J.  Open and check every item (letters, books, magazines, toilet articles, and so forth)

K.  Examine coat hangers; certain types of plastic hangers are excellent places to conceal contraband.

L.  Check all footwear, including linings, soles, and heels: feel inside shoes all the way to the toe and remove inner soles and any removable arch supports.

M.  Shake talcum powder containers and squeeze toothpaste tubes.  Remove a small contents of commonplace items to check for illegal substitutions.  Check to see that cakes of soap have not been hollowed out.

N.  Look in, under, and behind the wash basin and in the drain, overflow, and gooseneck water seal (if accessible). Contraband may be suspended in the pipes or hollows on wires or threads, or stuck on with glue or tape.

O.  Examine the toilet carefully, inside and out. Check under the base of the toilet, behind the toilet where it connects to the wall, and the toilet drain.

P.  Examine the toilet paper holder and all rolls of toilet paper to make certain that currency or other contraband is not rolled up within the roll.

Q.   If there are electrical outlets or other similar
     access panels in the room, remove them and inspect the
     cavities.

R.   If there are appliances, examine them carefully.
     Remove backs if applicable, check battery wells,
     examine electrical cords, and confiscate items with
     tampered property seals or appear to have been altered
     so the insides can be searched by designated
     individuals prior to return to the inmate.

S.   Carefully remove any pictures from frames and examine
     the frame and backing material.   Remove all wall
     coverings to see if there are any cuts in walls.

T.   Carefully scrutinize the walls, ceiling and floor for
     indications of sawing, digging, cutting, defacing or
     other possible signs of an escape attempt.

U.   Look for indications that mortar has been removed and
     replaced with a substitute.   If the concrete is of
     poor quality, it is easy for the inmate to gouge out
     holes as hiding places for contraband.

V.   Check heat or ventilation duct openings for
     indications of tampering or concealed contraband.
     Look for strings, thread, or wire holding something
     suspended in the duct.

W.   Look around interior and exterior window frames and
     the outside window ledge.   If ledges have a covering
     of any sort, be sure that nothing is concealed beneath
     them.

X.   Examine window bars for evidence of tampering.   Be
     alert for any wires, strings, or thread fastened to
     the bars and suspended outside the window.

Y.   Carefully examine the cell door or grille, and the
     wall in which it is set.   Pay particular attention to
     the areas above eye level.   Examine the bars and cell
     door locking device for signs of tampering, and check
     the area with the door in both the open and closed
     positions.

506.07    NON-HOUSING, SHOP, PROGRAM AND ACTIVITY AREA SEARCHES

The following is recommended search techniques for these areas of a correctional facility:

A.    Common-areas of the institution (including areas in housing units, shops, and program areas) should be inspected at a minimum of monthly.

B.    When performed by security staff, searches in other areas of the institution ideally should be conducted in the company of the department head or manager of that section. This facilitates access to otherwise secured areas and assists in advising the staff conducting the search on questionable items.

C.    Visiting areas (including trash, furniture, shakedown areas, and toilet areas) should be thoroughly searched before and after visits. Trash removal should be completed by staff only.

D.    An element of the daily perimeter checks should include searching for items hidden next to or under fences etc.

E.    Yard areas should be inspected daily prior to opening. An element of the search plan should include that all yards on a monthly basis are scanned by a metal detection device to locate buried weapons or other contraband. Yards adjacent to roadways should be carefully searched for items thrown over the wall/fence.

F.    All institutional buildings when searched should be checked for evidence of tunnels.

G.    The vicinity of all visitor traffic points should be searched daily to discover items that are hidden or thrown by visitors that are intended for inmates. Visitor holding areas and gates should be scrutinized carefully.

H.    The ductwork and plenums (air chambers) that carry air to and from the building and into individual rooms, should be searched, not only for breaches in security, but for signs that they are being used as places of concealment for contraband.

I.  Tunnels, utility corridors, and plumbing chases should be searched.

J.  Areas outside the secure perimeter should be searched for contraband to help stem the flow of contraband into the facility.

K.  Shops, vocational training and industrial areas have a wide range of possible contraband hiding places; vents, block and brick walls, workbenches, machinery, bins, toolboxes, covered openings, elevator shafts, outbuildings, lockers and staff only areas.

## 506.08    VEHICLE AND SUPPLY SEARCHES

1.  All vehicles and supplies entering and exiting an institution within a secure perimeter shall be thoroughly searched in accordance with 103 DOC 501, Vehicle Trap.

