## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE, | |
|     Plaintiff, | |
|     v. | Civil Action No. 1:17-CV-12255-RGS |
| MASSACHUSETTS DEPARTMENT OF CORRECTION; THOMAS A. TURCO III; SEAN MEDEIROS; JAMES M. O'GARA JR; And STEPHANIE COLLINS, | |
|     Defendants. | |

### BRIEF OF *AMICI CURIAE* BAZELON CENTER FOR MENTAL HEALTH LAW, DISABILITY RIGHTS EDUCATION & DEFENSE FUND, HEALTH LAW ADVOCATES, INC., MASSACHUSETTS TRANSGENDER POLITICAL COALITION, AND NATIONAL CENTER FOR TRANSGENDER EQUALITY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Joshua M. Daniels (BBO# 673034)
THE LAW OFFICE OF JOSHUA M. DANIELS
P.O. Box 300765
Jamaica Plain, MA 02130
Local Counsel for *Amici Curiae*
(617) 942-2190
attorneyjoshdaniels@gmail.com

Kevin Barry
(admitted *pro hac vice*)
QUINNIPIAC UNIVERSITY SCHOOL OF LAW
LEGAL CLINIC
275 Mount Carmel Ave.
Hamden, Connecticut 06518
Counsel for *Amici Curiae*
(203) 582-3238
legalclinic@quinnipiac.edu

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................iii-vi

STATEMENT OF INTEREST OF AMICI CURIAE .............................................vii-ix

INTRODUCTION ....................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 5

ARGUMENT ............................................................................................................... 5

    I. The Purpose of the ADA and Section 504 is to Protect People with Disabilities from Discrimination Based on Stigma, Prejudice, and Ignorance. ..................................... 5

        A. The ADA's Legislative History ....................................................................... 7

        B. The ADA's Text ............................................................................................... 9

        C. Judicial Interpretations ................................................................................... 11

    II. People with Gender Dysphoria Routinely Experience Discrimination Based on Stigma, Prejudice, and Ignorance, and Should Be Protected by the ADA and Section 504.................. 13

    III. Interpreting the ADA and Section 504 to Exclude Gender Dysphoria Would Ascribe to Congress an Impermissible Intent to Discriminate Against Transgender People. ................... 19

CONCLUSION.......................................................................................................... 20

APPENDIX.....................................................................................................attached

# TABLE OF AUTHORITIES

**Cases**

*Cleburne v. Cleburne Living Ct'r,*
    473 U.S. 432 (1985) ...................................................................................12, 13

*Alexander v. Choate,*
    469 U.S. 287 (1985) ......................................................... 7, 11, 12, 15

*Arnold v. United Parcel Service, Inc.,*
    136 F.3d 854 (1st Cir. 1998) ..........................................................10

*Bragdon v. Abbott,*
    524 U.S. 624 (1998) ...................................................................13

*Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.,*
    208 F. Supp. 3d 850 (S.D. Ohio 2016) ...............................................15

*Blatt v. Cabela's Retail, Inc., No. 5:14-CV-04822,*
    2017 WL 2178123 (E.D. Pa. May 18, 2017) ............................. 5, 14-15

*Disability Advocates, Inc. v. Paterson,*
    598 F. Supp. 2d 289 (E.D.N.Y. 2009) ..............................................18

*Doe 1 v. Trump, No. 17–1597,*
    2017 WL 4873042 (D.D.C. 2017) ...................................................16

*Olmstead v. L.C. ex rel. Zimring,*
    527 U.S. 581 (1999) ................................................................. 13

*Sch. Bd. of Nassau Cnty., Fla. v. Arline,*
    480 U.S. 273 (1987) ........................................................... 10-12, 15

*Tennessee v. Lane,*
    541 U.S. 509 (2004) ....................................................................5

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*
    858 F.3d 1034 (7th Cir. 2017) ................................................. 15-16

**Federal Statutes**

29 U.S.C. § 705 .............................................................................2

42 U.S.C. § 12101 .....................................................................9-10, 15

42 U.S.C. § 12102 ........................................................................10

42 U.S.C. § 12112 .......................................................................10-11

42 U.S.C. § 12182 .......................................................................10-11

42 U.S.C. § 12183 ................................................................................................11

42 U.S.C. § 12201 ..................................................................................................7

42 U.S.C. § 12211 ..................................................................................................2

ADA Amendments Act of 2008,
    Pub. L. No. 110-325, 122 Stat. 3553 (2008) ................................................6, 9

Fair Housing Amendments Act of 1988,
    Pub. L. No. 100-430, 102 Stat. 1619 (1988) ....................................................1

**Federal Regulations**

28 C.F.R. § 35.130................................................................................... 10-11, 17

28 C.F.R. § 35.139....................................................................................................17

28 C.F.R. § 35.150....................................................................................................11

28 C.F.R. § 35.151....................................................................................................11

28 C.F.R. § 115.41....................................................................................................17

28 C.F.R. § 115.42....................................................................................................18

28 C.F.R. Pt. 35, app. B ...........................................................................................17

**Congressional Record & Reports**

136 CONG. REC. S7422-03,
    1990 WL 144937 (June 6, 1990) (Statement of Sen. Harkin) ...............................3, 9

135 CONG. REC. S10765-01,
    1989 WL 183216 (Sept. 6, 1989) (Statement of Sen. Harkin) ............................. 8-9

H.R. REP. 101-485(II)
    (May 15, 1990) (House Comm. on Educ. & Lab.) ....................................7-8, 14, 17

H.R. REP. 101-485(III)
    (May 15, 1990) (House Jud. Comm.) ...................................................................8, 17

S. REP. 101-116
    (Aug. 30, 1989) (Sen. Comm. Labor and Hum. Resources) ................................8, 17

**State Statutes**

MASS. GEN. LAWS ch. 46, § 13(e)...........................................................................3

MASS. GEN. LAWS ch. 76, § 5 .................................................................................2

**Other**

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL
    MANUAL OF MENTAL DISORDERS (5th ed. 2013) ............................................. 2, 13-14

Arli Christian, *Montana is the 15th State to Modernize Its
    Birth Certificate Gender Change Policy*, NATIONAL CENTER
    FOR TRANSGENDER EQUALITY (Dec. 23, 2017) ......................................................3

Carol J. Gill, *Questioning Continuum, in* THE RAGGED EDGE:
    THE DISABILITY EXPERIENCE FROM THE PAGES OF THE FIRST
    FIFTEEN YEARS OF THE DISABILITY RAG (Barrett Shaw ed., 1994) .........................6

