# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JANE DOE,

      Plaintiff,

      v.

MASSACHUSETTS DEPARTMENT OF
CORRECTION; THOMAS A. TURCO III;
SEAN MEDEIROS; JAMES M. O'GARA
JR.; and STEPHANIE COLLINS,

      Defendants.

Civil Action No. 1:17-CV-12255-RGS

(Leave to file granted 2/27/2018)

## BRIEF OF *AMICI CURIAE* BAZELON CENTER FOR MENTAL HEALTH LAW, DISABILITY RIGHTS EDUCATION & DEFENSE FUND, HEALTH LAW ADVOCATES, INC., MASSACHUSETTS TRANSGENDER POLITICAL COALITION, AND NATIONAL CENTER FOR TRANSGENDER EQUALITY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Joshua M. Daniels (BBO# 673034)
THE LAW OFFICE OF JOSHUA M. DANIELS
P.O. Box 300765
Jamaica Plain, MA 02130
Local Counsel for *Amici Curiae*
(617) 942-2190
attorneyjoshdaniels@gmail.com

Kevin Barry
(admitted *pro hac vice*)
QUINNIPIAC UNIVERSITY SCHOOL OF LAW
LEGAL CLINIC
275 Mount Carmel Ave.
Hamden, Connecticut 06518
Counsel for *Amici Curiae*
(203) 582-3238
legalclinic@quinnipiac.edu

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................iii-vi

STATEMENT OF INTEREST OF AMICI CURIAE ............................................................vii-ix

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ..................................................................................................... 5

ARGUMENT ........................................................................................................................ 5

   I. The Purpose of the ADA and Section 504 is to Protect People with Disabilities from Discrimination Based on Stigma, Prejudice, and Ignorance. ...................................................... 5

      A. The ADA's Legislative History ......................................................................... 7

      B. The ADA's Text .............................................................................................. 9

      C. Judicial Interpretations ................................................................................... 11

   II. People with Gender Dysphoria Routinely Experience Discrimination Based on Stigma, Prejudice, and Ignorance, and Should Be Protected by the ADA and Section 504................... 13

   III. Interpreting the ADA and Section 504 to Exclude Gender Dysphoria Would Ascribe to Congress an Impermissible Intent to Discriminate Against Transgender People. ................... 19

CONCLUSION.................................................................................................................... 20

APPENDIX................................................................................................................ attached

# TABLE OF AUTHORITIES

**Cases**

*Cleburne v. Cleburne Living Ct'r,*
    473 U.S. 432 (1985) ...................................................................................12, 13

*Alexander v. Choate,*
    469 U.S. 287 (1985) .......................................................... 7, 11, 12, 15

*Arnold v. United Parcel Service, Inc.,*
    136 F.3d 854 (1st Cir. 1998) ..................................................................10

*Bragdon v. Abbott,*
    524 U.S. 624 (1998) .................................................................................13

*Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.,*
    208 F. Supp. 3d 850 (S.D. Ohio 2016) ..................................................15

*Blatt v. Cabela's Retail, Inc., No. 5:14-CV-04822,*
    2017 WL 2178123 (E.D. Pa. May 18, 2017) ............................. 5, 14-15

*Disability Advocates, Inc. v. Paterson,*
    598 F. Supp. 2d 289 (E.D.N.Y. 2009) ...................................................18

*Doe 1 v. Trump, No. 17–1597,*
    2017 WL 4873042 (D.D.C. 2017) ..........................................................16

*Olmstead v. L.C. ex rel. Zimring,*
    527 U.S. 581 (1999) ............................................................................... 13

*Sch. Bd. of Nassau Cnty., Fla. v. Arline,*
    480 U.S. 273 (1987) ...................................................................... 10-12, 15

*Tennessee v. Lane,*
    541 U.S. 509 (2004) ..................................................................................5

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*
    858 F.3d 1034 (7th Cir. 2017) ......................................................... 15-16

**Federal Statutes**

29 U.S.C. § 705 ...................................................................................................2

42 U.S.C. § 12101 ..........................................................................................9-10, 15

42 U.S.C. § 12102 .............................................................................................10

42 U.S.C. § 12112 .........................................................................................10-11

42 U.S.C. § 12182 .........................................................................................10-11

42 U.S.C. § 12183 ........................................................................................................11

42 U.S.C. § 12201 ..........................................................................................................7

42 U.S.C. § 12211 ..........................................................................................................2

ADA Amendments Act of 2008,
    Pub. L. No. 110-325, 122 Stat. 3553 (2008) ....................................................6, 9

Fair Housing Amendments Act of 1988,
    Pub. L. No. 100-430, 102 Stat. 1619 (1988) .........................................................1

**Federal Regulations**

28 C.F.R. § 35.130............................................................................................. 10-11, 17

28 C.F.R. § 35.139..........................................................................................................17

28 C.F.R. § 35.150..........................................................................................................11

28 C.F.R. § 35.151..........................................................................................................11

28 C.F.R. § 115.41..........................................................................................................17

28 C.F.R. § 115.42..........................................................................................................18

28 C.F.R. Pt. 35, app. B .................................................................................................17

**Congressional Record & Reports**

136 CONG. REC. S7422-03,
    1990 WL 144937 (June 6, 1990) (Statement of Sen. Harkin) ...............................3, 9

135 CONG. REC. S10765-01,
    1989 WL 183216 (Sept. 6, 1989) (Statement of Sen. Harkin) ............................. 8-9

H.R. REP. 101-485(II)
    (May 15, 1990) (House Comm. on Educ. & Lab.)................................... 7-8, 14, 17

H.R. REP. 101-485(III)
    (May 15, 1990) (House Jud. Comm.)................................................................8, 17

S. REP. 101-116
    (Aug. 30, 1989) (Sen. Comm. Labor and Hum. Resources) ..............................8, 17

**State Statutes**

MASS. GEN. LAWS ch. 46, § 13(e)....................................................................................3

MASS. GEN. LAWS ch. 76, § 5 .........................................................................................2

**Other**

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL
   MANUAL OF MENTAL DISORDERS (5th ed. 2013) ............................................... 2, 13-14

Arli Christian, *Montana is the 15th State to Modernize Its
   Birth Certificate Gender Change Policy*, NATIONAL CENTER
   FOR TRANSGENDER EQUALITY (Dec. 23, 2017) ........................................................3

Carol J. Gill, *Questioning Continuum, in* THE RAGGED EDGE:
   THE DISABILITY EXPERIENCE FROM THE PAGES OF THE FIRST
   FIFTEEN YEARS OF THE DISABILITY RAG (Barrett Shaw ed., 1994) ........................6

Chai R. Feldblum, *Definition of Disability Under Federal Anti-Discrimination Law:
   What Happened? Why? And What Can We Do About it?*,
   21 BERKELEY J. EMP. & LAB. L. 91 (2000) ................................................................6

Christine Michelle Duffy, *The Americans with Disabilities Act of 1990
   and the Rehabilitation Act of 1973, in* GENDER IDENTITY AND SEXUAL ORIENTATION
   DISCRIMINATION IN THE WORKPLACE: A PRACTICAL GUIDE
   (Christine Michelle Duffy ed., Bloomberg BNA 2014) ...................................... 3, 14

*ID Documents Center*, NATIONAL CENTER FOR
   TRANSGENDER EQUALITY (Jan. 2018) ........................................................................3

James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M.,
   *The Report of the 2015 U.S. Transgender Survey*,
   NATIONAL CENTER FOR TRANSGENDER EQUALITY ..................................................16

Jennifer L. Levi & Bennett H. Klein, *Pursuing Protection for
   Transgender People Through Disability Laws, in* TRANSGENDER RIGHTS (2006) .............6, 10

Kevin M. Barry et al., *A Bare Desire to Harm: Transgender People and
   the Equal Protection Clause*, 57 B.C. L. REV. 507 (2016) ............................1, 2, 19

Mary Crossley, *Disability Kaleidoscope*,
   74 NOTRE DAME L. REV. 621 (1999) ........................................................................6

MASSACHUSETTS DEPARTMENT OF ELEMENTARY & SECONDARY EDUCATION,
   SAFE SCHOOLS PROGRAM FOR LGBTQ STUDENTS, GUIDANCE FOR
   MASSACHUSETTS PUBLIC SCHOOLS CREATING A SAFE AND SUPPORTIVE
   SCHOOL ENVIRONMENT (Feb. 15, 2013) ...................................................................2

MASS. REG. OF MOTOR VEHICLES, MASS. GENDER
   DESIGNATION CHANGE FORM.....................................................................................2

NATIONAL COUNCIL ON DISABILITY, EQUALITY OF OPPORTUNITY:
   THE MAKING OF THE AMERICANS WITH DISABILITIES ACT (2010) .......................8, 13

Samuel R. Bagenstos, *Subordination, Stigma, and "Disability,"*
   86 VA. L. REV. 397 (2000) ................................................................................5, 6, 7, 13

Stat. of Int. of U.S., *Doe v. Dzurenda*, No. 3:16-CV-1934
   (D. Conn. Oct. 27, 2017) ...............................................................................................4

Stat. of Int. of U.S., *Doe v. Arrisi*, No. 3:16-cv-08640
   (D.N.J. July 17, 2017) ....................................................................................................4

Sec. Statement of Int. of U.S., *Blatt v. Cabela's Retail, Inc.*,
   No. 5:14-CV-04822 (E.D. Pa. Nov. 16, 2015) ...............................................................4

WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH,
   STANDARDS OF CARE (7th ed., 2012) ..................................................................... 14-15, 19

## STATEMENT OF INTEREST OF AMICI CURIAE

The Judge David L. Bazelon Center for Mental Health Law is a national non-profit legal advocacy organization founded in 1972 to advance the rights of individuals with mental disabilities. The Bazelon Center uses litigation, public policy advocacy, education, and training to advocate for laws and policies that ensure equal opportunities for people with psychiatric or intellectual disabilities in all aspects of life, including education, housing, community living, employment, health care, voting, parental and family rights, and other areas. The Bazelon Center has significant expertise with respect to the Americans with Disabilities Act (ADA), and has participated as amicus in numerous cases involving the rights of people with disabilities under the ADA.

The Disability Rights Education & Defense Fund (DREDF), based in Berkeley, California, is a national nonprofit law and policy center dedicated to protecting and advancing the civil rights of people with disabilities. Founded in 1979 by people with disabilities and parents of children with disabilities, DREDF works through education, advocacy and law reform efforts. DREDF is nationally recognized for expertise in the interpretation of federal disability rights laws, including Section 504 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990.

Health Law Advocates, Inc. is a public interest non-profit law firm whose mission is to provide *pro bono* legal representation to Massachusetts residents experiencing difficulty accessing or paying for needed medical care. Health Law Advocates is committed to ensuring universal access to quality health care in Massachusetts, particularly for those who are most likely to be subject to discrimination, including transgender individuals.

The Massachusetts Transgender Political Coalition, founded in 2001, is dedicated to ending discrimination on the basis of gender identity and gender expression.  It envisions a world where persons of all genders are treated with respect and fully participate in all areas of society, free from fear of discrimination, harassment, or violence based on their gender identity and/or expression.

The National Center for Transgender Equality (NCTE) is a national social justice organization devoted to ending discrimination and violence against transgender people through education and advocacy on issues of national importance to transgender people.  Founded in 2003, NCTE advocates for policy reform at the federal level on a wide range of issues affecting transgender people, provides technical assistance to organizations and institutions at the state and local levels, and works to create greater public understanding of issues affecting transgender people.

*Amici* seek to provide information to this Court regarding the vital importance of allowing individuals with gender dysphoria to bring claims under the ADA and Section 504 of the Rehabilitation Act ("Section 504") when they have experienced discrimination.  At the heart of the ADA and Section 504 is the protection of people with disabilities from discrimination based on stigma, prejudice, and ignorance.  People with gender dysphoria routinely experience such discrimination and should be protected by these laws.  A contrary interpretation would attribute to Congress an unconstitutional purpose and therefore must be avoided.

Only one court in the Nation has analyzed whether the ADA's exclusion of "gender identity disorders not resulting from physical impairments" and "transsexualism" applies to gender dysphoria.  *See Blatt v. Cabela's Retail, Inc.*, No. 5:14-CV-04822, 2017 WL 2178123, at *4 (E.D. Pa. May 18, 2017) (denying defendant's partial motion to dismiss and holding that the

ADA does not exclude gender dysphoria).  No court has analyzed whether an identical exclusion under the Rehabilitation Act applies to gender dysphoria, nor has any court addressed the rights of individuals with gender dysphoria to bring claims under the ADA and Section 504 in the prison context.  Additionally, no court has focused on the ADA's and Section 504's prohibition of discrimination against people with gender dysphoria based on stigma, prejudice, and ignorance, as gleaned from legislative history, statutory text, and judicial interpretations.

A motion requesting leave to file was submitted in tandem with this brief.  No party's counsel authored the attached *amici curiae* brief in whole or in part.  No party or party's counsel, and no person other than *amici*, its members, or its counsel, contributed money intended to fund preparing or submitting the brief.

## INTRODUCTION

There has been a sea change in society's understanding of disability since the ADA became law in 1990.  The ADA acknowledges that the exclusion, segregation, and mistreatment of people with disabilities is not an inherent part of the disability itself, but instead is a result of stigma, prejudice, and ignorance.  This understanding is the hallmark of the ADA.  Yet Defendants in this case attempt to use the ADA to perpetuate the harms that Congress intended to eradicate in passing the ADA.  They do so by seizing on a narrow exclusion rooted in prejudice, and arguing that it applies to Plaintiff's disability, gender dysphoria.  It does not.

On August 1, 1988, North Carolina Senator Jesse Helms successfully argued for the exclusion of "transvestites" from the protections of the Fair Housing Amendments Act.  *See* Fair Housing Amendments Act of 1988, § 6(b)(3), Pub. L. No. 100-430, 102 Stat. 1619 (1988) (codified as a note to 42 U.S.C. § 3602).  Senator Alan Cranston, one of only two senators to oppose the Helms amendment, rose in objection.  "This amendment," Cranston argued,

> would single out one category of individuals who are already being discriminated against and say to them, "Sorry you now have no protections.  Congress has decided that it no longer cares whether or not you are cast out of our society." . . . This amendment could open the door to any number of attempts to exclude other disabilities from this and other antidiscrimination laws. . . . [T]he whole purpose of . . . antidiscrimination laws is to provide across-the-board evenhanded protection, not to pick and choose disabilities we approve of and exclude the ones we don't.

134 CONG. REC. 19,728, *quoted in* Kevin M. Barry et al., *A Bare Desire to Harm: Transgender People and the Equal Protection Clause*, 57 B.C. L. REV. 507, 529 & nn.136-37 (2016).

Senator Cranston lost that debate, and his concern proved prescient.  On September 7, 1989, Senator Helms and another conservative senior senator, William Armstrong, caused

approximately twelve so-called "deviant" and "immoral"[1] conditions to be cast out of the Americans with Disabilities Act (ADA), including "gender identity disorders not resulting from physical impairments" and "transsexualism."  42 U.S.C. § 12211(b)(1).  Two years later, Congress passed an identical exclusion to the Rehabilitation Act.  29 U.S.C. § 705(20)(F)(i).

Congress did not exclude gender dysphoria, which modern science recognizes is based on a physical impairment.  *See, e.g.*, AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 452, 454 (5th ed. 2013) [hereinafter DSM-5].[2] The outmoded idea that gender dysphoria is a moral transgression has been discredited by both medical science and social understandings.  However, the ignorance and prejudice faced by individuals with this disability endure, as illustrated by the horrendous treatment of the Plaintiff in this case.

While discrimination against individuals with gender dysphoria is rampant, there has been a significant shift for people with gender dysphoria in recent years.  In Massachusetts and a number of others states, for example, students with gender dysphoria are able to use restrooms and locker rooms consistent with their gender identity,[3] drivers can change their licenses to reflect their identity,[4] and people born in Massachusetts can revise their birth certificates to

---

[1] *A Bare Desire to Harm*, *supra*, at 531-32 & n.144 (quoting Senator Jesse Helms and Senator Warren Rudman).

[2] For a description of the diagnosis of gender dysphoria, *see infra* section II of this brief and app. A (compiling sections of DSM-5).

[3] *See* MASSACHUSETTS DEPARTMENT OF ELEMENTARY & SECONDARY EDUCATION, SAFE SCHOOLS PROGRAM FOR LGBTQ STUDENTS, GUIDANCE FOR MASSACHUSETTS PUBLIC SCHOOLS CREATING A SAFE AND SUPPORTIVE SCHOOL ENVIRONMENT (Feb. 15, 2013), http://www.doe.mass.edu/sfs/lgbtq/GenderIdentity.html (stating that, pursuant to Massachusetts antidiscrimination law, MASS. GEN. LAWS ch. 76, § 5, a student "may access the restroom, locker room, and changing facility that corresponds to the student's gender identity").

[4] *See* MASS. REG. OF MOTOR VEHICLES, MASS. GENDER DESIGNATION CHANGE FORM, http://www.massrmv.com/Portals/30/docs/21816.pdf (permitting change to sex designation on driver's license without requiring genital surgery).

accurately reflect their sex, without having to undergo genital surgery.[5]  As with other historically stigmatized medical conditions, such as epilepsy, mental disabilities, and HIV/AIDS,[6] our society is at last moving away from the old myths and stereotypes surrounding gender dysphoria and toward an understanding of gender dysphoria that is consistent with medical and scientific information—and with the dignity of those who have the condition.

Defendants' treatment of the Plaintiff in this case is wholly out of step with these developments.  Defendants have incarcerated Plaintiff, a woman with gender dysphoria, in a men's prison.  Pl.'s Mot. Prelim. Injun. at 2.  They have forced her to shower in view of—and having to view—men, to be strip-searched by men, to be vulnerable to taunts and ridicule by men, and to live her life in fear of being sexually victimized by men.  *Id.* at 6-9.  In defense of their appalling actions, Defendants incorrectly rely on the ADA's and Section 504 of the Rehabilitation Act's ("Section 504") exclusion of "gender identity disorders not resulting from physical impairments" and "transsexualism."[7]  Ms. Doe has no civil rights under the ADA or Section 504, Defendants argue, because these statutes exclude gender dysphoria.

---

[5] *See* MASS. GEN. LAWS ch. 46, § 13(e) (permitting amendment of sex designation on birth certificate without requiring genital surgery); *see also* Arli Christian, *Montana is the 15th State to Modernize Its Birth Certificate Gender Change Policy*, NATIONAL CENTER FOR TRANSGENDER EQUALITY (Dec. 23, 2017), https://medium.com/transequalitynow/montana-is-the-15th-state-to-modernize-its-birth-certificate-gender-change-policy-9123112b67; *see generally ID Documents Center*, NATIONAL CENTER FOR TRANSGENDER EQUALITY, https://transequality.org/documents (Jan. 2018) (collecting state laws regarding name changes and changes to driver's licenses and birth certificates).

[6] *See, e.g.*, 136 CONG. REC. S7422-03, S7444, 1990 WL 144937 (June 6, 1990) (Statement of Sen. Harkin) (discussing historically stigmatized conditions).

[7] "It was not uncommon at the time [the ADA was being debated] for people to use the terms 'transsexualism' and 'GID' interchangeably."  Christine Michelle Duffy, *The Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973*, *in* GENDER IDENTITY AND SEXUAL ORIENTATION DISCRIMINATION IN THE WORKPLACE: A PRACTICAL GUIDE ch. 16-48 (Christine Michelle Duffy ed., Bloomberg BNA 2014); *see also id.* at 16-98 – 103 (explaining that, beginning in 1980, successive versions of the DSM referred to transsexualism as a subtype of gender identity disorder applicable to adults and adolescents, until 1994, when transsexualism

Defendants' argument is as deeply offensive as it is mistaken.  No one disputes that the ADA excludes "gender identity disorders not resulting from physical impairments" and "transsexualism."  The question raised by this case is whether the ADA *also* excludes gender dysphoria.  As discussed in Plaintiff's opposition brief and Motion for Preliminary Injunction, as well as in Dr. Randi Ettner's affidavit supporting the Motion, gender dysphoria is a serious medical condition that results from a physical impairment.  *See* Pl.'s Opp. Mot. Dismiss at 2; Pl.'s Mot. Prelim. Inj. at 3-6 & Ex. A.  It is also a highly stigmatized condition.  Analysis of the legislative history and text of the ADA, as well as Supreme Court decisions interpreting the ADA and its predecessor, Section 504, compels inclusion of people with gender dysphoria, who routinely experience discrimination based on stigma, prejudice, and ignorance.[8]

The contrary interpretation advanced by Defendants would ascribe to Congress a poisoned purpose that violates equal protection.  Indeed, in over three years of litigation involving three separate cases alleging ADA coverage of gender dysphoria—in Pennsylvania, New Jersey, and Connecticut—no one, including the U.S. Department of Justice, has argued that Congress's purported exclusion of gender dysphoria would be constitutional, nor has anyone even articulated a legitimate purpose that could be advanced for its exclusion.[9]  Under the

---

was removed from the DSM).  For a graphic depiction of the organization of GIDs, transsexualism, and gender dysphoria in the various editions of the DSM, see app. B.

[8] *Amici* agree with the Plaintiff's arguments that the plain language of the ADA does not exclude gender dysphoria, *see* Pl.'s Mot. Prelim. Injun., at 19-22, and submit this brief to supplement those arguments with reference to the ADA's purpose, as gleaned from legislative history, text, and judicial decisions.

[9] *See, e.g.*, Stat. of Int. of U.S. at 2-3, *Doe v. Dzurenda*, No. 3:16-CV-1934 (D. Conn. Oct. 27, 2017), ECF No. 57; Stat. of Int. of U.S. at 2, *Doe v. Arrisi*, No. 3:16-cv-08640 (D.N.J. July 17, 2017), ECF No. 49; Sec. Statement of Int. of U.S. at 5-6, *Blatt v. Cabela's Retail, Inc.*, No. 5:14-CV-04822 (E.D. Pa. Nov. 16, 2015), ECF No. 67.  Defendants likewise do not argue that the exclusion is constitutional; they instead defer to the federal government on this issue.  *See* Defs.' Mem. Law. Supp. Defs.' Opp. Pl.'s Mot. Prelim. Injun. at 17-18.

constitutional avoidance canon, it is this Court's obligation to avoid an interpretation that renders federal law unconstitutional if there is a plausible way, consistent with the statutory language, to do so. *See Blatt v. Cabela's Retail, Inc.*, 2017 WL 2178123, at *4 (E.D. Pa. 2017) (stating that it was "the Court's duty to adopt" an interpretation of the ADA covering gender dysphoria because such interpretation "allows the Court to avoid the constitutional questions raised in this case").

For the reasons set forth below, this Court should hold that gender dysphoria is not excluded by the ADA and Section 504.

## STATEMENT OF FACTS

Amici adopt and incorporate in their entirety the factual allegations set forth in the Complaint, Plaintiff's Opposition to Defendant's Motion to Dismiss, and Plaintiff's Motion for Preliminary Injunction.

## ARGUMENT

### I. The Purpose of the ADA and Section 504 is to Protect People with Disabilities from Discrimination Based on Stigma, Prejudice, and Ignorance.

Throughout much of American history, people with disabilities have been stigmatized; they have been typed as "abnormal or defective in mind or body" because they "differ too much from a socially defined 'norm.'" Samuel R. Bagenstos, *Subordination, Stigma, and "Disability,"* 86 VA. L. REV. 397, 437, 445 (2000); *see also Tennessee v. Lane*, 541 U.S. 509, 536 (2004) (Ginsburg, J., concurring) ("The ADA 'guarantee[s] a baseline of equal citizenship by protecting against stigma and systematic exclusion from public and private opportunities . . .

.'") (quoting Bagenstos).[10]  They have also been ignored, unfairly stereotyped, and even hated.[11]

For many years, government policy toward people with disabilities did not address

discrimination; instead, it focused almost exclusively on vocational rehabilitation designed to

help people with disabilities overcome their limitations, and on benefits entitlement programs.

*See* Jennifer L. Levi & Bennett H. Klein, *Pursuing Protection for Transgender People Through*

*Disability Laws*, *in* TRANSGENDER RIGHTS 78 (2006).[12]  Beginning in the 1970's, government

policy toward people with disabilities radically changed with the emergence of the disability

rights movement, which reframed disability as primarily a social condition.  *See* Bagenstos,

*supra*, at 427-30.  According to the "social model" of disability, people are "disabled" not by the

functional limitations imposed by their medical conditions, but rather by society's negative

reactions—stigma, prejudice, and ignorance—toward those conditions.  *See* Mary Crossley,

*Disability Kaleidoscope*, 74 NOTRE DAME L. REV. 621, 654 (1999) ("[The] disadvantaged status

of persons with disabilities is the product of a hostile (or at least inhospitable) social

---

[10] *Accord.* Carol J. Gill, *Questioning Continuum*, *in* THE RAGGED EDGE: THE DISABILITY EXPERIENCE FROM THE PAGES OF THE FIRST FIFTEEN YEARS OF THE DISABILITY RAG 42, 44 (Barrett Shaw ed., 1994) ("[D]isability is a marginalized status that society assigns to people who are different enough from majority cultural standards to be judged abnormal or defective in mind or body."); Pl.'s Mot. Prelim. Injun. at 2 ("These laws recognize that people with medical conditions often face barriers because policies and practices incorrectly presume that all human bodies function the same.").

[11] *See, e.g.*, ADA Amendments Act of 2008 § 2(a)(2), Pub. L. No. 110-325, 122 Stat. 3553 (2008) (codified at 42 U.S.C. §§ 12101-13) (discussing "prejudice, antiquated attitudes, [and] . . . the failure to remove societal and institutional barriers" for people with disabilities); *see also* Bagenstos, *supra*, at 422-25 (discussing prejudice, stereotypes, and neglect toward people with disabilities).

[12] *See also* Chai R. Feldblum, *Definition of Disability Under Federal Anti-Discrimination Law: What Happened?  Why?  And What Can We Do About it?*, 21 BERKELEY J. EMP. & LAB. L. 91, 96 (2000) (stating that rehabilitation laws "presumed . . . that integration required changing the person with the disability, not changing any aspect of the surrounding society that might have made it difficult for the person to function in that society").

environment, not simply the product of bodily defects.").[13]  Barriers to full participation for people with disabilities, the model holds, lay not with the individual, but rather with society's unfair treatment of the individual.

