UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *
*JANE DOE                          *
         Plaintiff                 *      CIVIL ACTION
              vs.                  *      No. 17-12255-RGS
                                   *
*MASSACHUSETTS DEPARTMENT OF       *
CORRECTION, et al.                 *
         Defendants                *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```


BEFORE THE HONORABLE RICHARD G. STEARNS
UNITED STATES DISTRICT JUDGE
HEARING ON MOTIONS
February 28, 2018


Courtroom No. 21
1 Courthouse Way
Boston, Massachusetts 02109


JAMES P. GIBBONS, RPR/RMR
Official Court Reporter
1 Courthouse Way, Suite 7205
Boston, Massachusetts  02210
jmsgibbons@yahoo.com

```
 1   APPEARANCES:

 2

 3         GAY & LESBIAN ADVOCATES & DEFENDERS, (By Jennifer
     L. Levi, Esq., and Bennett H. Klein, Esq.), 30 Winter
     Street, Suite 800, Boston, Massachusetts  02108, on
 4   behalf of Plaintiff

 5         GOODWIN PROCTER, LLP, (By J. Anthony Downs, Esq.),
     100 Northern Avenue, Boston, Massachusetts 02210, on
 6   behalf of Plaintiff

 7

 8         PRISONERS' LEGAL SERVICES, (By Elizabeth Matos,
     Esq.), 10 Winthrop Square, 3rd Floor, Boston,
 9   Massachusetts   02110, on behalf of Plaintiff

10         COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF
     CORRECTION, (By Richard C. McFarland, Esq.), 70 Franklin
11   Street, Suite 600, Boston, Massachusetts 02110, on
     behalf of the Defendants

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2          THE CLERK:  All rise.
3       (Whereupon, the Court entered the courtroom.)
4          THE CLERK:  This is Civil Action No. 17-12255, Jane
5    Doe versus Massachusetts Department of Correction.
6       Would counsel please identify themselves for the
7    record.
8          MS. LEVI:  Good afternoon, your Honor, Jennifer
9    Levi on behalf of the plaintiff.
10          MR. KLEIN:  Good afternoon, your Honor, Bennett
11    Klein for the plaintiff.
12          MR. DOWNS:  Tony Downs, from Goodwin Procter, also
13    for the plaintiff.
14          MS. MATOS:  Elizabeth Matos, also for the
15    plaintiff.
16          MR. McFARLAND:  Richard McFarland for the
17    defendants, your honor.
18          THE COURT:  Who will be addressing the Court for
19    the plaintiff?
20          MS. LEVI:  I will be, your Honor.
21          THE COURT:  All right, there are before the Court
22    two motions.  There is, of course, the motion to dismiss
23    brought by the Department of Correction, and then the Jane
24    Doe motion for a preliminary injunction.
25       As I understand it, we all agree now that the state
```

1    claims are no longer part of the suit, that those have been

2    voluntarily dismissed, leaving us with the claims under the

3    Americans with Disabilities Act, or ADA, the Rehabilitation

4    Act, and the Fourteenth Amendment claims as a separate

5    matter.

6        I think, given the structure of the case, it would make

7    sense for the Department of Correction, Mr. McFarland, for

8    you to begin because it is your motion, and then perhaps,

9    Ms. Levi, you could argue both the opposition and introduce

10   us to the preliminary injunction argument, and then we will

11   go back to Mr. McFarland for any reply DOC wishes to make.

12       Just a couple of things in reading the briefs that at

13   this point are just thoughts that I have, and perhaps it

14   will help focus counsel on either moving me in a different

15   direction or perhaps taking some cue from what I was

16   thinking.

17       The first issue to me, and this may go to the heart of

18   the case, is whether there is a meaningful distinction

19   between gender dysphoria and gender identity disorder that

20   would support a reading of gender dysphoria as not covered

21   by the statutory exclusion under ADA.

22       Constitutional avoidance, is an approach, in some of

23   the cases that you've given me, that other courts have

24   taken.  The Supreme Court decision yesterday in Jennings v.

25   Rodriguez was not very friendly to the constitutional

avoidance canon.  As I understood the majority in <u>Jennings</u>,
they were saying that the avoidance canon should only be
applied when a statute is ambiguous or, plainly on its face,
susceptible to more than one reading, that constitutional
avoidance is not an invitation for a court to simply adopt a
preferred interpretation of an otherwise unambiguous
statute, that is, to read its own statute into the existing
statute.

If the Court were to find -- that's a fancy word we use
to describe yourself -- if I was to find that gender
dysphoria is sufficiently like gender-identify disorder to
fall within the exclusion in the ADA, is there any way,
given what appears to be a background of obvious animus and
misconceptions about gender identify that would allow the
exclusion to remain constitutionally within the statute?  I
think that was the direction the amicus brief was trying to
point me.

When we get to the Fourteenth Amendment claims, if we
do, if you think those should be addressed today, there
obviously is an issue about the appropriate level of
scrutiny that ought to be applied to the equal protection
claim.

And then the last issue that, again, I think I have to
be concerned with as a federal judge is that we have a long
line of cases, tracing to <u>Sandin v. O'Connor</u>, that make it

```
 1   clear to federal district judges that we have no business

 2   trying to run prisons, particularly when it comes to matters

 3   of transfer of inmates and housing situations in state

 4   prisons, and federal prisons for that matter.

 5        So, again, to the extent that this is an issue in the

 6   case, how should this be approached by the Court?

 7        Those are a few of my preliminary thoughts.

 8        Mr. McFarland, would you like to begin with your motion

 9   to dismiss?

10        MR. McFARLAND:  Yes.  Thank you, your Honor.

11        As you mentioned earlier, that the state law claims

12   have been dismissed by the plaintiffs, that cuts down a

13   little bit of my argument.

14        I do have a question, though, your Honor.  With regard

15   to the plaintiff's filing a notice of Constitutional

16   question under Rule 5.1, and it does provide for the U.S.

17   Attorney's Office to get involved, I am not sure if I should

18   address some of these issues with the Court, or should I

19   wait for the U.S. Attorney's Office to perhaps step in

20   and --

21        THE COURT:  I've gotten no indication from the

22   Deportment of Justice that they had an interest in

23   intervening or appearing in the suit.  And I see no one here

24   that is eagerly stepping forward to take that role, so

25   perhaps you may want to say what you wish to say on the
```

1   issue, and, you know, if you wish, I'll remind them that

2   they have the right to be heard if they wish to be heard.

