UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 17-12255-RGS

JANE DOE

v.

MASSACHUSETTS DEPARTMENT OF CORRECTION, et al.

MEMORANDUM AND ORDER
ON DEFENDANTS' MOTION TO DISMISS

June 14, 2018

STEARNS, D.J.

Plaintiff Jane Doe is a transgender woman, currently housed at MCI-Norfolk, a men's prison overseen by the Massachusetts Department of Correction (DOC). Doe brought this Complaint against the DOC and several of its officials[1], alleging that she has been discriminated against in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* (ADA), and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* The Complaint alleges that defendants have failed to make reasonable

---

[1] The individual defendants, who are sued in their official capacities, are: Thomas A. Turco III, DOC Commissioner; Sean Medeiros, Superintendent of MCI-Norfolk; Stephanie Collins, DOC Assistant Deputy Commissioner of Clinical Services; and James M. O'Gara Jr., DOC ADA Coordinator.

accommodations of her Gender Dysphoria (GD) disability.  It also alleges

violations of the Equal Protection and Due Process Clauses of the Fourteenth

Amendment, and violations of the Federal Civil Rights Act, 42 U.S.C. § 1983.

The defendants moved to dismiss the Complaint pursuant to Fed. R.

Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

Doe countered with a Motion for a Preliminary Injunction, seeking among

other forms of relief a transfer to MCI-Framingham, a Massachusetts

women's prison.  The court heard oral argument on both motions on

February 28, 2018.  At that hearing, a principal issue was whether Doe's GD

fits within the ADA's exclusion of "transvestism, transsexualism, pedophilia,

gender identity disorders not resulting from physical impairments, or other

sexual behavioral disorders" from the definition of "disability," 42 U.S.C. §

12211(b)(1),  and if so, whether the exclusion is constitutional as applied to

Doe.

The court, deeming the constitutional question to be substantial,

certified a question to the U.S. Attorney General pursuant to Fed. R. Civ. P.

5.1(b), and 28 U.S.C. § 2403, *see* Dkt #57, and reserved ruling on the

defendants' Motion to Dismiss.  However, recognizing the exigencies

underlying Doe's claim, the court granted her Motion for a Preliminary

Injunction in part, ordering the defendants – whenever feasible and

consistent with the DOC's applicable collective bargaining agreements and staffing availability – to: (1) utilize female corrections officers when conducting strip searches of Doe; (2) to make permanent the arrangement permitting Doe to shower at different times than male inmates; and (3) to station a corrections officer as a privacy guard while Doe showered. *See* Dkt #59.

On the DOC's Motion for Clarification, the court agreed to two minor adjustments of its order: first, that Doe be allowed shower time during prison lockdowns; and second, that in those instances where two female guards were not available to strip search Doe, that a male guard be permitted to search Doe's lower body, while a female guard searched her torso. *See* Dkt #s 63 & 64. The court recognized Doe's contention that the bifurcated strip search risked exacerbating her GD, *see* Dkt #66, but explained that its purpose was to provide Doe with the broadest relief possible while maintaining the *status quo ante* to the extent possible while awaiting a full resolution of the DOC's Motion to Dismiss and the consideration of any intervention by the Department of Justice (DOJ).

On May 30, 2018, the DOJ, after requesting and receiving an extension of time to respond, *see* Dkt #71, informed the court that it would not intervene in Doe's case, *see* Dkt #77. The court therefore considers the DOC's

Motion to Dismiss to be ripe and will proceed on the merits.[2]  For the reasons

to be explained, the Motion to Dismiss will be denied.

---

[2] The court takes judicial notice that the Criminal Justice Reform Act,
signed into law by Governor Baker on April 13, 2018, provides as follows.

> A prisoner of a correctional institution, jail or house of correction
> that has a gender identity, as defined in section 7 of chapter 4,
> that differs from the prisoner's sex assigned at birth, with or
> without a diagnosis of gender dysphoria or any other physical or
> mental health diagnosis, shall be: (i) addressed in a manner
> consistent with the prisoner's gender identity; (ii) provided with
> access to commissary items, clothing, programming, educational
> materials and personal property that is consistent with the
> prisoner's gender identity; **(iii) searched by an officer of the
> same gender identity if the search requires an inmate to
> remove all clothing or includes a visual inspection of
> the anal cavity or genitals;** provided, however, that the
> officer's gender identity shall be consistent with the prisoner's
> request; and provided further, that such search shall not be
> conducted for the sole purpose of determining genital status; and
> **(iv) housed  in a correctional facility with inmates with
> the same gender identity; provided, that the placement
> shall be consistent with the prisoner's request, unless
> the commissioner, the sheriff or a designee  of the
> commissioner or sheriff certifies in writing that the
> particular placement would not ensure the prisoner's
> health or safety or that the placement would present
> management or security problems**.