2.  Vehicle Searches (outside the secure perimeter):

A.  It is recognized there may be instances when it is necessary to conduct searches of all vehicles on or entering institution property outside the secured facility.  For the purpose of these searches the following guidelines must be adhered to.

B.  All vehicle entrances to institutional property must be clearly marked with signs posted in both English and Spanish, stating that all vehicles entering upon correctional institutional property are subject to a search (use of K-9 patrols, etc).

Note: All visitors refusing to comply with the search will be denied visiting privileges for that day. (Should be adapted to the institutional visiting rules and procedures).

C.  For the authorization to search vehicles not owned by the department of correction, on institutional property, one of the following requirements must be met:

The owner/operator of the vehicle to be searched, must consent and sign to the provisions according to Permission to Search Waiver.  (See Attachment A)

In cases where the owner/operator refuses to submit to the search, the following actions maybe taken:

D.    If the search requested, is without probable cause, the owner/operator may refuse the vehicle search and shall be permitted to leave the property.

E.    If the search requested, is based upon probable cause, the following actions will be taken:

    1.    Consultations with the district attorney's office or attorney general's office is recommended.

    2.    If the vehicle to be searched cannot be secured, and if the suspected items would be considered to be hazardous in nature, or the immediate seizure is required to preserve evidence that might otherwise be destroyed, a search warrant would not be needed. Once the seizure of a vehicle has been authorized the department of correction seizure inspection report and vehicle inventory sheet be completed. A copy of the D.O.C. seizure inspection report must be maintained at the institution and one copy shall be given to the owner of the vehicle. (See Attachments B and C).

    3.    If the vehicle to be searched can be secured, and the evidence can be preserved a search warrant must be attained. Only officers appointed as Special State Police Officers under the provisions of M.G.L. c. 127, § 127, shall complete the affidavit required to apply for a search warrant. Once this search warrant has been approved and when the seizure of a vehicle has been authorized the department of correction seizure inspection report, vehicle inventory sheet must be completed.

    A copy of the D.O.C. seizure inspection report must be maintained at the institution and one copy shall be given to the owner of the vehicle (see Attachments B and C).

Note:    This affidavit shall be made readily available at the institutions. In the event that the affidavit is not available the local state police can provide you with the

affidavit, application and search warrant form to be filed under the general laws chapter 276, §§ 1-7. When applying for a search warrant, the warrant must be based on probable cause, the application must provide in detail: reasons for warrant, including property and places to be searched and the person/persons to be searched.

3.    Parking Lot Areas:

The use of K-9's and patrol officers to conduct random searches of vehicles in institutional parking areas is permitted. These searches are to insure that vehicles are locked and no valuables are left in the open according to D.O.C. visiting policy. In the event, a certified drug K-9 unit reacts to a vehicle, or through the officer observation, may provide probable cause. The owner/operator will be requested to submit to a search of his/her vehicle(s). If the request of the search refused, the following procedures shall be followed is 506.08 #2, (D) (E).

## 506.09    CELL PHONE AND CONTRABAND INTERDICTION SEARCH PLAN

Superintendents of Minimum/Pre-Release facilities shall conduct at least quarterly searches of random areas of the facility to include housing unit(s) and non-housing areas such as program space and inmate work areas. Results shall be entered into the IMS search results.

Superintendents of Minimum/Pre-Release facilities shall request canine from Special Operations to assist in at least quarterly searches for the detection of contraband. These searches will be random and based on a schedule established by Special Operations Division. An incident report via the IMS system shall be generated to document the at least quarterly search.

Superintendents of minimum and pre-release facilities shall ensure parking areas that are used by inmate visitors are searched after all visiting periods and documented in the IMS system search results.

All CWC vans, equipment, containers and other items that may conceal contraband, shall be thoroughly searched on a daily basis.

The Superintendent of all facilities shall ensure that any area that facility work crews have access without direct supervision

is searched bi-weekly and documented in the IMS system search results.

Superintendents shall ensure that all cell phone finds are posted on the intranet.

506.10    SEIZURE OF CONTRABAND/EVIDENCE

A.  When searches result in the seizure of contraband/evidence to be used for the purpose of evidence in either disciplinary proceeding or prosecution the following procedure must be followed:

  1.  The officer who seized the evidence must seal the evidence in an evidence bag with an evidence custody form (Attachment D) attached to the bag.

  2.  Once the evidence has been tagged the evidence should be turned over to the custody of the assigned evidence officer to be logged and placed in the designated evidence locker. If the evidence was seized during times where the evidence officer is unavailable it will be placed in a secured area designed for the purpose of storing evidence until custody has been turned over to the evidence officer.