Chai R. Feldblum, *Definition of Disability Under Federal Anti-Discrimination Law:
    What Happened?  Why?  And What Can We Do About it?*,
    21 BERKELEY J. EMP. & LAB. L. 91 (2000) ..............................................................6

Christine Michelle Duffy, *The Americans with Disabilities Act of 1990
    and the Rehabilitation Act of 1973, in* GENDER IDENTITY AND SEXUAL ORIENTATION
    DISCRIMINATION IN THE WORKPLACE: A PRACTICAL GUIDE
    (Christine Michelle Duffy ed., Bloomberg BNA 2014)..................................... 3, 14

*ID Documents Center*, NATIONAL CENTER FOR
    TRANSGENDER EQUALITY (Jan. 2018) ......................................................................3

James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M.,
    *The Report of the 2015 U.S. Transgender Survey*,
    NATIONAL CENTER FOR TRANSGENDER EQUALITY...................................................16

Jennifer L. Levi & Bennett H. Klein, *Pursuing Protection for
    Transgender People Through Disability Laws, in* TRANSGENDER RIGHTS (2006).............6, 10

Kevin M. Barry et al., *A Bare Desire to Harm: Transgender People and
    the Equal Protection Clause*, 57 B.C. L. REV. 507 (2016).............................1, 2, 19

Mary Crossley, *Disability Kaleidoscope*,
    74 NOTRE DAME L. REV. 621 (1999) .......................................................................6

MASSACHUSETTS DEPARTMENT OF ELEMENTARY & SECONDARY EDUCATION,
    SAFE SCHOOLS PROGRAM FOR LGBTQ STUDENTS, GUIDANCE FOR
    MASSACHUSETTS PUBLIC SCHOOLS CREATING A SAFE AND SUPPORTIVE
    SCHOOL ENVIRONMENT (Feb. 15, 2013) ..................................................................2

MASS. REG. OF MOTOR VEHICLES, MASS. GENDER
    DESIGNATION CHANGE FORM....................................................................................2

NATIONAL COUNCIL ON DISABILITY, EQUALITY OF OPPORTUNITY:
    THE MAKING OF THE AMERICANS WITH DISABILITIES ACT (2010) ....................8, 13

Samuel R. Bagenstos, *Subordination, Stigma, and "Disability,"*
86 VA. L. REV. 397 (2000) ................................................................................5, 6, 7, 13

Stat. of Int. of U.S., *Doe v. Dzurenda*, No. 3:16-CV-1934
(D. Conn. Oct. 27, 2017) .........................................................................................4

Stat. of Int. of U.S., *Doe v. Arrisi*, No. 3:16-cv-08640
(D.N.J. July 17, 2017) .............................................................................................4

Sec. Statement of Int. of U.S., *Blatt v. Cabela's Retail, Inc.*,
No. 5:14-CV-04822 (E.D. Pa. Nov. 16, 2015) ......................................................4

WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH,
STANDARDS OF CARE (7th ed., 2012) ........................................................ 14-15, 19

## STATEMENT OF INTEREST OF AMICI CURIAE

The Judge David L. Bazelon Center for Mental Health Law is a national non-profit legal advocacy organization founded in 1972 to advance the rights of individuals with mental disabilities. The Bazelon Center uses litigation, public policy advocacy, education, and training to advocate for laws and policies that ensure equal opportunities for people with psychiatric or intellectual disabilities in all aspects of life, including education, housing, community living, employment, health care, voting, parental and family rights, and other areas. The Bazelon Center has significant expertise with respect to the Americans with Disabilities Act (ADA), and has participated as amicus in numerous cases involving the rights of people with disabilities under the ADA.

The Disability Rights Education & Defense Fund (DREDF), based in Berkeley, California, is a national nonprofit law and policy center dedicated to protecting and advancing the civil rights of people with disabilities. Founded in 1979 by people with disabilities and parents of children with disabilities, DREDF works through education, advocacy and law reform efforts. DREDF is nationally recognized for expertise in the interpretation of federal disability rights laws, including Section 504 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990.

Health Law Advocates, Inc. is a public interest non-profit law firm whose mission is to provide *pro bono* legal representation to Massachusetts residents experiencing difficulty accessing or paying for needed medical care. Health Law Advocates is committed to ensuring universal access to quality health care in Massachusetts, particularly for those who are most likely to be subject to discrimination, including transgender individuals.

The Massachusetts Transgender Political Coalition, founded in 2001, is dedicated to ending discrimination on the basis of gender identity and gender expression.  It envisions a world where persons of all genders are treated with respect and fully participate in all areas of society, free from fear of discrimination, harassment, or violence based on their gender identity and/or expression.

The National Center for Transgender Equality (NCTE) is a national social justice organization devoted to ending discrimination and violence against transgender people through education and advocacy on issues of national importance to transgender people.  Founded in 2003, NCTE advocates for policy reform at the federal level on a wide range of issues affecting transgender people, provides technical assistance to organizations and institutions at the state and local levels, and works to create greater public understanding of issues affecting transgender people.

*Amici* seek to provide information to this Court regarding the vital importance of allowing individuals with gender dysphoria to bring claims under the ADA and Section 504 of the Rehabilitation Act ("Section 504") when they have experienced discrimination.  At the heart of the ADA and Section 504 is the protection of people with disabilities from discrimination based on stigma, prejudice, and ignorance.  People with gender dysphoria routinely experience such discrimination and should be protected by these laws.  A contrary interpretation would attribute to Congress an unconstitutional purpose and therefore must be avoided.

Only one court in the Nation has analyzed whether the ADA's exclusion of "gender identity disorders not resulting from physical impairments" and "transsexualism" applies to gender dysphoria.  *See Blatt v. Cabela's Retail, Inc.*, No. 5:14-CV-04822, 2017 WL 2178123, at *4 (E.D. Pa. May 18, 2017) (denying defendant's partial motion to dismiss and holding that the

ADA does not exclude gender dysphoria). No court has analyzed whether an identical exclusion under the Rehabilitation Act applies to gender dysphoria, nor has any court addressed the rights of individuals with gender dysphoria to bring claims under the ADA and Section 504 in the prison context. Additionally, no court has focused on the ADA's and Section 504's prohibition of discrimination against people with gender dysphoria based on stigma, prejudice, and ignorance, as gleaned from legislative history, statutory text, and judicial interpretations.

A motion requesting leave to file was submitted in tandem with this brief. No party's counsel authored the attached *amici curiae* brief in whole or in part. No party or party's counsel, and no person other than *amici*, its members, or its counsel, contributed money intended to fund preparing or submitting the brief.