The ADA and its predecessor, Section 504, embody this understanding.  They are premised on outlawing policies and practices that discriminate against those who are "not considered to be among the 'normals' for whom society, and its institutions, are designed." Bagenstos, *supra*, at 437.  The ADA's legislative history and text confirm this protection from discrimination based on stigma, prejudice, and ignorance, as do Supreme Court decisions interpreting the ADA and Section 504.[14]

### A. The ADA's Legislative History

The ADA's legislative history is replete with appalling examples of discrimination against people with disabilities based on stigma, prejudice, and ignorance: a New Jersey zoo keeper who refused to admit children with Down's Syndrome because he feared they would upset the chimpanzees; operators of an auction house who attempted to remove a woman with polio because she was deemed to be "disgusting to look at"; a woman with arthritis who was denied a job at a college because the college trustees believed that "normal students shouldn't see her"; a man with AIDS who was forced by police to remain in his car overnight as neighbors

---

[13] *See also* H.R. REP. 101-485(II), at 41 (May 15, 1990) (House Comm. on Educ. & Lab) ("The social consequences that have attached to being disabled often bear no relationship to the physical or mental limitations imposed by the disability.  For example, being paralyzed has meant far more than being unable to walk—it has meant being excluded from public schools, being denied employment opportunities, and being deemed an 'unfit parent.'") (quoting testimony of Arlene Mayerson of the Disability Rights Education and Defense Fund).
[14] Given Section 504's lack of legislative history, *see, e.g.*, *Alexander v. Choate*, 469 U.S. 287, 295 n.13 (1985) (noting lack of congressional debate devoted to Section 504), and its nearly identical language to the ADA, *see, e.g.*, 42 U.S.C. § 12201(a) (requiring the ADA to be construed consistently with Section 504), this brief's discussion of legislative history and text focuses on the ADA, not Section 504.

peered at him through the car's windows; a child with cerebral palsy who was excluded from public school because his teacher claimed that his physical appearance "produced a nauseating effect" on his classmates; a woman who was fired from a job she had held for many years because her son, who lived with her, had contracted AIDS; a woman with HIV whose use of a community swimming pool led the town to close the pool for a week and prompted a neighbor to start a petition demanding that she move out of the town; and fully-registered people with disabilities who were turned away from voting booths because they did not look sufficiently "competent" to vote.  *See* H.R. REP. 101-485(II), *supra*, at 56-57; NATIONAL COUNCIL ON DISABILITY, EQUALITY OF OPPORTUNITY:  THE MAKING OF THE AMERICANS WITH DISABILITIES ACT (2010), https://ncd.gov/publications/2010/equality_of_Opportunity_The_Making_of_the_Americans_with_Disabilities_Act [hereinafter EQUALITY OF OPPORTUNITY].[15]

In numerous congressional committee reports, Congress made clear its intent that the ADA should prohibit such discriminatory actions, which "result[] from false presumptions, generalizations, misperceptions, patronizing attitudes, ignorance, irrational fears, and pernicious mythologies" associated with disability.  H.R. REP. 101-485(II), *supra*, at 30.[16]  As Senator Tom Harkin, one the ADA's sponsors, memorably stated:

> There is a wellspring of fears and unfounded prejudices about people with disabilities, unfounded fears, whether people have mental disorders, whether they are manic depressives or schizophrenia or paranoia, or unfounded fears and prejudices based upon physical disabilities.  The point of the [ADA] is to start breaking down those barriers of fear and prejudice and unfounded fears, to get past that point so that people begin to look at people based on their abilities, not first looking at their disability.

---

[15] *Accord.* S. REP. 101-116, at 5-7 (Aug. 30, 1989) (Sen. Comm. Labor and Hum. Resources), *available at* https://transition.fcc.gov/Bureaus/OSEC/library/legislative_histories/1387.pdf.
[16] *See also id.* at 40 (discussing "stereotypical assumptions, fears and myths [about people with disabilities] not truly indicative of the ability of such individuals to participate in and contribute to society"); *accord.* S. REP. 101-116, *supra*, at 6 (1989); H.R. REP. 101-485(III), at 30 (May 15, 1990) (House Jud. Comm.).

135 Cong. Rec. S10765-01, S10768, 1989 WL 183216 (Sept. 6, 1989) (Statement of Sen. Harkin).

The ADA, Senator Harkin explained, "offers promise that [people with disabilities] will no longer

be shunned and isolated because of the ignorance of others."  136 Cong. Rec. S7422-03, S7444,

1990 WL 144937 (June 6, 1990) (Statement of Sen. Harkin).[17]

### B. The ADA's Text

The ADA's text—specifically, its findings, definition of disability, and non-

discrimination provisions—underscore the ADA's purpose of prohibiting discrimination based

on stigma, prejudice, and ignorance.  The ADA's findings, for example, acknowledge the

persistent and pervasive history of discrimination against people with disabilities, who have been

"isolate[d] and segregate[d]" by society, and who experience "prejudice" and "occupy an inferior

status."  42 U.S.C. § 12101(2), (6), (8); *see also* ADA Amendments Act of 2008 § 2(a)(2), Pub.

L. No. 110-325, 122 Stat. 3553 (2008) (codified at 42 U.S.C. §§ 12101-13) ("[I]n enacting the

ADA, Congress recognized that . . . people with physical or mental disabilities are frequently

precluded from [fully participating in all aspects of society] because of prejudice, antiquated

attitudes, or the failure to remove societal and institutional barriers.").  The findings also

acknowledge the various forms that such discrimination takes:

> outright intentional exclusion, the discriminatory effects of architectural,
> transportation, and communication barriers, overprotective rules and policies,
> failure to make modifications to existing facilities and practices, exclusionary
> qualification standards and criteria, segregation, and relegation to lesser services,
> programs, activities, benefits, jobs, or other opportunities.

---

[17] *See also id.* (discussing "irrational fears and misperceptions about people with AIDS and HIV
disease," and stating that people with other disabilities "are all too familiar with such prejudicial
attitudes because they have been similarly shunned by the same kinds of stereotypes. . . . [T]he
fear of epilepsy was once so great that people with this disease were believed to be possessed by
the devil and were shut out of schools and the workforce.  Even cancer was once thought to be
contagious and resulted in discrimination.").

*Id.* § 12102(5). The findings further state that discrimination against people with disabilities is not an isolated affair; it occurs across a wide spectrum of economic, social, and political activities, in "such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." 42 U.S.C. § 12101(3).

Like its findings, the ADA's three-prong definition of disability extends protection to those who are discriminated against because of irrelevant and often non-existent limitations imposed by their medical conditions (under the first and second prongs), *see id.* § 12102(1)(A)-(B), (4)(D)-(E),[18] and because of others' negative reactions toward their conditions, whether real or imagined (under the regarded-as prong), *see* 42 U.S.C. § 12102(1)(C), (3)(A).[19]

Finally, the ADA's antidiscrimination provisions are carefully crafted to address discrimination based on stigma, prejudice, and ignorance. The ADA's prohibitions on disparate treatment and disparate impact, for example, address intentionally discriminatory actions (such as categorical exclusion or segregation of people with particular conditions)[20] and overbroad rules that have discriminatory effects (such as qualification standards that screen out people with

---

[18] *See Arnold v. United Parcel Service, Inc.*, 136 F.3d 854, 861 (1st Cir. 1998) ("[T]he thrust of [the Act's] purpose is essentially to protect individuals who have an underlying medical condition or other limiting impairment, but who *are* in fact capable of doing the job, with or without the help of medications, prosthetic devices, or other ameliorative measures, and with or without a reasonable accommodation by the employer.") (emphasis in original).

[19] *See School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 284 (1987) (stating that, by including the regarded-as prong, "Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment."); *see also* Levi & Klein, *supra*, at 89 ("The legislative history of the ADA . . . makes clear that the 'regarded as' prong is intended to prohibit discrimination against persons with impairments that invoke fear and discomfort in others.").

[20] *See, e.g.*, 42 U.S.C. § 12112(b)(1)-(2), (b)(4) (Title I); *id.* § 12182(b)(1)(A)-(C) (Title III); 28 C.F.R. § 35.130(b)(1)-(2), (d) (DOJ regulations implementing Title II).

particular conditions).[21]  Other antidiscrimination provisions in the ADA address society's historical neglect of people with disabilities by requiring universal design and the removal of architectural barriers,[22] reasonable accommodations in the workplace,[23] and reasonable modification of policies, practices, and procedures in government and private business.[24]

### C. Judicial Interpretations

Supreme Court case law confirms the ADA's and Section 504's protection against discrimination based on stigma, prejudice, and ignorance.  In 1987, in *School Board of Nassau County v. Arline*, the Supreme Court concluded that Section 504 protected a school teacher with tuberculosis who was discharged from her job because of others' fears that she might be contagious.  480 U.S. at 281.  "[T]he basic purpose of § 504," the Court concluded, "is to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others"—including "society's accumulated myths and fears about disability and disease."  *Id.* at 284; *see also id.* at 283 (stating that ADA covers those who experience "negative reactions . . . to the impairment").  "[D]iscrimination on the basis of mythology," the Court explained, "[is] precisely the type of injury Congress sought to prevent." *Id.* at 285.

The Court's discussion in *Arline* echoed its findings two years earlier in *Alexander v. Choate*, where the Court located the roots of Section 504 in "well-catalogued instances of invidious discrimination" and "thoughtlessness and indifference" toward people with disabilities,

---

[21] *See, e.g.*, 42 U.S.C. § 12112(b)(3), (b)(6) (Title I); *id.* § 12182(b)(1)(D), (b)(2)(A)(i) (Title III); 28 C.F.R. § 35.130(b)(3), (b)(8) (DOJ regulations implementing Title II).
[22] 42 U.S.C. §§ 12182(b)(2)(A)(iv)-(v), 12183 (Title III); 28 C.F.R. §§ 35.150, 35.151 (DOJ regulations implementing Title II).
[23] *See, e.g.*, 42 U.S.C. § 12112(b)(5) (Title I).
[24] *See, e.g.*, 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii) (Title III); 28 C.F.R. § 35.130(b)(7) (DOJ regulations implementing Title II).

which caused them "to live among society shunted aside, hidden, and ignored."  469 U.S. at 295-96 & n.12 (citation omitted).

   *Arline*'s observations concerning society's "accumulated myths and fears" about disability, 480 U.S. at 284, also find expression in Justice Thurgood Marshall's important concurrence in *Cleburne v. Cleburne Living Center*, in which the Court invalidated a zoning ordinance that discriminated against people with intellectual disabilities in violation of equal protection.  *See* 473 U.S. 432, 435 (1985).  According to Justice Marshall, people with intellectual disabilities "have been subject to a 'lengthy and tragic history' . . . of segregation and discrimination that can only be called grotesque"—a "regime of state-mandated segregation and degradation . . . that in its virulence and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow."  *Id.* at 461-62 (Marshall, J., concurring) (citation omitted).  Widely considered to be a "menace to society and civilization," people with intellectual disabilities were housed in "[m]assive custodial institutions" designed to "halt [their] reproduction" and "extinguish their race."  *Id.* at 462.  They were "categorically excluded from public schools, based on the false stereotype that all were ineducable and on the purported need to protect [non-disabled] children from them."  *Id.* at 462-63.  State laws deemed them unfit for citizenship, disqualified them from voting, compelled their sterilization to stop them from procreating, and made their marriages voidable and even criminal.  *Id.* at 463-64.  Although much has changed for people with intellectual disabilities, Justice Marshall explained, this long history of "social and cultural isolation" has resulted in "ignorance, irrational fears, and stereotyping" that continue to endure—"stymie[ing] recognition of the[ir] dignity and individuality."  *Id.* at 464, 467.[25]

---

[25] Because *Cleburne*'s facts centered on people with intellectual disabilities, Justice Marshall's vivid portrait of discrimination did not include other forms of state-sanctioned discrimination against people with disabilities, including the institutionalization of people with a range of

Subsequent Supreme Court decisions confirm the ADA's protection against discrimination based on stigma, prejudice, and ignorance.  In *Bragdon v. Abbott*, the Court held that the ADA's definition of "disability" covered a woman with HIV whose dentist refused to render services out of fear of infection—a position shared by the Department of Justice and every other agency and court that had considered the issue under Section 504.  524 U.S. 624, 628-29, 642-45 (1998).

And, in *Olmstead v. L.C. ex rel. Zimring*, the Court held that unnecessary institutionalization of people with various mental impairments violated the ADA, in part, because it "stigmatiz[ed]" them, "perpetuat[ing] unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life."  527 U.S. 581, 600 (1999) (citation omitted).

## II. People with Gender Dysphoria Routinely Experience Discrimination Based on Stigma, Prejudice, and Ignorance, and Should Be Protected by the ADA and Section 504.

People with gender dysphoria should be protected by the ADA and Section 504 because they routinely experience discrimination based on stigma, prejudice, and ignorance.  Gender dysphoria is a serious medical condition that results from a physical impairment.  *See* DSM-5, *supra*, at 452, 454 (stating that gender dysphoria "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning," and, without treatment, can lead to "suicidal ideation, suicide attempts, and suicides"); *id.* at 457 (discussing

---

conditions other than intellectual disabilities, such as epilepsy and blindness; the passage of state "ugly laws" that prohibited "unsightly" people—including people with disabilities—from appearing in public; and a built environment that excluded people with disabilities, quite literally, at every step—from the sidewalks encircling their homes to the stairs leading up to the U.S. Capitol.  *See* Bagenstos, *supra*, at 440-41; *see also* EQUALITY OF OPPORTUNITY, *supra* (describing Capitol steps as "a symbol of discrimination against the disabled") (quoting Michael Auberger, co-founder of ADAPT).

genetic and physiological contributions to gender dysphoria); *accord.* Pl.'s Opp. Mot. Dismiss at 2; Pl.'s Mot. Prelim. Injun. at 3-6 & Ex. A.[26]  Gender dysphoria is also a highly stigmatized condition.  According to the American Psychiatric Association, gender dysphoria:

> is associated with high levels of stigmatization, discrimination, and victimization, leading to negative self-concept, increased rates of mental disorder comorbidity, school dropout, and economic marginalization, including unemployment, with attendant social and mental health risks, especially in individuals from resource-poor family backgrounds.  In addition, these individuals' access to health services and mental health services may be impeded by structural barriers, such as institutional discomfort or inexperience in working with this patient population.

DSM-5, *supra*, at 458.  The internationally accepted Standards of Care for the treatment of gender dysphoria, published by the World Professional Association for Transgender Health (WPATH), similarly recognize the risk of "abuse and stigmatization" of people with gender dysphoria.  *See* WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, STANDARDS OF CARE 21 (7th ed., 2012), https://s3.amazonaws.com/amo_hub_content/Association140/files/Standards%20of%20Care%20V7%20-%202011%20WPATH%20(2)(1).pdf [hereinafter STANDARDS OF CARE].

Like the medical conditions featured in the ADA's legislative history, gender dysphoria evokes "false presumptions, generalizations, misperceptions, patronizing attitudes, ignorance, irrational fears, and pernicious mythologies."  *See, e.g.*, H.R. REP. 101-485(II), *supra*, at 30.  Consistent with the ADA's findings, people with gender dysphoria have experienced pervasive and persistent discrimination across a wide spectrum of economic, social, and political activities, as documented by courts and the medical community.  *See* 42 U.S.C. § 12101.  Consistent with

---

[26] *See also* Duffy, *supra*, at 16-72 ("Current medical studies continue to point in the direction of hormonal and genetic causes for the in utero development of gender dysphoria."), *quoted in* Sec. Statement of Int. of U.S. at 5-6, *Blatt v. Cabela's Retail, Inc.*, No. 5:14-CV-04822 (E.D. Pa. Nov. 16, 2015), ECF No. 67.

Supreme Court case law, people with gender dysphoria have been the targets of "society's accumulated myths and fears" and the "prejudiced attitudes or the ignorance of others," *see Arline*, 480 U.S. at 284; they have been "shunted aside, hidden, . . . ignored," and even hated for who they are, *see Alexander*, 469 U.S. at 295-96 & n.12. And, as contemplated by the ADA's definition of disability, people with gender dysphoria regularly experience discrimination based on others' negative reactions toward their condition and the medical interventions they use to treat the condition, *i.e.*, surgery, hormone therapy, living part time or full time in another gender role, and/or psychotherapy.[27] *See Blatt*, 2017 WL 2178123, at *3 & n.3 (likening gender dysphoria to highly stigmatized conditions of HIV and AIDS, and determining that none are excluded from ADA).

Recent cases involving transgender people with gender dysphoria illustrate the depth of stigma, prejudice, and ignorance routinely experienced by people with gender dysphoria, including: transgender students with gender dysphoria who were told by their principals that they could not use gender-appropriate restrooms because it would violate "the dignity and privacy rights of other students" and would create "safety issues and lewdness concerns," *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016); *accord. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1052 (7th Cir. 2017); and transgender military service members with gender dysphoria who were told by the President of the United States that they were no longer welcome in the military because they were a "burden[]" and a "disruption." *Doe 1 v. Trump*, No. 17–1597, 2017

---

[27] The WPATH Standards of Care recommend an individualized approach to gender transition, consisting of a medically-appropriate combination of hormone therapy, living part time or full time in another gender role, consistent with one's gender identity, surgery, and/or psychotherapy. STANDARDS OF CARE, *supra*, at 9-10; *accord.* Pl.'s Mot. Prelim. Injun. at 6.

WL 4873042, at *7 (D.D.C. 2017) (quoting tweet of President Donald Trump).  Gender dysphoria's close association with transgender people—an "historically persecuted and politically powerless" class who "face discrimination, harassment, and violence because of their gender identity"—likewise contributes to the stigmatization of the condition.  *Whitaker*, 858 F.3d at 1051; *Doe 1*, 2017 WL 4873042, at *2.[28]

Such discrimination is also evident in the facts of this case, which involve offensive name-calling; the application of blanket gender-based rules regarding prison placement, showering, and strip-searching; and a failure to consider reasonable modifications to prison policies requested by the Plaintiff.  *See* Pl.'s Mot. Prelim. Injun. at 7-9.  Here, Defendants have engaged in precisely the sort of intentional discrimination, enforcement of overbroad rules, and refusal to modify policies prohibited by the ADA and Section 504.

Importantly, Defendants cannot avoid their antidiscrimination obligations by invoking generalized safety concerns.  According to U.S. Department of Justice (DOJ) regulations implementing the ADA, a public entity may impose safety requirements only if such requirements "are based on *actual* risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities."  28 C.F.R. § 35.130(h) (emphasis added).  In assessing such risks,

> a public entity must make an *individualized* assessment, based on reasonable judgment that relies on current medical knowledge or on the best available *objective* evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications

---

[28] *See* James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M., *The Report of the 2015 U.S. Transgender Survey*, NATIONAL CENTER FOR TRANSGENDER EQUALITY (2016), https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF (surveying nearly 28,000 transgender people and concluding that they are disproportionately at risk for discrimination in almost all aspects of life, including employment, housing, education, public accommodations, and access to government services).

of policies, practices, or procedures or the provision of auxiliary aids or services
will mitigate the risk.

28 C.F.R. § 35.139 (emphasis added).  This careful approach is "essential if the law is to achieve

its goal of protecting disabled individuals from discrimination based on prejudice, stereotypes, or

unfounded fear, while giving appropriate weight to legitimate concerns, such as the need to avoid

exposing others to significant health and safety risks."  28 C.F.R. Pt. 35, app. B, at § 35.104; *see*

*also* H.R. REP. 101-485(II), *supra*, at 56 ("The determination that an individual with a disability

will pose a safety threat to others must be made on a case-by-case basis and must not be based on

generalizations, misperceptions, ignorance, irrational fears, patronizing attitudes, or pernicious

mythologies.").[29]

Similarly, under federal regulations implementing the Prison Rape Elimination Act

(PREA), prisons must use "objective" criteria to screen inmates for their risk of sexual

victimization; resort to myths and fears about people with gender dysphoria is prohibited.  28

C.F.R. § 115.41(c)-(d).  The regulations further provide that prisons must make "*individualized*

determinations about how to ensure the safety of each inmate," including considering "on a *case-*

*by-case basis* whether a placement would ensure the inmate's health and safety, and whether the

placement would present management or security problems"—giving "serious consideration" to

---

[29] *See also* H.R. REP. 101-485(III), *supra*, at 45-46 (stating that "[a] person with a disability must
not be excluded, or found to be unqualified, based on stereotypes or fear.  Nor may a decision be
based on speculation about the risk of harm to others.  Decisions are not permitted to be based on
generalizations about the disability but rather must be based on the facts of an individual case. . .
. The purpose of creating the 'direct threat' standard is to eliminate exclusions which are not
based on objective evidence about the individual involved.  Thus, in the case of a person with
mental illness there must be objective evidence from the person's behavior that the person has a
recent history of committing overt acts or making threats which caused harm or which directly
threatened harm."); *accord.* S. REP., *supra*, at 25.

the inmate's "own views with respect to his or her own safety." *Id.* § 115.42(b)(c), (e) (emphasis added).

There is no indication that Defendants' refusal to transfer the Plaintiff to a women's prison was based on an individualized assessment of actual risks based on objective evidence. Additionally, Defendants cannot justify denial of the reasonable accommodation of transferring the Plaintiff to a women's prison based on defenses of undue burden or fundamental alteration, given that federal regulations *explicitly contemplate* that precise transfer. *See, e.g.*, *Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 335 (E.D.N.Y. 2009) ("Where individuals with disabilities seek to receive services in a more integrated setting—and the state *already provides* services to others with disabilities in that setting—assessing and moving the particular plaintiffs to that setting, in and of itself, is not a 'fundamental alteration.'") (emphasis in original).

Accordingly, a blanket prison policy that segregates prisoners based on anatomy, external genitalia, or assigned birth sex is prohibited by the ADA and Section 504, as well as the PREA regulations. Although such a policy raises no concern for most people who are incarcerated, this is not true for people with gender dysphoria like Ms. Doe. Such a policy is predicated on the presumption that everyone's sex is the same as that which was assigned to them at birth. *See* Pl.'s Opp. Mot. Dismiss at 2. As a result, people with gender dysphoria, for whom the underlying presumption is not true, face discrimination because the policy ignores the negative impact it has on people with a stigmatized medical condition. To remedy this discrimination, such a policy must either be replaced altogether (for example, with a policy that segregates inmates based on "gender identity" rather than anatomy, external genitalia, or assigned birth sex) or, alternatively, a person with gender dysphoria must be provided the reasonable

accommodation of placement based on the person's post-gender-transition sex. Defendants did not take either action in this case.

### III. Interpreting the ADA and Section 504 to Exclude Gender Dysphoria Would Ascribe to Congress an Impermissible Intent to Discriminate Against Transgender People.

Defendants ask this Court to disregard the purpose of the ADA, which is to protect against discrimination based on stigma, prejudice, and ignorance, and to instead interpret "gender identity disorders not resulting from physical impairments" and "transsexualism" broadly to reflect a generalized intent to discriminate against all transgender-related medical conditions.[30] Such an interpretation must be rejected where it is contrary to the statutory language and where it ascribes to Congress a poisoned purpose—a bare desire to harm transgender people—in violation of equal protection.

As discussed above, in over three years of litigation in three separate cases, no one, including the U.S. Department of Justice, has argued that Congress's purported exclusion of gender dysphoria would be constitutional. No one has offered a constitutionally valid argument for singling out from the ADA, beginning in 1990 and continuing forevermore, all medical conditions associated with transgender people. And that is because there is no valid argument. There is absolutely no reason why Congress would systematically exclude any and every medical condition ever associated with transgender people *other* than to harm them.

---

[30] Because the defining feature of gender dysphoria is nonconformity between gender identity and assigned sex at birth, a law that excludes gender dysphoria is necessarily a transgender classification, in much the same way that a law excluding sickle cell anemia would be a racial classification. *See* STANDARDS OF CARE, *supra*, at 5 (discussing gender nonconformity and gender dysphoria); *accord. A Bare Desire to Harm*, *supra*, at 549; Pl.'s Mot. Prelim. Injun. at 24. Plaintiff's argument, shared by Amici, is that the ADA does *not* exclude gender dysphoria—nor could it.

Notwithstanding the biased statements of several senators regarding three conditions closely associated with transgender people, *see* Pl.'s Mot. Prelim. Injun. at 26-27 (collecting statements),[31] those senators did not—and, indeed, could not as a constitutional matter—exclude every condition associated with transgender people in the future.  The exclusion of "gender identity disorders not resulting from physical impairments" and "transsexualism" was a regrettable snapshot, not a blank check for bias in perpetuity.  The ADA's purpose, in conjunction with the constitutional avoidance canon, compel the conclusion that gender dysphoria is not excluded by the ADA or Section 504.

## CONCLUSION

For the forgoing reasons, this Court should hold that gender dysphoria is not excluded by the ADA and Section 504.

/s/ Joshua M. Daniels
Joshua M. Daniels (BBO# 673034)
THE LAW OFFICE OF JOSHUA M. DANIELS
P.O. Box 300765
Jamaica Plain, MA 02130
Local Counsel for *Amici Curiae*
(617) 942-2190
attorneyjoshdaniels@gmail.com

Kevin Barry
(*pro hac vice* pending)
QUINNIPIAC UNIVERSITY SCHOOL OF LAW
LEGAL CLINIC
275 Mount Carmel Ave.
Hamden, Connecticut 06518
Counsel for *Amici Curiae*
(203) 582-3238
legalclinic@quinnipiac.edu

February 27, 2018

---

[31] For relevant legislative history regarding the ADA, see app. C.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JANE DOE** | **:** |
| | **:** |
| **Plaintiff,** | **:  CIVIL ACTION NO. 1:17-CV-12255-RGS** |
| **v.** | **:** |
| | **:** |
| **MASSACHUSETTS DEPARTMENT OF** | **:** |
| **CORRECTION; THOMAS A. TURCO** | **:** |
| **III; SEAN MEDEIROS; JAMES M.** | **:** |
| **O'GARA JR.; and STEPHANIE COLLINS** | **:** |
| | **:** |
| **Defendants.** | **:** |

## APPENDIX TO BRIEF OF AMICI CURIAE
## IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
## AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

APPENDIX A: AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 20, 451-59, 685-86, 704, 814-15 (5th ed. 2013) ............................................. A-1

APPENDIX B: Christine Michelle Duffy, *The Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973, in* GENDER IDENTITY AND SEXUAL ORIENTATION DISCRIMINATION IN THE WORKPLACE: A PRACTICAL GUIDE ch. 16, Exhibits 16.1 to 16.6 (Christine Michelle Duffy ed. Bloomberg BNA 2014) ..................................................................................................................... B-1

APPENDIX C: Excerpts from Congressional Record: 135 CONG. REC. 810753 – S10755, 1989 WL 183115 (daily ed. Sept. 7, 1989); 135 CONG. REC. 810765 – S10803, 1989 WL 1832l6 (daily ed. Sept. 7, 1989); 135 CONG. REC. Sl 1173 - Sl 1178, 1989 WL 183785 (daily ed. Sept. 14, 1989) ............................................................................................................................... C-1

## APPENDIX A

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF
MENTAL DISORDERS 20, 451-59, 685-86, 704, 814-15 (5th ed. 2013)

mania, depression, anxiety, substance intoxication, or neurocognitive symptoms—so that an "unspecified" disorder in that category is identified until a fuller differential diagnosis is possible.