3   I've gotten no indication from them.

4           MR. McFARLAND:  That's fine, your Honor.  Thank.

5   You.

6           Initially, I just want to go through some of the facts

7   in this case.  The plaintiff is a male-to-female transgender

8   inmate who is currently incarcerated at MCI-Norfolk.  She is

9   serving a three- to four-year sentence for a drug offense.

10  She is eligible for parole in September of this year, and

11  has a release date of September of 2019.

12          The plaintiff has been diagnosed with gender dysphoria,

13  and she receives treatment in the form of hormones,

14  psychotherapy, clothing and canteen that are the same as

15  available for female offenders, facial hair removal that's

16  been provided, and she's had a mammogram.  The plaintiff

17  also has a single cell and access to an alternative time

18  period where she can shower apart from other inmates.

19          Recently, the plaintiff completed a six-month substance

20  abuse program, the Correctional Academy program, and she has

21  had a job assignment, and engaged in programs during her

22  stay at MCI in Norfolk.

23          We have -- and I can get into additional facts when we

24  get to the preliminary injunction phase, your Honor.

25          But we have initially moved to dismiss the claims under

1    the ADA and the Federal Rehabilitation Act based on he

2    language that's currently present in the statute, under 42

3    U.S.C. Section 12211(b)(1), which excludes from the

4    definition of disability a number of individual groups,

5    including transgenderism and gender-identity disorder

6    without a physical impairment.

7        This case was -- and our position is that the GID

8    definition that's identified in the statute, which was in

9    the DSM-IV, and the change in the description to general

10   dysphoria, GD, in DSM-5 is very similar.  They both look at

11   an individual who has an incongruence between their birth

12   sex, birth gender, and their identified gender at this time.

13   And both diagnoses require that the individual have a

14   clinically significant distress or impairment in social,

15   occupational or other areas.

16       So we maintain that the two diagnoses are very similar

17   in their basic diagnosing of the gender disorders.

18           THE COURT:  Does DSM-5 define them separately?

19   I've forgotten.

20           MR. McFARLAND:  I'm sorry, your Honor?

21           THE COURT:  Does the DSM define them as separate

22   disorders or as disorders as being in a more aggregated

23   form of the underlying --

24           MR. McFARLAND:  My understanding in the DSM-IV and

25   earlier DSMs, they used the term "gender identity disorder."

1    But then when they came out with the DSM-5, they changed all

2    that and now call it "gender dysphoria," and no reasons for

3    doing that clinically.  But the bottom line appears to be

4    you still have an individual who has experienced --

5    experiences incongruence with their gender, that believes

6    that their -- the gender they were born with is not the

7    gender that they identify with, and then to either

8    diagnosis, either GD or GSM -- GID, you still must show the

9    presence of a clinically significant distress and impairment

10    in social, occupational, or other areas.

11        Now, when the Court addressed it in the Blatt case in

12    the Eastern District of Pennsylvania, from my reading of the

13    decision from the judge, it appeared that she was splitting

14    up -- dividing GID and GD into groups where one individual

15    who may just experience incongruence, and that's it, for the

16    gender assigned and preferred, but then the other group

17    would be those who had gender incongruence as well but also

18    feel that there is a substantial physical -- or a

19    substantial clinical distress or impairment.

20        And in that case the judge found that for those

21    individuals who merely have an incongruence in their gender

22    dysphoria -- in their gender, they would fall under the

23    current GID definition and be excluded.

24        But those individuals who were incon -- had

25    incongruence but also had experienced a clinically

1    significant distress and dysphoria, would be taken outside

2    of the exclusion and that they could be -- have their claim

3    adjudicated under the ADA.

4         Now, our position has been that you really can't have

5    either/or.  Either you're gender dysphoric or gender -- or

6    GID, or you're not.  You have to have -- you can't be --

7    once you have determined that you have gender incongruence,

8    it's a diagnosis, you also have to have the clinically

9    significant dysphoria, the distress or the impairment in

10   your social --

11            THE COURT:  Let's try this sort of as a

12   quasi-hypothetical.

13        Not everyone, but I am sure any number of people, none

14   of them write novels, have toyed with the idea of what it

15   would be like to be of another gender, or maybe even drifted

16   toward, Wouldn't it be better if I had been... whether

17   that's just a form of thought-play or a curiosity, or a

18   creativity, in the case of someone, a novelist trying to

19   write in a woman's voice or a woman novelist writing in a

20   male voice; whereas, the American Psychiatric -- so assume

21   that that is something that people might toy with, and it

22   wouldn't be considered a disorder, it just might be

23   considered more curiosity or creativity; whereas, a paper I

24   read from the America Psychiatric Association that talks

25   about the symptomology of gender dysphoria, they seem to use

1     the word "strong" before every symptom that they assign,

2     which suggests to me that they're treating dysphoria as an

3     aggravated case of the underlying gender identity disorder.

4          I can understand why a judge might want to separate the

5     two, which is why I asked whether there was enough daylight

6     between the two to permit that, because then you open the

7     door, if that is your inclination to do, to constitutional

8     avoidance, which is one way to duck what seems to me an

9     underlying difficult issue in the case.

10          MR. McFARLAND:  I understand, your Honor, and I

11     think certainly it would be helpful if the U.S. Attorney

12     General had given us their wisdom with regard to this

13     construction of the statute.  But we -- at this point we do

14     believe that there isn't a lot of daylight between the two,

15     gender dysphoria or gender identity disorder.  There are

16     some semantical issues, but they basically have an

17     incongruence between one's birth gender and then with what

18     they now identify with as a gender.

19          And then you have to have, to have a diagnosis, you

20     have to show the clinicians that you -- or the powers that

21     bring the diagnosis, that you have in addition a clinically

22     significant distress or dysphoria or impairment in such

23     areas as social, occupational, or other areas.