Mass. Acts of 2018, c. 69, § 91 (amending Chapter 127 of Mass. Gen. Laws by
inserting a new Section 32A) (emphasis supplied).  This provision of the Act
does not take effect until December 31, 2018, and is subject to possible
revision in the interim.  While Section 32A will likely provide relief to
inmates in the future who are similarly situated to Doe, absent voluntary
compliance now by the DOC it will not provide full relief to Doe, who is
scheduled for parole in September of 2018.

## FACTUAL BACKGROUND

The following facts are taken from the Doe's well-pleaded Complaint.[3] Jane Doe[4] is a 53-year old transgender woman serving a three- to four-year sentence at MCI-Norfolk for a nonviolent drug offense. Compl. ¶¶ 24, 30. Although anatomically born a male – and assigned that gender at birth – Doe experienced serious emotional and mental health issues as a child caused by tension between her assigned gender and her gender identity. *Id.* ¶ 25.

As a teenager, Doe was diagnosed as suffering from Gender Identity Disorder (GID). *Id.* ¶ 26. At her doctor's recommendation, she began gender transition therapy, *id.* ¶ 27, including a course of hormone treatment, which she has continued to this day. *Id.* ¶¶ 27, 46. Prior to her incarceration, Doe lived her life as a female, with her friends and family referring to her by her preferred female name. *Id.* ¶¶ 24, 28. Doe's Massachusetts Identity Card lists her as a woman, and she is in the process of obtaining a court order legalizing a change of her birth name to her chosen female name. *Id.* ¶ 29. The DOC in its pleadings does not dispute the sincerity of Doe's belief that she is, in fact, a woman.

---

[3] These facts are deemed true for purposes of evaluating the Motion to Dismiss. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

[4] On November 15, 2017, the court approved plaintiff's Motion to Proceed Under Pseudonym and for a Protective Order. *See* Dkt #s 13, 16.

A growing consensus in the medical and psychiatric community now regards Doe's condition, although diagnosed in her teenage years as GID, as more accurately classified as GD, a rare but serious medical condition. *Id.* ¶ 2. GD supplanted GID in the American Psychiatric Association's (APA) Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-V).[5] GD is defined in DSM-V as follows:

A. A marked incongruence between one's experienced / expressed gender and assigned gender, of at least six months' duration, as manifested by at least two of the following:

1. A marked incongruence between one's experienced / expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
2. A strong desire to be rid of one's primary and / or secondary sex characteristics because of a marked incongruence with one's experienced / expressed gender (or in young adolescents, a desire to prevent the development of the anticipated sex characteristics).
3. A strong desire for the primary and / or secondary sex characteristics of the other gender.
4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

---

[5] Both parties treat the DSM-V as authoritative. For example, in its Opposition to Doe's Motion for a Preliminary Injunction, the DOC attached the Department's Policy on the Identification, Treatment and Correctional Management of Inmates Diagnosed with Gender Dysphoria (GD Policy), which cites the DSM-V definition verbatim. *See* Dkt #45-2.

6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational or other important areas of functioning.

Persons diagnosed with GD often experience bouts of negative self-esteem, which manifests itself in anxiety, depression, and suicidality. Compl. ¶¶ 2o, 21. They also face an increased risk of other mental disorders, as well as a sense of stigmatization and victimization. *Id.* The APA treatment protocol for GD recommends "counseling, cross-sex hormones, gender reassignment surgery, and social and legal transition" from a patient's sex as assigned at birth to the sex associated with his or her gender identification. Compl. ¶ 23. As part of her treatment regime, Doe began wearing girls' clothing as a youngster in school, used her chosen female name, and started a life-long course of hormonal treatment. *Id.* ¶ 47. As a result of the hormone injections, Doe exhibits clear signs of female breast development, which according to the Complaint, invites unwanted attention from male inmates.

Although Doe's GD diagnosis is not disputed, the DOC has housed Doe at MCI-Norfolk, a men's prison, since October 31, 2016. Compl. ¶ 10. The Complaint relates a litany of humiliations and trauma caused by this placement. Doe alleges that, at least prior to this court's injunctive order,

strip searches, which took place with some regularity, were conducted by male guards, who frequently groped her breasts. Compl. ¶ 33. She also alleges that during a facility-wide lockdown in June of 2017, she was forced to strip naked in the presence of male DOC staff and in plain view of other prisoners, many of whom made audible sexually suggestive comments about her body. *Id.* ¶ 34.