  3.  A disciplinary report or incident report shall be turned in to the shift commander prior to the end of that tour of duty by the officer in charge of the search. (see 103 CMR 430, Disciplinary Actions)

  4.  If the evidence / contraband is of a perishable nature (food, suspected home brew etc.) and needs to be disposed of, pictures shall be taken to serve as documentary evidence and shall be stored / filed along with the evidence custody form.

  5.  Any monetary evidence discovered / seized shall be forwarded to the institution treasurer who will provide a receipt of the money which will serve as documentary evidence and shall be stored / filed along with the evidence custody form.

506.11    STORAGE OF CONTRABAND/EVIDENCE

The following guidelines shall be utilized to ensure secure storage and accountability of evidence and seized controlled substances, firearms/ammunition, chemical agent and security impact devices.

A.    The superintendent shall designate one staff person to be the evidence officer and another staff person to be the assistant evidence officer.

B.    All evidence including common area finds shall be stored in a locked cabinet within a secure room with access to the room being limited. Access to the cabinet shall be limited to only the evidence officer and the assistant evidence officer.

    1.    The institution shall take precautions to ensure that all evidence is safely stored from water and fire damage.

C.    Evidence/contraband considered a controlled substance and or associated paraphernalia shall be stored in a locked cabinet within a secure room with access to the room being limited. Access to the cabinet shall be limited to only the evidence officer and the assistant evidence officer. The cabinet shall have two separate locks on it. The evidence officer maintains the key to one lock and the assistant evidence officer maintains the key to the other lock. These keys shall not be given to any other persons or interchanged between the evidence officers. This method insures that two persons are present each time the cabinet is opened.

    1.    Suspected controlled substances found when the evidence and assistant evidence officer are not available shall be placed into a fixed steel drop box, which is secured by two locks. Access to the locks shall be restricted. The evidence officer shall be issued the key to access one lock and the assistant evidence officer shall be issued the key to access the other lock. When both officers are present the substance shall be removed and placed into the evidence locker.

2.  All drops made into the box and items removed shall be documented with the staff name(s), date and time.

3.  A bound log shall be maintained in a secured location on ALL evidence including common area finds as well as controlled substances. Each item shall be logged and each entry should include:

    - Suspects name;
    - date of recovery;
    - location of recovery;
    - arresting and/or finding officers name;
    - detailed description of item;
    - case number;
    - inventory number;
    - storage location;
    - chain of custody;
    - disposition; and
    - logging officer's name.

4.  Controlled substances shall be duplicated in a separate in/out log. This log shall be maintained on all controlled substance evidence and is to be stored inside the controlled substance cabinet. Any evidence that leaves the controlled substance cabinet for any reason (i.e., state police lab) shall be logged in and out in this log book.

5.  Evidence submitted to the Crime Laboratory for analysis by the Drug Unit must meet the criteria set forth in Attachment I – Massachusetts State Police Drug Unit Submission Guidelines.

6.  With each piece of evidence a separate "evidence custody form" (Attachment D) shall be filled out and kept with the piece of evidence.

7.  Evidence shall be stored chronologically by year and evidence number to ensure easy accountability and access.

D.  Any firearm and/or ammunition, chemical agent and specialty impact devices classified as evidence shall be stored with the Special Operations Division.

1.  Any firearm and/or ammunition, chemical agent or specialty impact device evidence discovered at a medium or maximum security facility shall be temporarily stored within the armory during non-business hours until transported to the special operations division for long term storage at the next available business day.  The evidence shall be documented in accordance with this policy.

2.  Any firearm and/or ammunition, chemical agent or specialty impact device evidence discovered at a minimum or prerelease facility shall be transported to the nearest facility armory for temporary storage during non-business hours until transported to the special operations division for long term storage at the next available business day. The evidence shall be documented in accordance with this policy.

## 506.12    DISPOSAL OF EVIDENCE/CONTRABAND

1.  Evidence not associated with any disciplinary or legal matter shall be maintained at the institution where it was recovered no longer than six months.

2.  Final disposition of all evidence shall be approved in writing by the director of security.  Final disposition of evidence relating solely to a disciplinary or civil matter and not involving any possible criminal prosecution shall be approved in writing by the department's general counsel. All evidence related to a disciplinary matter shall be held for three years from the initial sanction date to ensure that no civil action has been brought against the department.  Thus, evidence relating to a disciplinary matter that is less than three years from the initial disciplinary sanction date, shall not be submitted to the department's general counsel for approval.  After the three year period has lapsed, then approval to destroy evidence through the general counsel shall be obtained.  Final disposition of evidence relating to a criminal matter must be approved in writing by the district attorneys office. Once the DA's approval is obtained, the evidence shall be reviewed and approved by the general counsel to ensure no civil or potential civil litigation can be brought against the department.