## INTRODUCTION

There has been a sea change in society's understanding of disability since the ADA became law in 1990.  The ADA acknowledges that the exclusion, segregation, and mistreatment of people with disabilities is not an inherent part of the disability itself, but instead is a result of stigma, prejudice, and ignorance.  This understanding is the hallmark of the ADA.  Yet Defendants in this case attempt to use the ADA to perpetuate the harms that Congress intended to eradicate in passing the ADA.  They do so by seizing on a narrow exclusion rooted in prejudice, and arguing that it applies to Plaintiff's disability, gender dysphoria.  It does not.

On August 1, 1988, North Carolina Senator Jesse Helms successfully argued for the exclusion of "transvestites" from the protections of the Fair Housing Amendments Act.  *See* Fair Housing Amendments Act of 1988, § 6(b)(3), Pub. L. No. 100-430, 102 Stat. 1619 (1988) (codified as a note to 42 U.S.C. § 3602).  Senator Alan Cranston, one of only two senators to oppose the Helms amendment, rose in objection.  "This amendment," Cranston argued,

> would single out one category of individuals who are already being discriminated against and say to them, "Sorry you now have no protections.  Congress has decided that it no longer cares whether or not you are cast out of our society." . . . This amendment could open the door to any number of attempts to exclude other disabilities from this and other antidiscrimination laws. . . . [T]he whole purpose of . . . antidiscrimination laws is to provide across-the-board evenhanded protection, not to pick and choose disabilities we approve of and exclude the ones we don't.

134 CONG. REC. 19,728, *quoted in* Kevin M. Barry et al., *A Bare Desire to Harm: Transgender People and the Equal Protection Clause*, 57 B.C. L. REV. 507, 529 & nn.136-37 (2016).

Senator Cranston lost that debate, and his concern proved prescient.  On September 7, 1989, Senator Helms and another conservative senator, William Armstrong, caused

1

approximately twelve so-called "deviant" and "immoral"[1] conditions to be cast out of the Americans with Disabilities Act (ADA), including "gender identity disorders not resulting from physical impairments" and "transsexualism."  42 U.S.C. § 12211(b)(1).  Two years later, Congress passed an identical exclusion to the Rehabilitation Act.  29 U.S.C. § 705(20)(F)(i).

Congress did not exclude gender dysphoria, which modern science recognizes is based on a physical impairment.  *See, e.g.*, AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 452, 454 (5th ed. 2013) [hereinafter DSM-5].[2] The outmoded idea that gender dysphoria is a moral transgression has been discredited by both medical science and social understandings.  However, the ignorance and prejudice faced by individuals with this disability endure, as illustrated by the horrendous treatment of the Plaintiff in this case.

While discrimination against individuals with gender dysphoria is rampant, there has been a significant shift for people with gender dysphoria in recent years.  In Massachusetts and a number of others states, for example, students with gender dysphoria are able to use restrooms and locker rooms consistent with their gender identity,[3] drivers can change their licenses to reflect their identity,[4] and people born in Massachusetts can revise their birth certificates to

---

[1] *A Bare Desire to Harm*, *supra*, at 531-32 & n.144 (quoting Senator Jesse Helms and Senator Warren Rudman).
[2] For a description of the diagnosis of gender dysphoria, *see infra* section II of this brief and app. A (compiling sections of DSM-5).
[3] *See* MASSACHUSETTS DEPARTMENT OF ELEMENTARY & SECONDARY EDUCATION, SAFE SCHOOLS PROGRAM FOR LGBTQ STUDENTS, GUIDANCE FOR MASSACHUSETTS PUBLIC SCHOOLS CREATING A SAFE AND SUPPORTIVE SCHOOL ENVIRONMENT (Feb. 15, 2013), http://www.doe.mass.edu/sfs/lgbtq/GenderIdentity.html (stating that, pursuant to Massachusetts antidiscrimination law, MASS. GEN. LAWS ch. 76, § 5, a student "may access the restroom, locker room, and changing facility that corresponds to the student's gender identity").
[4] *See* MASS. REG. OF MOTOR VEHICLES, MASS. GENDER DESIGNATION CHANGE FORM, http://www.massrmv.com/Portals/30/docs/21816.pdf (permitting change to sex designation on driver's license without requiring genital surgery).

accurately reflect their sex, without having to undergo genital surgery.[5]  As with other historically stigmatized medical conditions, such as epilepsy, mental disabilities, and HIV/AIDS,[6] our society is at last moving away from the old myths and stereotypes surrounding gender dysphoria and toward an understanding of gender dysphoria that is consistent with medical and scientific information—and with the dignity of those who have the condition.

Defendants' treatment of the Plaintiff in this case is wholly out of step with these developments.  Defendants have incarcerated Plaintiff, a woman with gender dysphoria, in a men's prison.  Pl.'s Mot. Prelim. Injun. at 2.  They have forced her to shower in view of—and having to view—men, to be strip-searched by men, to be vulnerable to taunts and ridicule by men, and to live her life in fear of being sexually victimized by men.  *Id.* at 6-9.  In defense of their appalling actions, Defendants incorrectly rely on the ADA's and Section 504 of the Rehabilitation Act's ("Section 504") exclusion of "gender identity disorders not resulting from physical impairments" and "transsexualism."[7]  Ms. Doe has no civil rights under the ADA or Section 504, Defendants argue, because these statutes exclude gender dysphoria.

---

[5] *See* MASS. GEN. LAWS ch. 46, § 13(e) (permitting amendment of sex designation on birth certificate without requiring genital surgery); *see also* Arli Christian, *Montana is the 15th State to Modernize Its Birth Certificate Gender Change Policy*, NATIONAL CENTER FOR TRANSGENDER EQUALITY (Dec. 23, 2017), https://medium.com/transequalitynow/montana-is-the-15th-state-to-modernize-its-birth-certificate-gender-change-policy-9123112b67; *see generally ID Documents Center*, NATIONAL CENTER FOR TRANSGENDER EQUALITY, https://transequality.org/documents (Jan. 2018) (collecting state laws regarding name changes and changes to driver's licenses and birth certificates).

[6] *See, e.g.*, 136 CONG. REC. S7422-03, S7444, 1990 WL 144937 (June 6, 1990) (Statement of Sen. Harkin) (discussing historically stigmatized conditions).