## Definition of a Mental Disorder

Each disorder identified in Section II of the manual (excluding those in the chapters entitled "Medication-Induced Movement Disorders and Other Adverse Effects of Medication" and "Other Conditions That May Be a Focus of Clinical Attention") must meet the definition of a mental disorder. Although no definition can capture all aspects of all disorders in the range contained in DSM-5, the following elements are required:

> A mental disorder is a syndrome characterized by clinically significant disturbance in an individual's cognition, emotion regulation, or behavior that reflects a dysfunction in the psychological, biological, or developmental processes underlying mental functioning. Mental disorders are usually associated with significant distress or disability in social, occupational, or other important activities. An expectable or culturally approved response to a common stressor or loss, such as the death of a loved one, is not a mental disorder. Socially deviant behavior (e.g., political, religious, or sexual) and conflicts that are primarily between the individual and society are not mental disorders unless the deviance or conflict results from a dysfunction in the individual, as described above.

The diagnosis of a mental disorder should have clinical utility: it should help clinicians to determine prognosis, treatment plans, and potential treatment outcomes for their patients. However, the diagnosis of a mental disorder is not equivalent to a need for treatment. Need for treatment is a complex clinical decision that takes into consideration symptom severity, symptom salience (e.g., the presence of suicidal ideation), the patient's distress (mental pain) associated with the symptom(s), disability related to the patient's symptoms, risks and benefits of available treatments, and other factors (e.g., psychiatric symptoms complicating other illness). Clinicians may thus encounter individuals whose symptoms do not meet full criteria for a mental disorder but who demonstrate a clear need for treatment or care. The fact that some individuals do not show all symptoms indicative of a diagnosis should not be used to justify limiting their access to appropriate care.

Approaches to validating diagnostic criteria for discrete categorical mental disorders have included the following types of evidence: antecedent validators (similar genetic markers, family traits, temperament, and environmental exposure), concurrent validators (similar neural substrates, biomarkers, emotional and cognitive processing, and symptom similarity), and predictive validators (similar clinical course and treatment response). In DSM-5, we recognize that the current diagnostic criteria for any single disorder will not necessarily identify a homogeneous group of patients who can be characterized reliably with all of these validators. Available evidence shows that these validators cross existing diagnostic boundaries but tend to congregate more frequently within and across adjacent DSM-5 chapter groups. Until incontrovertible etiological or pathophysiological mechanisms are identified to fully validate specific disorders or disorder spectra, the most important standard for the DSM-5 disorder criteria will be their clinical utility for the assessment of clinical course and treatment response of individuals grouped by a given set of diagnostic criteria.

This definition of mental disorder was developed for clinical, public health, and research purposes. Additional information is usually required beyond that contained in the DSM-5 diagnostic criteria in order to make legal judgments on such issues as criminal responsibility, eligibility for disability compensation, and competency (see "Cautionary Statement for Forensic Use of DSM-5" elsewhere in this manual).

© American Psychiatric Association, May 22, 2013, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (D American Psychiatric Publishing, Washington, D.C., ISBN: 9780890425572



Gender Dysphoria

**In this chapter,** there is one overarching diagnosis of gender dysphoria, with separate developmentally appropriate criteria sets for children and for adolescents and adults. The area of sex and gender is highly controversial and has led to a proliferation of terms whose meanings vary over time and within and between disciplines. An additional source of confusion is that in English "sex" connotes both male/female and sexuality. This chapter employs constructs and terms as they are widely used by clinicians from various disciplines with specialization in this area. In this chapter, *sex* and *sexual* refer to the biological indicators of male and female (understood in the context of reproductive capacity), such as in sex chromosomes, gonads, sex hormones, and nonambiguous internal and external genitalia. Disorders of sex development denote conditions of inborn somatic deviations of the reproductive tract from the norm and/or discrepancies among the biological indicators of male and female. *Cross-sex* hormone treatment denotes the use of feminizing hormones in an individual assigned male at birth based on traditional biological indicators or the use of masculinizing hormones in an individual assigned female at birth.

The need to introduce the term *gender* arose with the realization that for individuals with conflicting or ambiguous biological indicators of sex (i.e., "intersex"), the lived role in society and/or the identification as male or female could not be uniformly associated with or predicted from the biological indicators and, later, that some individuals develop an identity as female or male at variance with their uniform set of classical biological indicators. Thus, *gender* is used to denote the public (and usually legally recognized) lived role as boy or girl, man or woman, but, in contrast to certain social constructionist theories, biological factors are seen as contributing, in interaction with social and psychological factors, to gender development. *Gender assignment* refers to the initial assignment as male or female. This occurs usually at birth and, thereby, yields the "natal gender." *Gender-atypical* refers to somatic features or behaviors that are not typical (in a statistical sense) of individuals with the same assigned gender in a given society and historical era; for behavior, *gender-nonconforming* is an alternative descriptive term. *Gender reassignment* denotes an official (and usually legal) change of gender. *Gender identity* is a category of social identity and refers to an individual's identification as male, female, or, occasionally, some category other than male or female. *Gender dysphoria* as a general descriptive term refers to an individual's affective/cognitive discontent with the assigned gender but is more specifically defined when used as a diagnostic category. *Transgender* refers to the broad spectrum of individuals who transiently or persistently identify with a gender different from their natal gender. *Transsexual* denotes an individual who seeks, or has undergone, a social transition from male to female or female to male, which in many, but not all, cases also involves a somatic transition by cross-sex hormone treatment and genital surgery (*sex reassignment surgery*).

*Gender dysphoria* refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender. Although not all individuals will experience distress as a result of such incongruence, many are distressed if the desired physical interventions by means of hormones and/or surgery are not available. The current term is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity per se.

451

© American Psychiatric Association, May 22, 2013, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (D American Psychiatric Publishing, Washington, D.C., ISBN: 9780890425572

452                                                                 Gender Dysphoria

# Gender Dysphoria

## Diagnostic Criteria

### Gender Dysphoria in Children                              302.6 (F64.2)

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least six of the following (one of which must be Criterion A1):

   1. A strong desire to be of the other gender or an insistence that one is the other gender (or some alternative gender different from one's assigned gender).
   2. In boys (assigned gender), a strong preference for cross-dressing or simulating female attire; or in girls (assigned gender), a strong preference for wearing only typical masculine clothing and a strong resistance to the wearing of typical feminine clothing.
   3. A strong preference for cross-gender roles in make-believe play or fantasy play.
   4. A strong preference for the toys, games, or activities stereotypically used or engaged in by the other gender.
   5. A strong preference for playmates of the other gender.
   6. In boys (assigned gender), a strong rejection of typically masculine toys, games, and activities and a strong avoidance of rough-and-tumble play; or in girls (assigned gender), a strong rejection of typically feminine toys, games, and activities.
   7. A strong dislike of one's sexual anatomy.
   8. A strong desire for the primary and/or secondary sex characteristics that match one's experienced gender.

B. The condition is associated with clinically significant distress or impairment in social, school, or other important areas of functioning.

Specify if:
   **With a disorder of sex development** (e.g., a congenital adrenogenital disorder such as 255.2 [E25.0] congenital adrenal hyperplasia or 259.50 [E34.50] androgen insensitivity syndrome).

   **Coding note:** Code the disorder of sex development as well as gender dysphoria.

### Gender Dysphoria in Adolescents and Adults                302.85 (F64.1)

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

   1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
   2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).
   3. A strong desire for the primary and/or secondary sex characteristics of the other gender.
   4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
   5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
   6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

© American Psychiatric Association, May 22, 2013, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (D American Psychiatric Publishing, Washington, D.C., ISBN: 9780890425572

A-4

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

*Specify* if:

**With a disorder of sex development** (e.g., a congenital adrenogenital disorder such as 255.2 [E25.0] congenital adrenal hyperplasia or 259.50 [E34.50] androgen insensitivity syndrome).

**Coding note:** Code the disorder of sex development as well as gender dysphoria.

*Specify* if:

**Posttransition:** The individual has transitioned to full-time living in the desired gender (with or without legalization of gender change) and has undergone (or is preparing to have) at least one cross-sex medical procedure or treatment regimen—namely, regular cross-sex hormone treatment or gender reassignment surgery confirming the desired gender (e.g., penectomy, vaginoplasty in a natal male; mastectomy or phalloplasty in a natal female).

© American Psychiatric Association, May 22, 2013, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (D American Psychiatric Publishing, Washington, D.C., ISBN: 9780890425572

## Specifiers

The posttransition specifier may be used in the context of continuing treatment procedures that serve to support the new gender assignment.

## Diagnostic Features

Individuals with gender dysphoria have a marked incongruence between the gender they have been assigned to (usually at birth, referred to as *natal gender*) and their experienced/expressed gender. This discrepancy is the core component of the diagnosis. There must also be evidence of distress about this incongruence. Experienced gender may include alternative gender identities beyond binary stereotypes. Consequently, the distress is not limited to a desire to simply be of the other gender, but may include a desire to be of an alternative gender, provided that it differs from the individual's assigned gender.

Gender dysphoria manifests itself differently in different age groups. Prepubertal natal girls with gender dysphoria may express the wish to be a boy, assert they are a boy, or assert they will grow up to be a man. They prefer boys' clothing and hairstyles, are often perceived by strangers as boys, and may ask to be called by a boy's name. Usually, they display intense negative reactions to parental attempts to have them wear dresses or other feminine attire. Some may refuse to attend school or social events where such clothes are required. These girls may demonstrate marked cross-gender identification in role-playing, dreams, and fantasies. Contact sports, rough-and-tumble play, traditional boyhood games, and boys as playmates are most often preferred. They show little interest in stereotypically feminine toys (e.g., dolls) or activities (e.g., feminine dress-up or role-play). Occasionally, they refuse to urinate in a sitting position. Some natal girls may express a desire to have a penis or claim to have a penis or that they will grow one when older. They may also state that they do not want to develop breasts or menstruate.

Prepubertal natal boys with gender dysphoria may express the wish to be a girl or assert they are a girl or that they will grow up to be a woman. They have a preference for dressing in girls' or women's clothes or may improvise clothing from available materials (e.g., using towels, aprons, and scarves for long hair or skirts). These children may role-play female figures (e.g., playing "mother") and often are intensely interested in female fantasy figures. Traditional feminine activities, stereotypical games, and pastimes (e.g., "playing house"; drawing feminine pictures; watching television or videos of favorite female characters) are most often preferred. Stereotypical female-type dolls (e.g., Barbie) are often favorite toys, and girls are their preferred playmates. They avoid rough-and-tumble play and competitive sports and have little interest in stereotypically masculine toys (e.g., cars, trucks). Some may pretend not to have a penis and insist on sitting to urinate. More

rarely, they may state that they find their penis or testes disgusting, that they wish them removed, or that they have, or wish to have, a vagina.

In young adolescents with gender dysphoria, clinical features may resemble those of children or adults with the condition, depending on developmental level. As secondary sex characteristics of young adolescents are not yet fully developed, these individuals may not state dislike of them, but they are concerned about imminent physical changes.

In adults with gender dysphoria, the discrepancy between experienced gender and physical sex characteristics is often, but not always, accompanied by a desire to be rid of primary and/or secondary sex characteristics and/or a strong desire to acquire some primary and/or secondary sex characteristics of the other gender. To varying degrees, adults with gender dysphoria may adopt the behavior, clothing, and mannerisms of the experienced gender. They feel uncomfortable being regarded by others, or functioning in society, as members of their assigned gender. Some adults may have a strong desire to be of a different gender and treated as such, and they may have an inner certainty to feel and respond as the experienced gender without seeking medical treatment to alter body characteristics. They may find other ways to resolve the incongruence between experienced/expressed and assigned gender by partially living in the desired role or by adopting a gender role neither conventionally male nor conventionally female.

## Associated Features Supporting Diagnosis

When visible signs of puberty develop, natal boys may shave their legs at the first signs of hair growth. They sometimes bind their genitals to make erections less visible. Girls may bind their breasts, walk with a stoop, or use loose sweaters to make breasts less visible. Increasingly, adolescents request, or may obtain without medical prescription and supervision, hormonal suppressors ("blockers") of gonadal steroids (e.g., gonadotropin-releasing hormone [GnRH] analog, spironolactone). Clinically referred adolescents often want hormone treatment and many also wish for gender reassignment surgery. Adolescents living in an accepting environment may openly express the desire to be and be treated as the experienced gender and dress partly or completely as the experienced gender, have a hairstyle typical of the experienced gender, preferentially seek friendships with peers of the other gender, and/or adopt a new first name consistent with the experienced gender. Older adolescents, when sexually active, usually do not show or allow partners to touch their sexual organs. For adults with an aversion toward their genitals, sexual activity is constrained by the preference that their genitals not be seen or touched by their partners. Some adults may seek hormone treatment (sometimes without medical prescription and supervision) and gender reassignment surgery. Others are satisfied with either hormone treatment or surgery alone.

Adolescents and adults with gender dysphoria before gender reassignment are at increased risk for suicidal ideation, suicide attempts, and suicides. After gender reassignment, adjustment may vary, and suicide risk may persist.

## Prevalence

For natal adult males, prevalence ranges from 0.005% to 0.014%, and for natal females, from 0.002% to 0.003%. Since not all adults seeking hormone treatment and surgical reassignment attend specialty clinics, these rates are likely modest underestimates. Sex differences in rate of referrals to specialty clinics vary by age group. In children, sex ratios of natal boys to girls range from 2:1 to 4.5:1. In adolescents, the sex ratio is close to parity; in adults, the sex ratio favors natal males, with ratios ranging from 1:1 to 6.1:1. In two countries, the sex ratio appears to favor natal females (Japan: 2.2:1; Poland: 3.4:1).

## Development and Course

Because expression of gender dysphoria varies with age, there are separate criteria sets for children versus adolescents and adults. Criteria for children are defined in a more con-

© American Psychiatric Association, May 22, 2013, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), American Psychiatric Publishing, Washington, D.C., ISBN: 9780890425572

© American Psychiatric Association, May 22, 2013, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (D American Psychiatric Publishing, Washington, D.C., ISBN: 9780890425572

crete, behavioral manner than those for adolescents and adults. Many of the core criteria draw on well-documented behavioral gender differences between typically developing boys and girls. Young children are less likely than older children, adolescents, and adults to express extreme and persistent anatomic dysphoria. In adolescents and adults, incongruence between experienced gender and somatic sex is a central feature of the diagnosis. Factors related to distress and impairment also vary with age. A very young child may show signs of distress (e.g., intense crying) only when parents tell the child that he or she is "really" not a member of the other gender but only "desires" to be. Distress may not be manifest in social environments supportive of the child's desire to live in the role of the other gender and may emerge only if the desire is interfered with. In adolescents and adults, distress may manifest because of strong incongruence between experienced gender and somatic sex. Such distress may, however, be mitigated by supportive environments and knowledge that biomedical treatments exist to reduce incongruence. Impairment (e.g., school refusal, development of depression, anxiety, and substance abuse) may be a consequence of gender dysphoria.

**Gender dysphoria without a disorder of sex development.**    For clinic-referred children, onset of cross-gender behaviors is usually between ages 2 and 4 years. This corresponds to the developmental time period in which most typically developing children begin expressing gendered behaviors and interests. For some preschool-age children, both pervasive cross-gender behaviors and the expressed desire to be the other gender may be present, or, more rarely, labeling oneself as a member of the other gender may occur. In some cases, the expressed desire to be the other gender appears later, usually at entry into elementary school. A small minority of children express discomfort with their sexual anatomy or will state the desire to have a sexual anatomy corresponding to the experienced gender ("anatomic dysphoria"). Expressions of anatomic dysphoria become more common as children with gender dysphoria approach and anticipate puberty.

Rates of persistence of gender dysphoria from childhood into adolescence or adulthood vary. In natal males, persistence has ranged from 2.2% to 30%. In natal females, persistence has ranged from 12% to 50%. Persistence of gender dysphoria is modestly correlated with dimensional measures of severity ascertained at the time of a childhood baseline assessment. In one sample of natal males, lower socioeconomic background was also modestly correlated with persistence. It is unclear if particular therapeutic approaches to gender dysphoria in children are related to rates of long-term persistence. Extant follow-up samples consisted of children receiving no formal therapeutic intervention or receiving therapeutic interventions of various types, ranging from active efforts to reduce gender dysphoria to a more neutral, "watchful waiting" approach. It is unclear if children "encouraged" or supported to live socially in the desired gender will show higher rates of persistence, since such children have not yet been followed longitudinally in a systematic manner. For both natal male and female children showing persistence, almost all are sexually attracted to individuals of their natal sex. For natal male children whose gender dysphoria does not persist, the majority are *androphilic* (sexually attracted to males) and often self-identify as gay or homosexual (ranging from 63% to 100%). In natal female children whose gender dysphoria does not persist, the percentage who are *gynephilic* (sexually attracted to females) and self-identify as lesbian is lower (ranging from 32% to 50%).

In both adolescent and adult natal males, there are two broad trajectories for development of gender dysphoria: early-onset and late onset. *Early-onset gender dysphoria* starts in childhood and continues into adolescence and adulthood; or, there is an intermittent period in which the gender dysphoria desists and these individuals self-identify as gay or homosexual, followed by recurrence of gender dysphoria. *Late-onset gender dysphoria* occurs around puberty or much later in life. Some of these individuals report having had a desire to be of the other gender in childhood that was not expressed verbally to others. Others do not recall any signs of childhood gender dysphoria. For adolescent males with late-onset gender dysphoria, parents often report surprise because they did not see signs of gender

456                                                                                    Gender Dysphoria

dysphoria during childhood. Expressions of anatomic dysphoria are more common and salient in adolescents and adults once secondary sex characteristics have developed.

Adolescent and adult natal males with early-onset gender dysphoria are almost always sexually attracted to men (androphilic). Adolescents and adults with late-onset gender dysphoria frequently engage in transvestic behavior with sexual excitement. The majority of these individuals are gynephilic or sexually attracted to other posttransition natal males with late-onset gender dysphoria. A substantial percentage of adult males with late-onset gender dysphoria cohabit with or are married to natal females. After gender transition, many self-identify as lesbian. Among adult natal males with gender dysphoria, the early-onset group seeks out clinical care for hormone treatment and reassignment surgery at an earlier age than does the late-onset group. The late-onset group may have more fluctuations in the degree of gender dysphoria and be more ambivalent about and less likely satisfied after gender reassignment surgery.

In both adolescent and adult natal females, the most common course is the early-onset form of gender dysphoria. The late-onset form is much less common in natal females compared with natal males. As in natal males with gender dysphoria, there may have been a period in which the gender dysphoria desisted and these individuals self-identified as lesbian; however, with recurrence of gender dysphoria, clinical consultation is sought, often with the desire for hormone treatment and reassignment surgery. Parents of natal adolescent females with the late-onset form also report surprise, as no signs of childhood gender dysphoria were evident. Expressions of anatomic dysphoria are much more common and salient in adolescents and adults than in children.

Adolescent and adult natal females with early-onset gender dysphoria are almost always gynephilic. Adolescents and adults with the late-onset form of gender dysphoria are usually androphilic and after gender transition self-identify as gay men. Natal females with the late-onset form do not have co-occurring transvestic behavior with sexual excitement.

**Gender dysphoria in association with a disorder of sex development.**    Most individuals with a disorder of sex development who develop gender dysphoria have already come to medical attention at an early age. For many, starting at birth, issues of gender assignment were raised by physicians and parents. Moreover, as infertility is quite common for this group, physicians are more willing to perform cross-sex hormone treatments and genital surgery before adulthood.

Disorders of sex development in general are frequently associated with gender-atypical behavior starting in early childhood. However, in the majority of cases, this does not lead to gender dysphoria. As individuals with a disorder of sex development become aware of their medical history and condition, many experience uncertainty about their gender, as opposed to developing a firm conviction that they are another gender. However, most do not progress to gender transition. Gender dysphoria and gender transition may vary considerably as a function of a disorder of sex development, its severity, and assigned gender.

# Risk and Prognostic Factors

**Temperamental.**    For individuals with gender dysphoria without a disorder of sex development, atypical gender behavior among individuals with early-onset gender dysphoria develops in early preschool age, and it is possible that a high degree of atypicality makes the development of gender dysphoria and its persistence into adolescence and adulthood more likely.

**Environmental.**    Among individuals with gender dysphoria without a disorder of sex development, males with gender dysphoria (in both childhood and adolescence) more commonly have older brothers than do males without the condition. Additional predisposing

© American Psychiatric Association, May 22, 2013, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), American Psychiatric Publishing, Washington, D.C., ISBN: 9780890425572

factors under consideration, especially in individuals with late-onset gender dysphoria (adolescence, adulthood), include habitual fetishistic transvestism developing into autogynephilia (i.e., sexual arousal associated with the thought or image of oneself as a woman) and other forms of more general social, psychological, or developmental problems.

**Genetic and physiological.**    For individuals with gender dysphoria without a disorder of sex development, some genetic contribution is suggested by evidence for (weak) familiality of transsexualism among nontwin siblings, increased concordance for transsexualism in monozygotic compared with dizygotic same-sex twins, and some degree of heritability of gender dysphoria. As to endocrine findings, no endogenous systemic abnormalities in sex-hormone levels have been found in 46,XY individuals, whereas there appear to be increased androgen levels (in the range found in hirsute women but far below normal male levels) in 46,XX individuals. Overall, current evidence is insufficient to label gender dysphoria without a disorder of sex development as a form of intersexuality limited to the central nervous system.

In gender dysphoria associated with a disorder of sex development, the likelihood of later gender dysphoria is increased if prenatal production and utilization (via receptor sensitivity) of androgens are grossly atypical relative to what is usually seen in individuals with the same assigned gender. Examples include 46,XY individuals with a history of normal male prenatal hormone milieu but inborn nonhormonal genital defects (as in cloacal bladder exstrophy or penile agenesis) and who have been assigned to the female gender. The likelihood of gender dysphoria is further enhanced by additional, prolonged, highly gender-atypical postnatal androgen exposure with somatic virilization as may occur in female-raised and noncastrated 46,XY individuals with 5-alpha reductase-2 deficiency or 17-beta-hydroxysteroid dehydrogenase-3 deficiency or in female-raised 46,XX individuals with classical congenital adrenal hyperplasia with prolonged periods of non-adherence to glucocorticoid replacement therapy. However, the prenatal androgen milieu is more closely related to gendered behavior than to gender identity. Many individuals with disorders of sex development and markedly gender-atypical behavior do not develop gender dysphoria. Thus, gender-atypical behavior by itself should not be interpreted as an indicator of current or future gender dysphoria. There appears to be a higher rate of gender dysphoria and patient-initiated gender change from assigned female to male than from assigned male to female in 46,XY individuals with a disorder of sex development.

## Culture-Related Diagnostic Issues

Individuals with gender dysphoria have been reported across many countries and cultures. The equivalent of gender dysphoria has also been reported in individuals living in cultures with institutionalized gender categories other than male or female. It is unclear whether with these individuals the diagnostic criteria for gender dysphoria would be met.

## Diagnostic Markers

Individuals with a somatic disorder of sex development show some correlation of final gender identity outcome with the degree of prenatal androgen production and utilization. However, the correlation is not robust enough for the biological factor, where ascertainable, to replace a detailed and comprehensive diagnostic interview evaluation for gender dysphoria.

## Functional Consequences of Gender Dysphoria

Preoccupation with cross-gender wishes may develop at all ages after the first 2–3 years of childhood and often interfere with daily activities. In older children, failure to develop age-typical same-sex peer relationships and skills may lead to isolation from peer groups and to distress. Some children may refuse to attend school because of teasing and harass-

© American Psychiatric Association, May 22, 2013, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (D American Psychiatric Publishing, Washington, D.C., ISBN: 9780890425572

ment or pressure to dress in attire associated with their assigned sex. Also in adolescents and adults, preoccupation with cross-gender wishes often interferes with daily activities. Relationship difficulties, including sexual relationship problems, are common, and functioning at school or at work may be impaired. Gender dysphoria, along with atypical gender expression, is associated with high levels of stigmatization, discrimination, and victimization, leading to negative self-concept, increased rates of mental disorder comorbidity, school dropout, and economic marginalization, including unemployment, with attendant social and mental health risks, especially in individuals from resource-poor family backgrounds. In addition, these individuals' access to health services and mental health services may be impeded by structural barriers, such as institutional discomfort or inexperience in working with this patient population.

## Differential Diagnosis

**Nonconformity to gender roles.**   Gender dysphoria should be distinguished from simple nonconformity to stereotypical gender role behavior by the strong desire to be of another gender than the assigned one and by the extent and pervasiveness of gender-variant activities and interests. The diagnosis is not meant to merely describe nonconformity to stereotypical gender role behavior (e.g., "tomboyism" in girls, "girly-boy" behavior in boys, occasional cross-dressing in adult men). Given the increased openness of atypical gender expressions by individuals across the entire range of the transgender spectrum, it is important that the clinical diagnosis be limited to those individuals whose distress and impairment meet the specified criteria.

**Transvestic disorder.**   Transvestic disorder occurs in heterosexual (or bisexual) adolescent and adult males (rarely in females) for whom cross-dressing behavior generates sexual excitement and causes distress and/or impairment without drawing their primary gender into question. It is occasionally accompanied by gender dysphoria. An individual with transvestic disorder who also has clinically significant gender dysphoria can be given both diagnoses. In many cases of late-onset gender dysphoria in gynephilic natal males, transvestic behavior with sexual excitement is a precursor.

**Body dysmorphic disorder.**   An individual with body dysmorphic disorder focuses on the alteration or removal of a specific body part because it is perceived as abnormally formed, not because it represents a repudiated assigned gender. When an individual's presentation meets criteria for both gender dysphoria and body dysmorphic disorder, both diagnoses can be given. Individuals wishing to have a healthy limb amputated (termed by some *body integrity identity disorder*) because it makes them feel more "complete" usually do not wish to change gender, but rather desire to live as an amputee or a disabled person.

**Schizophrenia and other psychotic disorders.**   In schizophrenia, there may rarely be delusions of belonging to some other gender. In the absence of psychotic symptoms, insistence by an individual with gender dysphoria that he or she is of some other gender is not considered a delusion. Schizophrenia (or other psychotic disorders) and gender dysphoria may co-occur.

**Other clinical presentations.**   Some individuals with an emasculinization desire who develop an alternative, nonmale/nonfemale gender identity do have a presentation that meets criteria for gender dysphoria. However, some males seek castration and/or penectomy for aesthetic reasons or to remove psychological effects of androgens without changing male identity; in these cases, the criteria for gender dysphoria are not met.

## Comorbidity

Clinically referred children with gender dysphoria show elevated levels of emotional and behavioral problems—most commonly, anxiety, disruptive and impulse-control, and de-

© American Psychiatric Association, May 22, 2013, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (D American Psychiatric Publishing, Washington, D.C., ISBN: 9780890425572

pressive disorders. In prepubertal children, increasing age is associated with having more behavioral or emotional problems; this is related to the increasing non-acceptance of gender-variant behavior by others. In older children, gender-variant behavior often leads to peer ostracism, which may lead to more behavioral problems. The prevalence of mental health problems differs among cultures; these differences may also be related to differences in attitudes toward gender variance in children. However, also in some non-Western cultures, anxiety has been found to be relatively common in individuals with gender dysphoria, even in cultures with accepting attitudes toward gender-variant behavior. Autism spectrum disorder is more prevalent in clinically referred children with gender dysphoria than in the general population. Clinically referred adolescents with gender dysphoria appear to have comorbid mental disorders, with anxiety and depressive disorders being the most common. As in children, autism spectrum disorder is more prevalent in clinically referred adolescents with gender dysphoria than in the general population. Clinically referred adults with gender dysphoria may have coexisting mental health problems, most commonly anxiety and depressive disorders.