24          So that's one of -- that's our position at this point,

25     your Honor.

1        We also maintain that while there is some scientific

2    evidence that has been pointed to by the plaintiffs that

3    show that gender dysphoria has genetic or physiological

4    underpinnings, we believe that those studies that are

5    mentioned in Dr. Ettner's affidavit do not reach the level

6    of a clear scientific consensus.

7        And even if you look at the DSM-5 and their discussion

8    of genetics and physiological, even their own discussion is

9    couched in, We have a long way to go.  They acknowledge that

10   there are studies that this is an interesting area, but

11   nowhere do they say that -- do they conclude that gender

12   dysphoria is strictly a result of genetics or simply a

13   result of biological hormonal changes or physiological

14   changes.  So we would argue that the evidence is really not

15   scientifically clear in the community.

16        THE COURT:  So you would argue that -- in fact, you

17   do argue that the exemption applies, and I know that,

18   prudently, you have not taken a position on the

19   constitutionality of the exemption, so it may be advisable

20   that I do ask, I don't know whether there would be a

21   response, for the Department of Justice to give us what the

22   position of the United States is on the constitutional

23   aspects.  So I do not expect you to address that because I

24   know in your brief you explicitly --

25        MR. McFARLAND:  I think it would be helpful to us

1    and to the Court, I would think, and to all parties.

2        I would also further say that if the Court was to find

3    that the ADA and the Rehabilitation Act apply in this case,

4    then we would argue that there is no discrimination shown by

5    the department's actions, that we do not have a blanket

6    policy that prohibits a transgender or a gender dysphoric

7    inmate from being transferred to a prison where their gender

8    identity is accepted.  So having a male-to-female

9    transgender preoperatively could go to, say, Framingham.

10       Our policy, our gender dysphoria policy -- and a copy

11   of that was given to the Court in our pleadings opposing

12   preliminary junction -- talks about that policy, and that

13   policy is mentioned in our motion to dismiss.  So we would

14   argue that that policy itself does not discriminate.

15       Now, with regard to the issue of the strip searches

16   that the plaintiff undergoes at MCI-Norfolk, they are done

17   by male officers at this time.  We argue that even if this

18   was determined to be a violation, discrimination, or -- and

19   that the plaintiffs want a -- request an accommodation of

20   having only female COs at MCI-Norfolk search the plaintiff,

21   we would argue that there are numerous issues that are

22   raised by that operationally and security-wise.

23       THE COURT:  Can I ask a question, because I do not

24   know the answer.

25       Framingham is the main women's prison in the

```
 1   Massachusetts system?
 2              MR. McFARLAND:  That's correct, your Honor.
 3              THE COURT:  Do males serve as correction officers
 4   in Framingham?
 5              MR. McFARLAND:  Yes.  I think there -- my
 6   understanding is that there are many more female COs,
 7   correction officers, at Framingham than there are at
 8   Norfolk, but there are male COs that work at MCI-Framingham.
 9              THE COURT:  I assume that is part of, among other
10   things, a collective bargaining arrangement?
11              MR. McFARLAND:  That's very true, your Honor.
12   Officers and C -- correction officers can bid for a certain
13   facility that may be near their home, or a variety of
14   reasons why they can do that, but they are able to bid.  But
15   Framingham does have many more female correction officers
16   and senior staff than you would find at MCI-Norfolk.
17         With regard to the transfer to MCI-Framingham requested
18   by the plaintiff as an accommodation, we have indicated that
19   there is a policy and a procedure for providing transgender
20   or gender dysphoric inmates with an individualized
21   assessment of their medical and mental health needs, their
22   treatment for GD, their history of crimes and disciplinary
23   histories, as well as program needs.  And those are
24   conducted every six months under the GD policy.  But it is
25   based on each individual inmate, a review of their needs,
```

1    their vulnerabilities, their predatory behaviors.  And that

2    comes in -- that runs up in the decision with regard to a

3    placement within the DOC system.

4        And again with regard to the due process claim raised

5    by the plaintiffs in their complaint, we would argue that

6    the classification of an inmate within the DOC does not

7    create a liberty interest, and that's been established by

8    many, many years of federal and state constitutional

9    decisions, and that the plaintiff is unable to show that she

10   is subjected to an atypical and significant hardship during

11   her incarceration at MCI-Norfolk.

12       And we would also say that the plaintiff is unable to

13   show -- to succeed on a claim of substantive due process,

14   where she's unable to present facts which would show that

15   she is subjected to outrageous, uncivilized, and intolerable

16   acts, acts that shock the conscience.

17       So we would ask the Court to dismiss the claims raised

18   by the plaintiffs on those grounds, your Honor.

19           THE COURT:  All right.  Thank you, Mr. McFarland.

20   Ms. Levi.

21           MS. LEVI:  Thank you, your Honor.

22   I want to make a couple of introductory remarks, and

23   then I am happy to address specifically the questions that

24   you've raised.

25       My client is a 53-year-old transgender woman who's

1    currently serving four years in a men's correctional

2    facility.  She has diagnosis of gender dysphoria, about

3    which there is no dispute in the record.

4        Gender dysphoria is a condition that results when a

5    person's identity, their brain sex, is inconsistent with

6    their assigned birth sex.  And there is no dispute but that

7    it's a serious medical condition for which there is also an

8    established course of treatment.  And that course of

9    treatment includes gender transition.

10       She has been on female hormones and antiandrogens now

11   for nearly four decades, and the result of that care and

12   treatment has been a significant -- has had a significant

13   impact on her body and has brought her body into conformity

14   with her female identity, including having typical female

15   breast development, female body fat distribution, reduction

16   in body hair, softing of her skin, and the expert in the

17   case has testified that her hormone levels are that of a

18   typical female with her range and background and experience.

19       And so the ADA really provides a unique framework for

20   addressing the challenges that she has been experiencing in

21   the men's correctional facility.

22       I want to address -- actually, if I can put up, I want

23   to address specifically -- and, in particular, which is to

24   say she is having to live as a woman in a men's facility,

25   and the rules and experiences that she's had, which have

1    included some horrific experiences in term of treatment by

2    other inmates and guards, undermines her ability to live and

3    function as a woman, which is the treatment goal for the

4    medical condition that she experiences.