Doe further alleges that she was forced to shower, on several occasions, in the presence of, or in a place where she could be seen by male inmates. *Id.* ¶ 35. She claims that these experiences have instilled in her a fear of falling victim to sexual violence, and that she began experiencing difficulty sleeping after "men gawked at her from the [prison] tier above her as she showered." *Id.* ¶ 36; *see also id.* ¶ 44 (alleging that "prisoners often harass her sexually in the bathrooms, with the knowledge and tacit approval of DOC staff"). She complains that while the DOC often provides separate shower facilities or shower times to transgender inmates – an accommodation she enjoyed when placed for a time in a housing area with access to a transgender-specific shower facility – "[o]n more than one occasion . . . Defendants have denied Jane Doe the right to use this shower and forced her to shower along with male prisoners while these prisoners snickered and made demeaning, hurtful, and denigrating comments about her." *Id.* ¶ 39. While the DOC

makes available to transgender prisoners a shower curtain with an opaque middle section designed to obscure an inmate's torso, the Complaint alleges that the opaque section "does not line up with Jane Doe's body, so male prisoners can see most of her naked body, including her breasts." *Id.* ¶ 40.

Other factual allegations in the Complaint fault various corrections officers for refusing to call Doe by her chosen female name or to otherwise treat her as a woman. The Complaint asserts that "certain DOC correctional officers make a point of asserting that Jane Doe's anatomy is different than any other woman and repeatedly state that she is still a man," while others deride Doe and other transgender prisoners as "chicks with dicks" and "wannabe women." *Id.* ¶ 42. Doe complains that she is subjected to similar taunts and harassment from other inmates, leading her to frequently skip meals in the prison mess hall and to avoid group activities made available to other prisoners. *Id.* ¶ 44. She also alleges that prisoners have on occasion entered her cell and attempted to physically force themselves on her. *Id.*

Doe's lawsuit was filed on November 15, 2017.[6] In response to the DOC's 12(b)(6) Motion to Dismiss, as previously noted, Doe filed a Motion

---

[6] In addition to the ADA, Rehabilitation Act, Fourteenth Amendment and § 1983 claims, Doe's original Complaint contained various state constitutional claims. However, Doe agreed in her Opposition to the Motion to Dismiss to the dismissal, without prejudice, of the state-law claims. *See* Doe Opp'n, Dkt #33, at 1 n.1. In any event, the Eleventh Amendment's grant

for a Preliminary Injunction, *see* Dkt #34, praying that the court order the

DOC to:

> (1) transfer Doe to MCI-Framingham [a DOC facility for women]; (2) enjoin Defendants from using male correctional officers to conduct strip searches of Jane Doe, except in exigent circumstances; (3) enjoin Defendants from forcing Jane Doe to shower in the presence of men and with a shower curtain that does not adequately cover her; (4) enjoin Defendants from treating Jane Doe differently than other women held by the DOC; (5) train all staff on how to appropriately accommodate, treat and communicate with individuals with Gender Dysphoria within 60 days of this order; (6) enjoin Defendants from using male pronouns when speaking to or about Jane Does; (7) enjoin Defendants from referring to Jane Doe by her former male name (or any abbreviated version thereof); (8) refer to Jane Doe by her chosen female name; and (9) award such other relief as is just and proper.

Dkt #35 at 3.[7]

## DISCUSSION

## A. LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must state a claim to relief

"that is plausible on its face." *Twombly*, 550 U.S. at 570. This burden

"requires more than labels and conclusions, and a formulaic recitation of the

---

of sovereign immunity would have likely barred her state-law claims for injunctive relief in a federal court. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

[7] The DOC filed an opposition to Doe's Motion for a Preliminary Injunction on February 21, 2018, *see* Dkt #45, to which it attached the aforementioned copy of the DOC's GD Policy.

elements of a cause of action will not do." *Id.* at 555. However, in evaluating a motion to dismiss, the court takes the "factual allegations in the complaint as true and make[s] all reasonable inferences" in favor of the non-moving party. *See Mississippi Pub. Employees' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 85 (1st Cir. 2008).

## B. THE ADA AND REHABILITATION ACT CLAIMS

### 1. Statutory Framework

The ADA was crafted to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). To state a claim under the ADA, a plaintiff must show "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against; and (3) that such an exclusion, denial of benefits, or discrimination was by reason of his disability." *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000). The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

The definition of "disability" in both statutes is virtually identical. *See* 42 U.S.C. § 12101(1) (ADA) (defining disability as "a physical or mental impairment that substantially limits one or more major life activities."); 29 U.S.C. § 705(9) (Rehabilitation Act) (defining a disability as "a physical or mental impairment that constitutes or results in a substantial impediment to employment"). In light of the twinned definitions, courts routinely apply the same legal analysis in interpreting claims under both statutes. *See Nunes v. Massachusetts Dep't of Corr.*, 766 F.3d 136, 144 (1st Cir. 2014) (noting that the court "need make no distinction between the two statutes for purposes of our analysis").