3.  · Once approved, the evidence officer will return evidence to
    its rightful owner.

4.  Evidence that is considered a controlled substance will be
    transported to a regional site for disposal with all
    accompanying documentation.  All control substance evidence
    transported to the regional site must be accompanied with
    the required disposal forms filled out as required by the
    Department of Public Health's drug destruction protocol.

5.  Disposal of evidence will be conducted regionally.  Each
    region will have one facility designated as the regional
    evidence site.   There are three regions which are as
    follows:

| REGION 1 | REGION 2 | REGION 3 |
|----------|----------|----------|
| MCI-CJ | OCCC | MCI-S |
| MCI-CJ | OCCC | SHIRLEYMED/MIN |
| MCI-N | BSH | NCCI |
| BSCC | MTC | MCI-C |
| PCC | MASAC | NECC |
| MCI-F | PLYMOUTH | SBCC |
| SMCC | | |
| LSH | | |
| BPRC | | |

6.  The evidence officer at the regional site will be
    responsible for the final disposal of evidence (for their
    institution as well as for the institutions within their
    region).  Disposal of controlled substance evidence will be
    arranged through the **Millbury State Police barracks (508-
    358-3260)** .  All efforts should be taken to dispose of any
    evidence transferred to the regional sites within six
    months of transfer.   If held longer than six months,
    evidence of disposal requests shall be maintained on file.

7.  The evidence officer at the regional site, after being
    contacted by a disposing facility, shall accept all
    evidence approved for disposal and shall sign a receipt
    acknowledging the change of custody.   This receipt will
    then be maintained on file at the sending institution.  The
    evidence officer of the sending institution shall be
    responsible for all appropriate documents including log
    entries.

8. The regional evidence officer shall be responsible for maintaining documentation on all evidence received and all evidence disposed. The regional evidence officer shall also submit an annual report to their respective assistant deputy commissioner detailing all evidence received and disposed.

9. The regional evidence officer shall ensure proper log notations are be made on evidence disposal and the evidence custody documents shall be complete and kept on a permanent file.

10. Quarterly audits/inventories shall be conducted by a supervisory staff person, along with the evidence officers, of the entire evidence process to include all evidence storage, disposal, logbooks, chain of custody forms, emergency drop box locations and accountability of all evidence at the facility. These audits shall occur at all facilities during the months of January, April, July and October and shall be documented accordingly in each logbook inspected.

## 506.13    CRIME SCENE SEARCH AND INVESTIGATION

1. When an incident occurs that may possibly result in criminal prosecution, the superintendent or his/her designee should be notified immediately after the incident has been contained or neutralized. Each superintendent shall ensure that the following procedures are adhered to as described in attachment E. Crime scene search and investigation should be conducted in such a manner so as to ensure the legal protection of the rights of the inmate(s) and the preservation of evidence for the commonwealth.

ATTACHMENT A

MASSACHUSETTS DEPARTMENT OF CORRECTION

PERMISSION TO SEARCH VEHICLE WAIVER

I, _____ have been informed
by_____ and _____
who made proper identification as (an) authorized law
enforcement officer(s) of the _____
of my CONSTITUTIONAL RIGHT not to have a search made of the
vehicle(s) owned by me and/or under my care, custody and
control, without a search warrant.

Knowing of my lawful right to refuse to consent to such a
search, I willingly give my permission to the above named
officer(s) to conduct a complete search of the vehicle(s)
located at _____.

The above said officer(s) further have my permission to take
from my vehicle, any letters, papers, materials or any other
property or things which they desire for criminal prosecution in
the case or cases under investigation.

This written permission to search without a search warrant is
given by me to the above officer(s) voluntarily and without any
reservations on the day of _____ 20_____, at
_____.