[7] "It was not uncommon at the time [the ADA was being debated] for people to use the terms 'transsexualism' and 'GID' interchangeably."  Christine Michelle Duffy, *The Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973*, *in* GENDER IDENTITY AND SEXUAL ORIENTATION DISCRIMINATION IN THE WORKPLACE: A PRACTICAL GUIDE ch. 16-48 (Christine Michelle Duffy ed., Bloomberg BNA 2014); *see also id.* at 16-98 – 103 (explaining that, beginning in 1980, successive versions of the DSM referred to transsexualism as a subtype of gender identity disorder applicable to adults and adolescents, until 1994, when transsexualism

Defendants' argument is as deeply offensive as it is mistaken.  No one disputes that the ADA excludes "gender identity disorders not resulting from physical impairments" and "transsexualism."  The question raised by this case is whether the ADA *also* excludes gender dysphoria.  As discussed in Plaintiff's opposition brief and Motion for Preliminary Injunction, as well as in Dr. Randi Ettner's affidavit supporting the Motion, gender dysphoria is a serious medical condition that results from a physical impairment.  *See* Pl.'s Opp. Mot. Dismiss at 2; Pl.'s Mot. Prelim. Inj. at 3-6 & Ex. A.  It is also a highly stigmatized condition.  Analysis of the legislative history and text of the ADA, as well as Supreme Court decisions interpreting the ADA and its predecessor, Section 504, compels inclusion of people with gender dysphoria, who routinely experience discrimination based on stigma, prejudice, and ignorance.[8]

The contrary interpretation advanced by Defendants would ascribe to Congress a poisoned purpose that violates equal protection.  Indeed, in over three years of litigation involving three separate cases alleging ADA coverage of gender dysphoria—in Pennsylvania, New Jersey, and Connecticut—no one, including the U.S. Department of Justice, has argued that Congress's purported exclusion of gender dysphoria would be constitutional, nor has anyone even articulated a legitimate purpose that could be advanced for its exclusion.[9]  Under the

---

was removed from the DSM).  For a graphic depiction of the organization of GIDs, transsexualism, and gender dysphoria in the various editions of the DSM, see app. B.

[8] *Amici* agree with the Plaintiff's arguments that the plain language of the ADA does not exclude gender dysphoria, *see* Pl.'s Mot. Prelim. Injun., at 19-22, and submit this brief to supplement those arguments with reference to the ADA's purpose, as gleaned from legislative history, text, and judicial decisions.

[9] *See, e.g.*, Stat. of Int. of U.S. at 2-3, *Doe v. Dzurenda*, No. 3:16-CV-1934 (D. Conn. Oct. 27, 2017), ECF No. 57; Stat. of Int. of U.S. at 2, *Doe v. Arrisi*, No. 3:16-cv-08640 (D.N.J. July 17, 2017), ECF No. 49; Sec. Statement of Int. of U.S. at 5-6, *Blatt v. Cabela's Retail, Inc.*, No. 5:14-CV-04822 (E.D. Pa. Nov. 16, 2015), ECF No. 67.  Defendants likewise do not argue that the exclusion is constitutional; they instead defer to the federal government on this issue.  *See* Defs.' Mem. Law. Supp. Defs.' Opp. Pl.'s Mot. Prelim. Injun. at 17-18.

constitutional avoidance canon, it is this Court's obligation to avoid an interpretation that renders federal law unconstitutional if there is a plausible way, consistent with the statutory language, to do so. *See Blatt v. Cabela's Retail, Inc.*, 2017 WL 2178123, at *4 (E.D. Pa. 2017) (stating that it was "the Court's duty to adopt" an interpretation of the ADA covering gender dysphoria because such interpretation "allows the Court to avoid the constitutional questions raised in this case").

For the reasons set forth below, this Court should hold that gender dysphoria is not excluded by the ADA and Section 504.

## STATEMENT OF FACTS

Amici adopt and incorporate in their entirety the factual allegations set forth in the Complaint, Plaintiff's Opposition to Defendant's Motion to Dismiss, and Plaintiff's Motion for Preliminary Injunction.

## ARGUMENT

### I. The Purpose of the ADA and Section 504 is to Protect People with Disabilities from Discrimination Based on Stigma, Prejudice, and Ignorance.

Throughout much of American history, people with disabilities have been stigmatized; they have been typed as "abnormal or defective in mind or body" because they "differ too much from a socially defined 'norm.'" Samuel R. Bagenstos, *Subordination, Stigma, and "Disability,"* 86 Va. L. Rev. 397, 437, 445 (2000); *see also Tennessee v. Lane*, 541 U.S. 509, 536 (2004) (Ginsburg, J., concurring) ("The ADA 'guarantee[s] a baseline of equal citizenship by protecting against stigma and systematic exclusion from public and private opportunities . . .

.'") (quoting Bagenstos).[10]  They have also been ignored, unfairly stereotyped, and even hated.[11]

For many years, government policy toward people with disabilities did not address

discrimination; instead, it focused almost exclusively on vocational rehabilitation designed to

help people with disabilities overcome their limitations, and on benefits entitlement programs.

*See* Jennifer L. Levi & Bennett H. Klein, *Pursuing Protection for Transgender People Through*

*Disability Laws*, *in* TRANSGENDER RIGHTS 78 (2006).[12]  Beginning in the 1970's, government

policy toward people with disabilities radically changed with the emergence of the disability

rights movement, which reframed disability as primarily a social condition.  *See* Bagenstos,

*supra*, at 427-30.  According to the "social model" of disability, people are "disabled" not by the

functional limitations imposed by their medical conditions, but rather by society's negative

reactions—stigma, prejudice, and ignorance—toward those conditions.  *See* Mary Crossley,

*Disability Kaleidoscope*, 74 NOTRE DAME L. REV. 621, 654 (1999) ("[The] disadvantaged status

of persons with disabilities is the product of a hostile (or at least inhospitable) social

---

[10] *Accord.* Carol J. Gill, *Questioning Continuum*, *in* THE RAGGED EDGE: THE DISABILITY EXPERIENCE FROM THE PAGES OF THE FIRST FIFTEEN YEARS OF THE DISABILITY RAG 42, 44 (Barrett Shaw ed., 1994) ("[D]isability is a marginalized status that society assigns to people who are different enough from majority cultural standards to be judged abnormal or defective in mind or body."); Pl.'s Mot. Prelim. Injun. at 2 ("These laws recognize that people with medical conditions often face barriers because policies and practices incorrectly presume that all human bodies function the same.").

[11] *See, e.g.*, ADA Amendments Act of 2008 § 2(a)(2), Pub. L. No. 110-325, 122 Stat. 3553 (2008) (codified at 42 U.S.C. §§ 12101-13) (discussing "prejudice, antiquated attitudes, [and] . . . the failure to remove societal and institutional barriers" for people with disabilities); *see also* Bagenstos, *supra*, at 422-25 (discussing prejudice, stereotypes, and neglect toward people with disabilities).