# Other Specified Gender Dysphoria

## 302.6 (F64.8)

This category applies to presentations in which symptoms characteristic of gender dysphoria that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for gender dysphoria. The other specified gender dysphoria category is used in situations in which the clinician chooses to communicate the specific reason that the presentation does not meet the criteria for gender dysphoria. This is done by recording "other specified gender dysphoria" followed by the specific reason (e.g., "brief gender dysphoria").

An example of a presentation that can be specified using the "other specified" designation is the following:

**The current disturbance meets symptom criteria for gender dysphoria, but the duration is less than 6 months.**

# Unspecified Gender Dysphoria

## 302.6 (F64.9)

This category applies to presentations in which symptoms characteristic of gender dysphoria that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for gender dysphoria. The unspecified gender dysphoria category is used in situations in which the clinician chooses *not* to specify the reason that the criteria are not met for gender dysphoria, and includes presentations in which there is insufficient information to make a more specific diagnosis.

© American Psychiatric Association, May 22, 2013, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (© American Psychiatric Publishing, Washington, D.C., ISBN: 9780890425572



Paraphilic disorders

© American Psychiatric Association, May 22, 2013, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (D American Psychiatric Publishing, Washington, D.C., ISBN: 9780890425572

Paraphilic disorders included in this manual are voyeuristic disorder (spying on others in private activities), exhibitionistic disorder (exposing the genitals), frotteuristic disorder (touching or rubbing against a nonconsenting individual), sexual masochism disorder (undergoing humiliation, bondage, or suffering), sexual sadism disorder (inflicting humiliation, bondage, or suffering), pedophilic disorder (sexual focus on children), fetishistic disorder (using nonliving objects or having a highly specific focus on nongenital body parts), and transvestic disorder (engaging in sexually arousing cross-dressing). These disorders have traditionally been selected for specific listing and assignment of explicit diagnostic criteria in DSM for two main reasons: they are relatively common, in relation to other paraphilic disorders, and some of them entail actions for their satisfaction that, because of their noxiousness or potential harm to others, are classed as criminal offenses. The eight listed disorders do not exhaust the list of possible paraphilic disorders. Many dozens of distinct paraphilias have been identified and named, and almost any of them could, by virtue of its negative consequences for the individual or for others, rise to the level of a paraphilic disorder. The diagnoses of the other specified and unspecified paraphilic disorders are therefore indispensable and will be required in many cases.

In this chapter, the order of presentation of the listed paraphilic disorders generally corresponds to common classification schemes for these conditions. The first group of disorders is based on *anomalous activity preferences*. These disorders are subdivided into *courtship disorders*, which resemble distorted components of human courtship behavior (voyeuristic disorder, exhibitionistic disorder, and frotteuristic disorder), and *algolagnic disorders*, which involve pain and suffering (sexual masochism disorder and sexual sadism disorder). The second group of disorders is based on *anomalous target preferences*. These disorders include one directed at other humans (pedophilic disorder) and two directed elsewhere (fetishistic disorder and transvestic disorder).

The term *paraphilia* denotes any intense and persistent sexual interest other than sexual interest in genital stimulation or preparatory fondling with phenotypically normal, physically mature, consenting human partners. In some circumstances, the criteria "intense and persistent" may be difficult to apply, such as in the assessment of persons who are very old or medically ill and who may not have "intense" sexual interests of any kind. In such circumstances, the term *paraphilia* may be defined as any sexual interest greater than or equal to normophilic sexual interests. There are also specific paraphilias that are generally better described as *preferential* sexual interests than as intense sexual interests.

Some paraphilias primarily concern the individual's erotic activities, and others primarily concern the individual's erotic targets. Examples of the former would include intense and persistent interests in spanking, whipping, cutting, binding, or strangulating another person, or an interest in these activities that equals or exceeds the individual's interest in copulation or equivalent interaction with another person. Examples of the latter would include intense or preferential sexual interest in children, corpses, or amputees (as a class), as well as intense or preferential interest in nonhuman animals, such as horses or dogs, or in inanimate objects, such as shoes or articles made of rubber.

A *paraphilic disorder* is a paraphilia that is currently causing distress or impairment to the individual or a paraphilia whose satisfaction has entailed personal harm, or risk of harm, to

Paraphilic Disorders

others. A paraphilia is a necessary but not a sufficient condition for having a paraphilic disorder, and a paraphilia by itself does not necessarily justify or require clinical intervention.

In the diagnostic criteria set for each of the listed paraphilic disorders, Criterion A specifies the qualitative nature of the paraphilia (e.g., an erotic focus on children or on exposing the genitals to strangers), and Criterion B specifies the negative consequences of the paraphilia (i.e., distress, impairment, or harm to others). In keeping with the distinction between paraphilias and paraphilic disorders, the term *diagnosis* should be reserved for individuals who meet both Criteria A and B (i.e., individuals who have a paraphilic disorder). If an individual meets Criterion A but not Criterion B for a particular paraphilia—a circumstance that might arise when a benign paraphilia is discovered during the clinical investigation of some other condition— then the individual may be said to have that paraphilia but not a paraphilic disorder.

It is not rare for an individual to manifest two or more paraphilias. In some cases, the paraphilic foci are closely related and the connection between the paraphilias is intuitively comprehensible (e.g., foot fetishism and shoe fetishism). In other cases, the connection between the paraphilias is not obvious, and the presence of multiple paraphilias may be coincidental or else related to some generalized vulnerability to anomalies of psychosexual development. In any event, comorbid diagnoses of separate paraphilic disorders may be warranted if more than one paraphilia is causing suffering to the individual or harm to others.

Because of the two-pronged nature of diagnosing paraphilic disorders, clinician-rated or self-rated measures and severity assessments could address either the strength of the paraphilia itself or the seriousness of its consequences. Although the distress and impairment stipulated in the Criterion B are special in being the immediate or ultimate result of the paraphilia and not primarily the result of some other factor, the phenomena of reactive depression, anxiety, guilt, poor work history, impaired social relations, and so on are not unique in themselves and may be quantified with multipurpose measures of psychosocial functioning or quality of life.

The most widely applicable framework for assessing the strength of a paraphilia itself is one in which examinees' paraphilic sexual fantasies, urges, or behaviors are evaluated in relation to their normophilic sexual interests and behaviors. In a clinical interview or on self-administered questionnaires, examinees can be asked whether their paraphilic sexual fantasies, urges, or behaviors are weaker than, approximately equal to, or stronger than their normophilic sexual interests and behaviors. This same type of comparison can be, and usually is, employed in psychophysiological measures of sexual interest, such as penile plethysmography in males or viewing time in males and females.

# Voyeuristic Disorder

| Diagnostic Criteria | 302.82 (F65.3) |
|---|---|

A.  Over a period of at least 6 months, recurrent and intense sexual arousal from observing an unsuspecting person who is naked, in the process of disrobing, or engaging in sexual activity, as manifested by fantasies, urges, or behaviors.

B.  The individual has acted on these sexual urges with a nonconsenting person, or the sexual urges or fantasies cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

C.  The individual experiencing the arousal and/or acting on the urges is at least 18 years of age.

*Specify* if:

**In a controlled environment:** This specifier is primarily applicable to individuals living in institutional or other settings where opportunities to engage in voyeuristic behavior are restricted.

© American Psychiatric Association, May 22, 2013. Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), American Psychiatric Publishing, Washington, D.C., ISBN: 9780890425572

Paraphilic Disorders

rectly to first ejaculation. In many cases, cross-dressing elicits less and less sexual excitement as the individual grows older; eventually it may produce no discernible penile response at all. The desire to cross-dress, at the same time, remains the same or grows even stronger. Individuals who report such a diminution of sexual response typically report that the sexual excitement of cross-dressing has been replaced by feelings of comfort or well-being.

In some cases, the course of transvestic disorder is continuous, and in others it is episodic. It is not rare for men with transvestic disorder to lose interest in cross-dressing when they first fall in love with a woman and begin a relationship, but such abatement usually proves temporary. When the desire to cross-dress returns, so does the associated distress.

Some cases of transvestic disorder progress to gender dysphoria. The males in these cases, who may be indistinguishable from others with transvestic disorder in adolescence or early childhood, gradually develop desires to remain in the female role for longer periods and to feminize their anatomy. The development of gender dysphoria is usually accompanied by a (self-reported) reduction or elimination of sexual arousal in association with cross-dressing.

The manifestation of transvestism in penile erection and stimulation, like the manifestation of other paraphilic as well as normophilic sexual interests, is most intense in adolescence and early adulthood. The severity of transvestic disorder is highest in adulthood, when the transvestic drives are most likely to conflict with performance in heterosexual intercourse and desires to marry and start a family. Middle-age and older men with a history of transvestism are less likely to present with transvestic disorder than with gender dysphoria.

## Functional Consequences of Transvestic Disorder

Engaging in transvestic behaviors can interfere with, or detract from, heterosexual relationships. This can be a source of distress to men who wish to maintain conventional marriages or romantic partnerships with women.

## Differential Diagnosis

**Fetishistic disorder.**   This disorder may resemble transvestic disorder, in particular, in men with fetishism who put on women's undergarments while masturbating with them. Distinguishing transvestic disorder depends on the individual's specific thoughts during such activity (e.g., are there any ideas of being a woman, being like a woman, or being dressed as a woman?) and on the presence of other fetishes (e.g., soft, silky fabrics, whether these are used for garments or for something else).

**Gender dysphoria.**   Individuals with transvestic disorder do not report an incongruence between their experienced gender and assigned gender nor a desire to be of the other gender; and they typically do not have a history of childhood cross-gender behaviors, which would be present in individuals with gender dysphoria. Individuals with a presentation that meets full criteria for transvestic disorder as well as gender dysphoria should be given both diagnoses.

## Comorbidity

Transvestism (and thus transvestic disorder) is often found in association with other paraphilias. The most frequently co-occurring paraphilias are fetishism and masochism. One particularly dangerous form of masochism, *autoerotic asphyxia*, is associated with transvestism in a substantial proportion of fatal cases.

© American Psychiatric Association, May 22, 2013, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (D American Psychiatric Publishing, Washington, D.C., ISBN: 9780890425572

© American Psychiatric Association, May 22, 2013, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (D American Psychiatric Publishing, Washington, D.C. ISBN: 9780890425572

## Sleep-Wake Disorders

In DSM-5, the DSM-IV diagnoses named sleep disorder related to another mental disorder and sleep disorder related to another medical condition have been removed, and instead greater specification of coexisting conditions is provided for each sleep-wake disorder. The diagnosis of primary insomnia has been renamed **insomnia disorder** to avoid the differentiation between primary and secondary insomnia. DSM-5 also distinguishes **narcolepsy**— now known to be associated with hypocretin deficiency—from other forms of hypersomnolence (hypersomnolence disorder). Finally, throughout the DSM-5 classification of sleep-wake disorders, pediatric and developmental criteria and text are integrated where existing science and considerations of clinical utility support such integration. **Breathing-related sleep disorders** are divided into three relatively distinct disorders: obstructive sleep apnea hypopnea, central sleep apnea, and sleep-related hypoventilation. The subtypes of **circadian rhythm sleep disorders** are expanded to include advanced sleep phase type and irregular sleep-wake type, whereas the jet lag type has been removed. The use of the former "not otherwise specified" diagnoses in DSM-IV have been reduced by elevating **rapid eye movement sleep behavior disorder** and **restless legs syndrome** to independent disorders.

## Sexual Dysfunctions

In DSM-5, some gender-specific sexual dysfunctions have been added, and, for females, sexual desire and arousal disorders have been combined into one disorder: **female sexual interest/arousal disorder.** All of the sexual dysfunctions (except **substance/medication-induced sexual dysfunction**) now require a minimum duration of approximately 6 months and more precise severity criteria. **Genito-pelvic pain/penetration disorder** has been added to DSM-5 and represents a merging of vaginismus and dyspareunia, which were highly comorbid and difficult to distinguish. The diagnosis of sexual aversion disorder has been removed due to rare use and lack of supporting research.

There are now only two subtypes for sexual dysfunctions: **lifelong** versus **acquired** and **generalized** versus **situational.** To indicate the presence and degree of medical and other nonmedical correlates, the following associated features have been added to the text: partner factors, relationship factors, individual vulnerability factors, cultural or religious factors, and medical factors.

## Gender Dysphoria

**Gender dysphoria** is a new diagnostic class in DSM-5 and reflects a change in conceptualization of the disorder's defining features by emphasizing the phenomenon of "gender incongruence" rather than cross-gender identification per se, as was the case in DSM-IV gender identity disorder. Gender dysphoria includes separate sets of criteria: for children and for adults and adolescents. For the adolescents and adults criteria, the previous Criterion A (cross-gender identification) and Criterion B (aversion toward one's gender) are merged. In the wording of the criteria, "the other sex" is replaced by "the other gender" (or "some alternative gender")." *Gender* instead of *sex* is used systematically because the concept "sex" is inadequate when referring to individuals with a disorder of sex development. In the child criteria, "strong desire to be of the other gender" replaces the previous "repeatedly stated desire to be…the other sex" to capture the situation of some children who, in a coercive environment, may not verbalize the desire to be of another gender. For children, Criterion A1 ("a strong desire to be of the other gender or an insistence that he or she is the other gender…)" is now necessary (but not sufficient), which makes the diagnosis more restrictive and conservative. The subtyping on the basis of sexual orientation is removed because the distinction is no longer considered clinically useful. A **posttransition specifier** has been added to identify

individuals who have undergone at least one medical procedure or treatment to support the new gender assignment (e.g., cross-sex hormone treatment). Although the concept of post-transition is modeled on the concept of full or partial remission, the term *remission* has implications in terms of symptom reduction that do not apply directly to gender dysphoria.

## Disruptive, Impulse-Control, and Conduct Disorders

The chapter "Disruptive, Impulse-Control, and Conduct Disorders" is new to DSM-5 and combines disorders that were previously included in the chapter "Disorders Usually First Diagnosed in Infancy, Childhood, or Adolescence" (i.e., oppositional defiant disorder; conduct disorder; and disruptive behavior disorder not otherwise specified, now categorized as other specified and unspecified disruptive, impulse-control, and conduct disorders) and the chapter "Impulse-Control Disorders Not Elsewhere Classified" (i.e., intermittent explosive disorder, pyromania, and kleptomania). These disorders are all characterized by problems in emotional and behavioral self-control. Notably, ADHD is frequently comorbid with the disorders in this chapter but is listed with the neurodevelopmental disorders. Because of its close association with conduct disorder, antisocial personality disorder is listed both in this chapter and in the chapter "Personality Disorders," where it is described in detail.

The criteria for **oppositional defiant disorder** are now grouped into three types: angry/irritable mood, argumentative/defiant behavior, and vindictiveness. Additionally, the exclusionary criterion for conduct disorder has been removed. The criteria for **conduct disorder** include a descriptive features specifier for individuals who meet full criteria for the disorder but also present with **limited prosocial emotions**. The primary change in **intermittent explosive disorder** is in the type of aggressive outbursts that should be considered: DSM-IV required physical aggression, whereas in DSM-5 verbal aggression and nondestructive/noninjurious physical aggression also meet criteria. DSM-5 also provides more specific criteria defining frequency needed to meet the criteria and specifies that the aggressive outbursts are impulsive and/or anger based in nature, and must cause marked distress, cause impairment in occupational or interpersonal functioning, or be associated with negative financial or legal consequences. Furthermore, a minimum age of 6 years (or equivalent developmental level) is now required.

## Substance-Related and Addictive Disorders

An important departure from past diagnostic manuals is that the chapter on substance-related disorders has been expanded to include **gambling disorder**. Another key change is that DSM-5 does not separate the diagnoses of substance *abuse* and *dependence* as in DSM-IV. Rather criteria are provided for **substance use disorder**, accompanied by criteria for intoxication, withdrawal, substance-induced disorders, and unspecified substance-related disorders, where relevant. Within substance use disorders, the DSM-IV recurrent substance-related legal problems criterion has been deleted from DSM-5, and a new criterion—craving, or a strong desire or urge to use a substance—has been added. In addition, the threshold for substance use disorder diagnosis in DSM-5 is set at two or more criteria, in contrast to a threshold of one or more criteria for a diagnosis of DSM-IV substance abuse and three or more for DSM-IV dependence. **Cannabis withdrawal** and **caffeine withdrawal** are new disorders (the latter was in DSM-IV Appendix B, "Criteria Sets and Axes Provided for Further Study").

**Severity** of the DSM-5 substance use disorders is based on the number of criteria endorsed. The DSM-IV specifier for a physiological subtype is eliminated in DSM-5, as is the DSM-IV diagnosis of polysubstance dependence. Early remission from a DSM-5 substance use disorder is defined as at least 3 but less than 12 months without meeting substance use disorder criteria (except craving), and sustained remission is defined as at least 12 months without meeting criteria (except craving). Additional new DSM-5 specifiers include "**in a controlled environment**" and "**on maintenance therapy**" as the situation warrants.

© American Psychiatric Association, May 22, 2013, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (D American Psychiatric Publishing, Washington, D.C., ISBN: 9780890425572

**APPENDIX B**

Christine Michelle Duffy, *The Americans with Disabilities Act
of 1990 and the Rehabilitation Act of 1973*, *in* GENDER IDENTITY AND SEXUAL ORIENTATION
DISCRIMINATION IN THE WORKPLACE: A PRACTICAL GUIDE ch. 16, Exhibits 16.1 to 16.6
(Christine Michelle Duffy ed. Bloomberg BNA 2014)

# Gender Identity
## and
# Sexual Orientation
# Discrimination
## in the
# Workplace

## A Practical Guide

> ### Chapter 16: The Americans with Disabilities Act
> ### of 1990 and the Rehabilitation Act of 1973
>
> *Christine Michelle Duffy, Esq.*
>
> ### Exhibits 16.1–16.6

*Editor-in-Chief*

## CHRISTINE MICHELLE DUFFY, ESQ.
*Pro Bono Partnership*
*Parsippany, New Jersey*

*State Laws Executive Editor*

## DENISE M. VISCONTI, ESQ.
*Littler Mendelson, P.C.*
*San Diego, California*

*With the assistance of The National LGBT Bar Association*
*and its Executive Director D'Arcy Kemnitz, Esq.*

## Bloomberg
## BNA
**Arlington, VA**

Copyright © 2014

The Bureau of National Affairs, Inc.

*Reprinted by permission*

Nothing contained herein is to be considered the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. These materials and any forms or agreements herein are intended for educational and informational purposes only.

**Library of Congress Cataloging-in-Publication Data**

Gender identity and sexual orientation discrimination in the workplace : a practical guide / Editor-in-Chief Christine Michelle Duffy, Esq., Pro Bono Partnership, Parsippany, New Jersey ; State Laws Executive Editor Denise M. Visconti, Esq., Littler Mendelson, P.C., San Diego, California ; with the assistance of The National LGBT Bar Association and its Executive Director D'Arcy Kemnitz, Esq.

    pages   cm
    Includes index.
    ISBN 978-1-61746-300-6
  1.  Transgender people--Employment--Law and legislation--United States.
2.  Gays--Employment--Law and legislation--United States. 3.  Gender identity--Law and legislation--United States. 4.  Transphobia--Law and legislation--United States. 5.  Homophobia--Law and legislation--United States. I. Duffy, Christine Michelle, editor. II. Visconti, Denise M., editor. III. Kemnitz, D'Arcy. IV. National LGBT Bar Association
    KF3467.5.G46 2014
    344.7301'56--dc23

                   2014027148

All rights reserved. Photocopying any portion of this publication is strictly prohibited unless express written authorization is first obtained from BNA Books, 1801 S. Bell St., Arlington, VA 22202, *bna.com/bnabooks*. Authorization to photocopy items for internal or personal use, or the internal or personal use of specific clients, is granted by BNA Books for libraries and other users registered with the Copyright Clearance Center (CCC) Transactional Reporting Service, provided that $1.00 per page is paid directly to CCC, 222 Rosewood Dr., Danvers, MA 01923, *copyright.com*, Telephone: 978-750-8400, Fax: 978-746-8600.

Published by Bloomberg BNA
1801 S. Bell Street, Arlington, VA 22202
*bna.com/bnabooks*

ISBN 978-1-61746-300-6
*Printed in the United States of America*

Exhibit 16.1. Diagnostic Classes in the 1952 Edition of the *Diagnostic and Statistical Manual [of] Mental Disorders (DSM-I)*\*



\* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL [OF] MENTAL DISORDERS (1952), Copyright © 1952 American Psychiatric Association.

*Note:* This exhibit should be read in conjunction with the discussion of the history of the *DSM* that is contained in this chapter.

**Exhibit 16.2. Diagnostic Classes in the 1968 and 1973 Editions of the *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-II* and *DSM-II-R*)***



* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (2d ed. 1968); AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (2d ed. rev. 1973). Copyright © 1968, 1973 American Psychiatric Association. *Note*: This exhibit should be read in conjunction with the discussion of the history of the *DSM* that is contained in this chapter.

Exhibit 16.3. Diagnostic Classes in the 1980 Edition of the *Diagnostic and Statistical Manual of Mental Disorders (DSM-III)*[a]



[a] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980). Copyright © 1980 American Psychiatric Association.

*Note:* This exhibit should be read in conjunction with the discussion of the history of the *DSM* that is contained in this chapter.

**Exhibit 16.4. Diagnostic Classes in the 1987 Edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-III-R)***



* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (3d ed. rev. 1987). Copyright © 1987 American Psychiatric Association.

*Note:* This exhibit should be read in conjunction with the discussion of the history of the *DSM* that is contained in this chapter.

Exhibit 16.5. Diagnostic Classes in the 1994 and 2000 Editions of the *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV* and *DSM-IV-TR*)[*]



[*] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994); American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. text rev. 2000). Copyright © 1994, 2000 American Psychiatric Association.
*Note:* This exhibit should be read in conjunction with the discussion of the history of the *DSM* that is contained in this chapter.

Exhibit 16.6. Diagnostic Classes in the 2013 Edition of the *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*.



* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013). Copyright © 2013 American Psychiatric Association.

*Note:* This exhibit should be read in conjunction with the discussion of the history of the *DSM* that is contained in this chapter.

## APPENDIX C

Excerpts from Congressional Record:  135 CONG. REC.
S10753 – S10755, 1989 WL 183115 (daily ed. Sept. 7, 1989); 135 CONG. REC.
S10765 – S10803, 1989 WL 183216 (daily ed. Sept. 7, 1989); 135 CONG. REC.
S11173 – S11178, 1989 WL 183785 (daily ed. Sept. 14, 1989)

Westlaw.

135 Cong. Rec. S10734-02, 1989 WL 183115 (Cong.Rec.)

Congressional Record --- Senate
Proceedings and Debates of the 101st Congress, First Session
Thursday, September 7, 1989

AMERICANS WITH DISABILITIES ACT

. . .

**\*S10753**

. . .

Mr. ARMSTRONG addressed the Chair.
The PRESIDING OFFICER.
The Senator from Colorado.
Mr. ARMSTRONG.

I wonder if I could seek the assistance of a manager or somebody who is knowledgeable about the contents of this bill. I am concerned because it has come to my attention today that there are provisions in this bill that I do not understand. I came to work this morning thinking that we are going to vote on a bill to help the handicapped, and I would certainly be sympathetic to that.

I would not think you would have to be very smart to know that the ideals of our country certainly call upon the Senate to do whatever it can to be helpful to people in wheelchairs or who have some kind of a physical disability or handicap of some sort and who are trying to overcome it. I am concerned because it has been brought to my attention by counsel that there is doubt about some of the provisions.

Specifically, as I understand it, this bill intends to prohibit discrimination on the basis of disability in employment, public accommodation, public services and telecommunication. It defines disability as a physical or mental impairment that substantially limits one or more of the major life activities of such an individual.

What concerns me is the thought that this disability might include some things which by any ordinary definition we would not expect to be included. When my staff drew my attention to this-and I guess they must have spent most of August working on it, because they came in armed with cases and memos and so forth, which I have not fully digested. They are concerned that we will not cover such things as illegal drugs.

For example, if a person is a consumer of illegal drugs, does he gain a protected status under this bill?
Mr. HARKIN.

I can answer definitively to the Senator that current users of illegal drugs are not, and we are working out a couple of amendmrents with the Senator from North Carolina and a couple of others to better clarify that.
Mr. ARMSTRONG.

I appreciate that.
Would the same apply to alcohol abuse?
Mr. HARKIN.

The same thing applies to alcohol abuse.
Mr. ARMSTRONG.

I thank the Senator.
May I read a list of related items? I think perhaps the Senator is going to allay some of my fears.

Mental disorders, such as alcohol withdrawal, delirium, hallucinosis, dementia with alcoholism, marijuana, delusional disorder, cocaine intoxication, cocaine delirium, disillusional disorder.

I have a whole list of these.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Am I correct in assuming that these would not be covered as disabilities?
Mr. HARKIN.
Well, obviously I am not familiar with these disorders.
Mr. ARMSTRONG.
Can I submit this list and ask that the staff look at it overnight?
When my people brought it to my attention, my first reaction is, come on, you guys have had to much time and not enough to do to come up with this list.
But in fact, they responded by saying that the list was drawn from court cases under other legislation which has similar definitions. I could not imagine the sponsors would want to provide a protected legal status to somebody who has such disorders, particularly those who might have a moral content to them or which in the opinion of some people have a moral content.
What I would like to do is submit this list for the Senator and his staff to look at overnight; so if that is the *S10754 case, we ought to address it and straighten it out if we could.
Mr. HARKIN.
I will be forthright to the Senator from Colorado. I am hopeful we will finish the bill tonight. The majority leader said that. I said we are looking to clarify the intent of the legislation. Some people brought things to my attention earlier that I think do need clarification, that current users or illegal drugs are not covered by this bill.
Mr. ARMSTRONG.
How about homosexuality and bisexuality?
Mr. HARKIN.
That is not covered by this bill.
Mr. ARMSTRONG.
How about exhibitionism, pedophilia, voyeurism, and similar?
Mr. HARKIN.
That is not covered by this bill.
Mr. ARMSTRONG.
That is not covered?
Mr. HARKIN.
I can state definitively that is not covered.
Mr. ARMSTRONG.
How about compulsive kleptomania, or other impulse control disorders?
Mr. HARKIN.
Those are not covered.
Mr. ARMSTRONG.
I beg your pardon. You say you are sure?
Mr. HARKIN.
They are not.
Mr. ARMSTRONG.
How about conduct disorder, any other disruptive behavior disorder; not covered?
Mr. HARKIN.
There we are a little uncertain, because some may be mental disorders or may be closely connected with a mental disorder; they could be covered.
Mr. ARMSTRONG.
I think this has been helpful. I will submit a list and will be grateful if we could return to the subject, because I would feel uncomfortable if there were some doubt and Senators then found themselves in a situation where, for example, someone who abused alcohol or abused marijuana or something, tried to seek protection under this act and employers were put to a test and there was doubt about it.
If there is any doubt, I would like to offer an amendment. If there is not any doubt, I am perfectly satisfied to clarify the record.
Could I, while I have the managers' attention, ask one other question, and perhaps we could just solve that problem without an amendment as well.
I am told that in the bill there is a provision which says in effect that a party who brings litigation under this bill, if

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the party is successful, may recover attorneys' fees from the other party to the case. Is this correct?