5        The exclusion from the ADA that you've asked about that

6    I put up on the screen includes an exclusion for gender

7    identity disorder, not resulting from physical impairment,

8    as you know.

9        And in answer to your question, the diagnosis of gender

10   identity disorder no longer exists in the DSM.  The most

11   recent version of the DSM refers to gender dysphoria, and

12   there's a good reason for that.  It's because the consensus

13   of the medical community is that the core feature of the

14   condition is different than the core feature of the prior

15   diagnosis that was in the DSM, and, in particular,

16   Dr. Ettner explains that distinction in Paragraph 7 of her

17   expert report, but, in particular, the critical element of

18   gender dysphoria is the incongruity between the individual's

19   brain sex, their gender identity, and the expression of the

20   features of their body.  It's not the disorder of the

21   person's gender identity, which was the core component of

22   the diagnosis of gender identity disorder.

23       Attorney McFarland's focus on the clinical distress is

24   really -- is not really related to the issues.  There's many

25   diagnoses within the Diagnostic and Statistical Manual that

1    require clinically significant distress associated with the

2    core component or the core feature of the condition.  So

3    it's a distinct and different diagnosis.

4        And in response to your question with regard to the

5    constitutional avoidance principle, it's our argument that,

6    based on the plain language of the statute, there is no

7    exclusion for gender dysphoria, which is the medical

8    condition from which Ms. Doe suffers in this case.

9        THE COURT:  When was the amendment inserted?

10       MS. LEVI:  2013.

11       It's not an amendment.  It's a revision.  It's a

12   complete revision.

13       THE COURT:  I mean of the ADA.  When did this

14   exclusion, that goes back to the original --

15       MS. LEVI:  It does.  It goes back to the original

16   adoption of the Americans with Disabilities Act, and then

17   the Federal Rehab Act was, after the fact, revised to

18   include the same exclusion that didn't originally include

19   that exclusion.

20       But as the amicus refers to it, it was through, you

21   know, a process of negotiated compromise about the scope of

22   the ADA that the exclusion was included, and it does reflect

23   very significant animus against a group of individuals.

24       THE COURT:  I was thinking it's hard for me to

25   believe, given the background that the amicus paints, that

1    the authors of the exclusion would not have included

2    dysphoria if they thought of it.

3            MS. LEVI:  Well, if I might address that.

4            THE COURT:  If it existed as a diagnosis at the

5    time.

6            MS. LEVI:  I mean, I can't speculate on that, of

7    course, and, you know, consistent with the Supreme Court's

8    also direction about the court needing to focus on the

9    language of the statute as being the basis for its

10   assessment of its meaning, in particular in the case of

11   Oncale v. Sundowner, you know, even if there would have been

12   an intention at the time to include a medical condition

13   which wasn't included, this Court would be rejecting the

14   approach of the Court in Oncale v. Sundowner with regard to

15   following the language of the statute to incorporate an

16   intention to exclude an unrelated condition into the

17   statute.

18       But, more than that, I do want to point out, as I know

19   you focused on, that gender identity disorder not resulting

20   from physical impairments are not included within the

21   exclusion, which may have been a reflection of even the

22   understanding at the time, that medical understanding and

23   scientific understanding, of a particular condition could

24   change significantly over time.

25       And in -- you know, there is no question.  In fact,

1    it's the statement of Dr. Ettner that it does reflect the

2    scientific consensus at this point in time that the origins

3    in any case of gender dysphoria are physiological.  While

4    it's true that there might not be a precise agreement about

5    the specific origins, there is an agreement that the origins

6    of the condition are physiological, or biological, and, in

7    fact, that is the position that the United States has now

8    taken in three separate cases, which we cite in particular

9    the statement of the United States from the cases of Doe v.

10   Arrisi and Dzurenda, as well as the Blatt case, in which the

11   United States took the position regarding the

12   constitutionality of the statute in light of a narrowed

13   interpretation of that provision.

14          THE COURT:  Well, in support of what you are

15   saying, the analogy that occurs to me might be fibromyalgia,

16   which, when it originally was given a name, was thought to

17   be a, basically, yuppy flu, was what it was scoffed at as

18   simply an excuse for being too tired.

19          MS. LEVI:  Yeah.

20          THE COURT:  And then I think over time it has been

21   recognized as an actual -- has actual symptomatology and

22   probably chemical causes.  Although no one is quite sure,

23   but has evolved now into something that doctors, who used to

24   dismiss it as simply complaining --

25          MS. LEVI:  Yeah -- yes.

1          THE COURT:  -- now take seriously as -- oh, sorry.

2          MS. LEVI:  Yes, your Honor.

3      I mean, the DSM really has a number of different

4  medical conditions which were misunderstood at the time of

5  their original identification as being either not serious or

6  not rooted in a physiological origin.  Even, you know,

7  conditions like epilepsy, for example, or schizophrenia,

8  which were understood not to have physiological origin, are

9  now recognized as a consensus position across the medical

10  community.

11      So to the extent that the language is clear that there

12  is not an exclusion, even for gender identity disorders not

13  resulting from physical impairments, our argument is based

14  on a plain reading of the statute and not based on a need to

15  interpret it beyond the specific language that it includes.

16      But I do want to address the other question that you

17  raised, which is, to the extent that the Court were to

18  interpret it even beyond the terms of the specific

19  exclusion, along the lines of what the defendant would argue

20  here, it does create an exclusion from the statute for

21  anyone with -- or any transgender individuals who have a

22  medical condition associated with that identity, and it does

23  rise to the level of a classification which would subject

24  the statute to strict scrutiny, we would argue, and, at a

25  minimum, heightened review.  We have included within our

1    briefing the cases, of which there are now many, that

2    recognize that a transgender classification is subject to,

3    at minimum, a heightened level of review, including the four

4    cases currently challenging an exclusion from military

5    service for transgender individuals, as well as cases

6    involving challenges to the exclusion from facilities for

7    transgender students.  That means that there would need to

8    be, at a minimum, an exceedingly persuasive justification

9    for excluding individuals who have the particular medical

10   conditions, including gender dysphoria, associated with

11   being transgender.