In addition to demonstrating that she has "a physical or mental impairment that substantially limits one or more major life activities," Doe must also establish "a record of such an impairment,"[8] or "being regarded as having such an impairment" by representatives of the public entity in question, generally in the form of an adverse action or actions. *See* 42 U.S.C. 12102(3)(A) ("An individual meets the requirement of 'being regarded as

---

[8] It is beyond peradventure that if Doe is able to successfully demonstrate that she meets the statutory definition of "disability" under the ADA, she has an adequate "record" of her diagnosis, which dates over four decades. She has been continually treated for GD by the DOC's health care providers and contractors during her period of incarceration. *See* Compl. ¶¶ 45-53.

having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.").

Both of the statutory claims advanced by Doe rest on the premise that her GD qualifies as a disability, in turn imposing an obligation on the DOC to afford her reasonable accommodations. Doe maintains that the "major life activity" impaired by GD is her ability to reproduce, and that GD meets the regulatory definition of disability because it is a "physiological disorder or condition . . . affecting . . . [the] endocrine" system. 28 C.F.R. § 35.108(b)(1)(i). Because "a person born with Gender Dysphoria is born with circulating hormones inconsistent with their gender identity," Doe Opp'n at 6, and "because [she] requires lifelong treatment for Gender Dysphoria, including the administration of female hormones, which leaves her incapable of reproduction," *id.* at 6-7, Doe contends that GD meets the ADA's definition of a disability. *See* 42 U.S.C. § 12102(2)(B) (providing that a disability is a physical or mental impairment that substantially limits a major life activity, notably "the operation of a major bodily function, including . . . endocrine, and reproductive functions"); *see also Bragdon v. Abbott*, 524 U.S. 624, 639

(1998) ("[W]e agree . . . that reproduction is a major life activity for the purposes of the ADA.").

2. <u>The ADA's Exclusion for Gender Identity Disorders</u>

The court does not understand the DOC to contest that reproduction qualifies as a major life activity, nor do I read the DOC as disputing that Doe's GD diagnosis meets the ADA's statutory definition of a disability. However, the DOC identifies an exclusionary provision of the statute, 42 U.S.C. § 12211(b)(1). The exclusion lists "(1) transvestism, transsexualism, pedophilia, gender identity disorders not resulting from physical impairments, or other sexual behavioral disorders" as conditions which are outside the scope of the statute's definition of "disability."[9] The DOC contends that because GD for all practical purposes is equivalent to "gender identity disorder," it is categorically outside the ADA's protections.[10]

Doe counters with three arguments. First, she argues that the decision to treat "Gender Dysphoria" in DSM-V as a freestanding diagnosis is more

---

[9] The other exclusions in Section 12111 are "(2) compulsive gambling, kleptomania, or pyromania; or (3) psychoactive substance use disorders resulting from current illegal use of drugs."

[10] In an aside, the DOC notes that Doe is in fact a biological parent, having fathered a child prior to beginning her hormone treatment. *See* Peterson Aff., Dkt #45-3 at ¶ 17.

than a semantic refinement. Rather, it reflects an evolving re-evaluation by the medical community of transgender issues and the recognition that GD involves far more than a person's gender identification. She argues that GD is now understood to reflect the clinically significant distress that an affected person experiences as a result of the "marked incongruence" between an experienced/expressed sex and a person's birth sex. Because it has independent clinical significance, Doe contends that GD is not a "gender identity disorder" as that term was meant in crafting the ADA exclusions. Second, she maintains that even if the statutory exclusion encompasses GD, it is limited to "gender identity disorders not resulting from physical impairments," and because Doe's GD *does* result from physical impairments, the statutory exclusion as applied to her does not preclude her claim. Third, she argues that if the exclusion applies categorically to all diagnoses of GD, it violates the Fourteenth Amendment because the legislative history of the exclusion demonstrates that it was driven by animus towards transgender persons. If either or both of the first two arguments is correct, Doe notes that the court need not reach the constitutional question at all.

While reasonable minds might differ, the court is of the view that Doe has the better of the arguments. The ADA's exclusion applies only to "gender identity disorders *not resulting* from physical impairments," 42 U.S.C.

§ 12211(b)(1) (emphasis supplied), and Doe has raised a dispute of fact that her GD may result from physical causes. While medical research in this area remains in its initial phases, Doe points to recent studies demonstrating that GD diagnoses have a physical etiology, namely hormonal and genetic drivers contributing to the in utero development of dysphoria. *See* Doe Opp'n, Dkt #33 at 15 (citing Christine Michelle Duffy, *The Americans With Disabilities Act of 1990 and the Rehabilitation Act of 1973, in* GENDER IDENTITY AND SEXUAL ORIENTATION DISCRIMINATION IN THE WORKPLACE: A PRACTICAL GUIDE (Christine Michelle Duffy ed., Bloomberg BNA 2014)).[11] A further distinction can be made between the definition given in DSM-IV of "gender identity