                    Signed _____

Witness _____ Witness _____

Address _____ Address _____

Phone (H) _____ Phone (H) _____

Phone (B) _____ Phone (B) _____

ATTACHMENT B

MASSACHUSETTS DEPARTMENT OF CORRECTION
VEHICLE INVENTORY SHEET

Institution _____
O.I.C. _____
Date _____ Time _____
Location _____

OPERATOR'S NAME _____D.O.B. _____
OPERATOR'S ADDRESS _____LIC. # _____
REASON FOR INVENTORY _____
OWNER'S NAME _____ ADDRESS _____
VEH. MAKE _____ MODEL _____ YEAR _____
REG. # _____ VIN # _____ COLOR _____
_____

PURSUANT TO DEPARTMENTAL POLICY, THE ABOVE MOTOR VEHICLES'
CONTENTS WERE INVENTORIED AND BELOW IS AN INVENTORY OF ITEMS
FOUND AND WHERE LOCATED.
TOP OF DASHBOARD_____ ABOVE VISOR _____
GLOVE BOX OR CONSOLE _____
FRONT FLOOR DRIVERS SIDE _____
FRONT FLOOR PASSENGER SIDE _____
FRONT SEAT DRIVERS SIDE _____
FRONT SEAT PASSENGER SIDE _____
BETWEEN SEATS _____
REAR FLOOR DRIVERS SIDE _____
REAR FLOOR PASSENGERS SIDE _____
BEHIND REAR SEAT _____ TRUNK _____
STATION WAGON CARGO AREA _____
VAN CARGO AREA _____
DAMAGE/OTHER _____
_____
_____

Driver's Acknowledgement: I have reviewed this report, received
one copy, and acknowledge that it is a true and complete
description of the auto's physical condition, inventory of
items, and accessory items. I hold no one legally responsible
for any missing items.

Signature _____ Date _____

ATTACHMENT C

**DEPARTMENT OF CORRECTION**
**SEIZURE INSPECTION REPORT**

NAME OF INSTITUTION: _____    Date of Inspection:

Time: _____    Number of  Photos: _____

Insured's Owner's Manual: _____

Insured's Address: _____    Home Telephone: _____

Inspector's Name: _____    Site of

Inspection: _____    Plate No.: _____

Interior Color: _____    Year: _____    Make: _____

Model: _____    Color: _____

Vehicle Identification No.: _____

Odometer Reading: _____

ACCESSORIES AND OPTIONAL EQUIPMENT

AIR CONDITIONER☐    HIGH MOUNTED BRAKE LIGHT☐    ☐ AM/FM☐ AM ☐RADIO

CRUISE CONTROL☐    TRAILER HITCH☐    BUILT  STEREO☐ NO ☐ YES ☐IN

POWER BRAKES☐    VINYL TOP/ROOF☐    ☐ TAPE PLAYER

BRAND_____

POWER STEERING☐    SPECIAL MIRRORS - TYPE_____☐    BUILT IN

YES☐    NO☐

POWER WINDOWS☐    AUTOMATIC☐ TRANS. OVERDRIVE☐    ☐ C.D. PLAYER

BRAND_____

POWER LOCKS☐    MANUAL TRANS.☐ 3 SPD☐ ☐ 4 SPD  5☐ SPD

BUILT IN ☐ YES  ☐ NO

POWER ANTENNA☐    SPECIAL ROOF☐    ☐ STEREO AMPLIFIER-

BRAND_____

TILT WHEEL☐    FACTORY INSTALLED  YES☐  NO☐    YES☐BUILT IN  ☐ NO

TINTED GLASS☐    SPECIAL INSTRUMENTATION-TYPE_____☐    C.B.RADIO-☐

BRAND_____

REAR DEFROSTER☐    BUILT IN  YES☐  NO☐

REAR WIPER☐    RADAR DETECTOR-BRAND _____☐

OTHER SPECIAL OPTIONS OR☐ ADDITIONS_____

ROOF RACK☐    CAR☐ ALARM-

BRAND_____

☐ BUCKET SEATS    ☐ ANTI-THEFT DEVICE-

TYPE_____

SPARE☐ TIRE (OUTSIDE MOUNT)    ☐ AUTO RECOVERY SYSTEM-

TYPE_____

SPECIAL WHEELS☐    ☐ CAR PHONE

ANTENNA_____

SPECIAL HUB CAPS☐    CAR PHONE TRANSMITTER☐

SPECIAL TIRES-TYPE_____☐ CAR PHONE-BRAND_____☐

BUILT IN  YES☐  NO☐

_____

MISCELLANEOUS PROPERTY FOUND IN VEHICLE

_____

MISCELLANEOUS PROPERTY FOUND IN VEHICLE

CHECK DAMAGE, POOR CONDITION, AND MISSING PARTS BELOW

DAMAGED    RUSTED    DAMAGED    RUSTED    DAMAGED

01 ☐ FRONT BUMPER        ☐    08  DOOR RIGHT REAR☐        ☐        WHEEL COVERS☐15
☐02  REAR BUMPER        ☐    QUARTER PANEL LEFT REAR☐09   ☐    16  WINDSHIELD☐
☐03  FENDER LEFT FRONT    ☐    QUARTER PANEL RIGHT REAR☐10  ☐    17 ☐ SIDE GLASS LEFT FRONT
☐04  FENDER RIGHT FRONT        ☐    HOOD PANEL☐11        ☐    ☐18 SIDE GLASS RIGHT FRONT
☐05  DOOR RIGHT FRONT     ☐    ROOF PANEL☐12        ☐    SIDE GLASS☐19 LEFT REAR
☐06  DOOR LEFT FRONT      ☐    TRUNK LID☐13         ☐    SIDE GLASS☐20 RIGHT REAR
☐07  DOOR LEFT REAR       ☐    GRILL☐14             ☐    REAR WINDOW☐21
 WORN OR SOILED INTERIOR☐22
DESCRIBE DAMAGE_____

_____

| This above is a true statement of any existing damage, rust or missing parts as of this | ☐ NO EXISTING DAMAGE, |
|---|---|
| date.  The undersigned certifies that this inspection report is true and complete and that | MISSING PARTS. |
| I have seen and photographed the vehicle stated above. | |
| X............................................................ | |
| ............................................ | |
|   Inspector's Signature | |

DRIVER'S ACKNOWLEDGMENT:      I have reviewed this report, received one copy, and acknowledge
that it is a true and complete description of the auto's physical condition and accessory
items, and I hold no one legally responsible for any missing items.


Person Returning Vehicle                    Date
Witness                                      Date
_____
Owner's Name                  Owner's Address

Signature



# Commonwealth of Massachusetts
## *Department of Correction*
# Evidence Custody Form

### 103 DOC 506 – Attachment D

| Institution | |
|---|---|

| Suspects Name / No. | | Inventory # | | Case # | |
|---|---|---|---|---|---|
| Date / Time of recovery | | Location of recovery | | | |
| Recovered by | | Logging Officer | | | |
| Reason obtained | | Storage Location | | | |

| Evidence Description |
|---|
| |

| Chain of Custody | | | |
|---|---|---|---|
| Date | Released by: (name / title ) | Received by: (name / title ) | Purpose: |
| | | | |
| | | | |
| | | | |
| | | | |

### Final Disposition Authorization

The item(s) listed on this document are no longer required as evidence and may be disposed of.
The disposal action shall be:_____

_____
Name / Title (print)                    Signature                        Date
### Witness to Disposal
The item(s) listed on this document (was) (were) destroyed by the evidence officer by means of:
_____in my presence.

_____
Name / Title (print)                    Signature                        Date

Attachment E

## Protection of the Crime Scene:

1.    **Preservation of Life is the First Priority:**

    a.    Radio for  assistance.
    b.    Ensure your own safety.
    c.    Assume the assailant is still in the vicinity.
    d.    Survey the area to ensure no further injury will occur, to inmates or staff responders.
    e.    If there is any question of life, remove the victim(s) to medical care or have medical care brought to him/her.
    f.    If a victims injuries are life threatening the shift commander shall ensure that an escorting officer is advised of the elements of a dying declaration and that one is sought (see attachment F).
    g.    Life saving measures shall be started and continued even if the victim appears dead.
    h.    Life saving measures need not be started if the victim is completely decapitated.
    i.    In cases where preservation of life is not an issue Secure the Scene.

2.    **Securing the Scene:**

    a.    Isolate and contain the crime scene area.
    b.    Make the crime scene as large as possible (you can always decrease but never increase)
    c.    If warranted ensure the securement of any secondary crime scene.
    d.    Remove all inmates from the immediate area inmates should be searched (check hands and body for blood or bruising).
    e.    Keep them segregated from the other inmates. (Keep them apart from each other if practical )
    f.    Assign one officer to identify each inmate and make a list of names or collect IDs.
    g.    Do not allow **ANYONE** in until the investigators arrive or authorization has been approved by the shift commander.

3. **Do not touch anything:**

    a.   This rule is the most often violated by responding personnel.

    b.   Make notes of everything you saw when you arrived.

        i.   Lights in room or area – on or off ?

        ii.   Door to room – open or closed ?

        iii. Signs of struggle ?

        iv.  Look over entire area and room – TV, radio, etc. – on or off ?

        v.   Odors – any strange smells ?

        vi.  Look up – most people have a habit of looking only at eye level.