[12] *See also* Chai R. Feldblum, *Definition of Disability Under Federal Anti-Discrimination Law: What Happened? Why? And What Can We Do About it?*, 21 BERKELEY J. EMP. & LAB. L. 91, 96 (2000) (stating that rehabilitation laws "presumed . . . that integration required changing the person with the disability, not changing any aspect of the surrounding society that might have made it difficult for the person to function in that society").

environment, not simply the product of bodily defects.").[13]  Barriers to full participation for

people with disabilities, the model holds, lay not with the individual, but rather with society's

unfair treatment of the individual.

The ADA and its predecessor, Section 504, embody this understanding.  They are

premised on outlawing policies and practices that discriminate against those who are "not

considered to be among the 'normals' for whom society, and its institutions, are designed."

Bagenstos, *supra*, at 437.  The ADA's legislative history and text confirm this protection from

discrimination based on stigma, prejudice, and ignorance, as do Supreme Court decisions

interpreting the ADA and Section 504.[14]

### A. The ADA's Legislative History

The ADA's legislative history is replete with appalling examples of discrimination

against people with disabilities based on stigma, prejudice, and ignorance: a New Jersey zoo

keeper who refused to admit children with Down's Syndrome because he feared they would

upset the chimpanzees; operators of an auction house who attempted to remove a woman with

polio because she was deemed to be "disgusting to look at"; a woman with arthritis who was

denied a job at a college because the college trustees believed that "normal students shouldn't

see her"; a man with AIDS who was forced by police to remain in his car overnight as neighbors

---

[13] *See also* H.R. REP. 101-485(II), at 41 (May 15, 1990) (House Comm. on Educ. & Lab) ("The social consequences that have attached to being disabled often bear no relationship to the physical or mental limitations imposed by the disability.  For example, being paralyzed has meant far more than being unable to walk—it has meant being excluded from public schools, being denied employment opportunities, and being deemed an 'unfit parent.'") (quoting testimony of Arlene Mayerson of the Disability Rights Education and Defense Fund).
[14] Given Section 504's lack of legislative history, *see, e.g.*, *Alexander v. Choate*, 469 U.S. 287, 295 n.13 (1985) (noting lack of congressional debate devoted to Section 504), and its nearly identical language to the ADA, *see, e.g.*, 42 U.S.C. § 12201(a) (requiring the ADA to be construed consistently with Section 504), this brief's discussion of legislative history and text focuses on the ADA, not Section 504.

peered at him through the car's windows; a child with cerebral palsy who was excluded from public school because his teacher claimed that his physical appearance "produced a nauseating effect" on his classmates; a woman who was fired from a job she had held for many years because her son, who lived with her, had contracted AIDS; a woman with HIV whose use of a community swimming pool led the town to close the pool for a week and prompted a neighbor to start a petition demanding that she move out of the town; and fully-registered people with disabilities who were turned away from voting booths because they did not look sufficiently "competent" to vote. *See* H.R. REP. 101-485(II), *supra*, at 56-57; NATIONAL COUNCIL ON DISABILITY, EQUALITY OF OPPORTUNITY: THE MAKING OF THE AMERICANS WITH DISABILITIES ACT (2010), https://ncd.gov/publications/2010/equality_of_Opportunity_The_Making_of_the_Americans_with_Disabilities_Act [hereinafter EQUALITY OF OPPORTUNITY].[15]

In numerous congressional committee reports, Congress made clear its intent that the ADA should prohibit such discriminatory actions, which "result[] from false presumptions, generalizations, misperceptions, patronizing attitudes, ignorance, irrational fears, and pernicious mythologies" associated with disability. H.R. REP. 101-485(II), *supra*, at 30.[16] As Senator Tom Harkin, one the ADA's sponsors, memorably stated:

> There is a wellspring of fears and unfounded prejudices about people with disabilities, unfounded fears, whether people have mental disorders, whether they are manic depressives or schizophrenia or paranoia, or unfounded fears and prejudices based upon physical disabilities. The point of the [ADA] is to start breaking down those barriers of fear and prejudice and unfounded fears, to get past that point so that people begin to look at people based on their abilities, not first looking at their disability.

---

[15] *Accord.* S. REP. 101-116, at 5-7 (Aug. 30, 1989) (Sen. Comm. Labor and Hum. Resources), *available at* https://transition.fcc.gov/Bureaus/OSEC/library/legislative_histories/1387.pdf.

[16] *See also id.* at 40 (discussing "stereotypical assumptions, fears and myths [about people with disabilities] not truly indicative of the ability of such individuals to participate in and contribute to society"); *accord.* S. REP. 101-116, *supra*, at 6 (1989); H.R. REP. 101-485(III), at 30 (May 15, 1990) (House Jud. Comm.).

135 CONG. REC. S10765-01, S10768, 1989 WL 183216 (Sept. 6, 1989) (Statement of Sen. Harkin).

The ADA, Senator Harkin explained, "offers promise that [people with disabilities] will no longer

be shunned and isolated because of the ignorance of others."  136 CONG. REC. S7422-03, S7444,

1990 WL 144937 (June 6, 1990) (Statement of Sen. Harkin).[17]

### B. The ADA's Text

The ADA's text—specifically, its findings, definition of disability, and non-

discrimination provisions—underscore the ADA's purpose of prohibiting discrimination based

on stigma, prejudice, and ignorance.  The ADA's findings, for example, acknowledge the

persistent and pervasive history of discrimination against people with disabilities, who have been

"isolate[d] and segregate[d]" by society, and who experience "prejudice" and "occupy an inferior

status."  42 U.S.C. § 12101(2), (6), (8); *see also* ADA Amendments Act of 2008 § 2(a)(2), Pub.

L. No. 110-325, 122 Stat. 3553 (2008) (codified at 42 U.S.C. §§ 12101-13) ("[I]n enacting the

ADA, Congress recognized that . . . people with physical or mental disabilities are frequently

precluded from [fully participating in all aspects of society] because of prejudice, antiquated

attitudes, or the failure to remove societal and institutional barriers.").  The findings also

acknowledge the various forms that such discrimination takes:

> outright intentional exclusion, the discriminatory effects of architectural,
> transportation, and communication barriers, overprotective rules and policies,
> failure to make modifications to existing facilities and practices, exclusionary
> qualification standards and criteria, segregation, and relegation to lesser services,
> programs, activities, benefits, jobs, or other opportunities.

---

[17] *See also id.* (discussing "irrational fears and misperceptions about people with AIDS and HIV
disease," and stating that people with other disabilities "are all too familiar with such prejudicial
attitudes because they have been similarly shunned by the same kinds of stereotypes. . . . [T]he
fear of epilepsy was once so great that people with this disease were believed to be possessed by
the devil and were shut out of schools and the workforce.  Even cancer was once thought to be
contagious and resulted in discrimination.").