Mr. HARKIN.

The only way that applies, is getting injunctive relief. I tell the Senator that the first draft of the bill when it was introduced last year provided for the recovery of compensatory damages, punitive damages. We have taken that out.

The only cause of action now for an individual is injunctive relief. If injunctive relief is granted, then the individual can get relief.

Mr. ARMSTRONG.

What happens, could the Senator tell me, if an individual seeks such relief? As I understand, what they do is go to the EEOC, and the EEOC actually prosecutes the case for them. If there is a finding against the employer, that is, the EEOC prevails and gets an injunction of some kind, as I understand it, EEOC could seek and under the statute be given some compensation for attorney fees. Is that correct?

Mr. HARKIN.

Would the Senator repeat that last statement?

Mr. ARMSTRONG.

As I understand the way this works, if I am an employee and I think I am unfairly and illegally discriminated against--

Mr. HARKIN.

On the basis of handicap--

Mr. ARMSTRONG.

I go to the EEOC and tell them my story. If they agree, they actually then bring the case?

Mr. HARKIN.

I am informed by the staff that in that situation, you do not get attorneys' fees.

Mr. ARMSTRONG.

You do not?

Mr. HARKIN.

No.

Mr. ARMSTRONG.

Could you then clarify under what circumstances fees might be payable by the losing party to the party that prevails?

Mr. KENNEDY.

Will the Senator yield?

Mr. HARKIN.

Yes.

Mr. KENNEDY.

It is private parties. This is standard language included in all civil rights. There is no variation, I understand. It is limited to the private parties, as the Senator from Iowa pointed out.

Mr. HARKIN.

If I could give an example. If a private person, an individual with a handicap, let us say, was discriminated against either in employment or let us say in public accommodations, maybe once, twice, has been discriminated against and not allowed into a place because of disability, and that person went out and hired a private attorney to go to court to seek injunction against the place of business to keep them from doing that again and that person prevails, that is when they would be able to recover attorney fees.

Mr. ARMSTRONG.

If the handicapped person prevails, then the person against whom they prevail should pay the attorney fees to the person who brought the case?

Mr. HARKIN.

In that case, if injunctive relief is granted.

Mr. ARMSTRONG.

I appreciate that. My question is, suppose the person who is being sued prevails. Can they also get attorney fees paid?

To take an example, if a person is seeking access to public accommodation, if they prevail against the provider of the accommodation, they can get the attorneys' fees.

Suppose the reverse is right. The provider of the public accommodation proves they did not violate the law. Can

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

they get the attorney fees paid?

Mr. HARKIN.

No.

Mr. KENNEDY.

I wonder if the Senator would yield on this point, as a matter of practice the answer is "no." If considered by the judge to be frivolous, then there can be no award of attorney fees for the defendant and that is following the other civil rights legislation.

Mr. ARMSTRONG.

Mr. President, let me point out that in a lot of analogous cases where there is good faith on both sides there is heavy litigation expense often over quite technical points of law. My concern is that the burden of bearing those attorneys' fees should not be a factor in the outcome. In other words, if it is fair that the plaintiff's get their attorney fees if they prevail, then it ought to be equally fair that the defendants get their attorney fees if they prevail whether before the EEOC or the district court or whatever.

My question is, would that not be a reasonable provision to include in here whichever side is entitled to attorney fees if they prevail that the other side be entitled?

Mr. HARKIN.

As a practical matter we know the demographics of the handicapped people. Most of them are very low-income people. They do not have a lot of assets.

As I said, this was a compromise that we worked out in this bill to take out the damages that preclude the kind of actions I think the Senator sort of at least obliquely is talking about where someone might bring a case, get attorneys, go out and prosecute and go out and pay attorney fees, that kind of thing. That is not in the bill. The only thing is injunction.

You take a handicapped person as the distinguished chairman of the committee pointed out earlier, and they have enough just to get through the day. They have enough of a tough time just to keep themselves together to get through, day by day, and do not have the financial resources to go out and frivolously try to prosecute a case.

I think the instances in which, practically speaking, instances in which cases could be brought for injunctive relief would be very few and will involve egregious cases of multiple types of discrimination, probably against more than one person with a disability.

Suppose an individual with a disability goes into a place of public accommodation and is told he cannot come in or something, is that person going to go to court and get an injunction? No, they will just go someplace else. They will say, "Heck, we will not go back to that place of business again."

Practically speaking the cases you find will be the egregious cases and multiple kinds.

Mr. ARMSTRONG.

Mr. President, then if that is the case then I think I would agree with the argument of the Senator from Iowa. I think the more likely instance is a little different. I think it is more likely sort of at margins*S10755 at the frontier of the law where we are litigating some question as what is reasonable, what kind of accommodation must be made to a handicap and it might involve some very technical issues and it might not involve some poor person who is just trying to buy a cup of coffee in the neighbor coffee shop or might involve much larger actors on the Nation's stage than that.

I guess I want to think about it. I urge the Senator from Iowa to think about it.

My intention is if it is fair on one side it is fair on the other. I would be willing to take it on both sides or put in both sides.

It does not seem fair to me if someone's side is entitled to get attorney fees if they prevail the other side should not have the same right to attorney fees if they prevail.

While I appreciate what the Senator said about the plight of the handicapped, I also have firsthand knowledge of a bunch of people who get harassed by lawsuits all the time. I am not worried about General Motors. They can afford to hire a battalion of lawyers. I am worried about a typical case involving small public entities, small companies. They do not have full-time lawyers nor can hire a part-time lawyer. The lawsuit is a levy burden for them to bear. In a lot of cases they end up caving in.

I am not talking about an employment issue. I am talking about tax matters and environmental issues, and the threat of lawsuits becomes a serious problem whether a public or private entity.

I am saying we ought to equalize the law particularly so where it involves prosecution of the case by a public agency.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Although I understand the Senator's explanation that would not be a case under this bill. If it is an EEOC proceedings they cannot get compensation back for attorney fees, that is a great reassurance because it is particularly unfair if you have the government taking some private individual or some school district or some fire district or some local jurisdiction to court.

I thank the Senator for his explanation. I will send these items over.

Mr. HELMS.

Will the Senator yield?

Mr. ARMSTRONG.

I am happy to yield.

Mr. HELMS.

I am interested in the Senator's statement that this bill is aimed at the egregious violators. Was the Senator saying that is the intent of the bill?

Mr. HARKIN.

No; I am sorry. The Senator misunderstood what I said. I think in 99.9 percent of the cases where a case would be brought for injunctive relief, those would be in very egregious cases of discrimination, probably on a multiple basis.

Mr. HELMS.

I would say to the Senator, once a horde of bureaucrats descends upon a small businessman, then he is hooked.

Is there not some way that the Senator can make legislative history to emphasize that you do not intend for these bureaucrats to go out and look for victims-and that is what I think they would be-can you make some sort of legislative history on that point? You almost made it in what you said.

Mr. HARKIN.

There is nothing in the bill that provides for any agency of Government to go out and do that kind of thing. This is left as a private right of action for a disabled person. The only provision in the bill that provides for the Attorney General of the United States in pattern and practice cases to vindicate the public interest, then the Attorney General then can go out on his own and prosecute a case. But that is the only provision in the bill. There is no other area there.

Mr. HELMS.

There is going to be some agency in the Government administering this legislation if and when it is enacted and signed into law. Is the Senator telling the Senator from North Carolina that no effort by the Government will be made, short of the Justice Department, the Attorney General, to go out and look into these things? Will there not be any other agency?

Mr. HARKIN.

In the employment sector, the Commissioner of EEOC would be empowered to hear cases that would be brought by a disabled person in the employment sector. And the Commissioner of EEOC could, in pattern and practice cases, also bring a case against someone in a pattern and practice case. But those are the only two.

First of all, as the Senator from Colorado pointed out, if a disabled person brought a case under employment, it would go through the administrative remedies of EEOC first and, of course, that would go to the Commissioner of EEOC. But he would not, in that kind of situation, be able to proceed on his own.

Mr. HELMS.

If the distinguished Senator from Colorado would yield further to me, I would say to the Senator that on all three matters that the Senator from Iowa and the Senator from Utah and I, along with the Senator from Massachusetts, have discussed and we have been able to reach a pretty good accommodation. But I am still concerned about the tendency of this Government, the IRS for example, to focus in and say we are going to get this guy's hide. I want to be sure or as sure as I can be that this legislation is not implemented in that fashion. Is there something the Senator could say for legislative history as to the intent with respect to-well, let us call it what it is-the persecution of some small businessman.

Mr. HARKIN.

I can assure the Senator that it is not this Senator's intent. I trust after reading the bill myself and the report and the colloquy that we have had here on the floor, the amendments that have been accepted, and those are still being worked on, I want to make it perfectly clear that there is no intention in this bill whatsoever to persecuting small business people in any way whatsoever.

Let me clarify two points.

First, regarding the availability of damages as a remedy for private individuals enforcing the act, the Senator from

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Colorado raised this question in the context of employment and public accommodations covered by titles I and III of the act. It is true that the employment provisions of title I make available the rights and remedies of title VII of the 1964 Civil Rights Act, which provides for backpay and equitable relief. Also, under the public accommodations provisions of title III, the bill expressly limits relief to equitable remedies. However, title II of the act, covering public services, contains no such limitation. Title II of the bill makes available the rights and remedies also available under section 505 of the Rehabilitation Act, and damages remedies are available under that provision enforcing section 504 of the Rehabilitation Act and, therefore, also under title II of this bill.

Second, let me clarify the extent to which administrative remedies are available. Under title I of the bill, the EEOC is authorized to investigate complaints of discrimination in employment. Under title III of the bill, covering public accommodations, the Attorney General is authorized to investigate alleged violations of title III, and is authorized to undertake periodic reviews of compliance of covered entities. Under title II of the bill, covering public services, administrative enforcement is available to the same extent it is available under section 504 of the Rehabilitation Act.

Mr. HELMS.

I thank the Senator.

. . .

135 Cong. Rec. S10734-02, 1989 WL 183115 (Cong.Rec.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

C-7

Westlaw.

135 Cong. Rec. S10765-01, 1989 WL 183216 (Cong.Rec.)

Congressional Record --- Senate
Proceedings and Debates of the 101st Congress, First Session
Thursday, September 7, 1989

OPENING OF SESSION

(Legislative day of Wednesday, September 6, 1989)[*]

AMERICANS WITH DISABILITIES ACT

The Senate continued with the consideration of the bill.

Mr. HELMS.

Mr. President, for the record, I wish to ask the distinguished manager a few questions about this bill, the Americans With Disabilities Act of 1989.

In the bill, the definition of "individuals with disabilities" includes anyone with a physical or mental impairment limiting one of life's major activities, and anyone regarded as having such an impairment.

The report lists many mental and physical disorders and therefore it must have been the intent of S. 933's authors that it be an all-encompassing bill; is that correct?

Mr. HARKIN.

Well, the Senator's question was, Did we intend for the bill to be all-encompassing?

Mr. HELMS.

Yes.

Mr. HARKIN.

Within the definition the Senator just read, that is correct.

Mr. HELMS.

I thought the Senator would say that, so I will be specific. Does the list of disabilities include pedophiles?

Mr. HARKIN.

What?

Mr. HELMS.

P-e-d-o-p-h-i-l-e-s?

Mr. HARKIN.

I can assure the Senator no.

Mr. HELMS.

How about schizophrenics?

Mr. HARKIN.

Schizophrenics, yes.

Mr. HELMS.

---

[*] "Legislative day" is a term of art that refers to the "day" that "starts when the Senate meets after an adjournment and ends when the Senate next adjourns. Hence, a legislative day may extend over several calendar days or even weeks or months." UNITED STATES SENATE, GLOSSARY, https://www.senate.gov/reference/glossary_term/legislative_day.htm. The debate that follows occurred on calendar day Thursday, September 7, 1989. For the opening of the senate debate on the ADA, see 135 CONG. REC. S10708-01, 1989 WL 183110 (daily ed. Sept. 7, 1989).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Kleptomania?

Mr. HARKIN.

Well, I am not certain on that.

Mr. HELMS.

Manic depressives?

Mr. HARKIN.

Manic depressives, yes. I can state that.

Mr. HELMS.

People with intelligence levels, as measured on standardized tests such as the IQ test, which are so far below standard average levels as to limit substantially one or more major life activities, but who do not have any identifiable mental disease?

Mr. HARKIN.

It is my understanding that they would be covered in this bill. If I understood the Senator correctly to say that it was so low that it did limit one or more, I do think I heard the Senator say that. I did hear the Senator say the IQ is so low that it limited one or more life activities.

Mr. HELMS.

Correct.

Mr. HARKIN.

Yes; in that case.

Mr. HELMS.

How about a person with psychotic disorders?

Mr. HARKIN.

I am told, yes. I am informed by staff it covers that.

Mr. HELMS.

Homosexuals?

Mr. HARKIN.

No; absolutely not.

Mr. HELMS.

The Senator is certain about that?

Mr. HARKIN.

I am absolutely certain.

Mr. HELMS.

Transvestites?

Mr. HARKIN.

Absolutely not.

Mr. HELMS.

People who are HIV positive or who have active AIDS disease?

Mr. HARKIN.

Just a moment, I may have misspoken.

Let us back up to transvestite. I said no, but I am told by staff that one court at one time held that a transvestite was mentally impaired, and I further understand the Senator from North Carolina added an amendment to the fair housing amendments last year that took care of that, and it was accepted.

Mr. HELMS.

Where does that leave us with respect to this bill?

Mr. HARKIN.

I do not know. Just a minute.

If the Senator would like to offer an amendment, we will accept it. If I can ask the Senator, if it could be drafted the same way you did last year on the Fair Housing Act.

Mr. HATCH.

I agree. I think the Senator is doing a service by pointing that out.

Mr. HELMS.

I thank the Senator.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mr. HATCH.

If we can also work on other similar problems, we can work them out as fast as we can.

Mr. HELMS.

I will ask the managers of the bill, with respect to the categories I have identified which meet the act's definition of disabilities, will this act make it unlawful to take those conditions into account in making employment decisions, if the employer cannot prove that the condition in question will prevent the employee from performing the functions of the job in question?

Mr. HARKIN.

I am sorry, could the Senator repeat that? It is a legal question, and I have to make sure I understand it.

Mr. HELMS.

Let me give the Senator the short form. Does an employer's own moral standards enable him to make a judgment about any or all of the employees identified in our previous question?

Mr. HARKIN.

Are you talking about transvestites?

Mr. HELMS.

Pardon?

Mr. HARKIN.

Are you talking about transvestites?

Mr. HELMS.

Right, or kleptomaniacs or manic depressives. You said they are covered and that schizophrenics are covered as well. How far does your covered list of individuals go in denying the small businessman-so often referred to on this floor-the right to run his company as he sees fit?

Mr. HARKIN.

All we are saying in this bill is that those persons who are identified as being covered by this act, and we just talked about some of them, they are covered by the act, that just means-we are talking about title I employment-that these people have to be judged on the basis of their abilities and not on the basis of a disability, taking into account what they can do and how they can perform on a job and are they qualified for the job.

Mr. HELMS.

Who makes that judgment?

Mr. HARKIN.

The employer.

*S10766 Mr. HELMS.

And you think he ought to have a right to make that judgment? Is that the intent of this act?

Mr. HARKIN.

He should have the right to make that judgment in the manner in which the act provides for such judgments.

Mr. HELMS.

I thank the manager of the bill for stating that for purposes of the legislative history on this act.

Mr. HARKIN.

The Senator is right.

Mr. HELMS.

So the employer makes the judgment. Does the Senator also say the employer should not, under this act, be hauled into court for making that judgment?

Mr. HARKIN.

The employee would have the right. If the employees feel they were discriminated against on the basis of their handicap, then they would have the right first to go to EEOC. They have to exhaust their administrative remedies first. They would go to EEOC and file a complaint.

Mr. HELMS.

I understand, but the EEOC is not exactly a dispassionate, disinterested party in this. These questions and your answers are meant to give some guidance to the EEOC and everybody else involved as to the intent of this legislation. So what does the legislation intend to do in the instances I have mentioned?

Mr. HARKIN.

In which case?

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mr. HELMS.

All of them the individuals whose handicaps you said were covered under this bill.

Mr. HARKIN.

The act intends, if you are talking about the employment section-and that is what we are talking about-that employers will treat employees or prospective employees based on their abilities to perform the job or jobs in question, not based upon any disability that that person might have had at one time or may have had previous to that one point in time.

Mr. HELMS.

Which means according to the Senator's answers that an employer cannot really exercise his judgment in the case of schizophrenia or with a manic-depressive; that is what I understand the Senator to have just said.

Mr. HARKIN.

That is not exactly what the Senator said.

Mr. HELMS.

What exactly did my friend say?

Mr. HARKIN.

What this Senator said, in cases where a person has a disability, let us say schizophrenia, the employer has obviously every right to determine what that disability is and whether or not it would affect the performance of that person's job, the ability of that person to perform the job or the jobs in question. If it did, then the employer could say this person was not qualified. If, however, the disability in question, whether schizophrenia, manic-depressive or whatever it might be is, let us say, controlled by drugs, the person is under a doctor's care, and the person is qualified for the job, then the employer can say, "Well, I am not going to hire you based on your disability," but the employee then would be able to go to the EEOC and file a complaint and show, A, that that employee is qualified; B, that the disability in question does not inhibit his or her performance on that job. Then it would be up to the employer to respond.

Mr. HELMS.

Then this bill runs full tilt into more and more bureaucracy. How is an employer, or prospective employer, supposed to find out whether a man is a pedophile or schizophrenic. An employer cannot even inquire about such a handicap under this act, can he?

Mr. HARKIN.

I think I have it clear, if the Senator will ask the question.

Mr. HELMS.

Is it true that under this bill, a prospective employer is prohibited from even inquiring of a job applicant whether or not that applicant is a schizophrenic or a manic-depressant or if he has any of the other disabilities the Senator says are covered in S. 933. So how is an employer supposed to know when he cannot ask? An employer cannot ask, correct?

Mr. HARKIN.

It is my understanding that that would not be permissible as a first step in the employment process. But after a conditional offer of employment is made-I understand that is the term of art-after a conditional offer of employment is made, then the employer can ask that they fill out a medical history and all that kind of thing and they can inquire into that. The point is that in the initial stages the approach would be that the employer wants to find out: Is this person qualified for the job? Can this person perform the job in question?

After that, then there comes a conditional offer of employment based upon other things. And that is when they fill out the medical history.

Mr. HELMS.

Let me go to title 3, covering public accommodations which as used in this bill includes an adoption agency. Can an adoption agency, for example, take any of the disabling conditions into consideration before allowing the completion of an adoption?

Mr. HARKIN.

Under title 3, is the Senator talking about under public accommodations?

Mr. HELMS.

Yes.

Mr. HARKIN.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Can an adoption agency do what?

Mr. HELMS.

Take any of the disabling conditions that the Senator and I have been discussing into consideration in connection with a proposed or requested adoption?

Mr. HARKIN.

I am sorry, I just do not understand the question. I have to be honest, I do not understand.

Mr. HELMS.

The Senator has said that the long word that I used for one who has had relations with a child, a pedophile, is not covered by this act. Is that correct?

Mr. HARKIN.

That is correct.

Mr. HELMS.

But a schizophrenic is covered, the Senator said. But I want to know if an adoption agency is forbidden to take that into consideration if the prospective adopter is a schizophrenic or manic-depressive.

Mr. HARKIN.

Let me rephrase it and see if I understand. The Senator is saying, let us say, there is an adoption agency and a couple comes in that want to adopt a child.

Mr. HELMS.

Right.

Mr. HARKIN.

Can the adoption agency inquire? Is that what the Senator is asking? Can they inquire as to whether or not--

Mr. HELMS.

First, I am asking if they may inquire. And second, if the adopters are otherwise qualified to adopt, does the adoption agency-under the definitions of this act-have the right to say, "No, sorry about that, but you are a manic-depressive by your own acknowledgment; we cannot let you have the child?" Will the adoption agency be able to do that without being hauled into court?

Mr. HARKIN.

I would respond that I do not believe so just as a general rule. I think they would have to do that on an individual basis.

When the Senator uses the term manic-depressive, that is like an IQ level. There are various stages of being a manic-depressive; it may be a slight manic-depressive completely controlled by prescription drugs, or it could be a manic-depressive so severely impaired they just cannot handle themselves any longer. Each case has to be handled on its own merits and that is what the adoption agency, I am sure, would look at.

I am sure there are plenty of manic-depressives in this country-I know some. I have met some who are completely controlled under doctors' orders as long as they are on prescription drugs. They may have a slight case of it. But each case would have to be handled on its own merits.

Mr. HELMS.

The Senator said that homosexuals are not covered in the definitions.

Mr. HARKIN.

That is correct. Homosexuality is not a disability.

Mr. HELMS.

I want to be sure about that.

Mr. HARKIN.

Yes.

Mr. HELMS.

We have an amendment in process with respect to transvestites. But the Senator says that-well, the committee report says, as a matter of fact, if I recall correctly, that those who are HIV positive or who have active AIDS disease are covered.

Does that mean that an adoption ageny cannot inquire about HIV infection under this bill? I apologize for raising all these questions but I need to know the answers.

Mr. HARKIN.

Again, I would ask what is the relevancy to an adoption agency whether or not a person has tested HIV positive?

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

What is the relevancy of that to whether or not they can be good parents?

Mr. HELMS.

If I understood the Senator's question, I hope he is not serious.**S10767** What is the relevancy of somebody who tests HIV positive or who has AIDS with respect to the adoption of a child, is that what the Senator is asking me?

Mr. HARKIN.

Is this something that is absolutely relevant to whether or not one or both parents can be good parents? I am asking the Senator.

Mr. HELMS.

I think it is absolutely relevant.

Mr. HARKIN.

In that case, if it is relevant, and that is proven, the adoption agency can take that into account.

Mr. HELMS.

What does the bill say, though? What is the intent of the bill with regard to this?

Mr. HARKIN.

Maybe I should ask the Senator, and again I ask the Senator why it would be relevant if someone tests HIV positive? Maybe there is something I do not understand.

Mr. HELMS.

I think the Senator does understand.

, Mr. HARKIN.

No. I do not understand.

Mr. HELMS.

You want to put a child up for adoption and subject him to a terrible risk. Bear in mind, Senator that approximately 85 percent of the HIV-positive people in this country are drug users and/or homosexuals.

Mr. HARKIN.

Then they can take that into account.

Homosexuals are not covered by this on the basis of their homosexuality. And current drug users, I might add, are not covered by this, either on the basis of their current illegal drug use. It is people who have AIDS and HIV infection who are covered on the basis of those disabilities.

Mr. HELMS.

I thank the Senator. I think we have made some important legislative history today.

Mr. HARKIN.

Because they are HIV-positive, I point that out, that makes them covered.

Mr. HELMS.

Mrs. Helms and I were blessed many years ago with the privilege of adopting a child who has been the biggest blessing to us. And you will not believe the questions that the adoption agency asked. The questions were endless.

So the Senator is telling me, I hope, that nothing will be changed about that, that the adoption agencies can continue to ask the questions, and that they can continue to refuse to assign a child to prospective adopters. Is that what the Senator is saying, under this bill?

Mr. HARKIN.

If I understand the Senator's question correctly, the Senator is correct. What the bill is saying is they just cannot refuse to go forward simply because someone has a disability. They can take a lot of factors into account; but not on the basis of disability.

Mr. HELMS.

I hope this act is not going up one side of the street and down the other on its definitions.

But let me move on. Under section 102(c), preemployment screening is virtually eliminated. Would the Senator agree with that?

Mr. HARKIN.

As I said before, a preemployment type of screening is not permitted, but as a possible condition of employment, it is.

Mr. HELMS.

Then could a hospital, for example, or other health care provider, or a day care provider for that matter, be permitted to make inquiries regarding the following factors before offering a person employment as a physician.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mr. DOMENICI.

Mr. President, could we have order?

The PRESIDING OFFICER.

The Senate will be in order. Those who have business other than that before the Senate at this time will please remove themselves from the floor.

The Senator from North Carolina.

Mr. HELMS.

I thank the Chair. I hate to inconvenience my colleagues, but I am interested in the answers I am getting.

Let me start again. Could a hospital or other health care provider or day care provider be permitted to make inquiries regarding various disabling conditions before offering a person employment as a physician, or a psychiatric or psychological counselor, nurse, paramedic, hospital orderly, or a teacher?

Mr. HARKIN.

Could the hospital do what?

Mr. HELMS.

Make inquiries regarding these various conditions. Let me state three or four such factors.

Can they ask, for example, whether the applicant is infected with any contagious disease, such as HIV? Can they ask that question?

Mr. HARKIN.

Again, after a conditional offer of employment is made, the answer is yes.

Mr. HELMS.

May they ask regarding a history of psychosis, neurosis, or other mental, psychological disease or disorder?

Mr. HARKIN.

If I might be a little bit more specific on this, the purpose of this prohibition-that is, the prohibition on initial asking of these questions-is to ensure that employers do not inappropriately screen out people with disabilities at the initial stage of the application process by simply reacting to a prejudice or stereotype about a person's disability.

Of course, in some jobs, medical examinations are necessary or useful prerequisites for a job. Therefore, the amendment allows employers completely at their discretion to institute medical examinations of job applicants after such applicants have received conditional offers of employment. There is no restriction on the scope of these medical examinations. Therefore, if an employer chooses, this examination may include a test for HIV. There are three requirements on the use of these medical exams. The tests must be given to all job applicants, the results must be kept confidential, as described in the Act, and the results may be used only in accordance with the amendment. That is, if test results show an applicant is in fact not qualified for the job, the results may then legitimately be used to justify withdrawing the conditional job offer. And this way, applicants know why the job offer has been withdrawn and can contest it if necessary. These requirements all derive from the basic concepts underlying the amendment, and have been in place for 15 years under section 504.

Mr. HELMS.

So the Senator is saying that if a job applicant comes into the Tom Harkin Pharmacy, in Iowa, and he would like to talk to you about a job, you say OK. Let us go back in the office. You cannot ask that applicant any of these questions at that point. It is only at the time, according to my understanding of the Senator's answer, that you offer him a job that you can ask him these legitimate questions? Is that correct?

Mr. HARKIN.

Well, no. It is a conditional offer of employment.

Mr. HELMS.

Which is what I said.

Mr. HARKIN.

That is right. Then you ask the questions.

Mr. HELMS.