12        And, as the amicus brief also points out, there has not

13   been any justification, any legitimate justification, that

14   has been advanced for that exclusion, and, of course, that's

15   in part because the legislative history is really replete

16   with the animus that the exclusion reflects.  And so we

17   would argue that the exclusion is unconstitutional and that

18   the provisions of Title II should, you know, otherwise

19   address the issues in this case.

20        I want to turn to the arguments that have been made in

21   particular about the modest changes that have been made in

22   the prison that Ms. Doe has experienced.

23        I do want to highlight that for someone who has lived

24   her entire adult life as a female, and who has never been

25   socialized as a male, it is excruciating for her to be

1    stripped searched by men, to be seen by men when she's

2    changing or showering and have to be made as sexually

3    vulnerable as she has been made to be under the -- in the

4    context in which she has been incarcerated.

5        So I want to -- just if I can pull up -- I want to

6    address a couple of -- that's fine -- a couple of the

7    specific modifications that have been made, which are wholly

8    insufficient to address the problems that she has

9    experienced.

10        I just want to note that since the time she has been

11   incarcerated, she has been moved through many different

12   housing units, including three transfers in the last three

13   months.  At the moment, she's currently -- and so that has

14   meant that every time she has used a shower facility, she

15   has had other men walk in while she's showering, coming in

16   specifically to look at her body and have made offensive and

17   really degrading comments while in the shower facility.

18        If we can pull up the -- I want to really --

19            THE COURT:  Can I ask just an informational

20   question?

21            MS. LEVI:  Sure.

22            THE COURT:  And if you don't know -- I'm sure you

23   do -- but Mr. McFarland I'm sure will know.

24        When I was a young lawyer, I was at Norfolk several

25   times, and I am trying to remember if it is the prison I am

1    remembering, that it was not a traditional prison in the

2    sense that Cedar Junction, which we used to know as

3    Walpole -- I think the biggest mistake they made is they

4    should have changed the name of the town to Cedar

5    Junction --

6         (Laughter.)

7         THE COURT:  -- because you can't get away from

8    "Walpole."

9         But I remember it as being more a campus-style, with

10   separate housing units.  Is that still the case, or has it

11   been --

12        MS. LEVI:  Well, when I've gone there, it looks

13   like a traditional prison facility to me, where you walk

14   into an entryway, and then you walk through a courtyard, and

15   then you walk into a building where there are separate --

16   but I have not gone beyond the space where I can speak to my

17   client.

18        Actually, can I ask my co-counsel, Ms. Matos, who is a

19   regular visitor at a number of the correctional facilities

20   across the Commonwealth?

21        MS. MATOS:  I am an attorney with Prisoners' Legal

22   Services, so I am familiar with both facilities.  And it is

23   distinctly different from Walpole in that way.  Still, it's

24   an old building, so it's the same where you visited.  It is

25   technically more campus style, but there are very few people

1   who feel like it feels like a college campus versus a

2   prison.

3       (Laughter.)

4         THE COURT:  I want to make sure I am remembering it

5   right.

6         MS. LEVI:  It doesn't feel like a college campus to

7   me when I visit it.

8         THE COURT:  Depends on the college.

9       (Laughter.)

10        MS. LEVI:  So I do want to turn the Court's

11   attention to the shower area in particular and note a couple

12   of the really continuing significant problems that Ms. Doe

13   experiences.  There is not a door on any of shower rooms in

14   any of the cellblocks throughout the correctional facility,

15   and that means that other inmates, male inmates, can come in

16   at any time while she's in the shower facility, and it's her

17   sworn statement that that does happen regularly.

18      The description of the shower facility suggested that

19   there was in some way some privacy that somebody would have

20   in standing behind the 3-foot long opaque strip on the

21   showers, but at 5-foot-3 standing behind them, she is not

22   covered, including her torso not being covered.

23      But, more than that, it's -- you know, it is completely

24   commonplace that anyone who walks in there could see or look

25   over that 4-foot barrier and will see her unclothed and in

1    the shower.

2         The Court is correct that the shower room where she is

3    -- that she is currently allowed to use has a completely

4    enclosed part in the back, but what that means -- and there

5    is, it is has been reported to me, a sign outside of the

6    room, or maybe just inside the room, that says, you know,

7    other inmates are not allowed to use at particularly

8    designated shower times.  My client has said that the shower

9    time that she is actually restricted to is not even listed

10   on that notice outside of the door as prohibiting people

11   from coming in during that time.

12        But, even if it were, again, it's her sworn statement

13   that other inmates do regularly come in, and what it means

14   is that to enforce the private shower time that she has, she

15   would actually have to come out of the shower and show

16   someone the shower letter that she has, three in the last

17   three months, in order to enforce the possibility even of

18   having privacy in the shower facility during the time that

19   it's specified for her to use it.

20        I also want to address, if I may, a couple of other

21   issues, including the statements about there not being women

22   correctional officers to do strip searches on her in the

23   men's facility.  And, of course, the accommodation that we

24   are requesting is to have her transferred to Framingham,

25   where that would not be an issue, except to the extent that

1    among the justification for denying the transfer is a

2    statement by the Department of Corrections by the

3    superintendent that he was concerned that female correction

4    officers would not want to do the strip searches that they

5    would otherwise be required to do as part of their job.

6        The other statement that has been submitted to this

7    court as a statement -- as a justification for not providing

8    a transfer is a concern that is included in the affidavit by

9    Mitzi Peterson at Paragraph 18 that it would create a,

10    quote, climate issue with the women inmates at Framingham.

11        And the reason in particular I want to highlight these

12    statements is because these statements are the very kinds of

13    non-specific, generalized, non-objective or concrete

14    speculations, stereotypes about individuals with

15    disabilities that the ADA is intended to address.