---

[11] One final point with respect to the distinction between GID and GD is the treatment of this issue by other courts. The one case cited by the defendants in which a court found that GD and GID were simply different labels for an identical diagnosis predated the publication of DSM-V. *See Michaels v. Akal Security, Inc.*, 2010 WL 2573988 at *6 (D. Colo. June 24, 2010) ("Gender dysphoria, as a gender identity disorder, is specifically exempted as a disability by the Rehabilitation Act."). By contrast, a more recent case has recognized that the distinction between GID and GD is a meaningful one for purposes of a *prima facie* ADA claim. *See Blatt v. Cabela's Retail, Inc.*, 2017 WL 2178123, at *4 (E.D. Pa. May 18, 2017) (concluding that "it is fairly possible to interpret the term gender identity disorders narrowly to refer to simply the condition of identifying with a different gender, not to exclude from ADA coverage disabling conditions that persons who identify with a different gender may have — such as [plaintiff's] gender dysphoria, which substantially limits her major life activities of interacting with others, reproducing, and social and occupational functioning.").

disorders," and that now given in DSM-V of "gender dysphoria." In contrast to DSM-IV, which had defined "gender identity disorder" as characterized by a "strong and persistent cross gender-identification" and a "persistent discomfort" with one's sex or "sense of inappropriateness" in a given gender role, the diagnosis of GD in DSM-V requires attendant disabling physical symptoms, in addition to manifestations of clinically significant emotional distress.

While the court need not take a position on whether GD may definitively be found to have a physical etiology – nor would it be confident doing so without the aid of expert testimony – the continuing re-evaluation of GD underway in the relevant sectors of the medical community is sufficient, for present purposes, to raise a dispute of fact as to whether Doe's GD falls outside the ADA's exclusion of gender identity-based disorders as they were understood by Congress twenty-eight years ago.

3. <u>Constitutional Avoidance</u>

A second reason to deny the Motion to Dismiss lies in the prudential doctrine of constitutional avoidance. Under this doctrine, a court has a duty where "a serious doubt of constitutionality is raised" with respect to a statutory provision to "first ascertain whether a construction of the statute is fairly possible by which [a constitutional] question may be avoided."

*Ashwander* v. *Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring) (quoting *Crowell* v. *Benson*, 285 U.S. 22, 62 (1932)).

As the Supreme Court has cautioned, the doctrine should not be read as permission for a court to "adopt[] implausible constructions" of a statute or to otherwise "rewrite it." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). Here, however, in light of the court's finding that Doe has made a plausible case that GD arises from physical impairments and is not merely another term for "gender identity disorder," the constitutional avoidance canon "permits a court to 'choos[e] between competing plausible interpretations of a statutory text.'" *Id.* at 843 (quoting *Clark v. Martinez*, 543 U.S. 371, 381 (2005)). *See also United States v. Dwinells*, 508 F.3d 63, 70 (1st Cir. 2007) ("Congress is presumed to legislate in accordance with the Constitution and . . . therefore, as between two plausible constructions of a statute, an inquiring court should avoid a constitutionally suspect one in favor of a constitutionally uncontroversial alternative.").

The source of constitutional concern over a reading of the ADA's exclusionary provision that would bar Doe's claim is located in the Equal Protection Clause of the Fourteenth Amendment. It has long been recognized that where the government draws a distinction "against a historically disadvantaged group and [where that distinction] has no other

basis, Supreme Court precedent marks this as a reason undermining rather than bolstering the distinction." *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 14 (1st Cir. 2012) (citing *Plyler v. Doe*, 457 U.S. 202, 227 (1982), and *Romer v. Evans*, 517 U.S. 620, 635 (1996)). The reason for heightened judicial sensitivity in this context lies in the painful lessons taught by our history, that "discrete and insular minorities" have often been unable to rely upon the political process to provide them with protection, *see United States v. Carolene Prods Co.*, 304 U.S. 144, 152 n.4 (1938); *see generally* John Hart Ely, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW (1980).

Consider the company that "gender identity disorders not resulting from physical impairments" keeps within the same subsection of the statute: pedophilia, exhibitionism, and voyeurism. The pairing of gender identity disorders with conduct that is criminal or viewed by society as immoral or lewd raises a serious question as to the light in which the drafters of this exclusion viewed transgender persons. Also excluded are "(2) compulsive gambling, kleptomania, or pyromania" and "(3) psychoactive substance use disorders resulting from current illegal use of drugs." Here, again, the statute excludes from a possible ADA claim activities that are illegal, dangerous to society, or the result of harmful vices.