4. **Crime Scene Search:**

    a.   **DO NOT DO IT !!!!!!**

    b.   Leave the search for the investigative unit.

    c.   Keep accurate records of people arriving and leaving the scene.

5. **Notes:**

    a.   Make as many notes as you think necessary and then, make plenty more!

    b.   Remember the five "W's".

        i.   Who told you about it?

        ii.   When were you told?

        iii. Where were you when you were told?

        iv.  What exactly were you told?

        v.   Why did you feel you had to respond?

6. **Types of Crime Scenes:**

    I.   **Allegations of a sexual assault:**

    a.   If an inmate reports being victimized by a sexual assault staff will respond in accordance with 103 DOC 519 Sexually Abusive Behavior Prevention and Intervention Policy.

    b.   The area where the assault occurred, the alleged victim's body, and the alleged perpetrator (s) body shall be considered the crime scene and preserved as such.

    c.   Request that the alleged victim not take any actions that could destroy physical evidence,

including as appropriate, washing, brushing teeth, urinating, defecating or eating. If it is necessary for the inmate to use the restroom, the inmate should wipe before going and the wipe shall be placed into evidence.

d.   Both the alleged victim and alleged perpetrator (s) (if known) clothing (i.e. underwear, socks, shoes ) is considered evidence and shall be processed in accordance with 103 DOC 506.10.

e.   The inmates should be required to stand on a clean sheet and remove all clothing including underwear, socks, and shoes.

f.   The sheet should then be folded around the clothes in such a way as to maintain any forensic evidence (semen, pubic hairs etc).

g.   The clothing and sheet should then be processed in accordance with 103 DOC 519 Sexually Abusive Behavior Prevention and Intervention Policy.

h.   To maintain its integrity (IE paper bag and refrigeration if it is to be maintained in excess of twenty-four hours).

**II.   Strangulation and Hangings:**

a.   All victims must be removed from suspension, as soon as possible, with every effort used to preserve life.

b.   The knot is a very important piece of evidence **(cut the noose above the knot).**

c.   If the noose can not be cut, the body must be lifted to relieve pressure from the neck. If absolutely necessary, untie the knot.

d.   Should the noose be cut, label the loose ends. The ends may be tied back together with a string or tape.

e.   It is important to note which end of the noose was anchored.

f.   The noose should be deemed evidence and processed in accordance with 103 DOC 506.10 Seizure of Contraband/Evidence and 103 DOC 506.11 Storage of Contraband/Evidence.

**III.  Unattended Death:**

a.   Although not every unattended inmate death is a crime (i.e. anticipated death from terminal illness), the scene shall be treated as a crime

to uphold the integrity of the investigation until such time as it is determined that a crime did not take place.

b.   The crime scene is to be maintained in a manner that will not compromise any criminal prosecution.

7.   Notifications:

a.   Notifications shall be made pursuant to 103 DOC 105, Departmental Duty Officer and Institution procedures.

b.   Ensure that all appropriate notifications are complete and in accordance with applicable policies i.e. 103 DOC 622 Death Procedures, 103 DOC 519 Sexually Abusive Behavior Prevention and Intervention Policy.

Non investigative staff should refrain from interviewing an inmate who has allegedly committed an act covered by criminal law. Any information or confessions could be deemed inadmissible in a court of law if not obtained under requirements set forth by the Commonwealth of Massachusetts.

Attachment F

## DYING
## DECLARATION

1.    INJURY RECEIVED BY THE VICTIM HAS TO BE LIFE
      THREATNING

2.    THE VICTIM HAS TO BELIEVE THAT THEIR INJURY
      IS LIFE THREATENING

3.    WHATEVER THE VICTIM TELLS YOU HAS TO BE
      DIRECTLY RELATED TO THE INJURY RECEIVED.

4.    THE VICTIM HAS TO DIE.

Attachment G

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION
STANDARD OPERATING PROCEDURES
ATTACHMENT TO 103 DOC 506, SEARCH POLICY
BODY ORIFICE SECURITY SCANNER (BOSS CHAIR)
Not For Public Access
Located on D.O.C. Intranet

Attachment H

**Protocol for Searching Medicine Bag**

When an officer searches a medicine bag for purposes of ensuring the safety and security of the institution, its inmates, employees and visitors, the following procedure will be adhered to:

1. The inmate shall be given a direct order to open his/her medicine bag and display the contents for inspection.

2. If the inmate refuses to comply with the officer's order, the medicine bag shall be confiscated (unopened) and the inmate will be detained until a supervisor arrives on the scene.