*Id.* § 12102(5).  The findings further state that discrimination against people with disabilities is not an isolated affair; it occurs across a wide spectrum of economic, social, and political activities, in "such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services."  42 U.S.C. § 12101(3).

Like its findings, the ADA's three-prong definition of disability extends protection to those who are discriminated against because of irrelevant and often non-existent limitations imposed by their medical conditions (under the first and second prongs), *see id.* § 12102(1)(A)-(B), (4)(D)-(E),[18] and because of others' negative reactions toward their conditions, whether real or imagined (under the regarded-as prong), *see* 42 U.S.C. § 12102(1)(C), (3)(A).[19]

Finally, the ADA's antidiscrimination provisions are carefully crafted to address discrimination based on stigma, prejudice, and ignorance.  The ADA's prohibitions on disparate treatment and disparate impact, for example, address intentionally discriminatory actions (such as categorical exclusion or segregation of people with particular conditions)[20] and overbroad rules that have discriminatory effects (such as qualification standards that screen out people with

---

[18] *See Arnold v. United Parcel Service, Inc.*, 136 F.3d 854, 861 (1st Cir. 1998) ("[T]he thrust of [the Act's] purpose is essentially to protect individuals who have an underlying medical condition or other limiting impairment, but who *are* in fact capable of doing the job, with or without the help of medications, prosthetic devices, or other ameliorative measures, and with or without a reasonable accommodation by the employer.") (emphasis in original).

[19] *See School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 284 (1987) (stating that, by including the regarded-as prong, "Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment."); *see also* Levi & Klein, *supra*, at 89 ("The legislative history of the ADA . . . makes clear that the 'regarded as' prong is intended to prohibit discrimination against persons with impairments that invoke fear and discomfort in others.").

[20] *See, e.g.*, 42 U.S.C. § 12112(b)(1)-(2), (b)(4) (Title I); *id.* § 12182(b)(1)(A)-(C) (Title III); 28 C.F.R. § 35.130(b)(1)-(2), (d) (DOJ regulations implementing Title II).

particular conditions).[21]  Other antidiscrimination provisions in the ADA address society's historical neglect of people with disabilities by requiring universal design and the removal of architectural barriers,[22] reasonable accommodations in the workplace,[23] and reasonable modification of policies, practices, and procedures in government and private business.[24]

### C. Judicial Interpretations

Supreme Court case law confirms the ADA's and Section 504's protection against discrimination based on stigma, prejudice, and ignorance.  In 1987, in *School Board of Nassau County v. Arline*, the Supreme Court concluded that Section 504 protected a school teacher with tuberculosis who was discharged from her job because of others' fears that she might be contagious.  480 U.S. at 281.  "[T]he basic purpose of § 504," the Court concluded, "is to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others"—including "society's accumulated myths and fears about disability and disease."  *Id.* at 284; *see also id.* at 283 (stating that ADA covers those who experience "negative reactions . . . to the impairment").  "[D]iscrimination on the basis of mythology," the Court explained, "[is] precisely the type of injury Congress sought to prevent."  *Id.* at 285.

The Court's discussion in *Arline* echoed its findings two years earlier in *Alexander v. Choate*, where the Court located the roots of Section 504 in "well-catalogued instances of invidious discrimination" and "thoughtlessness and indifference" toward people with disabilities,

---

[21] *See, e.g.*, 42 U.S.C. § 12112(b)(3), (b)(6) (Title I); *id.* § 12182(b)(1)(D), (b)(2)(A)(i) (Title III); 28 C.F.R. § 35.130(b)(3), (b)(8) (DOJ regulations implementing Title II).
[22] 42 U.S.C. §§ 12182(b)(2)(A)(iv)-(v), 12183 (Title III); 28 C.F.R. §§ 35.150, 35.151 (DOJ regulations implementing Title II).
[23] *See, e.g.*, 42 U.S.C. § 12112(b)(5) (Title I).
[24] *See, e.g.*, 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii) (Title III); 28 C.F.R. § 35.130(b)(7) (DOJ regulations implementing Title II).

which caused them "to live among society shunted aside, hidden, and ignored." 469 U.S. at 295-96 & n.12 (citation omitted).

*Arline*'s observations concerning society's "accumulated myths and fears" about disability, 480 U.S. at 284, also find expression in Justice Thurgood Marshall's important concurrence in *Cleburne v. Cleburne Living Center*, in which the Court invalidated a zoning ordinance that discriminated against people with intellectual disabilities in violation of equal protection. *See* 473 U.S. 432, 435 (1985). According to Justice Marshall, people with intellectual disabilities "have been subject to a 'lengthy and tragic history' . . . of segregation and discrimination that can only be called grotesque"—a "regime of state-mandated segregation and degradation . . . that in its virulence and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow." *Id.* at 461-62 (Marshall, J., concurring) (citation omitted). Widely considered to be a "menace to society and civilization," people with intellectual disabilities were housed in "[m]assive custodial institutions" designed to "halt [their] reproduction" and "extinguish their race." *Id.* at 462. They were "categorically excluded from public schools, based on the false stereotype that all were ineducable and on the purported need to protect [non-disabled] children from them." *Id.* at 462-63. State laws deemed them unfit for citizenship, disqualified them from voting, compelled their sterilization to stop them from procreating, and made their marriages voidable and even criminal. *Id.* at 463-64. Although much has changed for people with intellectual disabilities, Justice Marshall explained, this long history of "social and cultural isolation" has resulted in "ignorance, irrational fears, and stereotyping" that continue to endure— "stymie[ing] recognition of the[ir] dignity and individuality." *Id.* at 464, 467.[25]

---

[25] Because *Cleburne*'s facts centered on people with intellectual disabilities, Justice Marshall's vivid portrait of discrimination did not include other forms of state-sanctioned discrimination against people with disabilities, including the institutionalization of people with a range of

Subsequent Supreme Court decisions confirm the ADA's protection against discrimination based on stigma, prejudice, and ignorance.  In *Bragdon v. Abbott*, the Court held that the ADA's definition of "disability" covered a woman with HIV whose dentist refused to render services out of fear of infection—a position shared by the Department of Justice and every other agency and court that had considered the issue under Section 504.  524 U.S. 624, 628-29, 642-45 (1998).

 And, in *Olmstead v. L.C. ex rel. Zimring*, the Court held that unnecessary institutionalization of people with various mental impairments violated the ADA, in part, because it "stigmatiz[ed]" them, "perpetuat[ing] unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life."  527 U.S. 581, 600 (1999) (citation omitted).