Will the Senator tell me what is the purpose of that? Why take Tom Harkin, the pharmacist Tom Harkin, who says, "Look, I don't want any drug user, I don't want anybody with a history of psychosis, neurosis, or mental or psychological difficulties or disorder-do you have any of those problems?" This is before a conditional job offer is made. He is prohibited at that point from even asking the question.

Mr. HARKIN.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

I will respond to the Senator by saying that at that point you can ask about the applicant's ability to do the job. If I had a pharmacy, and the person came in for a job, you name the job. What job is it, Pharmacist?

Mr. HELMS.

I use that as an example.

Mr. HARKIN.

Let us say they came in to be a pharmacist. You want a job as a pharmacist.

Mr. HELMS.

Not necessarily. It can be a clerk.

Mr. HARKIN.

OK. They want to be a checkout clerk. Well, I might inquire as to their experience, what job they have held before. They know how to run a cash register. What is your job history? What is your previous job? Have you ever had any experience working at a checkout counter? I might check into all of that. Are you qualified for that position? And if, first of all, I determine they are not qualified, they have never had a job like that, I would say, well, I need someone who is qualified. But if I determine, that they are qualified, at that point I can then say, "OK, I will offer you this job conditionally." Now I have to know some other things.

The idea, if I might respond to the Senator quite frankly, is that the testimony that we have received in our committee demonstrates instances *S10768 when individuals were judged on the basis of their disabilities and not their abilities. I can tell the Senator it happens every day all over this country.

There is a wellspring of fears and unfounded prejudices about people with disabilities, unfounded fears, whether people have mental disorders, whether they are manic depressives or schizophrenia or paranoia, or unfounded fears and prejudices based upon physical disabilities. The point of the bill is to start breaking down those barriers of fear and prejudice and unfounded fears, to get past that point so that people begin to look at people based on their abilities, not first looking at their disability.

That is really what the point of this legislation is, is to get past that initial barrier. Certainly, at the point of conditional offer of employment, of course, an employer can inquire about all sorts of things, as long as all applicants are asked. I thought I would clarify that as to the intent of what this bill is seeking to do.

Mr. HELMS.

If the Senator will forgive me, I know everybody has a different idea about how to draft a piece of legislation. If this were a bill involving people in a wheelchair or those who have been injured in the war, that is one thing. But how in the world did you get to the place that you did not even include transvestites? How did you get into this business of classifying people who are HIV positive, most of whom are drug addicts or homosexuals or bisexuals, as disabled?

BOB DOLE in an expression said something about disabled. It does not mean unable. Now, everybody in this Chamber has an abiding interest in handicapped people. But I do not know how you got so far afield in definitions of who is going to be covered by this. I will not ask you to comment on that.

Mr. HARKIN.

If I might respond, some people only think of people who are physically disabled as being handicapped. People can be mentally handicapped as well.

There may be physical handicaps people have that are not readily apparent to people. There are all kinds of handicaps that in one way or another limits one of the major life activities of an individual. So I mean, we obviously could not restrict it and say just those people who use wheelchairs. We had to cover all kind of disabilities, mental as well as physical.

Mr. HELMS.

Two of the finest Senators we have ever had in this Chamber, the Senator served with, as did I, Senator Stennis of Mississippi, and the late John East, both in wheelchairs, and I marveled at their ability and intelligence. If anybody tried to discriminate against John Stennis or John East, I would be right on them.

I do not understand why, for example, you went down the road of including in your definitions people who are HIV positive, because 85 percent or more of the HIV positive people in this country are known to be drug users or homosexual or both.

Mr. HARKIN.

Then I respond to the Senator that they are not covered under this bill on the basis of their homosexuality or drug use.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mr. HELMS.

The Senator better read his committee report, because it says they are covered.

Mr. HARKIN.

They are covered on the basis of their HIV infection but not on the basis of being current drug users.

Mr. HELMS.

I am talking about the HIV positive.

Mr. HARKIN.

I beg your pardon?

Mr. HELMS.

I am talking about those who are HIV positive. You include them as handicapped, and you protect them, and the guy that runs that pharmacy we were talking about, if he dares to ask a question about it before there is a conditional job offer, he is in the soup, according to this; is that not correct?

Mr. HARKIN.

If he did it after the conditional job offer, then he can ask.

Mr. HELMS.

What was the point in making him go that far? Why could he not sit down and say, son, I want to talk to you about several things that are important to me as the owner of this drugstore. Are you HIV positive? Are you this or that? Because your condition and beliefs are important to me in the operation of my drugstore. Why can the employer not do that? Why does he have to go through all this rigamarole and get down to making a conditional job offer, at which point he has the right to ask the question? Why was that done? Why was that scenario set up?

Mr. HARKIN.

Because even though the person may be HIV positive, he may still be qualified for that clerk job of running that cash register. He may be fully qualified, and not a current drug user.

Mr. KENNEDY.

Will the Senator yield?

Mr. HELMS.

Sure.

Mr. KENNEDY.

I would like to point out, if we can go back a little bit, about the conclusion that we were going to follow our decision. As the chairman of the President's Commission on the HIV epidemic has pointed out, the linchpin of our ability to control the spread of this virus is protection against discrimination. If we fail to provide this protection, we will continue to drive this epidemic underground.

Now, continued inaction may be satisfactory to certain individuals in this body, but the President's Commission on HIV, the new congressional AIDS Commission, and a wide array of public health and medical organizations have repeatedly stated that in terms of a public health policy protection under the act is extraordinarily important in terms of bringing this epidemic under control. So, individuals have lived up to 8 years after testing HIV positive, and we are thankfully making medical advances with each passing day.

The most recent Public Health Service report that was released 2 weeks ago, has demonstrated that AZT has had a positive impact on those that have tested positive but do not have the disease. Now, the question is, if you are going to encourage individuals to come forward for counseling and testing and crucial medical care-if you are going to get them to go out and pursue voluntary testing, we must not limit their protection under this act. If we do, we are going to find out about the countless individuals, that have lost their jobs, their homes. They are going to be subject to discrimination in various other aspects of society, then you are going to find out that you "ain't" going to be able to provide much testing and counseling, and the disease is going underground.

Now, in the particular provision of the legislation we have pointed out very clearly, if you are asymptomatic and HIV positive, you are protected; if you have full-blown AIDS, you are also protected. I think this is completely consistent with public health policy, and reflects the bipartisan consensus that brought us to this day.

It is the recommendation of the President's Commission. And it certainly, I think, is a compassionate and wise public policy. Now, the Senator from North Carolina may not agree with that judgment, but that is at least some of the background of why we have included people in all stages of HIV diseases in the legislation.

I ask unanimous consent that these letters of support for this provision be printed in the RECORD.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

. . .

. . .

Mr. HELMS.

Well, all that is well and good. What I get out of all of this is here comes the U.S. Government telling the employer that he cannot set up any moral standards for his business by asking someone if he is HIV positive, even though 85 percent of those people are engaged in activities that most Americans find abhorrent. That is one of the problems I find with this bill.

How about asking if this employee would come in to see the pharmacist, TOM HARKIN; he cannot say, look I feel very strongly about people who engage in sexually deviant behavior or unlawful sexual practices. He cannot ask about that, can he? Because these people are covered.

Mr. HARKIN.

Homosexuality is not covered in this bill.

If I might respond to the Senator further a little bit on the issue of HIV positivity.

Mr. KENNEDY.

Mr. President, if the Senator will yield. No matter how those who may not want to support this legislation attempt to distort its intent, no matter how many times these issues are raised on the Senate floor, they do not apply. The definitions are clear.

Now I know the Senator from Colorado has a long list of various kinds of conduct that has been extracted from the DSM III and we are trying to review it. We received it late this afternoon. We are trying to determine the best approach for proceeding.

The PRESIDING OFFICER.

The Senator from North Carolina has the floor.

Mr. KENNEDY.

I apologize.

Mr. HELMS.

No apology is necessary.

We are making some important legislative history and frankly the Senator has given me more and more reason not to support a bill that I would like to support.

Mr. HARKIN.

If the Senator could just yield I would like to finish my statement on the HIV matter.

Mr. HELMS.

Yes, I yield for that purpose.

Mr. HARKIN.

I just want to read, Mr. President, the statement that came out here by the Secretary of Health and Human Services, Dr. Louis Sullivan. He said that:

While the political process can play a positive role in any successful resolution of the AIDS crisis, we must fight to keep the focus on public health. Fear and division must be dissolved through understanding and cooperation. Compassion must rule the day.

Finally, I must add that discrimination against individuals infected with the virus is unacceptable. This is a point that has been made again and again, especially in the final report of the President's Commission on the HIV Epidemic and by President Bush. HIV infection cannot be spread by casual contact. There is no medical reason for discrimination.

This Administration is committed to enacting legislation that will prohibit such discrimination. For example, we are working with Congress on legislation, the Americans With Disabilities Act, which includes under its scope Americans with HIV infection. Passage of this law will protect these people from discrimination.

Compassion, not prejudice, is needed.

I am not going to continue the other ones. I want to point out that this is a letter from Dr. Louis Sullivan, the Secretary of Health and Human Services.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mr. HELMS.

I thank the Senator and Dr. Sullivan is a fine man. I like him personally. He admitted he was wrong on a position he initially took, for example, on the clean needle issue. He took the position that we ought to give out needles. Now he is saying we ought not to do it. So who knows what his position will be or anybody else who professes to know what the risk of HIV positive is.

Mr. ARMSTRONG.

Mr. President, will the Senator yield for a moment.

Mr. HELMS.

I yield.

Mr. ARMSTRONG.

Mr. President, I was intrigued by the discussion a moment ago between the Senator from Massachusetts and the Senator from North Carolina.

The Senator from Massachusetts pointed out that I was concerned about voyeurism and assured the Senate that voyeurism is not a protected classification under this proposed bill.

I would be relieved to think that is true but in fact there is no basis that I can find for that because the definition which is contained in this bill is exactly the same definition that appears elsewhere in the law. Cases which have been litigated have referred to what the Senator described as some book and which I will now identify, if I may, as the diagnostic and statistical manual of mental disorder published by the American Psychiatric Association. This is the book which the courts have looked to to define what constitutes a mental impairment under statutory language which is identical to this proposed in this bill.

On page 289 of that book, the report of the American Psychiatric Association, is described the mental impairment of voyeurism. Voyeurism is in unless we take it out.

In due course, I am going to have an amendment that will take voyeurism and some other things out.

My concern is not just to try to imagine everything that might be in and try to make a list and take it out, although I could do that. My concern is that the big underlying premise of the bill is far too broad.

I do not want to impose on the Senator from North Carolina.

Mr. HELMS.

The Senator is not imposing.

Mr. ARMSTRONG.

If I could elaborate on this point a moment, historically Congress has extended the certain protected classifications of persons protected under the civil rights law.

We have said that it is and shall be against the law for a person to discriminate in employment, promotion, public accommodation, and so on, because of race, religion, and sex.

These are easily discernible factual situations. A person is or is not a man or a woman. A person is or is not a Catholic, a Jew, a Mormon, whatever, a Baptist, a Presbyterian. That is something we can readily determine. A person either is or is not Irish, Italian, and so on.

This bill proceeds from an entirely different point of view, and I hope Senators will take a moment to just refer to the bill at page 41 and read what the definition selection is.

The term "disability" means, with respect to an individual (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individuals.

That is a very broad vague definition.

I think the proper way to proceed and I am simply not learned enough or well enough informed to suggest an amendment to do so, but the proper way to proceed, as I have suggested to the managers of the bill, is for them to list the specific protected categories that they--

Mr. HELMS.

Precisely.

Mr. ARMSTRONG.

With to afford civil rights protection. That is what we have done in the past when dealing with very clear-cut, readily discernible categories.

Now we are extending in a very broad and in an unquantified way this civil rights protection in a manner which is appealing to the heart but which should give our heads some concern*S10773 because we do not know for sure what these words mean.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The best way to determine what "necessity" might mean is go to the court cases and the court cases when I seek recognition to offer my amendment I will cite to say specifically, but I will tell a story at that time about an FBI agent that was found to be a compulsive gambler.

In that particular case when the Government brought its motions they tried to say, look compulsive gambling is not a protected classification, and the judges said that is not right.

I will tell you all about it when we get to it, but I make the point that his reference in determining whether or not compulsive gambling was or was not covered was this document, what the Senator from Massachusetts described as some book.

That book, let me tell Senators again, is a diagnostic and statistical manual of mental disorders of the American Psychiatric Association.

I do not know if it is a good reference. I do not know if it is the best source of information.

It is the source of information which the courts use; therefore, if they say voyeurism is in, if they say pedophilia is in, then I think we have very little room to expect that in the future if we adopt the same statutory language that some other court will arrive at a different conclusion.

I apologize to the Senator from North Carolina for imposing on his time, but since the issue arose I wanted to speak to it before the subject got cold and when the Senator has completed his statement, which I followed with interest, I will arise to seek recognition and offer an amendment.

. . .

**\*S10776**

. . .

Mr. HELMS.

Mr. President, I move to reconsider the vote by which the amendment was agreed to.

The PRESIDING OFFICER.

Without objection, the motion to reconsider is laid on the table.

## AMENDMENT NO. 716

Mr. HELMS.

Mr. President, I send an amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER.

The amendment will be stated.

The legislative clerk read as follows:

The Senator from North Carolina <Mr. HELMS> proposes an amendment numbered 716.

At the appropriate place in the bill, add the following:

"For the purposes of this Act, the term 'disabled' or 'disability' shall not apply to an individual solely because that individual is a transvestite.".

The PRESIDING OFFICER.

The Senator from Iowa.

Mr. HARKIN.

Mr. President, without losing my right to the floor, I would like to inquire of the Senator is this the same language that is in 504?

Mr. HELMS.

The Senator is correct. My instruction to the staff was that. It is exactly the same wording.

Mr. HARKIN.

With those assurances then, Mr. President, we have no problems with the amendment and readily accept it.

The PRESIDING OFFICER.

If there be no further debate, the question is on agreeing to the amendment of the Senator from North Carolina.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The amendment (No. 716) was agreed to.

Mr. HELMS.

Mr. President, I move to reconsider the vote by which the amendment was agreed to.

The PRESIDING OFFICER.

Without objection, the motion to reconsider is laid on the table.

Mr. HELMS.

Mr. President, I want to thank the distinguished managers of the bill for their patience in helping me try to understand the technicalities of the bill as now written.

I yield the floor.

. . .

**\*S10778**

. . .

The Senator from New Mexico.

Mr. DOMENICI.

Mr. President, unless the distinguished minority \*S10779 leader is in an extreme hurry, I wonder if I might just take 3 or 4 minutes and comment on the amendment I just cosponsored. I want to make some views and observations about this bill, as well as some of the new definitions with reference to disability.

Mr. President, far be it from the standpoint of the Senator from New Mexico to understand this bill as well as those who have worked on it for many, many months, if not for years. It may be that some Senators who have concerns about definitions and breadth of definitions may have a point. But I would like to point out just one very precise aspect of this bill that I am very, very laudatory of the committee about, and hopeful that it will work.

It has to do with mental illness. I am not aware of the total series of definitions that come within the term "mental illness," but what I hear most of the time here on the floor of the Senate and in public discussions, are references to one, two or three of the most serious mental illnesses that are around. As soon as you talk about mental illness somebody says what about somebody who is schrizophrenic or manic-depressive or bipolar effective.

Let me suggest to the Senate that if Winston Churchill were alive today and was applying for a job and somebody wanted to eliminate from the workforce a manic-depressive, they may very well not hire Winston Churchill because it is almost universally accepted by those who diagnose the illness today that Winston Churchill was a manic-depressive.

I might also suggest that if Abraham Lincoln were to walk in and ask for a job, he might face the same problem. About 90 percent of those who look back and diagnose, would say Abraham Lincoln would today be carrying around a diagnosis of manic-depressive. I could go on and on with reference to names that are from bygone eras.

I tell you, there are hundreds of thousands of Americans today who have been diagnosed or are being treated for manic-depression, bipolar effective disease or schizophrenia, and I do believe we have to make a serious effort to eliminate the automatic stigma attached to those ailments. Think back in all our lives when we used terminology like "schizophrenia" or "that is schizophrenic." We all perceive some idea in our minds about people who have those kinds of ailments. It turns out that more times than not, we are wrong in or perception of their abilities. We certainly overstate their disabilities. .

As I said, I am not informed enough on the broad diagnostic use of words that come within mental illness, but I submit that the time has arrived in the United States when people who have mental illnesses that are clearly defined, such as the three I have talked about here this evening, that they not be automatically discriminated against for employment in this country.

That is not to say that for certain types of jobs and under certain observations by the experts in this country, be they psychologists, psychiatrists or even the new more combined professional people who work with these kind of illnesses in the United States, individuals with these illnesses may not be right for the job. But, clearly the time has come when they deserve an unbiased evaluation of their capability based upon the disease rather than some subjective disability attached to just the use of the name.

I think it is going to be difficult to implement legislation like this, and I understand, perhaps as well as most here,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

that the marketplace in the United States on the private sector side is a marketplace that responds to performance. Certainly I do not want to be part of forcing employers, especially those that are small, minimize their capability of succeeding in a very competitive American marketplace. But I do believe we have to make a start and we have to make a start in applying the term disability beyond some of those very easily defined and easy to see disabilities that come to our mind rather automatically when we think of disability.

I might suggest that there may have been a time in history when if you had diabetes somebody asked you, do you have diabetes and they could have said to you, we cannot hire you.

Certainly that is not the case today. Certainly you can have a disease as grave as that and fit more jobs. You are either in the process of being maintained, or we are coming close to finding a cure, or your disability is sporadic.

I think the time will come because of giant strides in understanding mental illness and the brain when somebody who walks in to seek employment will find no more prejudice. They will find that people will understand that it is a disease rather than some figment of the imagination or some subjective bias. There will come a time when somebody says, "I have suffered from schizophrenia," that people will then sit down and talk intelligently about that situation as it applies to that human being and their ability to get a job and hold a job in the American marketplace.

In that respect, it appears to me that we are making a very positive stride in the right direction if we really are concerned about job prejudice in the United States. It is very simple to say it is only a matter of sex discrimination and perhaps race and perhaps religion, as some have suggested. Those are easy ones.

But they just scratch the surface in terms of the suffering that goes on in the lives of people who are assumed to be disabled because of some of the niches that they are put in, especially when it comes to serious mental illness properly diagnosed and, currently, rather well understood.

In that respect, it is obvious to the Senator from New Mexico and with respect to this bill, that the employers of this country are going to have to get a lot of help and we are going to have to go slow and watch the regulations as they are developing.

Because of that I am pleased to cosponsor Senator DOLE's amendment which will provide a very significant opportunity to inform the employers of the United States in an orderly, well-defined, proper manner of "do's and don'ts" of this new law. I thank the Chair, and I yield the floor.

. . .

**\*S10782**

. . .

Mr. HUMPHREY.
Mr. President, the bill before us is one of the most radical pieces of legislation I have encountered in my 11 years in the Senate. Like most radical legislation, it has laudable policy goals. We all want to improve the lot of the handicapped, and I would gladly support reasonable and cost-effective legislation to achieve that goal.

But this bill treads so heavily on individual liberty, private property rights, and the legitimate concerns of employers that I cannot support it. I am equally concerned with the enormous hidden costs of this legislation. The New York Times, which is normally the first to endorse civil rights legislation, has just published an editorial stating that the costs of the ADA "could be monumental," but "nobody has even tried to spectulate about its costs." The reason for this is clear: the more that is disclosed about the bill's price tag, the more likely that Congress will feel the heat from the public about this spendthrift legislation.

I do not expect that many other Senators will oppose this bill, or even seriously question its provisions. Not many Senators enjoy the prospect of being protrayed as unsympathetic to the plight of the handicapped. And that is exactly what occurs when Members break from the pack and point out the excesses and flaws of these bills, as I can attest from past experience.

Nonetheless, after a thorough review of this extremely complex legislation, **\*S10783** I feel it is important to call the Senate's attention to some of its major flaws and excesses.

EMPLOYMENT PROVISIONS

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Other equal employment opportunity laws have required employers to treat applicants and employees on an even-handed and nondiscriminatory basis. This bill departs from that principle. It requires employers to extend special treatment to accommodate the special needs or disabilities of the 43 million Americans the bill classifies as disabled. And we are not simply talking about the blind, the deaf, or persons confined to wheelchairs. Under this bill, drug addicts and alcoholics are classified as "disabled persons" and given special employment protection. So are schizophrenics, manic depressives, and persons with extremely low IQ's. So are persons with deadly infectious diseases, like AIDS. In fact, the definition of protected "disabilities" in this bill is so broad that virtually any mental or physical shortcoming can be invoked as grounds for demanding the special " accommodations" which the bill requires employers to provide.

The bill compels employers to make "reasonable accommodations" to the " physical or mental limitations" which would otherwise render a person unfit for a job. It is anybody's guess how this radical new rule will be applied, because the bill provides inadequate guidance.

The committee report gives a few examples of what it regards as clear-cut cases of mandatory accommodations. For example, a business or agency can be required to hire a hand-sign interpreter to enable a deaf person to perform a job he could not perform without one. Of course, the committee report fails to tell us that the employer's annual cost for such a sign-language interpreter is $21,000 to $23,500.

Similarly, an accounting firm or other business would be required to hire a special reader to assist a blind accountant or executive who is "otherwise qualified." In other words, the bill will sometimes require an employer to hire two employees to get one job done. That's not an antidiscrimination law. It's a confiscatory law.

The bill also requires employers to provide auxiliary aids and devices which are necessary to enable disabled persons to perform a job. One example: computers with speech synthesizers and special software for blind persons. Cost? $5,000. And this bill will make it an act of illegal "discrimination" for a small businessman to decline to acquire such costly equipment to accommodate a disabled applicant for a job. That's outrageous.

While the committee report gives examples of clear-cut accommodations for the disabled, it studiously avoids the more bizarre accommodation requirements imposed by the bill. What are employers expected to do to accommodate alcoholics, the mentally retarded, or persons with neurotic or psychotic disorders? This Senator has no idea, and I doubt that other Senators do either. Of course, we don't have to comply with the bill, because as usual Congress is exempt from the law in question. But for the small businessman throughout America who will have to comply, the vagueness and complexity of this bill's requirements will constitute a legal nightmare.

The only concession the bill makes to small, hard-pressed businesses is that they need not make an accommodation if it constitutes an "undue burden." But again, the bill gives no meaningful guidance as to what this means. Employers will simply have to guess at how much money they must spend for readers, interpreters, and special equipment to accommodate the countless varieties of "disabled persons" protected by this act. If they guess wrong, they face the prospect of litigation, injunctions, and $50,000 fines for violations. And on top of everything else, the bill will require them to pay the attorney's fees of those who sue them, as well as their own.

The bill also prohibits employers from making entirely legitimate inquiries regarding the fitness of prospective employees prior to making an offer of employment. For example, police departments and school boards are barred from prescreening applicants for jobs as policemen and schoolteachers to find out if they have a history of drug addiction, mental illness, or emotional instability. After the job has been formally offered, the act permits some limited inquiries of this kind but these are only permitted if the employer can establish that its inquiries meet a strict test of "job-relatedness" and " business necessity."

It is obvious that these unprecedented Federal restrictions on employee qualifications will deter employers from preserving high standards of fitness, safety, and efficiency within their work force. It is nothing short of outrageous to prohibit police departments, hospitals, and other employers responsible for public health and safety from applying strict and selective hiring standards. But that is precisely what this bill does.

## PUBLIC ACCOMMODATIONS

In its effort to reshape the structural landscape of America in the name of handicapped accessibility, the ADA will require even the smallest shops, offices, and clubs to struggle with a complex and incomprehensible set of structural and architectural regulations.

The most sweeping requirements of this title concern the construction of new facilities. Any business, club, school,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

shop, or office which plans to construct or acquire a new building or facility must comply with complex Federal accessibility requirements which are at once strict and imprecise.

Any newly constructed facilities must comply with the strict Federal standard of "ready accessibility" for the handicapped. This means that no new shops or offices can be built which require climbing or descending stairs to enter the facility. We all know that there are many thousands, perhaps millions, of facilities throughout America which do not meet this standard of accessibility. Compliance with this new nationwide handicapped building code will require a drastic revolution in the design of commercial and office construction and design. Construction on elevated or depressed terrain will have to be avoided, since access to such buildings would clearly require stairs for access. The commonplace design of office basement space for "walk-down" shops will be illegal. The use of popular townhouse-style designs for small office and professional buildings will be greatly restricted because of accessibility problems.

The accessibility requirements will require greater space per office unit, and thereby increase construction and rental costs. All restroom facilities will have to be larger to accommodate wheelchair access and maneuverability requirements. Wider doorways and corridors will require more office space. Split-level designs in shops and stores will violate accessibility requirements, unless ramps or elevators are provided.

One of the most costly aspects of the bill will be its requirement for the installation of elevators in any building with over two stories. Three-story buildings without elevators are commonplace in American society and commerce today. Small office buildings, college dormitories and fraternity houses, clubhouses, boarding houses, and numerous other small business or association facilities are housed in three-story buildings. While many three-story buildings are equipped with elevators, many are not. And the reason for not including elevators is invariably the same: elevators are very expensive.

Installation of elevators in basic three-story buildings will generally add in the range of $35,000 to $45,000 to the cost of construction. For commercial buildings, the cost of elevators for a three-story building would be $75,000. Proponents might argue that many contemporary buildings of more than two stories would be built with elevators even without this legislation. Some are and some aren't, but that is not the point. This bill prohibits small businesses, clubs, and other private organizations from exercising their right to choose a far less costly form of building. For many businesses and organizations, the benefit to handicapped persons from this costly requirement will be marginal and speculative. But the increased building costs for businesses, associations, schools, clubs, and other organizations will be very real and very substantial.

In this regard, it needs to be said that the cost and economic impact assessment in the committee report is *S10784 laughable. It says that the costs of these new accessibility requirements for new constructions and renovations "are generally between zero and 1 percent of the construction budget." This claim is bogus on its face. The cost of elevators alone-$35,000 to $75,000 for a small three-story building-totally refutes the report's assertion. So does the fact that these new accessibility requirements have never been applied to the unlimited range of private sector facilities covered by this legislation. As the New York Times has stressed, the fact is that no one knows the extent of the costs entailed by this bill. The mandatory installation of elevators alone will entail enormous extra construction costs. So will the need to design buildings in a manner that will eliminate stairs as a necessary mode of entrance. The committee report's economic impact " assessment" simply avoids addressing the real cost impacts, and that is a real disservice to the paying public.

Like the bill's employment section, the bill's public accommodations section is riddled with vague terms and requirements which will make compliance virtually unachievable. The bill requires removal of all architectural barriers from existing facilities if such removal is "readily achievable," which the bill defines as something that can be done "without much difficulty or expense." Alterations of existing facilities must incorporate handicap accessibility to the "maximum extent feasible." Auxiliary aids and special services must be provided for the handicapped except if the cost would constitute an "undue burden."

No one will really know what these terms mean until the courts have thoroughly interpreted them. In the meantime businesses, schools, and other organizations will have to make their best guess at what the law requires of them. The penalties for guessing wrong will be harsh, including $50,000 fines, injunctions, and payment of the plaintiff's lawyers' exorbitant attorney's fees.