16        As I said, in this case, other than the particular

17    medical condition from which Ms. Doe suffers, the ADA really

18    provides an appropriate framework to address just this

19    issue.  Gender dysphoria is a stigmatized medical condition

20    which is widely understood that, based on the legislative

21    history of the ADA, as the argument has been made by the

22    Department of Corrections, that we would refute, is one that

23    is -- you know, can cause revulsion or offense or discomfort

24    by other individuals.  And it's just for that reason that

25    the American with Disabilities Act was passed, to address

1    individuals who experienced discrimination because of a

2    misunderstood medical condition.  It's been very effective

3    in doing so, reflecting the kinds of questions you've been

4    asking, and also addressing the kinds of hypotheticals that

5    are in the record of the ADA, where individuals with

6    conditions like cerebral palsy or cosmetic disfigurement or

7    Down syndrome face mistreatment because of bias and

8    stereotypes associated with the condition and having nothing

9    to do with the person's ability to be included within the

10   generalized setting, and that's why she seeks the

11   accommodation of the transfer that we are here to ask the

12   Court for today.

13        I do want to specifically address as well two other

14   issues, and one is with regard to your question about Sandin

15   and whether or not the Court can direct the relief that's

16   being requested here.

17        Transfer to a prison -- to another facility because of

18   a reasonable accommodation is specifically contemplated and

19   addressed in particular within a case that we have cited to

20   the this Court, including Lonergan, where an individual with

21   a skin condition that was exacerbated by exposure to sun

22   could be transferred to another facility where that

23   individual wouldn't be exposed to the amount of sun that

24   made it impossible for him to be integrated within a prison

25   facility where he was regularly exposed that way.

1          Title II of the ADA is really specifically in place to

2     ensure that courts can redress the kind of denials of

3     reasonable accommodation.  It defines the denial of the

4     reasonable accommodation as discrimination under the ADA.

5          And while I understand the Court's concern about

6     getting involved in the operation of prisons, that concern

7     also can't render Title II as applied to prisons

8     meaningless.  And in this case it is the accommodation

9     that's essential in order for her to be able to function and

10    not experience the kind of harm that she has already

11    experienced because of being in a men's facility.

12         And on that point I do want to address the argument

13    that we have set forth before this Court that she's

14    experienced irreparable harm, and particularly highlight the

15    conclusions of Dr. Ettner, that she has experienced, because

16    of being in the men's facility, post-traumatic stress

17    disorder as well as an anxiety disorder as a direct result

18    of what she has experienced.

19         And the fact of her having a diagnosis of PTSD, which

20    she did not have prior to her incarceration, is a point on

21    which the defendants agree in this case.  Now, they would

22    attribute it to other undisclosed and unstated and unnoted

23    prior trauma, but we could suggest, your Honor, that,

24    consistent with Dr. Ettner's report here, Ms. Doe's mental

25    health is significantly declining in the men's facility.

1    Anyway, that's -- unless of you have questions, your

2    Honor?

3        THE COURT:  Do you want to say anything about the

4    preliminary injunction?

5        MS. LEVI:  Yeah, yeah, absolutely.

6    So, the preliminary injunction is based on our argument

7    that both, as I said, that she is experiencing irreparable

8    harm from being in a men's facility, that her mental health

9    is steadily devolving.  She's at further risk of emotional

10   and physical decline.

11   And we have argued that she can show a likelihood of

12   success on the merits both on her ADA claim.  That, setting

13   aside the exclusion, which I've addressed, the

14   accommodations -- I should -- that she has been denied the

15   accommodations that she has requested, including being

16   strip-searched by women correctional officers, that could be

17   provided by the transfer to the Framingham facility.

18   We have also argued, your Honor, that she has a

19   likelihood of success on the merits of her equal protection

20   claim, that there are -- she's excluded from the women's

21   correctional facility because she is a transgender woman.

22   Other women, non-transgender women, are routinely placed in

23   the correctional facility.  She is not because she's

24   transgender.  And that classification, that exclusion from

25   the facility, is a sex-based classification that subjects

1    the classification and placement rule to, as I said, strict

2    scrutiny and, at a minimum, heightened review.

3         To the extent that there is any justification that's

4    being offered for her exclusion from the women's facility,

5    there are none that are proven by this record.

6         She has no disciplinary record that would trigger any

7    kind of safety concerns.  You know, she's serving for a

8    non-violent drug offense.  And, in any case, to the extent

9    that there was some justification related to safety, a rule

10   that excludes transgender individuals from the women's

11   facility doesn't advance any of those interests, and so it's

12   not substantially related to any kind of underlying concern

13   that would be advanced around safety concerns.

14        The other thing I would argue is that to the extent

15   that there is any public interest that's implicated by this

16   case, it would be in ensuring that someone like Ms. Doe can

17   be appropriately placed at the women's facility.

18        Unless you have any further questions.

19        I mean, the harm that she is experiencing is real and

20   serious and devastating and has, you know -- on a daily

21   basis is really subjecting her to sexual vulnerability,

22   violence, but also mental harm and anguish.  And so we would

23   ask this Court to order her to be transferred to the women's

24   facility and, in the alternative, for accommodations that

25   would provide her privacy in the shower facilities, which

1    could include, for example, a guard outside to ensure that

2    men don't walk in routinely.  And we would also ask that

3    women correctional officers be assigned to strip search her,

4    as well as ensure that she's regularly referred to as a

5    female, which she regularly is not, at the prison facility.

6              THE COURT:  Thank you very much.

7              MS. LEVI:  Thank you.

8              THE COURT:  Mr. McFarland, do you want the last

9    word?

10             MR. McFARLAND:  Yes, your Honor.

11        Again, I'll cite a few facts that I think are relevant

12   to the preliminary injunction review.  That the plaintiff,

13   as a male-to-female transgender inmate, does receive full

14   treatment for the general dysphoria, including hormones,

15   psychotherapy, same clothing and canteen as female

16   offenders, facial hair removal, and access to healthcare,

17   including mammograms.

18        She does have a single cell, with the alternative time

19   periods for showering, and they do have a notice posted in

20   front, such that if a male inmate goes near those showers at

21   that time, they are subject to a disciplinary report and all

22   that comes through that process.