It is virtually impossible to square the exclusion of otherwise bona fide disabilities with the remedial purpose of the ADA, which is to redress discrimination against individuals with disabilities based on antiquated or prejudicial conceptions of how they came to their station in life. *See Tennessee v. Lane*, 541 U.S. 509, 536 (2004) (Ginsburg, J., concurring) ("The ADA 'guarantee[s] a baseline of equal citizenship by protecting against stigma and systematic exclusion from public and private opportunities . . .'".) (citation omitted). The court is of the view that, to the extent that the statute may be read as excluding an entire category of people from its protections because of their gender status, such a reading is best avoided. *See Plessy v. Ferguson,* 163 U.S. 537, 559 (1896) (Harlan, J., dissenting) (arguing that the Constitution, properly interpreted, "neither knows nor tolerates classes among citizens").

4. Remaining Elements of Doe's ADA and Rehabilitation Act Claims

Finding for present purposes that Doe has established a *prima facie* claim to being a qualified individual with a disability under the ADA, the court is also of the view that the remaining two requirements for a viable ADA claim – that Doe has been denied some benefit or excluded from some public program or otherwise discriminated against by a public entity, and that the exclusion, denial, or discrimination has a causal connection to her

GD – are satisfied by the factual allegations of the Complaint.  The DOC's argument that Doe's "ADA claim cannot stand because she is not complaining of her *exclusion* or *denial* from services, programming, or activities available at MCI-Norfolk," *see* Dkt #28 at 14, suffers from a categorization error: Doe's Complaint is not about being denied services at MCI-Norfolk, but about being housed there in the first place.  Compl. ¶ 6.

Moreover, as Doe correctly points out, although the language of the statute speaks of "services, programs, or activities" denied to an individual with disabilities, in reality this provision "has been interpreted to be a catch-all phrase that prohibits all discrimination by a public entity."  *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (internal quotation marks and citation omitted); *see also Hason v. Med. Bd. of California*, 279 F.3d 1167, 1172-1173 (9th Cir. 2002) ("[T]he ADA's broad language brings within its scope anything a public entity does.").  Here, Doe's Complaint adequately states that, unlike other female inmates, she was assigned to a men's prison by virtue of her gender assignment at birth and denied access to facilities and programs that would correspond with her gender identification.

Doe also has made out a claim that the DOC's biological sex-based assignment policy has a disparate impact on inmates with GD because it

injects them into a prison environment that is contrary to a critical aspect of their prescribed treatment (that they be allowed to live as, in Doe's case, a woman). *See Wisconsin Cmty. Services v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006) (en banc) (noting that an ADA claim can be sustained where a "defendant's rule disproportionately impacts disabled people."). Both of these theories are sufficiently viable at this stage to defeat the Motion to Dismiss.

Finally, while the ADA does not require that accommodations to a disability be "optimal" or "finely tuned to [the inmate's] preferences," *Nunes*, 766 F.3d at 146, Doe has adequately pled that she has been denied the reasonable accommodation of a transfer to a woman's prison[12], as well as that she be addressed by prison personnel in a manner consistent with her gender identity. Because Doe has adequately stated a claim under the ADA, it follows that her Rehabilitation Act claim is equally viable.

---

[12] At least one Circuit Court has held that "a prisoner's transfer from or to a particular prison may become relevant when prison officials attempt to determine what constitutes a 'reasonable accommodation'" to a disability, and "whether the prison's interests outweigh the Plaintiff's" interest in a transfer "is not appropriate for resolution on the pleadings." *Lonergan v. Fla. Dep't of Corr.*, 623 F. App'x 990, 993-994 (11th Cir. 2015) (finding a viable ADA claim where, despite a dermatologist's order that an inmate with a serious skin condition be provided a hat and kept out of the sun, prison officials denied plaintiff's request to be transferred to a prison where no activities were conducted outdoors).

## C. CONSTITUTIONAL CLAIMS

While Doe raises equal protection arguments with respect to any reading of the ADA's exclusionary clause that would bar individuals with GD from seeking ADA protection, she also raises constitutional challenges under the Fourteenth Amendment and § 1983 to the DOC's inmate housing assignment policy, which she alleges is based solely on birth sex. The Fourteenth Amendment provides that: "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Federal Civil Rights Act, 42 U.S.C. § 1983, authorizes a cause of action against state officers, acting under color of state law, who are alleged to have deprived a plaintiff of rights secured by the U.S. Constitution.[13]

In framing the Equal Protection claim, Count Three of Doe's Complaint alleges that the defendants "have violated Jane Doe's rights by . . . impermissibly discriminating against Jane Doe on the basis of her sex, gender identity, transgender status, and disability." Compl. ¶ 81. The court

---

[13] A § 1983 suit, however, may be brought only against a state official in his personal capacity. A suit against a state government official in his or her official capacity is the same as a suit against the entity [the state] of which the officer is an agent and is therefore barred by the Eleventh Amendment. *See Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978).

agrees to this extent: where a State creates a classification based on transgender status, the classification is tantamount to discrimination based on sex and is therefore subject to heightened judicial scrutiny above the normal "rational basis" test that courts apply when reviewing a governmental policy that "does not employ suspect classifications or impinge on fundamental rights." *Hodel v. Indiana*, 452 U.S. 314, 331 (1981).