3. Once the supervisor arrives, he/she will assess and confirm the inmate's refusal to comply with the officer's directive.

4. The officer will then search the medicine bag in the presence of the inmate and supervisor.

5. The officer will open the medicine bag in a manner which is respectful, ensuring that none of the items from the medicine bag fall onto the floor.

6. Both the officer and supervisor will document the incident in an incident report and appropriate disciplinary action will be taken as a result of the inmate's refusal to follow a direct order; i.e., a disciplinary report will issue and the inmate will be removed from population.

Attachment I

**Massachusetts State Police Drug Unit Submission Guidelines**

Evidence submitted to the Crime Laboratory for analysis by the Drug Unit must meet certain guidelines. When submitted, all drug evidence must be:

- inventoried on the Massachusetts State Police Form SP-295 Narcotics Custody Form
- sealed in a suitable container

**Submittal Procedure for the Delivering Officer**

The SP-295 Narcotics Custody Form chain of custody must include the name of the officer delivering the evidence to the laboratory. It is imperative that the delivering officer makes all entries clearly and legibly, and that the inventory of evidence is accurate. The procedure for the delivering officer will be to:

1.  Advise the Evidence Technician (ET) of the number of incoming cases he or she has to submit,

2.  Seal the evidence in an envelope/bag (if not already sealed),

3.  Complete the SP 295 Narcotic Custody Form,

4.  will, be given three (3) labels by the ET, apply two (2) of the Laboratory Information Management System (LIMS) bar-code labels to the SP-295 (white and gold copies), and one (1) bar-code label to the corresponding evidence, and

5.  Deliver the evidence to the evidence technician (ET) or duty chemist.

**Rush Requests for Analysis**

Occasionally, the submitting officer will request a rush analysis for the evidence that is dropped off.
In order to do so, a Rush Analysis Request Form is completed. The form is maintained by the

Evidence Control Unit and is provided to submitting officer upon request.

## Procedure for Handling Drug Evidence Containing Hypodermic Syringes

Hypodermic syringes or needles will not be analyzed if submitted for cases involving possession of a controlled substance.

The health risks associated with the handling of these items far outweigh any evidentiary value gained from the analysis of their contents or surface residue. These items will only be considered for analysis only after all other investigative avenues have been exhausted and if they meet any of the following criteria:

- homicide
- suicide
- unattended death
- with approval from a Crime Laboratory Supervisor (the Supervisor will initial and date the CL-1
Form or SP 295 Form)

Reusable sharps that are contaminated with blood or potentially infectious materials must not be stored or processed in a manner that requires Laboratory personnel to reach by-hand into the
container where the sharps have been placed. If syringes or needles are submitted to the laboratory they must be submitted in a hypodermic safety container.

## Packaging of Syringes, Needles and other sharp items

All syringes, needles and sharps must be submitted in a hypodermic safety container puncture-proof container. A supply of containers should be maintained in each station's contraband storage room. Syringes or needles should only be transported to the Crime Laboratory in hypodermic safety containers. The Evidence Control Unit has the names of suppliers (vendors) of the containers and single containers may be pick-up at the laboratory. The Evidence Technician will not package syringes or needles for the submitting agency.

The container should be:
- constructed of clear plastic material

- leak-proof on the sides, bottom and top
- puncture resistant
- labeled as to its contents

**Packaging Knives and "Sharps" that Accompany Drug Evidence**

Knives and other sharp instruments should be packaged in specialty boxes when possible. If no special packaging is available, all cutting edges/points will be covered by cardboard or layers of heavy paper, e.g., a folded paper bag. The SP-295 Form, as well as the item packaging, should be identified conspicuously with the word: "SHARP INSTRUMENT" or "KNIFE".

**Narcotics Return Procedure**

When an agency representative submits narcotics to the laboratory they will be required to pick-up any completed cases for their agency. Agencies are allowed to call the Evidence Unit to schedule an appointment for pick-up only. The procedure for the delivering officer will be to:

1. Agency representative must provide identification with a LIMS barcode (the laboratory will issue the LIMS barcode on your first visit)

2. Sign the SP 295 Form

3. Remove the white and yellow copies of the SP 295 Form along with the evidence (Notarized Certificate of Analysis will be attached to the evidence).

Attachment J

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF CORRECTION
STANDARD OPERATING PROCEDURES
ATTACHMENT TO 103 DOC 506, SEARCH POLICY
B-SCAN BODY SCANNER
Not For Public Access
Located on D.O.C. Intranet