## II. People with Gender Dysphoria Routinely Experience Discrimination Based on Stigma, Prejudice, and Ignorance, and Should Be Protected by the ADA and Section 504.

People with gender dysphoria should be protected by the ADA and Section 504 because they routinely experience discrimination based on stigma, prejudice, and ignorance.  Gender dysphoria is a serious medical condition that results from a physical impairment.  *See* DSM-5, *supra*, at 452, 454 (stating that gender dysphoria "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning," and, without treatment, can lead to "suicidal ideation, suicide attempts, and suicides"); *id.* at 457 (discussing

---

conditions other than intellectual disabilities, such as epilepsy and blindness; the passage of state "ugly laws" that prohibited "unsightly" people—including people with disabilities—from appearing in public; and a built environment that excluded people with disabilities, quite literally, at every step—from the sidewalks encircling their homes to the stairs leading up to the U.S. Capitol.  *See* Bagenstos, *supra*, at 440-41; *see also* EQUALITY OF OPPORTUNITY, *supra* (describing Capitol steps as "a symbol of discrimination against the disabled") (quoting Michael Auberger, co-founder of ADAPT).

genetic and physiological contributions to gender dysphoria); *accord.* Pl.'s Opp. Mot. Dismiss at 2; Pl.'s Mot. Prelim. Injun. at 3-6 & Ex. A.[26]  Gender dysphoria is also a highly stigmatized condition.  According to the American Psychiatric Association, gender dysphoria:

> is associated with high levels of stigmatization, discrimination, and victimization, leading to negative self-concept, increased rates of mental disorder comorbidity, school dropout, and economic marginalization, including unemployment, with attendant social and mental health risks, especially in individuals from resource-poor family backgrounds.  In addition, these individuals' access to health services and mental health services may be impeded by structural barriers, such as institutional discomfort or inexperience in working with this patient population.

DSM-5, *supra*, at 458.  The internationally accepted Standards of Care for the treatment of gender dysphoria, published by the World Professional Association for Transgender Health (WPATH), similarly recognize the risk of "abuse and stigmatization" of people with gender dysphoria.  *See* WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, STANDARDS OF CARE 21 (7th ed., 2012), https://s3.amazonaws.com/amo_hub_content/Association140/files/ Standards%20of%20Care%20V7%20-%202011%20WPATH%20(2)(1).pdf [hereinafter STANDARDS OF CARE].

Like the medical conditions featured in the ADA's legislative history, gender dysphoria evokes "false presumptions, generalizations, misperceptions, patronizing attitudes, ignorance, irrational fears, and pernicious mythologies."  *See, e.g.*, H.R. REP. 101-485(II), *supra*, at 30. Consistent with the ADA's findings, people with gender dysphoria have experienced pervasive and persistent discrimination across a wide spectrum of economic, social, and political activities, as documented by courts and the medical community.  *See* 42 U.S.C. § 12101.  Consistent with

---

[26] *See also* Duffy, *supra*, at 16-72 ("Current medical studies continue to point in the direction of hormonal and genetic causes for the in utero development of gender dysphoria."), *quoted in* Sec. Statement of Int. of U.S. at 5-6, *Blatt v. Cabela's Retail, Inc.*, No. 5:14-CV-04822 (E.D. Pa. Nov. 16, 2015), ECF No. 67.

Supreme Court case law, people with gender dysphoria have been the targets of "society's accumulated myths and fears" and the "prejudiced attitudes or the ignorance of others," *see Arline*, 480 U.S. at 284; they have been "shunted aside, hidden, . . . ignored," and even hated for who they are, *see Alexander*, 469 U.S. at 295-96 & n.12. And, as contemplated by the ADA's definition of disability, people with gender dysphoria regularly experience discrimination based on others' negative reactions toward their condition and the medical interventions they use to treat the condition, *i.e.*, surgery, hormone therapy, living part time or full time in another gender role, and/or psychotherapy.[27] *See Blatt*, 2017 WL 2178123, at *3 & n.3 (likening gender dysphoria to highly stigmatized conditions of HIV and AIDS, and determining that none are excluded from ADA).

Recent cases involving transgender people with gender dysphoria illustrate the depth of stigma, prejudice, and ignorance routinely experienced by people with gender dysphoria, including: transgender students with gender dysphoria who were told by their principals that they could not use gender-appropriate restrooms because it would violate "the dignity and privacy rights of other students" and would create "safety issues and lewdness concerns," *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016); *accord. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1052 (7th Cir. 2017); and transgender military service members with gender dysphoria who were told by the President of the United States that they were no longer welcome in the military because they were a "burden[]" and a "disruption." *Doe 1 v. Trump*, No. 17–1597, 2017

---

[27] The WPATH Standards of Care recommend an individualized approach to gender transition, consisting of a medically-appropriate combination of hormone therapy, living part time or full time in another gender role, consistent with one's gender identity, surgery, and/or psychotherapy. STANDARDS OF CARE, *supra*, at 9-10; *accord.* Pl.'s Mot. Prelim. Injun. at 6.

WL 4873042, at *7 (D.D.C. 2017) (quoting tweet of President Donald Trump).  Gender dysphoria's close association with transgender people—an "historically persecuted and politically powerless" class who "face discrimination, harassment, and violence because of their gender identity"—likewise contributes to the stigmatization of the condition.  *Whitaker*, 858 F.3d at 1051; *Doe 1*, 2017 WL 4873042, at *2.[28]

Such discrimination is also evident in the facts of this case, which involve offensive name-calling; the application of blanket gender-based rules regarding prison placement, showering, and strip-searching; and a failure to consider reasonable modifications to prison policies requested by the Plaintiff.  *See* Pl.'s Mot. Prelim. Injun. at 7-9.  Here, Defendants have engaged in precisely the sort of intentional discrimination, enforcement of overbroad rules, and refusal to modify policies prohibited by the ADA and Section 504.