I could continue with other examples of this bill's excesses, such as the costly requirements for equipping all buses with lifts, but the point is the same. In the name of a good cause, this bill imposes unreasonable restrictions on individual and economic liberty. It treats sensible business decisions, based on efficiency and frugality, as invidious

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

discrimination. It imposes radical changes on the construction and design of commercial and private buildings throughout America without confronting the economic consequences. And it prohibits employers from applying the most basic standards of fitness in making hiring decisions.

The New York Times editorial may have put it best when it said this about the ADA:

It requires little legislative skill * * * to write blank checks for worthy causes with other people's money.

For all these reasons, I will vote against this legislation.

AMENDMENT NO. 721

Mr. HUMPHREY.

Mr. President, I will send an amendment to the desk which I understand is agreeable to both sides.

Frankly I am astounded that this bill has arrived on the floor in the shape we find it. There is a glaring loophole in the bill as it is now written which this amendment seeks to address the amendment which I will offer in a moment. The loophold creates benefits for drug addicts, of all classes of people, at a time when we are trying to deal effectively with the scourage of drug use in our society.

Mr. President, I will cite one example. As the bill is now written if a private school should expel a student because of drug use that student under the bill would have recourse to a suit claiming discrimination.

The committee report makes it quite clear that drug addiction is to be considered a handicap and falls under the scope of this bill. I will read what the committee report says:

It says: "It is not possible to include in the legislation a list of all the specific conditions, disease or infections that would constitute physical or mental impairment," et cetera.

It goes on to say the term includes, however, such conditions as, and skipping over a whole list of conditions, drug addicts.

So clearly, according to the committee report the bill in its original form, a form which is now before us, is intended to create benefits for drug addicts, right at a time when we are trying to fight this scourage of drugs in our society. I think that is one example on how poorly and hastily written this bill is.

Nonetheless, I want to thank Senator HARKIN, Senator KENNEDY and all involved for their cooperation in coming to an agreement on an amendment which I will now send to the desk.

AMENDMENT NO. 721

The PRESIDING OFFICER.

The Senator will suspend. As I understand it the Senator has offered the amendment and that being the case the clerk will read the amendment.

The legislative clerk read as follows:

The Senator from New Hampshire <Mr. HUMPHREY>, proposes amendment numbered 721.

At the end of the bill, add the following:

For purposes of this Act, an individual with a "disability" shall not include any individual who uses illegal drugs, but may include an individual who has successfully completed a supervised drug rehabilitation program, or has otherwise been rehabilitated successfully, and no longer uses illegal drugs.

However, for purposes of covered entities providing medical services, an individual who uses illegal drugs shall not be denied the benefits of such services on the basis of his or her use of illegal drugs, if he or she is otherwise entitled to such services.

Mr. President, this business of drug abuse and the loophole in this bill which we are now seeking to close is very serious business indeed and I am sure the Senator from Iowa will agree and it would be most unfortunate just as we are launching a new phase in this effort against the drugs in our society it creates special protection for the drug users. That ought not be the intent and effect of the amendment. It should be to close the loophole and take away the protection that a drug user would have absent this amendment.

It is a serious amendment, and I am grateful I have the support of the floor manager and others in formulating this compromise amendment.

I want some assurance and I am not going to seek a rollcall vote on this given the lateness of the hour. I want some assurance from the Senator that this is not just a sop to this side that his acceptance in this amendment is not just a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

sop and this thing is going to fall by the wayside in conference.

I want assurance that the Senator take this seriously and will make a good faith effort to retain it in the conference report.

Mr. HARKIN.

If I might respond to the Senator, we have looked at this amendment and we accept the amendment. It has been worked on.

Quite frankly, I believe that the bill as drafted did answer adequately the concern raised by the Senator from New Hampshire. However, if more clarifying language or stricter language can be incorporated as the Senator has drafted here that is fine with this Senator.

I can assure the Senator from New Hampshire that we will maintain this language because quite frankly I feel the language in this amendment really does what we did in the beginning. But if the Senator from New Hampshire feels it did not, that is fine; we will accept this language to allay any fears, apprehensions, or misgivings that this Senator or others might have that we did not accomplish this in the beginning. So I assure him we are going to keep this language because I think it does what we initially wanted to do anyway.

Mr. HUMPHREY.

I thank the Senator for that assurance.

I find his remarks strange in light of the clear language in the committee report which says that drug addiction is one of the conditions which is to be regarded as a handicap condition under this bill. That is what the report says.

The Senator is entitled to his interpretation but that to my way of thinking is a wide open loophole to create protections for persons addicted to drugs. The purpose of this amendment is to close that loophole. I think the language is clear and explicit, and I thank the floor manager for his assurances that this language will be retained in conference.

\*S10785 Mr. HATCH.

If the Senator will yield, I will fight for that language as well and we will try to make sure it is kept in any conference we have on this issue.

I appreciate the Senator in his efforts and work and ability to compromise on this matter.

The PRESIDING OFFICER.

Is there further debate on the amendment? If not, the question is on agreeing to the amendment of the Senator from New Hampshire.

The amendment (No. 721) was agreed to.

Mr. HATCH.

Mr. President, I move to reconsider the vote by which the amendment was agreed to.

Mr. KENNEDY.

I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. HATCH.

Mr. President, we are about ready to conclude this matter. I believe that we have reached an accommodation with the distinguished Senator from Colorado.

Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER.

The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. HATCH.

Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER.

Without objection, it is so ordered.

Mr. HATCH.

Mr. President, the distinguished Senator from Colorado has worked long and hard this evening with the majority floor managers and the minority floor manager to try and resolve what really are very difficult problems. We have arrived at a compromise amendment that is a very good amendment, much to the credit of the distinguished Senator from Colorado.

Should this amendment pass, by voice vote, and I believe it will, I will personally commit to keep this amendment in conference, if there be any conference. I would like to ask my colleagues, both the majority floor manager, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

distinguished Senator from Iowa, and the distinguished Senator from Massachusetts, the chairman of the committee, if they also would be willing to give assurances that we will keep this amendment in any conference or in any final version of this bill.

Mr. KENNEDY.

Mr. President, I would accept this amendment. It has been the result of many long hours of negotiations. I feel that there has been a good deal of good faith given and take on this amendment. It really represents a compromise. It is certainly not one that I would have wanted in the legislation, but we have divisions and concerns that have been expressed on this floor and in previous debates.

I think that this is a compromise which we can live with. I will do everything I can to ensure that it be maintained in the conference. Realistically, I know that if it is not, we will be facing this issue down the road in the course of further debate and discussion on some of the other matters that are not unrelated to the measures which we have been debating this evening.

So I want to say that we appreciate the position of the Senator from Colorado. I cannot say that I agree with it, but I know that he cannot agree with the way that we have framed the various definitions. Of course, I do want to point out that some of the behavior characteristics listed such as homosexuality and bisexuality are not, even without this amendment, considered disabilities.

This does represent a compromise. I still firmly believe that the basic, fundamental integrity of the measure is maintained. I hope we have addressed the most obvious concerns of the Senator from Colorado and have done it in a way which is consistent with the integrity of the legislation.

Mr. HATCH.

Could I also have the comments of the distinguished Senator from Iowa as well?

Mr. HARKIN.

I join my distinguished chairman in saying that this has been worked out long and hard. I think that it is a meaningful amendment. The language in the amendment is something I agree with. We certainly will make sure that it stays in the bill as it winds its way through the other body and through conference.

AMENDMENT NO. 722

Mr. ARMSTRONG.

Mr. President, in view of the statements that have just be made, I send to the desk an amendment and ask for it is immediate consideration. Under the circumstances, since it is very brief, I ask that the clerk read the amendment.

The PRESIDING OFFICER.

The clerk will report.

The assistant legislative clerk read as follows:

The Senator from Colorado <Mr. ARMSTRONG> for himself and Mr. HATCH, proposes an amendment numbered 722.

Under this act the term "disability" does not include "homosexuality," " bisexuality," "transvestism," "pedophilia," "transsexualism," " exhibitionism," "voyeurism," compulsive gambling," "kleptomania," or " pyromania," "gender identity disorders," current "psychoactive substance use disorders," current "psychoactive substance-induced organic mental disorders," as defined by DSM-III-R which are not the result of medical treatment, or " other sexual behavior disorders."

Mr. ARMSTRONG.

I have known Senators from time to time who come to the floor and have an amendment which has been agreed to and then made a lengthy speech and talked themselves out of it.

I think the amendment speaks for itself. It is, as the Senator from Utah and the Senator from Massachusetts have described, a product of a compromise which we have been working on through the evening. It seems to me that it expresses pretty well what would be the common wisdom of the body. So I commend it to the attention and the approval of my colleagues.

Mr. President, I also want to make this point, however, and I would invite the attention of anyone who wants to be involved in making the RECORD on this. The fact that we have enumerated what is not included is really for the comfort of Senators and it should not be assumed by anybody, including someone who might read the RECORD of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

this proceeding, that because we have failed to exclude something that it is necessarily included.

What we are adopting here is an amendment which is a practical compromise to avoid a protracted debate, to avoid a series of rollcalls, and to address, as the Senator from Massachusetts has accurately expressed it, the most obvious concerns. But no one should assume that because we have failed to mention something that it is necessarily covered by this admittedly broad bill.

Mr. President, with that word of explanation, I think we are ready to go to a vote. And while it had been my intention to ask for a rollcall, in light of the assurances that the managers of the bill have been kind enough to extend, I see no reason to have a rollcall on this.

I assume it would pass by a large margin and perhaps unanimously, and that there is no need for that under the circumstances.

I appreciate their willingness to support the amendment through conference and look forward to this being included in the final version of the bill.

The PRESIDING OFFICER.

The Senator from Utah.

Mr. HATCH.

Mr. President, I want to compliment the distinguished Senator from Colorado for his willingness to work this out.

I would also like to ask him to list me as a principal cosponsor, on this amendment, because I think he has done the Senate a singular service. I think these are areas that basically have been ignored in the bill, which, had they not been resolved by the distinguished Senator from Colorado, might have led to, I think, all kinds of misunderstandings with regard to rather sweeping language of this bill.

So I want to personally thank the distinguished Senator from Colorado. I think his workmanship is excellent. And I think we all owe him a debt of gratitude. I think the country will owe him a debt of gratitude when this bill is implemented.

So, with the Senator's permission I would like to be a principal cosponsor of this amendment.

Mr. ARMSTRONG.

I would be honored and I ask unanimous consent the Senator be listed in that way, but I want to note in passing it is his skill that enabled us to work out the amendment in such an amicable fashion. I am grateful to him and the Senator from Massachusetts particularly for helping us put together some *S10786 words that everyone could readily agree to.

The PRESIDING OFFICER.

Without objection, it is so ordered. The Senator from Utah is listed as a cosponsor of the amendment.

Mr. HARKIN.

Mr. President, we have here a compromise amendment to deal with various concerns that have been raised. I do not believe that this amendment is necessary or even particularly appropriate for this bill. Nevertheless, in order to deal with particular concerns raised, we are including this amendment.

First, I would like to point out that some of the behavior characteristics included on this list are not disabilities to begin with and individuals with such characteristics would not be considered people with disabilities even without this amendment. For example, homosexuality and bisexuality are not disabilities under any medical standards.

In addition, I would like to point out that for individuals with many of the other behavior characteristics included on this list, which would have been considered disabilities under this act, in many situations, such individuals would not have been qualified for various employment positions, for example. Therefore, this amendment was particularly unnecessary.

However, at the very least, this amendment is narrowly focused. That is, if a person exhibits only a sexual behavior disorder, that person is not a disabled person under this act and cannot bring a cause of action for discrimination based on that disorder. Of course, this provision cannot be used as a pretext for discrimination based on other disabilities.

In addition, the intent of the Senate is that only those who have one of the behaviors listed in this provision, and do not have a disability that is covered under this act, are to be excluded from protection. So, for example, a community health program which serves mentally retarded adults in its program, may not expel that adult solely on the basis of the fact that he exhibits a sexual behavioral disorder. Instead, the program must treat the individual as a person with a covered disability under the act-that is, mental retardation-and the program may then, of course, apply the eligibility criteria recognized under the act.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Finally, I would like to point out that this amendment excludes only current psychoactive substance use disorders and current psychoactive substance-induced organic mental disorders. Therefore, any individual who has recovered from, or is perceived as having, such disorders would still be covered by the act.

As I noted before, I do not think this amendment was necessary in any form. However, I wished to make these points clear regarding the compromise amendment that we have agreed upon.

The PRESIDING OFFICER.

Is there further debate?

If not, the question is in agreeing to the amendment.

The amendment (No. 722) was agreed to.

Mr. HATCH.

Mr. President, I move to reconsider the vote by which the amendment was agreed to.

Mr. ARMSTRONG.

Mr. President, I move to lay that motion on the table.

The motion to lay on the table was agreed to.

The PRESIDING OFFICER.

The Senator from New Mexico.

Mr. DOMENICI.

I wonder if I might ask the Senator from Colorado a question. I was listening when he quickly summarized this amendment and he indicated that while he had a list of exceptions to a general definition, that it was not intended to be exclusive. That did not mean that anything that was not in your excluded list was not automatically included.

I wonder, was my colleague just expressing his opinion or is there something in the amendment that says that?

Mr. ARMSTRONG.

No, Mr. President, I was simply expressing my opinion and reporting for the benefit of the RECORD what has occurred.

Had we not been able to reach an agreement on this particular list of excluded items, there would have been a pro-tracted debate and series of rollcalls and the convenience of the Senators would have been disrupted and maybe the bill would have been postponed or perhaps it would have passed. It is nothing more than a practical accommodation. But I am saying no Senator should vote for the amendment or for the bill feeling that because we forgot to mention some form of disability, that it is in or out. That is a separate question.

What we do know is that this specific list of categorical exceptions do not form the basis for a discrimination claim under this bill.

In all other respects, we are silent. In other words, there is no presumption that something is in or out as a result of this amendment except for those things which are mentioned.

Mr. DOMENICI.

The only reason I raise the question is I think the normal legal interpretation is, when you start listing things, and you do not list some things, then anything that is not listed is presumed to have not been intended. It just appears to me that the Senator is doing a little more than he thinks.

If legislative history is being made here, you are trying to say this is not intended to be anything other than a list that we are voting on. It is not inclusive or exclusive. It does not thoroughly define the entire prospect for inclusion or exclusion?

Mr. ARMSTRONG.

Mr. President, the problem with this bill, and I had not expected to be diverted into a lengthy discussion of this but since the Senator raised it, let me just say to the Senator and anybody else interested, on page 40 the purpose of the bill is expressed in the following terms "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with diabilities and to provide clear, strong, consistent enforceable standards," and so on.

It does not do that. What it expresses is a point of view, a value system, and sets up a standard which is so vague that it is going to be the subject of lengthy and somewhat unpredictable litigation, in my opinion.

I have clarified it to some extent by my amendment, but I do not represent to Senators or anybody else that I have provided clarity on subjects that I have not directly addressed. I am telling you my amendment does not solve that problem.

As a matter of fact, I am told there are lines of cases on both sides. Sometimes when statutes enumerate things as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

being excluded, that means other things are included, and sometimes it has worked the other way. My intention, my belief, what I think the legislative intent is, is that we are silent on that question. The fact that we have excluded some items does not automatically put something else in.

...

**\*S10796**

...

Mr. RUDMAN.

Mr. President, I am pleased to join as a cosponsor of the Americans With Disability Act of 1989. This bill, which originated as a recommendation of the National Council on Disability established by President Reagan, will, for the first time, extend to all disabled individuals protection from discrimination based on disability in employment, public services, and public accommodations.

At present, it is legal for non-federally funded entities to deny an individual employment solely on the basis of disability, without regard to whether an individual is qualified to perform a job. This is an unacceptable state of affairs. This legislation will prohibit employers from discriminating against an otherwise qualified individual solely on the basis of disability. It will further require that public entities purchase new buses and rail vehicles to assure that they are accessible to people with disabilities. This bill will also prohibit discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation."

Mr. President, commendable efforts have been made by the administration and the sponsors of this legislation to accommodate the diverse interests that have a stake in this legislation, as reflected by the unanimous committee approval of this legislation. Months of refinement and definition have resulted in a bill that protects the disabled while attempting to balance the legitimate concerns of businesses, nonprofit entities, and governments. Substantial effort has been made to define such terms as "reasonable accommodation" and "undue hardship" so that the obligations and prohibitions imposed by this legislation can be clearly understood.

Mr. President, the sponsors of the bill have taken steps to satisfy concerns about illegal drug use and alcohol abuse. They have agreed to accept an amendment providing that any job applicant or employee who is a current user of illegal drugs will be expressly excluded from title I's definition of a qualified individual with a disability. Title I also expressly allows employers to prohibit the use of illegal drugs or alcohol in the workplace, and that nothing in the act prohibits or restricts employers from conducting drug testing or from making employment decisions based on such results.

However, with the exceptions just noted, the broad definition of disability would provide protection from discrimination to drug addicts and alcoholics. More generally, the bill could protect individuals from discrimination on the basis of a variety of socially unacceptable, often illegal, behavior if such behavior is considered to be the result of a mental illness. Some examples that come to mind are compulsive gambling, pedophilia, and kleptomania. I have serious problems with this result.

As a matter of law, this country has always granted employers a wide degree of latitude in making employment-related decisions, including the right to make judgments based on non-work related behavior. To limit this right based on the diagnosis of a mental illness or chemical dependency may be opening up a Pandora's box.

First, it strikes me as absurd for Government to write a law making certain behavior illegal and then to write a law limiting the right of employers to take such illegal activity into account in making employment decisions. It is difficult for a person to develop an addiction to illegal drugs without first making a conscious decision to break the law.

Second, I have difficulty with the notion that a psychiatric diagnosis of the cause of improper behavior should affect the legal rights of an employer to take such behavior into account. Do we really want to say that an employer's legal exposure in refusing to hire a person with a record of illegal drug use or theft should depend on whether that person has seen a psychiatrist?

Third, while our knowledge of psychiatry has greatly improved in recent years, the fact remains that a diagnosis of certain types of mental illness is frequently made on the basis of a pattern of socially unacceptable behavior and lacks any physiological basis. In short, we are talking about behavior that is immoral, improper, or illegal and which individuals are engaging in of their own volition, admittedly for reasons we do not fully understand. Where we as a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

people have through a variety of means, including our legal code, expressed disapproval of certain conduct, I do not understand how Congress can create the possibility that employers are legally liable for taking such conduct into account when making employment-related decisions.

In principle, I agree with the concept that the mentally ill should be protected from infidious discrimination just as the physically handicapped should be. However, people must bear some responsibility for the consequences of their own actions.

In addressing this conflict, we found a few years ago, following the attempted assassination of President Reagan, that the law had been allowed to swing too far away from holding people accountable. Congress had to act to correct that. I am afraid that, in a civil rights context, we may be making the same mistake now. If this problem is not addressed now, we will certainly be debating it again in a few years on the Senate floor. ·

In sum, Mr. President, I congratulate the sponsors and President Bush for their tireless work in producing this important bill which now enjoys widespread support. However, I believe that the issues regarding the right of employers to take individual behavior into account when making employment decisions have not been adequately addressed, and I hope we will be able to do so during the Senate debate.

...
*S10803
...

<center>&lt;Rollcall Vote No. 173 Leg.&gt;</center>

<center>YEAS-76</center>

Biden Bingaman Boren Boschwitz Bradley Bryan Bumpers Burdick Byrd Chafee Coats Cochran Cohen Conrad Cranston D'Amato Danforth Daschle DeConcini Dixon Dodd Dole Domenici Durenberger Exon · Ford Fowler Gore Gorton Graham Gramm Grassley Harkin Hatch Hatfield Heflin Heinz Hollings Jeffords Johnston Kassebaum Kasten Kennedy Kerrey Kerry Kohl Lautenberg Leahy Levin Lieberman Lugar Mack Matsunaga McCain McConnell Mitchell Moynihan Nickles Nunn Packwood Pell Pressler Reid Riegle Robb Rockefeller Sarbanes . Shelby Simon Simpson Specter Stevens Thurmond Warner Wilson Wirth

<center>NAYS-8</center>

Armstrong Bond Garn Helms Humphrey McClure Symms Wallop

<center>NOT VOTING-16</center>

Adams Baucus Bentsen Breaux · Burns Glenn Inouye Lott Metzenbaum Mikulski Murkowski Pryor Roth Rudman Sanford Sasser

So the bill (S. 933), as amended, was passed, as follows:
&lt;NOTE.-The text of S. 933 as passed by the Senate will appear in a subsequent edition of the RECORD.&gt;
Mr. MITCHELL.
Mr. President, I move to reconsider the vote by which the bill was passed.
Mr. DOLE.
I move to lay that motion on the table.
The motion to lay on the table was agreed to.

135 Cong. Rec. S10765-01, 1989 WL 183216 (Cong.Rec.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

<center>C-30</center>

Westlaw.

135 Cong. Rec. S11173-01, 1989 WL 183785 (Cong.Rec.)

Congressional Record --- Senate
Proceedings and Debates of the 101st Congress, First Session
Thursday, September 14, 1989

**\*S11173 ADA, MENTAL IMPAIRMENTS, AND THE PRIVATE SECTOR**

Mr. ARMSTRONG.

Mr. President, last Thursday the Senate passed S. 933, the Americans With Disabilities Act of 1989. Before passage, the Senate adopted an amendment of mine (amendment number 722) that will exclude from the definition of " disability" certain sexual disorders, impulse control disorders, and drug-related disorders. Intervening events prompt me now to say something about the history of, and necessity for, that amendment.

In brief, S. 933 protects individuals who have disabilities against discrimination because of those disabilities. Private employers, employment agencies, labor organizations, hotels, restaurants, theaters, stores of all types, schools, and day care centers are covered by the bill. Under the bill, a person has a "disability" if he or she: First, has a physical or mental impairment that substantially limits one or more of the major life activities of such person; second, has a record of an impairment that substantially limits one or more of the major life activities of such person; or third, is regarded as having an impairment that substantially limits one or more of the major life activities of such person.

\*S11174 The language of the bill is comprehensive. All physical and mental impairments that substantially limit a major life activity; for example, caring for oneself, performing manual tasks, seeing, walking, working) are covered, including contagious and infectious diseases. My amendment focused on mental disorders, however.

In its report, the Committee on Labor and Human Resources said:

A physical or mental impairment means * * * any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

It is not possible to include in the legislation a list of all the specific conditions, diseases, or infections that would constitute physical or mental impairments because of the difficulty of ensuring the comprehensiveness of such a list, particularly in light of the fact that new disorders may develop in the future. The term includes, however, such conditions <and> diseases * * * as * * * mental retardation, emotional illness, specific learning disabilities, drug addiction, and alcoholism." S. Rpt. no. 101-116 <to accompany S. 933>, 101st Cong., 1st Sess. 22 (1989).

The explanation adopted by the committee is essentially identical to current regulations that govern the Rehabilitation Act of 1973 and which define " physical or mental impairment" to mean "any mental or psychological disorder." 29 CFR 1613.702(a) (1987).

In sum, the bill protects "mental impairments", and "mental impairments" means "any mental or psychological disorder." What then is a mental or psychological disorder? The committee refuses to say, but the American Psychiatric Association <APA> is less reticent.

The APA publishes a great, fat book called the "Diagnostic and Statistical Manual of Mental Disorders" that summarizes some of the diagnostic criteria for mental disorders that are used by the psychiatric and mental health professions. The latest version of the Manual is the revised third edition published in 1987 and known as DSM-III-R. The complete list of DSM-III-R classification categories and codes is attached to this statement, but the main categories are as follows:

I. Disorders usually first evident in infancy, childhood, or adolescence;

II. Organic mental disorders;

III. Psychoactive substance use disorders;

IV. Schizophrenia;

V. Delusional (paranoid) disorder;

VI. Psychotic disorders not elsewhere classified;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

VII. Mood disorders;
VIII. Anxiety disorders;
IX. Somatoform disorders;
X. Dissociative disorders;
XI. Sexual disorders;
XII. Sleep disorders;
XIII. Factitious disorders;
XIV. Impulse control disorders not elsewhere classified;
XV. Adjustment disorder; and
XVI. Personality disorders.

When psychiatrists talk of mental disorders they mean the kinds of disorders categorized here. And when psychiatrists testify about the disorders categorized here, judges-who are charged by law with determining what is or is not a "mental impairment"-listen to the psychiatrists.

The Diagnostic and Statistical Manual is cited regularly by judges in various contexts, including, for example, cases dealing with the mental competency of criminal defendants. Relevant "disability rights" cases that have cited DSM include Doe v. New York Univ., 666 F.2d 761, 768 (2d Cir. 1981); Rezza v. U.S. Dept. of Justice, 46 FEP Cases 1366, (E.D. Penn. 1988); Drew P. v. Clarke Co. School Dist., 676 F. Supp. 1559, 1561 n.3 (M.D.Ga. 1987); and Schmidt v. Bell, 33 FEP Cases 839, 846 (E.D.Penn. 1983).

The fact that a "condition" does not appear in DSM does not mean that such condition is not a mental disorder. DSM-III-R's introduction (page xxvi) says, "<C>onditions not included in the DSM-III-R's classification may be legitimate subjects of treatment or research efforts. * * * " And, at page xxix, "These diagnostic criteria and the DSM-III-R classification of mental disorders reflect a consensus of current formulations of evolving knowledge in our field but do not encompass all the conditions that may be legitimate objects of treatment or research efforts."

Appendix A of DSM-III-R lists three proposed diagnostic categories that were proposed for inclusion (disorders associated with the menstrual cycle; sadistic personality disorder; and self-defeating personality disorder) that were not included because further study was necessary. The next edition of the manual may include these three diagnoses (or others) as APA-recognized mental disorders, and the next edition may exclude diagnoses that are included in this edition. The idea and definition of "mental disorder" or "mental impairment" is not static.

Similarly, the inclusion of a diagnosis in DSM is not supposed to have any particular meaning for the law:

The purpose of DSM-III-R is to provide clear descriptions of diagnostic categories in order to enable clinicians and investigators to diagnose, communicate about, study, and treat the various mental disorders. It is to be understood that inclusion here, for clinical and research purposes, of a diagnostic category such as Pathological Gambling or Pedophilia does not imply that the condition meets legal or other nonmedical criteria for what constitutes mental disease, mental disorder, or mental disability. The clinical and scientific considerations involved in categorization of these conditions s mental disorders may not be wholly relevant to legal judgments, for example, that take into account such issues as individual responsibility, disability determination, and competency. DSM-III-R at p. xxix.

Nevertheless, as we have seen, DSM is used and it will continue to be used unless psychiatrists and their combined professional judgments respecting mental disorders are barred from the courtroom.

The Americans With Disabilities Act covers all mental impairments that substantially limit a covered person's major life activities. A private entity that wishes to know what the act might mean with respect to mental impairments would do well to turn to DSM-III-R because that is one reputable place where mental disorders are listed category-by-category, name-by-name. The Senate, and the committee, refused to list the mental impairments that are covered by the act; however, neither the Senate nor the committee left any doubt that the act is intended to cover "and mental or psychological disorder."