23        In the December -- late November, early December of

24   2017 the plaintiff underwent an individualized assessment

25   with regard to her placement within the DOC custody.  The

```
1    plaintiff had asked to be transferred to MCI-Framingham.

2    The classification was pursuant to the DOC classification

3    regulations and the DOC's gender dysphoria policy.

4        The plaintiff did undergo and individualized assessment

5    as to her criminal and disciplinary history, her medical and

6    mental health needs, her vulnerability to sexual

7    victimization, the potential for predatory behavior on her

8    part, as well as her need for various programs within the

9    facilities.

10        The individualized assessment determined that she, Jane

11   Doe, should remain at MCI-Norfolk based on the review of

12   those factors.

13        They also indicated that the GD Treatment Committee had

14   not recommended that she be placed at MCI-Framingham.

15        The plaintiff appealed the initial classification and

16   GD analysis, and it was reviewed by the Deputy

17   Superintendent, who upheld the decision to remain at

18   Norfolk, and also indicated that there was no recommendation

19   issued by the Gender Dysphoria Treatment Committee.

20        By mentioning this process, we are telling the Court

21   that there is no blanket prohibition restricting GD inmates

22   to the facility of their birth gender.  And this is pursuant

23   to the GD policy, which is, I think, Exhibit 2 in our

24   materials, your Honor, that the placement of the GD inmates

25   is -- involves a review of individual factors on a
```

1    case-by-case basis.  And the language in the policy is very

2    similar to the language used in the federal regulations that

3    pertain to the PREA standards.

4        Now, the other side mentioned the fact that in her

5    affidavit Director Peterson said that she had concerns with

6    regard to the -- John Doe's -- the plaintiff, Jane Doe's

7    placement at MCI-Framingham.

8        She has some concerns since she knows and is aware of

9    Jan Doe and is aware of the facility, that placing Jane Doe

10   within the population at MCI-Framingham may lead to some

11   distress and dysphoria if she was rejected by the females.

12       Doctor -- Director Peterson was responding to the

13   statements made by Ms. Ettner -- Dr. Ettner that seemed to

14   say that once you send Jane Doe to Framingham, everything

15   will be fine, hunky-dory, and there will be no issues.

16       So she was pointing out the fact that there may be

17   problems.  There may be issues with other offenders, and

18   that it may not be smooth sailing, given the nature of the

19   population and given the plaintiff's transfer.

20       Such concerns are not to be interpreted as a roadblock

21   to any future GD inmate being transferred to Framingham, but

22   an appraisal of the realistic situation that any

23   male-to-female transgender may experience going into that

24   facility.

25       Doctor -- Director Peterson's affidavit also talks to

1    the fact that the DOC does provide training for staff at

2    their facilities that address how staff members should

3    interact and work with inmates who are transgender -- who

4    are gender dysphoric.  So that takes place on a regular

5    basis.

6        As I said, the DOC policy is to provide GD inmates with

7    alternative times to shower that are separate from the other

8    inmates on their units.

9        And, as you saw in the photograph, we do provide at

10   MCI-Norfolk the so-called PREA shower curtains, which have

11   AN opaque barrier about a foot off the ground and 3 feet

12   high, so reaching about 4 feet, on the person's torso, which

13   are used in order to discourage any sexual acting out or

14   harassment or offenses while an inmate is in the shower.  So

15   the curtains are such that a staff member walking by could

16   see whether or not there were two or more inmates within the

17   shower.

18        With regard to the strip searches at MCI-Norfolk, the

19   affidavit of Superintendent Medeiros sets out the burdens

20   that would be placed upon his facility if they were ordered

21   to have only female COs conduct strip searches of the

22   plaintiff and other GD inmates.  In particular, there are

23   only 31 female officers on staff covering three shifts at

24   the facility, as compared to 340 male officers.  And to have

25   two female officers taken from their post to conduct a strip

1    search of the plaintiff or the six other GD inmates would

2    be -- would create a lot of disruption, according to the

3    Superintendent.

4        They would have to move people from other posts or

5    replace them.  There would be delays.  There would be some

6    situations where you don't have enough -- may not have

7    enough female COs on a given shift.  There are also concerns

8    that female COs would be restricted from other posts that

9    they may want because they needed to be in a post nearby

10   where they conduct a large amount of the strip searches of

11   inmates.

12           THE COURT:  That case seems to be pretty well made

13   with respect to Norfolk.

14       Is Ms. Levi right, that a transfer to Framingham

15   resolves at least that problem?

16           MR. McFARLAND:  Well, you would address this issue,

17   but, again, we have conducted a case -- an individualized

18   assessment of Jane Doe just recently, and the determination

19   was that she did not need to be at MCI-Framingham based on

20   all the factors that were considered.

21       So that was the decision by the Administrative

22   Classification Board and review and appeal.

23       So, you know, there are certain issues that do limit

24   the Superintendent at Norfolk with regard to staffing,

25   but --

1          THE COURT:  Transfer decisions are made by the

2     Commissioner; am I right?

3          MR. McFARLAND:  That's correct, your Honor.

4     And there is a process involved where they can, as I

5     mentioned, and also using -- the GD Treatment Committee also

6     gets involved in making a recommendation as to whether or

7     not the inmate requires to receive treatment or placement at

8     MCI-Framingham.

9          So, your Honor, we believe that we have many plans in

10    place that address some of the concerns raised by the

11    plaintiff.

12         We have, like I said, the separate showering times.  We

13    have training for staff.  We have the PREA curtains.  We

14    have the individualized assessment of each GD inmate as to

15    their placement within the system.

16         We also argue, with regard to the due process, that

17    there is no due process liberty interest in remaining at a

18    particular prison.  This has been stated by quite a long

19    history of cases in both the federal and state courts.

20         And again, that the placement -- that Jane Doe's

21    placement at MCI-Norfolk does not reach the level of an

22    outrageous and uncivilized and intolerable act that shocks

23    the conscience.