The trend in recent cases is to apply heightened scrutiny to classifications based on transgender status. *See, e.g., Equal Emp't Opportunity Comm'n v. R.G. & G.R. Harris Funeral Homes, Inc.*, 2018 WL 1177669, at *5 (6th Cir. Mar. 7, 2018) ("[D]iscrimination on the basis of transgender . . . status is necessarily discrimination on the basis of sex."); *Doe 1 v. Trump*, 275 F. Supp. 3d 167 (D.D.C. 2017) (holding that distinctions drawn on the basis of transgender status warrant heighted review); *cf. Evancho* v. *Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017) (holding that "gender identity is entirely akin to 'sex' as that term has been customarily used in the Equal Protection analysis" and therefore intermediate scrutiny applies). As with other sex-based classifications, the court will apply the category of "intermediate scrutiny," a level of review "between the[] extremes of rational basis review and strict scrutiny . . . which generally has been applied to discriminatory classifications based on sex or

illegitimacy." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Under intermediate scrutiny, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives" in order to be upheld. *Craig v. Boren*, 429 U.S. 190, 197 (1976). The "burden of justification" for the classification "is demanding and it rests entirely on the State," *United States v. Virginia*, 518 U.S. 515, 531 (1996), and "the reviewing court must determine whether the proffered justification is 'exceedingly persuasive.'" *Id.*

As a general rule, a party "claiming an equal protection violation must first 'identify and relate *specific instances* where persons *similarly situated in all relevant aspects* were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression.'" *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995) (emphasis in original) (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989). The crux, of course, is how one defines "similarly situated" individuals. The First Circuit has opined that "[a]n individual is 'similarly situated' to others for equal protection purposes when 'a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" *Davis v. Coakley*, 802 F.3d 128, 133 (1st Cir. 2015) (quoting *Barrington Cove Ltd. P'ship v. Rhode*

*Island Hous. & Mortg. Fin. Corp.,* 246 F.3d 1, 8 (1st Cir. 2001)).  The DOC, in its Motion to Dismiss, argues that the pertinent category of "similarly situated" individuals is "other inmates at MCI-Norfolk diagnosed with gender dysphoria," *see* Dkt #28 at 17, while Doe contends that the court should look at how she has been treated relative to other female inmates in Massachusetts prisons.

Taking Doe's well-pled allegations as true, the court accepts that Doe's assignment to MCI-Norfolk resulted from her biological sex assignment at birth and an ensuing categorical determination that she was ineligible to be assigned to a women's prison.[14]  In this sense, compulsory assignment to a men's prison caused Doe to be treated differently from other female prisoners in the Massachusetts penal system.  For purposes of the Motion to Dismiss, the court concludes that Doe has met her burden of demonstrating that the DOC's unmitigated prison assignment policy as it applies to transgender inmates is a sex-based classification that warrants heightened, intermediate scrutiny, and it will only survive review if the "classification

---

[14] The Complaint alleges that with respect to the request for a transfer, prison officials told Jane Doe that she would be required to undergo genital surgery before they would consider a transfer, but then refused to allow her access to such surgery.  Compl. ¶ 62.  This issue, as with the question of the DOC's GD policy for evaluating transgender inmates for purposes of determining prison assignments, cannot be definitively adjudicated without further factual development, discovery, and expert testimony.

serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (quoting *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150 (1980)).

The court agrees with Doe that for present purposes the DOC has not met its burden of demonstrating that housing her and other similarly-situated transgender prisoners in facilities that correspond to their birth sex serves an important governmental interest. It is true, as the defendants point out, that prison systems give priority to inmate safety and security and that this imperative will frequently warrant an interference with fundamental rights of inmates. *See Washington v. Harper*, 494 U.S. 210, 223 (1990). It is also true that courts are instructed to afford deference to state prison officials in formulating policies that facilitate order, discipline, and safety in the prison system. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," the means of which "are peculiarly within the province and professional expertise of corrections officials, and, in the

absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.") (internal citations omitted).

That said, generalized concerns for prison security are insufficient to meet the "demanding" burden placed on the State to justify sex-based classifications. *Virginia*, 518 U.S. at 531. Certainly one can imagine a particularized scenario in which a transgender inmate might pose a safety risk to other inmates, say, for example, where the inmate has a past history of crimes involving violence or sexual assault.[15] Here, however, the allegations in the Complaint are that the DOC houses inmates according to their biological sex without regard to such particularized considerations. Indeed, the Complaint points out that "Doe has had no disciplinary problems at MCI-Norfolk and does not present a security risk," Compl. ¶ 71(a), and that she is currently serving a sentence for a nonviolent drug offense.