Importantly, Defendants cannot avoid their antidiscrimination obligations by invoking generalized safety concerns.  According to U.S. Department of Justice (DOJ) regulations implementing the ADA, a public entity may impose safety requirements only if such requirements "are based on *actual* risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities."  28 C.F.R. § 35.130(h) (emphasis added).  In assessing such risks,

> a public entity must make an *individualized* assessment, based on reasonable judgment that relies on current medical knowledge or on the best available *objective* evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications

---

[28] *See* James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M., *The Report of the 2015 U.S. Transgender Survey*, NATIONAL CENTER FOR TRANSGENDER EQUALITY (2016), https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF (surveying nearly 28,000 transgender people and concluding that they are disproportionately at risk for discrimination in almost all aspects of life, including employment, housing, education, public accommodations, and access to government services).

of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

28 C.F.R. § 35.139 (emphasis added). This careful approach is "essential if the law is to achieve its goal of protecting disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to legitimate concerns, such as the need to avoid exposing others to significant health and safety risks." 28 C.F.R. Pt. 35, app. B, at § 35.104; *see also* H.R. REP. 101-485(II), *supra*, at 56 ("The determination that an individual with a disability will pose a safety threat to others must be made on a case-by-case basis and must not be based on generalizations, misperceptions, ignorance, irrational fears, patronizing attitudes, or pernicious mythologies.").[29]

Similarly, under federal regulations implementing the Prison Rape Elimination Act (PREA), prisons must use "objective" criteria to screen inmates for their risk of sexual victimization; resort to myths and fears about people with gender dysphoria is prohibited. 28 C.F.R. § 115.41(c)-(d). The regulations further provide that prisons must make "*individualized* determinations about how to ensure the safety of each inmate," including considering "on a *case-by-case basis* whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems"—giving "serious consideration" to

---

[29] *See also* H.R. REP. 101-485(III), *supra*, at 45-46 (stating that "[a] person with a disability must not be excluded, or found to be unqualified, based on stereotypes or fear. Nor may a decision be based on speculation about the risk of harm to others. Decisions are not permitted to be based on generalizations about the disability but rather must be based on the facts of an individual case. . . . The purpose of creating the 'direct threat' standard is to eliminate exclusions which are not based on objective evidence about the individual involved. Thus, in the case of a person with mental illness there must be objective evidence from the person's behavior that the person has a recent history of committing overt acts or making threats which caused harm or which directly threatened harm."); *accord.* S. REP., *supra*, at 25.

the inmate's "own views with respect to his or her own safety." *Id.* § 115.42(b)(c), (e) (emphasis added).

There is no indication that Defendants' refusal to transfer the Plaintiff to a women's prison was based on an individualized assessment of actual risks based on objective evidence. Additionally, Defendants cannot justify denial of the reasonable accommodation of transferring the Plaintiff to a women's prison based on defenses of undue burden or fundamental alteration, given that federal regulations *explicitly contemplate* that precise transfer. *See, e.g.*, *Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 335 (E.D.N.Y. 2009) ("Where individuals with disabilities seek to receive services in a more integrated setting—and the state *already provides* services to others with disabilities in that setting—assessing and moving the particular plaintiffs to that setting, in and of itself, is not a 'fundamental alteration.'") (emphasis in original).

Accordingly, a blanket prison policy that segregates prisoners based on anatomy, external genitalia, or assigned birth sex is prohibited by the ADA and Section 504, as well as the PREA regulations. Although such a policy raises no concern for most people who are incarcerated, this is not true for people with gender dysphoria like Ms. Doe. Such a policy is predicated on the presumption that everyone's sex is the same as that which was assigned to them at birth. *See* Pl.'s Opp. Mot. Dismiss at 2. As a result, people with gender dysphoria, for whom the underlying presumption is not true, face discrimination because the policy ignores the negative impact it has on people with a stigmatized medical condition. To remedy this discrimination, such a policy must either be replaced altogether (for example, with a policy that segregates inmates based on "gender identity" rather than anatomy, external genitalia, or assigned birth sex) or, alternatively, a person with gender dysphoria must be provided the reasonable

18

accommodation of placement based on the person's post-gender-transition sex.  Defendants did

not take either action in this case.

### III. Interpreting the ADA and Section 504 to Exclude Gender Dysphoria Would Ascribe to Congress an Impermissible Intent to Discriminate Against Transgender People.

Defendants ask this Court to disregard the purpose of the ADA, which is to protect

against discrimination based on stigma, prejudice, and ignorance, and to instead interpret

"gender identity disorders not resulting from physical impairments" and "transsexualism"

broadly to reflect a generalized intent to discriminate against all transgender-related medical

conditions.[30]  Such an interpretation must be rejected where it is contrary to the statutory

language and where it ascribes to Congress a poisoned purpose—a bare desire to harm

transgender people—in violation of equal protection.

As discussed above, in over three years of litigation in three separate cases, no one,

including the U.S. Department of Justice, has argued that Congress's purported exclusion of

gender dysphoria would be constitutional.  No one has offered a constitutionally valid argument

for singling out from the ADA, beginning in 1990 and continuing forevermore, all medical

conditions associated with transgender people.  And that is because there is no valid argument.

There is absolutely no reason why Congress would systematically exclude any and every

medical condition ever associated with transgender people *other* than to harm them.

---

[30] Because the defining feature of gender dysphoria is nonconformity between gender identity and assigned sex at birth, a law that excludes gender dysphoria is necessarily a transgender classification, in much the same way that a law excluding sickle cell anemia would be a racial classification.  *See* STANDARDS OF CARE, *supra*, at 5 (discussing gender nonconformity and gender dysphoria); *accord. A Bare Desire to Harm*, *supra*, at 549; Pl.'s Mot. Prelim. Injun. at 24.  Plaintiff's argument, shared by Amici, is that the ADA does *not* exclude gender dysphoria—nor could it.

Notwithstanding the biased statements of several senators regarding three conditions closely associated with transgender people, *see* Pl.'s Mot. Prelim. Injun. at 26-27 (collecting statements),[31] those senators did not—and, indeed, could not as a constitutional matter—exclude every condition associated with transgender people in the future.  The exclusion of "gender identity disorders not resulting from physical impairments" and "transsexualism" was a regrettable snapshot, not a blank check for bias in perpetuity.  The ADA's purpose, in conjunction with the constitutional avoidance canon, compel the conclusion that gender dysphoria is not excluded by the ADA or Section 504.

## CONCLUSION

For the forgoing reasons, this Court should hold that gender dysphoria is not excluded by the ADA and Section 504.

/s/ Joshua M. Daniels
Joshua M. Daniels (BBO# 673034)
THE LAW OFFICE OF JOSHUA M. DANIELS
P.O. Box 300765
Jamaica Plain, MA 02130
Local Counsel for *Amici Curiae*
(617) 942-2190
attorneyjoshdaniels@gmail.com

Kevin Barry
(*pro hac vice* pending)
QUINNIPIAC UNIVERSITY SCHOOL OF LAW
LEGAL CLINIC
275 Mount Carmel Ave.
Hamden, Connecticut 06518
Counsel for *Amici Curiae*
(203) 582-3238
legalclinic@quinnipiac.edu

February 27, 2018

---

[31] For relevant legislative history regarding the ADA, see app. C.