Psychiatrists are not the only persons who can define a mental disorder; judges do it all the time. We have, therefore, not only DSM-III-R but a substantial body of case law that defines "mental impairment." S. 933 proposes to take this case law (developed in cases involving the Federal Government or recipients of Federal financial assistance) and apply it throughout the private sector.

In the reported cases, persons with mental impairments often lose their cases because they are found not to be "otherwise qualified" for the position or benefit they seek. On the other hand, sometimes they win. In either case, S. 933 gives persons with mental impairments a statutory basis for a lawsuit whenever a private employer or private provider of public accommodations takes an action that the impaired persons believes is to his or her detriment and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

based on his or her disability. As the following examples make clear, a statute that protects all mental impairments that substantially limit a major life activity will have the most far-reaching and potentially disruptive effects on private decisionmakers.

Lawsuits based on a person's disability are, in virtually every case, tied tightly to the facts. in asking, "what constitutes impairment?" " is there a substantial limit on a major life activity?" "what makes a person "otherwise qualified?" and, "what constitutes reasonable accommodation?" every fact can be important.

The question of who is a handicapped person under the Act is best suited to a "case-by-case determination," E.E. Black, Ltd., v. Marshall, 497 F. Supp. 1088, 1100 (D.Hawaii 1980), as courts assess the effects of various impairments upon varied individuals. The definitional task cannot be accomplished merely through abstract lists and categories of impairments. The inquiry is, of necessity, an individualized one-whether the particular impairment constitutes for the particular person a significant barrier to employment. * * * Forrisi v. Bowen, 794 F.2d 931, 933 (4th Cir. 1986).

In the cases that follow, a different fact might have produced a different result. For example, in Forrisi, the case just cited, the employee himself testified that his impairment did not *S11175 and had not limited his life's activities. A different employee, or a better coached witness, well might produce a different result.

If S. 933 is enacted, private entities that take no Federal financial assistance can be expected to face the same kinds of lawsuits that have been brought already under the Rehabilitation Act. Private employers, prepare yourselves for lawsuits based on the following types of mental conditions!

## 1. COMPULSIVE GAMBLING

In Rezza v. U.S. Dept. of Justice, 46 FEP Cases 1366 (E.D. Penn. 1988), the court refused to say that compulsive gambling is not an impairment under the Rehabilitation Act. The Department of Justice, probably in a state of incredulity, moved for reconsideration and lost again. 698 F. Supp. 586. The Department then saw the handwriting on the wall and settled the case, but the terms of the settlement are secret. In Rezza, the largest law firm in the world (the Department of Justice) and the richest client in the world (the Government of the United States) had to settle a case rather than carry on a dispute over whether compulsive gambling was a covered disability.

I will have more to say about the Rezza case later in my remarks.

## 2. ACROPHOBIA (FEAR OF HEIGHTS)

In Forrisi v. Bowen, 794 F.2d 931 (4th Cir. 1986), the appellate court affirmed the district court's finding that Forrisi's acrophobia did not make him a handicapped individual within the meaning of the act becasue there was no evidence that his condition substantially limited a major life activity. Forrisi had simply testified that he had not been limited by his acrophobia. In other cases, of course, the result will turn on the particular facts and testimony. There are dozens or hundreds of phobias. In addition to heights, the most common simple phobias involve animals (particularly dogs, snakes, insects and spiders, and mice), witnessing blood or tissue injury (blood-injury phobia), closed spaces (claustrophobia), and air travel. In Barnes v. Barbosa, 494 N.E.2d 619, 40 FEP Cases 1490 (App.Ct.Ill. 1986), a State court applying State law agreed with the State's human rights commission and a lower court that a bus driver with "carbon monoxide phobia" is mentally handicapped.

## 3. DEPRESSIVE NEUROSIS

In Doe v. Region 13 Mental Health-Mental Retardation Comm'n, 704 F.2d 1402 (5th Cir. 1983), all parties and courts agreed that, because of depressive neurosis, Doe was handicapped within the meaning of the Rehabilitation Act. The jury found for Doe, but both the district court and the appellate court entered judgment for the defendants because they held that Doe (a mental health worker) was not otherwise qualified. Doe is particularly interesting because it pitted a health worker against a health provider; Doe swore she was qualified, Region 13 swore she was not. Who is a judge to believe?

## 4. PARANOID SCHIZOPHRENIA

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

In Franlin v. Postal Service, 687 F. Supp. 1214, 1219 (S.D.Ohio 1988), the court held, "A person suffering from the condition of paranoid schizophrenia that is controllable by the ingestion of medication who does not take such medication is not an 'otherwise qualified' handicapped person." This statement implies that a paranoid schizophrenic who can control his or her condition by medication and who does take such medication would be otherwise qualfied.

In Swann v. Walters, 620 F. Supp. 741 (D.D.C. 1984), a paranoid schizophrenic who had been dismissed from his job when he lost his security clearance (because he had been convicted of felony sexual child abuse) sued under the Rehabilitation Act. He lost his case because his security clearance had been yanked because of his conviction and he needed the clearance to be " otherwise qualified" for his job. However, the plaintiff was offered another position (not requiring a security clearance) so that his employer could meet the requirement of "reasonable accommodation". If the original position had not required a security clearance or if the plaintiff had never been tried (perhaps witnesses would not agree to testify, for example), the plaintiff presumably would have remained unmolested in his original position because he was protected by Federal civil rights law.

## 5. MANIC DEPRESSION

In Matzo v. Postmaster General, 46 FEP Cases 869 (D.D.C. 1987), a manic depressive employee was held not "otherwise qualified" because of her inability to report for work and remain on duty. In Balzac v. Columbia Univ. Press, 39 FEP Cases 830 (N.Y. App. Div. 1985), a State court applying State law and section 504 held that summary judgment for the employer was not appropriate where an employee was fired on the day he returned to work after being treated for manic-depressive illness. Now, private employers that do not receive Federal financial assistance do not need permission from a Federal judge to deal with a manic depressive employee. ADA will change that.

## 6. BORDERLINE PERSONALITY DISORDER

In Doe v. New York Univ., 666 F.2d 761 (2d Cir. 1981), the court of appeals reversed a lower court order that a medical school admit a student who had a long history of mental problems and was diagnosed as having borderline personality disorder and chronic, neurotic depression. One would think that a medical school had some expertise in admissions criteria and mental illness, but the district court disputed the school's expertise and overruled the school's decision. The court of appeals then disagreed with the medical expert who sat on the lower court and upheld the decision of the school. In Fields v. Lyng, 48 FEP Cases 1036 (D.C.Md. 1988), the EEOC held that an employee diagnosed as having borderline personality disorder (with obsessive compulsive features and side effects of travel anxiety and kleptomania) was a handicapped person under the Federal law. The district court "refrained from deciding" the issue because the employee was not "otherwise qualified," the court said.

## 7. SCHIZOID PERSONALITY DISORDER

In Guerriero v. Schultz, 31 FEP Cases 196, (D.D.C. 1983), a foreign service officer was held not "otherwise qualified" because he could not accept overseas assignments because of his therapy. Persons with schizoid personality disorders who do not have the burdens and responsibilities of a foreign service officer may well be "otherwise qualified" for their positions if the EEOC or a Federal judge says so.

## 8. SEXUAL DISORDERS: TRANSVESTISM AND TRANSSEXUALISM

In Blackwell v. U.S. Dept. of the Treasury, 639 F. Supp. 289, 656 F. Supp. 713 (D.D.C. 1986), the district court held that transvestism was covered under the Rehabilitation Act. ("The Department of the Treasury acknowledges that transvestism is recognized by the American Psychiatric Association as a mental disorder. Plaintiff has alleged that the position he sought was eliminated because Treasury officials regarded the fact that he is a transvestite as a handicap. This is enough to state a claim under the Rehabilitation Act." 639 F. Supp. at 290.) The court of appeals vacated the district court's second reported opinion (656 F. Supp. 713) because the lower court misinterpreted the law governing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the employee's giving notice of his or her handicap to the employer. Blackwell v. U.S. Dept. of the Treasury, 830 F.2d 1183, 1183-84 (D.C. Cir. 1987). The appellate court did not disturb the rationale that held tranvestism to be a covered impairment, however.

In Doe v. U.S. Postal Service, 37 FEP Cases 1867, 1869 (D.D.C. 1985), the court found "that the plaintiff ha<d> state<d> a claim of handicap discrimination under the Rehabilitation Act of 1973" where the plaintiff was a trans-sexual.

### 9. STRESS DISORDERS

In Boyd v. U.S. Postal Service, 32 FEP Cases 1217 (D.W.Wash. 1983), the court assumed that the plaintiff, who may have been suffering from a post-traumatic stress disorder, was a handicapped person under the Act but held that the plaintiff was not a "qualified" handicapped person because of his poor record at work. In Schmidt v. Bell, 33 FEP Cases 839 (D.E.Penn. 1983), the employee also suffered from post-traumatic stress disorder (or post-Vietnam syndrome) and was held not "otherwise qualified" because of his record of violence. The ADA will provide all employees who are seriously impaired by stress with a Federal cause of action.

### *S11176 10. MISCELLANEOUS MENTAL DISORDERS

In Majors v. Housing Authority of Co. of DeKalb Georgia, 652 F.2d 454 (5th Cir. 1981), the court of appeals ordered a trial in a case involving a resident of a housing project who was said to be "psychological<ly> and emotion-al<ly> dependen<t> upon her pet dog." The project had a "no pet" rule. The case was " remanded for a trial on the questions of whether Ms. Majors suffers from a handicap, whether the handicap requires the companionship of the dog and what, if any, reasonable accommodations can be made." Id. at 458.

Earlier I cited the Rezza case, the compulsive gambling case. That case provides an excellent example of the way in which a judge approaches the question of mental impairment. In Rezza, Judge Ludwig of the U.S. District Court for the Eastern District of Pennsylvania had before him a case involving a former FBI agent who took government money (received by him as part of an undercover operation) and gambled it away in Atlantic City. The agent was dismissed and then sued, alleging that he had been discriminated against on the basis of his handicap of compulsive gambling.

After reviewing the statute, the regulations, and some court interpretations, Judge Ludwig wrote:

Within this <Rehabilitation Act> framework, the issue is whether plaintiff is an "individual with a handicap." According to affidavits of plaintiff and Robert L. Custer, M.D., a leading authority in the field, plaintiff appears to be a compulsive gambler. Compulsive gambling is now widely recognized as a mental disorder. The most recent Diagnostic Manual of the American Psychiatric Association (DSM-III-R) classifies "pathological gambling" as a disorder, having certain essential features:

" '<C>hronic and progressive failure to resist impulses to gamble, and gambling behavior that compromises, disrupts, or damages personal, family, or vocational pursuits. The gambling preoccupation, urge, and activity increase during periods of stress. Problems that arise as a result of the gambling lead to an intensification of the gambling behavior. Characteristic problems include extensive indebtedness and consequent default on debts and other financial responsibilities, disrupted family relationships, inattention to work, and financially motivated illegal activities to pay for gambling.' American Psychiatric Association, "Diagnostic and Statistical Manual of Stress <sic> Disorders" (3d Ed. Revised 1987)." 46 FEP Cases at 1368 (footnotes omitted).

The judge simply dismissed precedents of the Merit Systems Protection Board which had twice held that compulsive gambling was not a covered impairment. Those "decisions are conclusory," wrote the judge, "and have no precedential value." Id.

As so often happens in these cases, the judge deferred a ruling until he held a trial and obtained more testimony. He gave every indication, however, of being ready to hold that compulsive gambling was a covered disability. Judge Ludwig wrote:

While "compulsive gambling" or "pathological gambling" may come within the abstract definition of "psychological impairment," the effect upon the person must also be evaluated to determine if there is actual impairment. Here, the facts though not extensively developed, suggest that "major life activities" were affected. Plaintiff's condi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion is alleged to have required residential treatment. In Arline, hospitalization was considered "a fact more than sufficient to establish that one or more * * * life activities were substantially limited by * * * impairment." Arline, -- U.S. at --, 107 S.Ct. at 1127. Even so, because the evidence of actual impairment is largely inferential and because a statutory issue persists whether plaintiff was " otherwise qualified"-to continue to be an FBI agent-a ruling on impairment will be deferred." Id (footnote omitted).

Although a final ruling on impairment was deferred, the Department of Justice could see which way the judge was headed and, because litigation is costly and time consuming, the U.S. Government settled the Rezza case after first losing its motion for summary judgment and then losing a motion for reconsideration. Unfortunately, we do not know and cannot know the terms of the settlement because they are secret.

Mr. President, if ADA is enacted the private sector will be swamped with mental disability litigation. My amendment excludes some of the mental disorders that would have created the more egregious lawsuits, but my amendment does no more than brush away a handful of the vast numbers of mental disorders and potential mental disorders.

My amendment is not based on hypothetical situations or unlikely scenarios; it is based on the clear language of the bill, the diagnostic knowledge of the psychiatric profession, and numerous legal precedents under the Rehabilitation Act. The amendment is narrow and necessary. If it has a shortcoming it is that it is too narrow, for my amendment will not address many of the mental disorders that are discussed in this speech.

The listing of classification categories and codes follows:

DSM-III-R CLASSIFICATION: AXES I AND II CATEGORIES AND CODES

I DISORDERS USUALLY FIRST EVIDENT IN INFANCY, CHILDHOOD, OR ADOLESCENCE

Developmental Disorders

Mental Retardation (28)

317.00 Mild mental retardation
318.00 Moderate mental retardation
318.10 Severe mental retardation
318.20 Profound mental retardation
319.00 Unspecified mental retardation

Pervasive Developmental Disorders (33)

299.00 Autistic disorder (38) Specify if childhood onset
299.80 Pervasive developmental disorder NOS

Specific Developmental Disorders (39)

Academic skills disorders:
315.10 Developmental arithmetic disorder (41)
315.80 Developmental expressive writing disorder (42)
315.00 Developmental reading disorder (43)
Language and speech disorders:
315.39 Developmental articulation disorder (44)
315.31* Developmental expressive language disorder (45)
315.31* Developmental receptive language disorder (47)
Motor skills disorder:
315.40 Developmental coordination disorder (48)
315.90* Specific developmental disorder NOS

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

### Other Developmental Disorders (49)

315.90* Developmental disorder NOS

### Disruptive Behavior Disorders (49)

314.01 Attention-deficit hyperactivity disorder (50)
Conduct disorder, (53):
312.20 group type
312.00 solitary aggressive type
312.90 undifferentiated type
313.81 Oppositional defiant disorder (56)

### Anxiety Disorders of Childhood or Adolescence (58)

309.21 Separation anxiety disorder (58)
313.21 Avoidant disorder of childhood or adolescence (61)
313.00 Overanxious disorder (63)

### Eating Disorders (65)

307.10 Anorexia nervosa (65)
307.51 Bulimia nervosa (67)
307.52 Pica (69)
307.53 Rumination disorder of infancy (70)
307.50 Eating disorder NOS

### Gender Identity Disorders (71)

302.60 Gender identity disorder of childhood (71)
302.50 Transsexualism (74) Specify sexual history: asexual, homosexual, heterosexual, unspecified
302.85* Gender identity disorder of adolescence or adulthood, nontranssexual type (76) Specify sexual history: asexual, homosexual, heterosexual, unspecified
302.85* Gender identity disorder NOS

### Tic Disorders (78)

307.23 Tourette's disorder (79)
307.22 Chronic motor or vocal tic disorder (81)
307.21 Transient tic disorder (81) Specify: single episode or recurrent
307.20 Tic disorder NOS

### Elimination Disorders (82)

307.70 Functional encopresis (82) Specify: primary or secondary type
307.60 Functional enuresis (84) Specify: primary or secondary type Specify: nocturnal only, diurnal only, nocturnal and diurnal

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Speech Disorders Not Elsewhere Classified (85)

307.00* Cluttering (85)
307.00* Stuttering (86)

Other Disorders of Infancy, Childhood, or Adolescence (88)

313.23 Elective mutism (88)
313.82 Identity disorder (89)
313.89 Reactive attachment disorder of infancy or early childhood (91)
307.30 Stereotypy/habit disorder (93)
314.00 Undifferentiated attention-deficit disorder (95)

II ORGANIC MENTAL DISORDERS (97)

Dementias Arising in the Senium and Presenium (119)

Primary degenerative dementia of the Alzheimer type, senile onset, (119):
290.30 with delirium
290.20 with delusions
290.21 with depression
290.00* uncomplicated
290.1xPrimary degenerative dementia of the Alzheimer type, presenile onset,--(119)
290.4xMulti-infarctdementia,--(121)
*S11177 290.00*Senile dementia NOS
290.10* Presenile dementia NOS

Psychoactive Substance-Induced Organic Mental Disorders (123)

Alcohol:
303.00 intoxication (127)
291.40 idiosyncratic intoxication (128)
291.80 Uncomplicated alcohol withdrawal (129)
291.00 withdrawal delirium (131)
291.30 hallucinosis (131)
291.10 amnestic disorder (133)
291.20 Dementia associated with alcoholism (133)
Amphetamine or similarly acting sympathomimetic:
305.70* intoxication (134)
292.00* withdrawal (136)
292.81* delirium (136)
292.11* delusional disorder (137)
Caffeine:
305.90* intoxication (138)
Cannabis:
305.20* intoxication (139)
292.11delusional disorder (140)
Cocaine:
305.60* intoxication (141)
292.00* withdrawal (142)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

292.81* delirium (143)
292.11* delusional disorder (143)
Hallucinogen:
305.30* hallucinosis (144)
292.11* delusional disorder (146)
292.84* mood disorder (146)
292.89* Posthallucinogen perception disorder (147)
Inhalant:
305.90* intoxication (148)
Nicotine:
292.00* withdrawal (150)
Opioid:
305.50* intoxication (151)
292.00* withdrawal (152)
Phencyclidine (PCP) or similarly acting arylcyclohexylamine:
305.90* intoxication (154)
292.81* delirium (155)
292.11* delusional disorder (156)
292.84* mood disorder (156)
292.90* organic mental disorder NOS
Sedative, hypnotic, or anxiolytic:
305.40* intoxication (158)
292.00* Uncomplicated sedative, hypnotic, or anxiolytic withdrawal (159)
292.00* wtihdrawal delirium (160)
292.83* amnestic disorder (161)
Other or unspecified psychoactive substance (162):
305.90* intoxication
292.00* withdrawal
292.81* delirium
292.82* dementia
292.83* amnestic disorder
292.11* delusional disorder
292.12 hallucinosis
292.84* mood disorder
292.89* anxiety disorder
292.89* personality disorder
292.90* organic mental disorder NOS
Organic Mental Disorders associated with Axis III physical disorders or conditions, or whose etiology is unknown.
(162)
293.00 Delirium (100)
294.10 Dementia (103)
294.00 Amnestic disorder (108)
293.81 Organic delusional disorder (109)
293.82 Organic hallucinosis (110)
293.83 Organic mood disorder (111) Specify: manic, depressed, mixed
294.80* Organic anxiety disorder (113)
310.10 Organic personality disorder (114) Specify if explosive type
294.80* Organic mental disorder NOS

III PSYCHOACTIVE SUBSTANCE USE DISORDERS (165)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Alcohol (173):

303.90 dependence
305.00 abuse
Amphetamine or similarly acting sympathomimetic (175):
304.40 dependence
305.70* abuse

Cannabis (176):

304.30 dependence
305.20* abuse
Cocaine (177):
304.20 dependence
305.60* abuse
Hallucinogen (179):
304.50* dependence
305.30* abuse
Inhalant (180):
304.60 dependence
305.90* abuse
Nicotine (181):
305.10 dependence
Opioid (182):
304.00 dependence
305.50* abuse
Phencyclidine (PCP) or similarly acting arylcyclohexylamine (183):
304.50* dependence
305.90* abuse
Sedative, hypnotic, or anxiolytic (184):
304.10 dependence
305.40* abuse
304.90* Polysubstance dependence (184)
304.90* Psychoactive substance dependence NOS
305.90* Psychoactive substance abuse NOS

IV SCHIZOPHRENIA (187)

Code in fifth digit: 1=subchronic, 2=chronic, 3=subchronic with acute exacerbation, 4=chronic with acute exacerbation, 5=in remission, 0=unspecified.
Schizophrenia,
295.2xcatatonic, --
295.1xdisorganized, --
295.3xparanoid, -- Specify if stable type
295.9xundifferentiated, --
295.6xresidual, -- Specify if late onset

V DELUSIONAL (PARANOID) DISORDER (199)

297.10 Delusional (Paranoid) disorder

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Specify type: erotomanic, grandiose, jealous, persecutory, somatic, unspecified.

### VI PSYCHOTIC DISORDERS NOT ELSEWHERE CLASSIFIED (205)

298.80 Brief reaction psychosis (205)
295.40 Schizophreniform disorder (207) Specify: without good prognostic features or with good prognostic features
295.70 Schizoaffective disorder (208) Specify: bipolar type or depressive type
297.30 Induced psychotic disorder (210)
298.90 Psychotic disorder NOS (Atypical psychosis) (211)

### VII MOOD DISORDERS (213)

Code current state of Major Depression and Bipolar Disorder in fifth digit:
1=mild
2=moderate
3=severe, with psychotic features
4=with psychotic features (specify mood-congruent or mood-incongruent)
5=in partial remission
6=in full remission
0=unspecified
For major depressive episodes, specify if chronic and specify if melancholic type.

#### Bipolar Disorders

Bipolar disorder, (225):
296.6xmixed, --
296.4xmanic, --
296.5xdepressed, --
301.13 Cyclothymia (226)
296.70 Bipolar disorder NOS

#### Depressive Disorders

Major Depression, (228):
296.2xsingle episode, --
296.3xrecurrent, --
300.40 Dysthymia (or Depressive neurosis) (230) Specify: primary or secondary type Specify: early or late onset
311.00 Depressive disorder NOS

### VIII ANXIETY DISORDERS (OR ANXIETY AND PHOBIC NEUROSES) (235):

Panic disorder (235):
300.21 with agoraphobia Specify current severity of agoraphobic avoidance. Specify current severity of panic attacks
300.01 without agoraphobia Specify current severity of panic attacks
300.22 Agoraphobia without history of panic disorder (240) Specify with or without limited symptom attacks
300.23 Social phobia (241) Specify if generalized type
300.29 Simple phobia (243)
300.30 Obsessive compulsive disorder (or Obsessive compulsive neurosis) (245)
309.89 Post-traumatic stress disorder (247) Specify if delayed onset

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

C-41

300.02 Generalized anxiety disorder (251)
300.00 Anxiety disorder NOS

## IX SOMATOFORM DISORDERS (255)

300.70* Body dysmorphic disorder (255)
300.11 Conversion disorder (or Hysterical neurosis, conversion type (257)
300.70* Hypochondriasis (or Hypochondriacal neurosis) (259)
300.81 Somatization disorder (261)
307.80 Somatoform pain disorder (264)
300.70* Undifferentiated somatoform disorder (266)
300.70* Somatoform disorder NOS (267)

## X DISSOCIATIVE DISORDERS (OR HYSTERICAL NEUROSES, DISSOCIATIVE TYPE) (269)

300.14 Multiple personality disorder (269)
300.13 Psychogenic fugue (272)
300.12 Psychogenic amnesia (273)
300.60 Depersonalization disorder (or Depersonalization neurosis) (275)
300.15 Dissociative disorder NOS

## XI SEXUAL DISORDERS (279)

### Paraphilias (279)

302.40 Exhibitionism (282)
302.81 Fetishism (282)
302.89 Frotteurism (283)
302.20 Pedophilia (284)
Specify: same sex, opposite sex, same and opposite sex
Specify if limited to incest
Specify: exclusive type or nonexclusive type
302.83 Sexual masochism (286)
302.84 Sexual sadism (287)
302.30 Transvestic fetishism (288)
302.82 Voyeurism (289)
302.90* Paraphilia NOS (290)

### Sexual Dysfunctions (290)

Specify: lifelong or acquired
Specify: generalized or situational
Sexual desire disorders (293):
302.71 Hypoactive sexual desire disorder
302.79 Sexual aversion disorder
Sexual arousal disorders (294):
302.72* Female sexual arousal disorder
302.72* Male erectile disorder
Orgasm disorder (294):
302.73 Inhibited female orgasm

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

302.74 Inhibited male orgasm
302.75 Premature ejaculation
Sexual pain disorders (295):
302.76 Dyspareunia
306.51 Vaginismus
302.70 Sexual dysfunction NOS

### Other Sexual Disorders

302.90* Sexual disorder NOS

## XII SLEEP DISORDERS (297)

### Dyssomnias (298)

Insomnia disorder:
307.42* related to another mental disorder (nonorganic) (300)
*S11178 780.50* related to known organic factor (300)
307.42* Primary insomnia (301) Hypersomnia disorder
307.44 related to another mental disorder (nonorganic) (303)
780.50* related to a known organic factor (303)
780.54 Primary hypersomnia (305)
Other dyssomnia:
307.45 Sleep-wake schedule disorder (305)
307.40* Dyssomnia NOS

### Parasomnias (308)

307.47 Dream anxiety disorder (Nightmare disorder) (308)
307.46* Sleep terror disorder (310)
307.46* Sleepwalking disorder (311)
307.40* Parasomnia NOS (313)

## XIII FACTITIOUS DISORDERS (315)

Factitious disorder:
301.51 with physical symptoms (316)
300.16 with psychological symptoms (318)
300.19 Factitious disorder NOS (320)

## XIV IMPULSE CONTROL DISORDERS NOT ELSEWHERE CLASSIFIED (321)

312.34 Intermittent explosive disorder (321)
312.32 Kleptomania (322)
312.31 Pathological gambling (324)
312.33 Pyromania (325)
312.39* Trichotillomania (326)
312.39* Impulse control disorder NOS (328)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

## XV ADJUSTMENT DISORDER (329)

Adjustment disorder:
309.24 with anxious mood
309.00 with depressed mood
309.30 with disturbance of conduct
309.40 with mixed disturbance of emotions and conduct
309.28 with mixed emotional features
309.82 with physical complaints
309.83 with withdrawal
309.23 with work (or academic) inhibition
309.90 Adjustment disorder NOS

## XVI PERSONALITY DISORDERS (335)

Note: These are coded on Axis II.

### Cluster A

301.00 Paranoid (337)
301.20 Schizoid (339)
301.22 Schizotypal (340)

### Cluster B

301.70 Antisocial (342)
301.83 Borderline (346)
301.50 Histrionic (348)
301.81 Narcissistic (349)

### Cluster C

301.82 Avoidant (351)
301.60 Dependent (353)
301.40 Obsessive compulsive (354)
301.84 Passive aggressive (356)
301.90 Personality disorder NOS<>

135 Cong. Rec. S11173-01, 1989 WL 183785 (Cong.Rec.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**CERTIFICATE OF SERVICE**

I, Joshua M. Daniels, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on February 27, 2018.

*/s/ Joshua M. Daniels*