24         And she has managed to complete a substance abuse

25    program at that facility.  She's engaged in programs and has

```
1    managed to do fine in the prison.
2         Also, there's opportunities to raise concerns to the
3    staff through the grievance procedures, as well as through
4    staff access, to talk to senior staff, if she has particular
5    problems with any one or two staff members.
6         So we request that the motion for preliminary
7    injunction be denied, your Honor.
8              THE COURT:  Okay.
9         A question for counsel, generally, just to make sure I
10   am not misunderstanding what I have to do.
11        Since it is probably clear from the remarks I have made
12   that I am at least willing to entertain a constitutional
13   challenge to the statute, I think I am obligated under Rule
14   5.1 to certify the question to the Attorney General, and, as
15   I remember under the statute, not the rule, the U.S. has 60
16   days to make a decision whether to intervene or not.
17             MR. McFARLAND:  I believe that's correct, your
18   Honor.
19             MS. LEVI:  I think that's right.
20        We did notify them, your Honor, with regard to the
21   potential issue of the constitutionality of the statute
22   already.
23             THE COURT:  So they got that notice probably the
24   beginning of this month?
25             MS. LEVI:  Yeah.  We submitted it at the time we
```

1    filed our motion for the preliminary injunction.

2         I can get you the date.

3              MS. LEVI:  February 2, my clerk tells me.

4              MR. McFARLAND:  I would note --

5              THE COURT:  The first thing I should do is

6    certify --

7              MR. McFARLAND:  Under Section -- part (b), it says

8    the court must, under 28 U.S.C. Section 2403, certify to the

9    appropriate Attorney General that the statute has been

10   questioned.  I am not sure if that's part and parcel --

11             THE COURT:  That's my memory.

12        I commented both of you, because most lawyers ignore

13   that altogether.  They don't even know that the rule exists.

14   But I think that's the first thing I should do.  I am going

15   to, clearly, take the matter under advisement.

16             MS. LEVI:  Your Honor, may I respond to some of the

17   arguments?

18             THE COURT:  Yes, of course.

19             MS. LEVI:  I'll let you finish.  I just --

20             THE COURT:  No.  I was just thinking, as soon as I

21   get back to my office, the first thing I am going to do is

22   certify the question so we can move things along a little

23   more quickly.

24        Yes, please.

25             MS. LEVI:  So I do want to address the argument

that the Department of Corrections is making that they've
done an assessment with regard to the transfer.  And it's
really important to note that the ADA specifically states
that a public entity can impose legitimate safety
requirements, but the public entity has to ensure that those
safety requirements are based on actual risks, not on mere
speculation, stereotypes, or generalizations about
individuals with disabilities.

And, as I highlighted before, they have identified no
specific safety risks associated with my client.

As I said, she's a 5-foot-3 woman who's serving for a
non-violent drug offense.  She has been -- she has
transitioned nearly 40 years, and so the statements that
other individuals at the women's facility might not -- you
know, that it might create, quote, climate issues, which
haven't even been specifically identified as associated with
my client, is not a justification that meets the standard
under the ADA for the denial of a reasonable accommodation.

Neither too are the statements that female correctional
officers wouldn't want to do strip searches.

And I do want to argue to this Court that that supposed
individual assessment is operating as a categorical bar in
this case.  It's hard to imagine an individual with gender
dysphoria who could pass that consideration if my client
doesn't meet that standard in the context of this case.

1    I do want to address specifically as well that she

2    would request a locked cell as an alternative to the

3    transfer if she's going to remain for any period of time at

4    MCI-Norfolk.

5        And I do also want to respond to the due process

6    arguments which have been made.  We haven't pressed those in

7    our reply as the basis for the preliminary injunction.

8    We're relying on the likelihood of success both on the ADA

9    claim and equal protection claim as well, your Honor.  But

10   we do argue that there is a set of facts that we can show,

11   and we believe we've shown them, in the context of the

12   allegations of complaint that the experiences that Ms. Doe

13   has had do shock the conscience.  But, in any case, there is

14   no basis for dismissing them from -- as a claim in the case.

15       THE COURT:  Okay.

16       MR. McFARLAND:  Your Honor, just one thing.

17       We received the amicus brief yesterday evening, and I

18   hadn't had a chance to go through it very well.  Can I have

19   more time in which to respond to the amicus brief?

20       THE COURT:  Yes, of course.

21       At least on the substantive issues, as opposed to the

22   injunctive issues, we are going to have to hear from the

23   United States as to whether it intends to intervene or not.

24       MR. McFARLAND:  Okay.

25       THE COURT:  So could you get me something within

```
 1    ten days?
 2              MR. McFARLAND:  Certainly your Honor.
 3              THE COURT:  It will not be a difficult brief for
 4    you to read because you are already well versed, but I think
 5    it makes as its strongest argument -- and I say "strongest"
 6    not necessarily -- I'm not judging the merits, but the most
 7    forcefully argued position is the constitutional position in
 8    that brief.
 9              MR. McFARLAND:  That seems to correct, your Honor.
10              THE COURT:  So ten days.
11              MR. McFARLAND:  Thank you.
12              THE COURT:  Any desire to submit further filings;
13    otherwise, the record will be complete.
14              MS. LEVI:  The only thing I would offer, your
15    Honor, is if you would like additional briefing on the
16    constitutional issue, we would certainly respond to that.
17              THE COURT:  I think I have the issue down --
18              MS. LEVI:  Okay.
19              THE COURT:  -- to the point that I doubt there is
20    much more case law that between you and the amicus could be
21    brought to my attention.
22              MR. DOWNS:  One housekeeping matter, your Honor.
23          We submitted the affidavit unsigned by Jane Doe.  We
24    have now a signed copy, which we will send into the court.
25              THE COURT:  That would be appreciated.
```

1          All right.  Thank you for the very coherent and helpful

2    arguments.  I will take the matter under advisement.

3              MS. LEVI:  Thank you, your Honor.

4              MR. McFARLAND:  Thank you, your Honor.

5              THE CLERK:  All rise.

6          (Proceeding adjourned.)

**C E R T I F I C A T E**

    I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

    /s/James P. Gibbons          April 20, 2018
       James P. Gibbons


          JAMES P. GIBBONS, CSR, RPR, RMR
            Official Court Reporter
          1 Courthouse Way, Suite 7205
          Boston, Massachusetts 02210
            jmsgibbons@yahoo.com