---

[15] Subsection IV, Section 32A of the Mass. Gen. Laws taking effect on December 31, 2018, contains just such a provision, allowing the DOC "commissioner, the sheriff or a designee of the commissioner or sheriff" to certify in writing that housing an inmate in the prison that corresponds to his or her gender identity "would not ensure the prisoner's health or safety or that the placement would present management or security problems."

The DOC in its Opposition to Doe's Motion for a Preliminary Injunction, *see* Dkt #45, argued that Doe's continued confinement at MCI-Norfolk, as with all inmates with GD, is the product of a case-by-case assessment that "include[d] security level, criminal and discipline history, medical and mental assessment of needs, vulnerability to sexual victimization and potential of perpetrating abuse based on prior history." *Id.* at 24 (quoting the DOC GD Policy). The defendants maintain that "the DOC's GD policy does not provide a blanket requirement that all GD inmates are placed in a facility which matches their assigned birth sex." *Id.* at 25.

While a copy of the purported GD policy was tacked to the DOC's Opposition to Doe's Motion for a Preliminary Injunction, Doe does not concede its authenticity. As the policy is not attached to or incorporated by reference in the Complaint, it cannot be considered in evaluating the Motion to Dismiss. *See Ironshore Specialty Ins. Co. v. United States*, 871 F.3d 131, 135 (1st Cir. 2017) (consideration of documents outside the pleadings is permitted on a motion to dismiss only "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.").

Discovery may ultimately establish that Doe was the beneficiary of a periodic review process and that the DOC made a particularized determination to continue to house her at MCI-Norfolk (and that it did so when initially deciding her housing assignment). For present purposes, however, the allegations in the Complaint, supplemented by Doe's Opposition to the Motion to Dismiss, allege that her housing classification and the rejection of her transfer requests were based solely on her biological sex. *See* Doe Opp'n, Dkt #33 at 20 (alleging that she is a transgender inmate "housed exclusively based on [her] birth sex or genitals without regard to [her] gender identity or the fact of having undergone gender transition"). Because the classification as alleged is sex-based, and because the DOC has not at this point met its burden of demonstrating a sufficiently persuasive justification for the policy to meet the requirements of intermediate scrutiny, the Motion to Dismiss Count Three will be denied.

Finally, Doe's Due Process Claim (Count Four) rests on a line of cases associated with *Sandin v. Conner*, 515 U.S. 472, 484 (1995), in which the Supreme Court held that prison housing classifications give rise to a protected liberty interest only if the classification creates an "atypical and significant hardship on the inmate in relation to the normal incidents of prison life." Where such an "atypical and significant hardship" is imposed,

the State must make available a procedure by which the aggrieved inmate can challenge the assignment. *See Brathwaite v. Phelps*, 2018 WL 2149771, at *2 (3d Cir. May 10, 2018) ("To establish his due process claim, [prisoner] was required to show that (1) the state, through the duration and conditions of his confinement, imposed 'atypical and significant hardship' on him giving rise to a protected liberty interest; and (2) the state deprived him of the process he was due to protect that interest.").

The Complaint clearly sets out allegations that meet the requirement of demonstrating an "atypical and significant hardship" imposed on Doe in relation to the normal incidents of prison life as compared to other inmates in the Massachusetts prison system.[16]  As discussed earlier in this opinion, Doe's hardships include fears for her physical safety, the potential for sexual violence and assault, the trauma and stigmatization instilled by undergoing regular strip-searches by male guards and, on occasion, being forced to shower in the presence of male inmates.  Doe has alleged that these fears do

---

[16] Whether the Commonwealth has provided adequate procedural due process for Doe may well present a different issue, as the DOC has provided Doe with a treatment plan for her GD and at least occasional review of her housing classification.  *See* Compl. ¶ 62.  The court, however, cannot on this record resolve the dispute of fact between the defendants' contention that Doe has received all of the process to which she is due and Doe's claims that her housing requests have received no individualized consideration.

not present themselves in the same degree to male inmates at MCI-Norfolk, and that inmates with GD housed at MCI-Norfolk are more likely to experience affronts to their rights to bodily autonomy and privacy.

The Court will deny the DOC's Motion to Dismiss Count Four.[17]

## ORDER

For the foregoing reasons, the Motion to Dismiss is <u>DENIED</u>.  As may be apparent from this decision, the court is of the view that Doe may very well prevail on her ADA and Equal Protection claims.  On the assumption that Doe will renew the motion for broad injunctive relief that she sought on February 2, 2018, the parties are directed to meet and confer as to which aspects of injunctive relief can be agreed to without the court's intervention. The parties will report the results of their conferral no later than July 13, 2018.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[17] Because the § 1983 count is predicated on alleged violations of Doe's constitutional rights to both equal protection and due process, Count Eight, also, survives the Motion to Dismiss.